1   Jennifer Tom

2   2101 Mangrove Court

3   Antioch, CA 94509

4   Phone Number: (925)698-5028

5   E-mail Address: jmtom3@yahoo.com

6   Pro Se *Plaintiff*

**FILED**

June 3, 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

7           **UNITED STATES DISTRICT COURT**

8           **NORTHERN DISTRICT OF CALIFORNIA**

9                       *Oakland*

10  Jennifer Tom _____     )   Case Number: <u>19-cv-06322-JST</u>
                                          )
11  Pro Se _____       )
                                          )
12              Plaintiff,                )   <u>Consolidated Amended Complaint</u>
                                          )
13                                        )
        vs.                               )
14                                        )
    Andrew Saul _____       )
15                                        )
    Commissioner of Social Security ___   )
16                                        )
    Administration _____       )
17                                        )
18              Defendant,                )
                                          )
19  _____      )

20  1.      Plaintiff resides at:

21      Address: 2101 Mangrove Court

22      City, State and Zip Code: Antioch, CA 94509

23      Telephone: 1 (925) 698-5028

24  2.      Defendant is located at:

25      Address: 160 Spear Street Suite 800

26      City, State and Zip Code: San Francisco, CA 94105

27  3.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employee

28  discrimination. Jurisdiction is conferred on this Court by 42 U.S.C. Section 2000e-5. Equitable

TITLE OF DOCUMENT: <u>Consolidated Amended Complaint</u>   CASE NO.: <u>19-cv-06322-JST</u>
Page 1 of 156

1   and other relief is sought under 42 U.S.C. Section 2000e-5(g), Rehabilitation Act 1973  42

2   U.S.C. sec. 12101, Americans with Disabilities Act of 2008, Disability Discrimination 42 U.S.C.

3   § 12112(b) (5), disparate treatment, hostile work environment, retaliation for engaging in

4   protected EEOC activity and wrongful termination under Chapter 75 of title 5 of United States

5   Code part 752 of title 5 of the federal regulations subpart D §752.403 (b). Venue is appropriate

6   in this court because Social Security Administration (SSA) is a Federal Agency and the actions

7   taken by SSA were taken in Northern California, and I live in Northern California.

8   4.      The acts complained of in this suit concern includes but not limited to the Defendants

9   (SSA) refusal and failure to provide me an adequate and effective reasonable accommodations

10  that accommodated my known disabilities and medical needs as required by the Rehabilitation

11  Act 1973 42 U.S.C. sec. 12101 and Americans with Disabilities Act. Defendant's wrongful

12  termination of my employment. Defendant ignored Defendants own Medical Officers

13  determination it would be impractical for most public buildings to provide a fragrance and

14  chemical free environment, Defendant acknowledges that the Defendant's buildings and

15  occupied spaces are not and will never be fragrance and chemical free. Defendants decision to

16  terminate my employment because I was out sick due to Defendants decision approve leave as a

17  reasonable accommodation in lieu of approving my reasonable accommodation requests for full

18  time Telework and a new clean laptop. Defendant's management James Dokko, Carmelita

19  Rivera, Kris Chamrernlaksa made it clear I was not terminated because of my job performance

20  but because I was out sick, I was out sick because of my known disabilities that were not

21  effectively accommodated by Defendant. Therefore, the only reasonable conclusion is that the

22  termination of my employment is the result of disability discrimination and unlawful termination

23  of a qualified disabled employee. Defendant's management made medical determinations to

24  discount my treating physician's findings and suggested accommodations that would provide me

25  with a fragrance and chemical free working environment. Defendant refused to provide me with

26  the ability to control my working environment, which would be possible if Defendant allowed

27  me to work from home via the reasonable accommodation of Telework as Defendant has always

28  maintained they cannot control the actions of staff and the working environment within SSA

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 2 of 156

occupied buildings and spaces. Defendant allowed staff whom I reported as my harassers to participate in decisions on what reasonable accommodations I would be provided and what documentation I would be required to provide for reasonable accommodations approval and leave approval. Defendant informed me that the rights of staff to wear and use fragrances and chemicals was more important than my right to a healthy and safe working environment, and that I needed to not bother my harassers and to make sure I did not bother staff. Defendant violated HIPPA Law by illegally disclosing my disabilities to staff without my permission and failed to stop staff from harassing me. Because of Defendants disclosure of my disabilities to staff, I was forced to move frequently because my workstation continued to be contaminated on a daily basis, based on my personal experience.    Defendant revoked approved reasonable accommodations I was provided even though the accommodations were still needed and the revoked reasonable accommodations were not replaced with new effective reasonable accommodations. Defendant denied me the equal right to a healthy and safe working environment, but provided healthy and safe working environments to other employees. Defendant questioned my doctor's diagnosis, suggested accommodations, and treatment of my disabilities when I requested the reasonable accommodations of Telework and my Article 39 Work at Home by Exception. Defendant acknowledged my disabilities as being valid when Defendant provided me with reasonable accommodations for my disabilities when the reasonable accommodations were provided within Defendants buildings and occupied spaces but Defendant questioned where my disabilities were genuine only when my requests for reasonable accommodations included Telework approval. Defendant's managers Mireille Hanft and James Dokko stated that under no circumstances would they approve Telework as a reasonable accommodation even if it was the only effective reasonable accommodation. Defendant has provided other qualified Benefit Authorizers the reasonable accommodation of Telework full time therefore Defendant decision to outright deny my reasonable accommodations request for Telework violates Rehabilitations Act of 1973, Americans with Disabilities Act, Reasonable Accommodations Policies, SSA/AFGE National Agreement Article 18 Equal Employment Opportunity and SSA/AFGE National Agreement Article 3 Employee Rights. Defendants

decision to refuse to approve sick leave starting October 2017 unless I reported to the building and triggered my disabilities on days I was not allowed to telework under the pilot telework program is unjustifiable, unlawful, inhumane and against the Rehabilitations Act of 1973, Americans with Disabilities Act, Reasonable Accommodations Policies, SSA/AFGE National Agreement Article 9 Health and Safety, SSA/AFGE National Agreement Article 31 Time and Leave, SSA/AFGE National Agreement Article 18 Equal Employment Opportunity and SSA/AFGE National Agreement Article 3 Employee Rights. Defendant made me choose between my health and welfare and a paycheck. The Defendant also created a hostile work environment, abused their authority, denied me to equal rights, full pay, fringe benefits, continued employment, retaliated against me and caused me extreme unwarranted physical harm, extreme unwarranted emotional harm, extreme unwarranted financial distress, extreme unwarranted distress and extreme unwarranted undue hardship for no lawful reason and lied under oath in both the EEOC Hearing in January 2017 and at the MSPB Hearing in June 2019. The Defendant is required by the Rehabilitation Act 1973  42 U.S.C. sec. 12101 and Americans with Disabilities Act of 2008 to provide qualified disabled employees with an effective reasonable accommodation for the disabled employee's specific known disabilities, and if the requested reasonable accommodation is denied an equally effective reasonable accommodation should be provided. Leave approval is not an effective reasonable accommodation if there is another reasonable accommodation that would enable a qualified disabled employee to return to work full time. Defendant also engaged in disability discrimination, harassment, disparate treatment, hostile work environment, retaliation for engaging in protected EEOC activity, revoking approved reasonable accommodations and wrongful termination under Chapter 75 of title 5 of United States Code part 752 of title 5 of the federal regulations subpart D §752.403 (b) because Defendants refusal to provide me with available effective reasonable accommodations forced me to take out sick leave. The Defendant used the sick leave they forced me to take as their false pretense for terminating my employment. Disability is not a choice it is a life altering infirmity that must be accommodated to allow the qualified disabled employees the ability to function on a daily basis so that a qualified disabled employee can enjoy equal rights, privileges

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 4 of 156

and a healthy and safe working environment as non-disabled employees are provided with. I have not chosen my disabilities and I continue to date to deal with them on a daily basis. For example, people do not choose to have cancer or Alzheimer's but they do what they can to accommodate their disabilities so that they can function on a daily basis as best they can. Defendant found I was a qualified disabled employee back in 2014 when I was provided my first reasonable accommodation and again in 2015 when Defendant purchased an air purifier as a reasonable accommodation for my personal use due to my known disability of sensitivity to environmental irritants and also approved the reasonable accommodation of Liberal Leave and the reasonable accommodation excused me from answering SSA's National 800 number and placed me in an office instead of a cubical, in 2019 Defendant's EEOC department found I was a qualified disabled employee who worked 100% via Telework once a week under the pilot telework program from July 27, 2016 through August 15, 2018 (my last day). In 2017 the EEOC AJ found I disabled but failed to take into account the fact the Defendant lied under oath about what the essential job functions of the Benefit Authorizer job and lied about what the nine (9) month Benefit Authorizer training program entailed and lied about the requirements a Benefit Authorizer has to achieve to move from trainee status to journeyman level status and that Defendant admitted that there were fully trained non-disabled Benefit Authorizer who were journeyman level status that have never been trained to answer SSA's National 800 number and are still considered to be performing the essential job functions of a Benefit Authorizer. EEOC AJ also ignored the fact that Defendant acknowledged I was working 100% via Telework once a week under the Pilot Telework program and receiving successful performance appraisals and that the Defendant admitted it would be possible to provide me with the reasonable accommodation of Telework and a new clean laptop and that the Defendant could not prove it would be an undue hardship if Defendant approved my reasonable accommodations requests. EEOC AJ found I was disabled in her hearing decision but ignored her earlier findings in her email dated October 31, 2016 in which she stated, "If Complainant is credible and her symptoms are genuine, then the current accommodations are not working, and the Agency must consider full-time teleworking. To justify not allowing Complainant to telework full-time, the Agency must demonstrate undue

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 5 of 156

1   hardship. In its MSJ, SSA did not address the undue hardship of full-time telework because the

2   Agency contends the other accommodations provided are effective." if EEOC AJ had applied her

3   original ruling that if I was found to be credible and disabled that the Defendant had to prove

4   undue hardship to justify not allowing me to telework full-time, she would have to

5   acknowledged that Defendant never brought up undue hardship at the hearing or in their closing

6   arguments and Defendant continued to claim that the reasonable accommodations I was provided

7   were effective, EEOC AJ would have had to follow her original ruling and find my favor

8   because I was found to be credible and disabled and Defendant did not demonstrate undue

9   hardship existed. EEOC AJ ignored the fact that the first two laptops I had been provided were

10  both new laptops and were uncontaminated initially and that I to leave the laptops in the building

11  on non-pilot Telework days and that my request to keep them with me at home were denied and

12  resulted it laptops becoming contaminated while left in the building. EEOC AJ ignored the fact

13  that I was only allowed to take the second laptop home after it was contaminated in the building

14  and that the third laptop was not a new laptop Dokko admitted that the third laptop was handled

15  by unknown employees and left in an was in fact a used and contaminated since the first day

16  received it. Defendant's manager James unsecure location open to staff and he could not confirm

17  whom handled the laptop prior to it being given to me and that steps could be taken to ensure the

18  next laptop I was given would be new and only handled by an employee who is known to be

19  fragrance and chemical free. During the 2017 EEOC Hearing Defendant acknowledged to EEOC

20  AJ I was receiving successful performance appraisals and Defendant acknowledged provided me

21  with reasonable accommodations there by proving I am a qualified disabled employee that I was

22  performing the essential job functions of the Benefit Authorizer job while I worked solely with

23  the third contaminated laptop solely via telework under the pilot telework program once a week

24  since July 27, 2016, all my requests for a new replacement laptop were denied I requested that

25  the cost of the new laptop come out of my paycheck because that is how bad I needed the new

26  laptop but  Defendant admitted that the denial was not because of cost of the new laptop but that

27  Defendant James Dokko did not believe I needed a new laptop. Therefore due to Defendants

28  delay in providing me with effective reasonable accommodations of full time telework and a new

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 6 of 156

clean laptop, my health further deteriorated. By the time of the 2017 EEOC Hearing my disabilities were exacerbated sensitivity to environmental irritants, migraines with aura and vertigo documentation was submitted which proved my health deteriorated due to Defendants delay in providing me with the requested  effective reasonable accommodations disregarding my treating physicians despite the fact that my medical documentation indicated that a delay could result in severe medical consequences. EEOC AJ actions of ignoring Defendant's admission of finding me a qualified disabled employee and providing me with reasonable accommodations during the 2017 EEOC hearing favored the Defendant and enabled them to falsely claim for the first time to the EEOC AJ that approving Telework full time as a reasonable accommodation would not remove essential job functions which was proven to be false because Defendant admitted I was receiving successful performance appraisals while I was working 100% via telework once a week under the pilot program during the January 2017 EEOC hearing. EEOC AJ failed to take to account that the Defendant suddenly claimed at the 2017 EEOC hearing that there was an essential job functions of the Benefit Authorizer job at issue, a clear cover up by the Defendant to hide their unlawful refusal of my reasonable accommodation request for full time telework. EEOC AJ acknowledges that my initial EEO case filed in 2014 included the request for Telework as a reasonable accommodation Defendant has known since 2014 there was no undue hardship if they approved my reasonable accommodation request for full time telework. EEOC AJ and MSPB AJ ignored the fact that the first two laptops I had been provided were both new laptops and were uncontaminated initially and that I to leave the laptops in the building on non-pilot Telework days and that my request to keep them with me at home were denied and resulted it laptops becoming contaminated while left in the building. EEOC AJ and MSPB AJ ignored the fact that the first laptop I received when I was selected for the pilot telework program was a laptop I had to share with another employee and that the second laptop I was given was a laptop that would replace my desk top computer and become my primary laptop for in the office and at home work. EEOC AJ and MSPB AJ ignored the fact that I was only allowed to take the second laptop home after it was contaminated in the building and that the third laptop was not a new laptop was in fact a used and contaminated since the first day received it. The MSPB AJ ignored

the fact that the fully trained non-disabled Benefit Authorizer who were journeyman level status that have never been trained to answer SSA's National 800 number whom were mentioned in the EEOC Hearing in 2017 are still not trained to answer SSA's National 800 number and are still considered to be performing the essential job functions of a Benefit Authorizer and the fact that Defendant admitted that I was not terminated because of my job performance but because I was out sick due to my disabilities not being effectively accommodated and that Defendant acknowledged that if I was charged with real AWOL and not AWOL as a placeholder I would have been removed from Defendant's Pilot Telework Program, would not have been approved to work overtime or work credit hours. MSPB AJ ignored the fact Kris Chamrernlaksa my first line manager informed Carmelita Rivera my second line manager and James Dokko my third line manager that I should be allowed to Telework full time instead of being terminated. MSPB AJ ignored the fact Carmelita Rivera stated that she never offered or considered providing me a reasonable accommodation before or after proposing my termination for being out sick due to my known disabilities because James Dokko was responsible for my reasonable accommodations requests and she did not believe it was her responsibly to provide me with a reasonable accommodation before or after proposing my termination. MSPB AJ ignored the fact James Dokko stated he considered my requests for an effective reasonable accommodation to be a separate issue form the proposed removal that was based on the sick leave I was forced to take due to my disabilities not being effectively accommodated. MSPB AJ also ignored the fact Defendant provided documented evidence that Defendant has been approving qualified disabled Benefit Authorizers with approval to telework under Article 39 Work at Home by Exemption since 2015 and approval of Telework as a reasonable accommodation since 2016. Thus proving Defendant could not prove it would be an undue hardship if Defendant approved my reasonable accommodations requests for Telework and a new clean laptop. MSBP Judge ignored the fact Defendant's manger Debby Ellis Acting Deputy Regional Commissioner admitted that qualified disabled Benefit Authorizers that were approved to Telework under Article 39 Work at Home by Exemption were excused from answering SSA's National 800 number and Teleworked five (5) days a week. Defendant's manager James Dokko told MSPB AJ that he would never approve a

1    reasonable accommodations request for Telework. James Dokko also informed MSPB AJ during

2    the June 2019 hearing that Defendant and I were still in reasonable accommodations talks even

3    though I was terminated by James Dokko's decision in August 2018 thus proving Defendant

4    knows I am a qualified disabled employee who still requires an effective reasonable

5    accommodation. MSPB AJ ignored the fact that Carmelita Rivera acknowledged that on days

6    employees teleworked their homes were their worksite so if I had been approved to telework full

7    time my home would have been my permanent worksite. MSPB AJ ignored that Carmelita

8    Rivera, James Dokko and Debby Ellis all stated that they preferred that I and other staff work in

9    SSA occupied buildings and locations but that there was no policy or law that required qualified

10   disabled employees to being limited to working in only SSA occupied buildings and locations.

11   EEOC AJ and MSPB AJ both ignored the fact that the Defendant's entire staff questioned

12   admitted that SSA building and other SSA occupied spaces are not and will never be fragrance

13   and chemical free and that Defendant acknowledges that I was not provided with a restroom or a

14   place to eat that was not fragrance and chemical free in SSA occupied buildings and locations.

15   EEOC AJ and MSPB AJ ignored the fact that the Frank Hagel Federal building has been

16   undergoing construction since 2014, has tested positive multiple times for Legionnaires Decease,

17   and had OSHA violations due to rodent infestations. EEOC AJ and MSPB AJ improperly relied

18   on an air test performed in the Frank Hagel Federal Building that only tested for relative

19   humidity, temperature and carbon dioxide levels and specifically stated that the test was only for

20   human comfort levels and was not an indication of health as a gauge in determining if the

21   building was providing me with a healthy and safe fragrance and chemical free work

22   environment dispute the fact the test did not include tests for chemicals or fragrances. MSPB AJ

23   ignored the EEOC AJ's findings I have the disability sensitivity to environmental irritants and

24   that Defendant's EEOC department found I am a known qualified disabled employee who

25   received successful performance appraisals while working 100% via Telework once a week

26   under the pilot telework program from home since July 27, 2016 to August 15, 2018 (my last

27   day) and continued to receive successful performance appraisals.

28

5.     Defendant's conduct is discriminatory with respect to my disabilities, retaliation for filing EEOC complaints under 5 U.S.C. § 2302 and wrongful termination under Chapter 75 of title 5 of United States Code part 752 of title 5 of the federal regulations subpart D §752.403 (b).

6.     The basic facts surrounding my claim of discrimination are:

1.   I was hired as a Benefit Authorizer GS05 with Social Security Administration (SSA). My start date was August 18, 2008; I have Schedule A documentation in my personnel file.

2.   I spend the first nine months of my employment in classroom training which included a few trips to the module for on the job training. While in the classroom, co-workers were accommodating to disabilities and no formal accommodations were necessary.

3.   I left module ten (10) for over a year on detail to SSA's Debt Department started in September 2011 and returned to the module in October 2012. In 2011, I also spent time out of module ten (10) to attend training for the training cadre. I left module ten (10) again in June 2014 on detail for a special project for almost a month. I received Individual Case Award NRB one in 2011, 2014 and 2015, Performance Award (ROC) one on 2014 and 2015)

4.   Defendant denied me the equal right to a healthy and safe working environment, but provided healthy and safe working environments to another employees; one was provided a work environment free from the fragrance of instant oatmeal because it triggered their disability and another employee was provided a working environment free from my fan because they claimed the fan I used triggered their disability and I was kicked out of a cubical I was moved to as a reasonable accommodation the same day I moved in.

5.   April 1, 2010 Social Security Administration Memorandum on page 2 that states: "Many people have allergies to cologne, perfumes, lotions, nail polish, nail polish removal ect., so please do not apply them in your work area. The use of these items in the work areas may cause someone to become ill." ROI exhibit 7-9

6.   February 21, 2012 Social Security Memorandum that states: "Please be reminded, it is the policy of SSA to restrict the use of 'any products/devices used to alter air quality' air fresheners and fragrant odor neutralizers included.'" And "Many employees in the

1   building suffer from 'hidden disabilities' and are allergic to or have severe reactions to

2   perfumes as well as chemicals used in these items. These chemicals cause a serious

3   health risk to those employees that are sensitive to such products." ROI exhibit 7-8.

4   7. April 25, 2013 Defendant provided a co-worker in my module with a molasses fragrance

5   free environment to prevent triggering their disability, the employee who was causing the

6   co-workers disability to be triggered by the other employee eating their breakfast of

7   maple brown sugar oatmeal was told their eating oatmeal in the module created a safety

8   hazard because it triggered an co-workers disability. The employee was told not heat or

9   to eat their oatmeal in the module and that if it happened again it would lead to

10   disciplinary actions like reprimand or suspension, for eating oatmeal. I did not receive

11   equal protection, in fact I was the one moved and told not to bother the employees who

12   triggered my disabilities completely the opposite reaction by the same managers.

13   8. On December 06, 2013 I made another request to the co-worker in the adjoined cubical,

14   requesting that they stop spraying perfume. I had told my first line manager Rolanda

15   Carter before this date many times in person that constant spraying of perfume triggered

16   my disable sensitivity to environmental irritants and that I was chocking and coughing

17   and my nose burned. I emailed Rolanda Carter that I had informed my second line

18   manager Mireille Hanft that the co-worker sprayed perfume in the adjoined cubical

19   aggravated my disability and that I had spoken with Rolonda Carter but the situation had

20   not improved. Mireille Hanft indicated to me in an email that she spoke to the co-worker

21   regarding the fact that they sprayed perfume at the adjoined cubical and that the co-

22   worker indicated that they would stop using perfume at work. Unfortunately co-worker in

23   the adjoined cubical stopped using the perfume for a short period, but then resumed

24   spraying perfume in their adjoined cubical almost hourly and wearing extreme amounts

25   of perfume to the office, causing the my disability to be aggravated and extreme stress.

26   9. The co-worker who sat in the adjoined cubical whom sprayed perfume had been out due

27   to training and for personal reasons (which they personally disclosed to me) for multiple

28   periods of months between 2012 and early part of 2014.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 11 of 156

10. December 2013 Rolonda Carter kept a hand off approach to my request for her to step in and stop the contamination of my workstation, harassment and failed to take action to provide me with a healthy and safe working environment. Rolanda Carter continued to take my complaints and taking absolutely no action to stop the contamination of my workstation while she was my first line manager through May 9, 2014.

11. January 1, 2014 Email subject FW: Schedule For Teleworkers from Rolanda Carter first line manager of Benefit Authorizer (BA) lists a BA scheduled to telework on Monday's in the pilot telework program, I was selected for the pilot telework program and was approved to telework on Wednesdays. Under the pilot telework program there was no requirement for BA's in the pilot telework program to come into the building on Spike days aka days the Payment Center assisted the Teleservice Center answer SSA's National 800 number.

12. January 2014 I received my first laptop for telework, which I shared with one other employee due to the limited laptops available for the pilot telework program. The laptop was a standard laptop and was not made to dock at my cubical like the second and third laptops were. The second and third laptop's were a single device set up, the laptops would be my office and telework laptop only I used and would replace the desk top PC's we had in 2014.

13. March 2014 provided FMLA form

14. On May 5, 2014 my work area was engulfed in chemical odor that was so bad left work and went to the emergency room. Rolanda Carter noted that I was injured in performance of my job and that I did not cause the injury and that she did not know who contaminated my area. The chemical odor caused my lungs to burn, gave me a headache, dizziness, nausea, and made me feel faint.

15. On May 6, 2014 provided Industrial Work Report due to injury previous day and when I returned my assigned cubical was still engulfed in chemical odors and I was not able to work in the cubical I asked a supervisor to be allowed to sit in another cubical and that my cubical be shampooed. I was approved to work in another cubical while I waited for

1    my cubical to be cleaned, which did not happen the chemicals were just added to the

2    cubical. The Defendant found me to be a qualified disabled employee in 2014 and it was

3    the first time I was approved to move to a different cubicle as a reasonable

4    accommodation.

5    16. On May 8 and 9, 2014 I requested permission to go to the nurse's station due to

6    becoming ill from the odors and was approved.

7    17. The week of May 12-19, 2014 was the first week Tammie Doan became my first line

8    manager replacing Rolanda Carter. Because I had not heard anything from Rolanda

9    Carter about what was going to be done to accommodate my disability and the de-

10    contamination of my cubical which I was still unable to work in I went to Tammie Doan

11    and asked her what would be the next step. Tammie Doan had no idea what I was talking

12    about she said Rolanda Carter had never said anything to her. I explained the whole

13    situation, it is important to note that Tammie Doan did not wear perfume during this

14    meeting or prior to the office, I say this based on my brief interactions with her prior to

15    her becoming my first line. I had offered to provide medical documentation if she wanted

16    me to and Tammie Doan told me it would not be necessary because my disability was

17    already known. I asked Tammie to visit my desk before co-worker in the adjoined cubical

18    who sprayed perfume came in and after so she could see the difference. I had asked what

19    the procedure was to resolve the problem and she said she would look into it. Tammie

20    Doan said before she did anything she wanted to talk to the co-worker in the adjoined

21    cubical who sprayed perfume to get their side of the story.

22    18. May 23, 2014 I contacted Tammie Doan via email asking her if she had come over to my

23    cubical to see how contaminated my cubical became when the co-worker in the adjoined

24    cubical sprayed perfume, I received no reply.

25    19. May 27, 2014 I sent an email to Tammie Doan about the strong perfume worn the co-

26    worker in the adjoined cubicle to Tammie Doan. I asked Tammie Doan if she had taken

27    the time to come over and see for herself my reports of harassment by contaminating my

28    workspace were true. Tammie Doan responded via instant message and indicated she had

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 13 of 156

not. In a one on one conversation that day Tammie Doan informed me that she did notice that the perfume was not only in my cubical but in the surrounding area as well. And Tammie Doan stated that the perfume did not bother her the way it did me and that she refused to say it did. I explained that it was not my intent for her to agree she had my same disability but I wanted her to visit my cubical and work area, because the purpose was to see that I was telling the truth about the extreme scent causing me physical pain and constant harassment. Tammie Doan informed me that Rolanda Carter and Mireille Hanft had spoken to the co-worker in the adjoined cubicle on numerous occasions about their perfume usage and that they were causing me aggrieved harm. Proof to that Defendant's management was well aware that the co-worker in the adjoined cubicle was knowingly and purposely physically harming and harassing me and still took no action to stop the harassment. Defendant failed to abide by their "Policy on The Prevention and Elimination of Harassment in The Workplace" and Rehabilitation Act of 1973 and Reasonable Accommodations policy because the harassment was not investigated and allowed to continue and despite Defendant knowing my disability since 2013 and took no actions to provide me with an effective reasonable accommodation.

20. May 29, 2014 I again reached out to Tammie Doan via email to plead with her to do something to step in because I was again suffering due to the constant spraying of perfume by the co-worker in the adjoined cubical and again offered to obtain medical documentation to help solve the problem if it was needed. I told her the situation was not improving just the opposite seemed to be happening.

21. May 30, 2014 the co-worker in the adjoined cubical and harasser sent an email to my first and second line supervisors and me documenting her disbelief in my "medical condition"/disability. They listed the things they said they had done to accommodate my disability stopped wearing perfume totally for an extended period of time (it was at most a few weeks), they requested to be moved multiple times, they changed the perfume they used, used light doses of perfume, stopped applying perfume at her desk, and stopped putting perfume on at work. The co-worker in the adjoined cubical and harasser went on

to demand that I be required to provide medical documentation and supported by SSA legal procedure and policy. The co-worker in the adjoined cubical and harasser goes on say "Every effort should be made by SSA to accommodate Ms. Tom's medical condition, (My possible suggestions are employee relocation, providing a fragrance free environment for all employees, telecommuting, medication, etc.)" and "… **I look forward to working with the agency to find a resolution that will allow Ms. Tom and I to move forward** … " (bolded for emphasis) This email and the conversation I had with Tammie Doan later on May 30, 2014 and with management the remaining time with SSA proves to me that providing me with an effective reasonable accommodation would have to first be approved by my harassers and management.

22. May 30, 2014 when I came to work in the temporary cubical I was in since May 6, 2014 the cubical was contaminated and I was not able to sit there and I was still unable to use my own cubical because it was still contaminated with chemical odors. I asked Mireille Hanft if I could go home for the day sick she said no and then I asked where I could sit she told me to pick a different cubical so I did and I took my fan which was not very effective, I ended up having to visit the nurses station. Going to the nurses station became a reasonable accommodation I used while I was in the building. Tammie Doan finally responded via email and told me that we could discuss the situation in a meeting that same day at 12:30pm to 1:00 pm. Based on the email from the co-worker in the adjoined cubical the meeting with Tammie Doan was clearly set by the demands my harasser had made to Tammie Doan and Tammie did not miss a beat. Tammie Doan started the meeting by telling me she discussed the situation with the co-worker in the adjoined cubical earlier and that she had a medical reason for wearing perfume and told me all of a sudden I needed to provided medical documentation to proof my disability which was already documented and known to management since 2013 and that I had to move and take actions to protect my own health, implying if I did not no one would. I had reminded Tammie Doan that when I initially approach her I had offered to supply medical documentation but she assured me it would not be needed, and I wanted to know what

changed, Tammie Doan said medical documentation was required for reasonable accommodations request which is not exactly accurate if the disability and needs are known there is no need to supply medical documentation. I had asked Tammie Doan if the need of the co-workers to wear perfume was more important than my right to a healthy and safe working environment. Tammie essentially said there was no policy that prevented the use of perfume and nothing would be done to reduce perfume. Tammie Doan told me that because I was the disabled employee I would have to temporarily relocate away from the co-worker who was harassing me and contaminating my work area, because management could not move the co-worker until management opened up biding for cubicles to the whole module. Tammie Doan also informed me that the co-worker in the adjoined cubical who sprayed perfume wanted to move but I had to move because my move would be temporary and because I was disabled. I asked Tammie Doan if it was normal procedure to make the employee reporting the harassment by another co-worker to move away from the harassing employee and she said yes, and that I was responsible for protecting my own health and if I was sick I would move, I told her I have no problem moving and that I was already not sitting in my own cubical but it does not stop coworkers from contaminating my workstation and that I wanted to confirm with the Union that it was proper procedure to make the employee reporting harassment move away from the employee they reported as harassing them. Defendants "Policy on The Prevention and Elimination of Harassment in The Workplace" (attached) dated May 1, 2014 states during an investigation of harassment "Interim measures do not include transferring, involuntary moving, or otherwise burdening the employee who complained of the harassment since such measures could constitute unlawful retaliation." Confirming that Tammie Doan requiring that I move away from my harasser and telling me to make sure I don't bother them was against harassment policy. To date no investigation into the harassment of the co-worker who sat in the adjoined cubical has occurred. I was the one who reported harassment and I was the one told to stay away from the people I reported as harassing me every time I reported harassment. Tammie Doan also told me that the co-

worker in the adjoined cubical who sprayed perfume did not want to discuss the issue management and me. But Tammie Doan failed to mention that management and my harasser would be working in tandem on how to handle me (see email from harasser above and email from Tammie Doan dated June 24, 2014 included). Tammie Doan discussed other possible accommodations including Telework. Tammie Doan told me that I would have to complete a form 551 for reasonable accommodations and I would have to get a letter from my doctor. Tammie Doan acknowledged that I had reported that the cubicles that I had tried other than my own were still being contaminated with perfume. I had left the meeting because I asked Tammie Doan to allow me to discuss what she had told me with the Union and I did before agreeing to anything. The Union representative I spoke with told me that employees had the rights to were perfume the Union representative was a perfume wearer and was adamant it was a right to wear perfume management could not take away. I told the Union representative that it could not be if it caused an unhealthy and unsafe working environment for a disabled employee and the Union represented said the disability would need to be recognized as a disability under the American with Disabilities Act (ADA). Fragrance Sensitivity is recognized by Social Security (see attacked document) and ADA. At the end of the day just as I was prepared to leave for the day I saw Tammie Doan was in a meeting with co-worker in adjoined cubical and the same union representative the I spoke with earlier. Which was the beginning of the harassment I suffered at the hands of Tammie Doan.

23. June 02, 2014 in an email from Tammie Doan suggested that I try other cubicles within the confines of just module 10. Tammie Doan informed me that because Telework was under a pilot program I could not telework more than once a week, Tammie failed to understand that Reasonable Accommodations requests are not limited by pilot programs. Tammie Doan commented that if the perfume was an issue in the other cubical I was using why I say there on May 30, 2014 and on June 02, 2014, I informed Tammie Doan that I had asked Mireille Hanft on May 30, 2014 if I could go home sick she said no so I picked a third cubical to try and because by June 02, 2014 there were no other cubicles to

1    use I was still in the same cubical with my fan that was not effective. Tammie said I

2    refused to move to a different cubical which was ridiculous since I was already sitting in

3    a different cubical than my own, in fact I was sitting in the second cubical that was not

4    my own because both my own cubical and the first cubical I tried as a replacement where

5    both contaminated. So the claim I would not move to another cubical is unjustified since I

6    had already moved twice and was looking for another place but was denied a forth

7    cubical on May 30, 2014 and June 02, 2014 by Mireille Hanft.

8    24. June 3, 2014 Tammie Doan called me to a meeting to force me to select a new temporary

9    cubical immediately; Tammie Doan would not let me leave the meeting until I selected a

10   temporary cubical to sit in until permanent cubical movements were approved. I

11   mentioned to Tammie Doan I had noticed that although she does not normally wear

12   perfume to day was the first time she did and decided to force me in to a meeting Tammie

13   Doan appeared to be offended and told the me it was just a little. I told Tammie Doan her

14   perfume was causing my allergies to act up. I felt very distressed, it was as though

15   Tammie Doan was testing to see if I was disabled and if perfume triggered my disability.

16   Tammie Doan walked with the me around the module each cubical Tammie Doan offered

17   were much closer to the areas that had the highest concentration of perfume. The areas I

18   want to relocate to was denied because Tammie Doan did not want me working between

19   cubicles. One of the requested cubicles had the link to a Spike phone but Tammie Doan

20   objected to that particular cubical because she told me she did not what me to complain

21   about my back and feet and she wanted to make sure my productivity did not drop.

22   Tammie Doan asked me why every time she tried to get close to me I moved away from

23   her I told her because of the perfume she decided to wear all of a sudden. I reminded

24   Tammie Doan she told me it was my responsibility to protect my own health and safety

25   and is exactly what I was doing and what I move away from her perfume so my disability

26   would not be further effected by her perfume. I told Tammie Doan that my reactions to

27   perfume were progressively getting worst to the point where my throat feels like it is

28   closing and I had to shower after work every day so I could start recovering from the

workday exposures. Tammie Doan eventually forced me back to my own cubical even though it still unclean and triggered my disability. Since June 3, 2014, Tammie Doan purposely wore perfume daily then demanded I meet with her to discuss where I would move to, thus trigging my disability and harass me. By that June 3, 2017 Tammie Doan had been aware of my disability since May 12, 2014 because I told her, Mireille Hanft and Rolanda Carter told her of my disability, and that perfume triggered. In the email dated May 27, 2014, Tammie admitted Mireille Hanft and Rolanda Carter told her of my disability. Tammie also had multiple medical documents documenting my disability and Tammie Doan still chose to have a meeting with me knowing she was wearing perfume and that it would aggravate my disability.

25. June 03, 2014 I replied to Tammie Doan's June 2, 2014 email I told her that had requested to be allowed to work in another cubical on June 02, 2014 on the other side of the module but I was denied because the cubical was raised very high for an employee who was tall and stood to work, the desk was just at my chest level and there was no other cubical available other than the previous cubical I used on May 30, 2014 with my fan again. I reminded Tammie Doan that she said I was the only one with the problem/disability and I was the one who had to keep my distance from co-workers with perfume, because no other employee complained about perfume it was up to me to look out for my own health so I picked the only available cubical. I also spoke with the Union and found out I had to complete a form SSA 501and not a 551. I reminded her that I had told her I was aware of an SA policy that talks about fragrance policies, and I found one a training manual that told SSA representatives to refrain from wearing perfume and a memorandum that talks about not spraying scents in restrooms or confined spaces (like cubicles) and finally a story on SSA Family page about a similar situation to mine in 2006 where management spoke to all employees about the need to be mindful of other employees and not wear perfume or scents. And that per "Policy on The Prevention and Elimination of Harassment in The Workplace" dated May 1, 2014 "What responsibilities do employees have? Employees are responsible for taking advantage of any preventative

of corrective opportunities that SSA and Federal law provide, to avoid harm otherwise. This responsibility includes immediately reporting any behavior viewed as harassment **before** it becomes sever or pervasive." And "Employees are encouraged to inform he alleged harasser directly that his or her conduct is unwelcome and must stop." Which I did but resulted in the co-worker in the adjoined cubical to reduce the spraying for a short period then they stopped talking to me and increase their perfume/fragrance usage exponentially. I took the harassment to management in 2013 but there is still no resolution and I continue to suffer. I told Tammie Doan I would relocated to another cubical on the other side of the module and with for the co-work in the adjoined cubical to move to a new cubical. I asked for more information on what my doctors letter would need to include so that I could finally be given an healthy and safe working environment and that I had a doctors letter for her. I reminded Tammie Doan that she said she would call CREO about the harassment issues and my need for a healthy and safe working environment and asked if there were any updates as to their suggestions. I also asked if I could move to the other side of the module and if the tall desk also on the other side of the module could be lowered so I could use it instead because it was father away from everyone so I could be in a healthy and safe working environment again.

26. The co-worker who was in the adjoined cubical was moved to the approximate middle of the module leaving no place in the module where there was not perfume. In fact the use of perfume increased in the module because other staff were trying to drown out the scent of each other's perfume.

27. June 5, 2014 I gave reasonable accommodation request and more medical documentation and sent an email to Tammie Doan that included 2 SSA memorandums, 1 training manual and 1 article on SSA's policies on fresh air rules, recognizing and treatment with disabled individuals with hidden disabilities including people with fragrance sensitivities and that SSA does have policies that prohibit the use of perfumes see ROI exhibit 21 all 8 pages for full training manual see ROI exhibit 7-05. Tammie forwarded this email to Mireille Hanft see ROI exhibit 20 page 8 of 22.

28. June 6, 2014 I sent an email to Tammie Doan asking if she had seen the email sent on June 5, 2014 regarding SSA policy on fragrances in the workplace. I never received a response from Tammie Doan. Mireille Hanft offered me the opportunity to work on a special project on the third floor. I accepted and started working on the third floor on June 9, 2014.

29. June 9, 2014 Even though I was no longer in the module on the fifth floor and on the other side of the building, I continued to have allergic reactions because of the other employees perfume usage. It had been six (6) months since I started requesting a fragrance free environment and I was no closer to my request for an effective accommodation. I reported issues from coming into contact with clouds of perfume/cologne in hallways, elevators, bathrooms. I stressed that even in different locations in the building I continued to suffer triggering fragrances through the building as listed above including the entrances and exits to Tammie Doan. Tammie Doan never referenced the SSA policies on fragrances I brought to her attention and Tammie Doan seemed to be ignored like all other requests for help and policy confirmation.

30. June 24, 2014 Tammie Doan sent an email to the co-worker who harassed me to confirm a meeting "Per your request, we are scheduled to meet with you Friday, June 27, 2014 at 10:05am **regarding closure on employee's odor allergy**." (bolded for emphasis) This is a meeting about me between my first line manager and my harasser about what is being done to close my allergy issue!

31. June 27, 2014 Tammie Doan held a BA meeting outside her cubical, at the meeting in front of my co-workers Tammie Doan made a point of asking me to move from where I was sitting to right next to the co-worker/harasser who was in the adjoined cubical and moved away from me. When I declined her request to sit next to the co-worker/harasser Tammie Doan laughed loudly and repeating my declining statement. The entire group who gathered for the meeting had a group look of confusion and the co-worker/harasser was clearly visibly upset, it was so humiliating for me and clearly not a good experience for the co-worker/harasser. Tammie Doan eventually stopped laughing and went on with

1   the meeting line nothing happened. Tammie Doan had continually shown lack of

2   professionalism and had taken every opportunity to bully and harass me.

3   32. July 09, 2014 Email to Tammie Doan about her abusive behavior and my last attempt to

4   get Tammie Doan to do the right thing. In the email I note that Tammie Doan informed

5   me that SSA made it my responsibility to provide myself with a healthy and safe working

6   environment at my own costs and that my reasonable accommodations request was not

7   subject to a reasonable accommodations decision but that I still needed to provide

8   medical documentation. I also told Tammie Doan that her actions have caused me harm

9   and extreme stress and her actions made my situation worst that when I brought it to her

10   attention in May 2014. Tammie Doan's refusal to work with me and failure to respond to

11   my emails, which provided evidence SSA does take actions to provide a fragrance free

12   environment, forced me to continue to work in an unhealthy and unsafe working

13   environment for me due to my disabilities. Tammie Doan forced me to work in unhealthy

14   and unsafe working environment because she claimed there was no resolution SSA would

15   afford me. I told Tammie Doan that her actions were clearly one sided and she made a

16   conserved effort to portray me as a troublemaker and that my reports of harassment had

17   no merit therefore protecting the employee who harassed me. Tammie Doan also force

18   me to abide by the demands made to management by the employee who harassed me to

19   provide medical documentation to satisfy her need for additional proof I am disabled.

20   Tammie Doan's actions to make sure I was told not to bother the employee who harassed

21   me but no action was taken to protect me from harassment. Tammie Doan harassing

22   included trying to force me into areas with perfume and trying to trigger my disability,

23   and her actions to make it clear to me the only thing she cared about was the amount of

24   work I did she had no concern for my health and safety. The one place in the module I

25   could have been as far away from co-workers I was denied because Tammie was worried

26   I would not produce enough work because the desk was too high and might complain

27   about standing but she was perfectly fine with me working in areas with perfume that

28

made it hard for me to breath and made me nauseous, dizzy, migraines, rash, swollen eyes and welts.

33. July 10, 2014 Tammie Doan replied to my email about her harassing and neglecting behavior, she said she would like to meet and recommended to have a facilitator for the meeting. I spend the day trying to find out what a facilitator meant. During first break I went to a co-worker to ask what a facilitator was because Tammie Doan did not explain what a facilitator was and the co-worker was in the middle of explaining to me what a facilitator was Tammie Doan was pacing back and forth the suddenly approached us trying to force her way into our conversation when she realized we were not going to invite her into our conversation she left. Tammie Doan had not talked to me or responded to my emails for help which is why I sent the email on July 10, 2014, then all of a sudden she could not keep away. Tammie Doan makes a point of frustrating me when she does interact with me, Tammie Doan has no sense of what is appropriate work behavior she is very unprofessional.

34. July 11, 2014 I replied to Tammie Doan and told her I was trying to find a facilitator and that when I had one I would let her know so we could talk about the issues.

35. July 15, 2014 Email to EEOC investigator about Tammie Doan's decision to make a point of spending time in my work area even though she wears perfume and by forcing me to meet with her every day and Tammie Doan forces me into conversations were she wants to know about my personal life and about the status of the EEOC investigation and what is going on with the case, despite my asking her to keep our interactions on a strictly professional subjects and that I am not required to report to her the status of the EEOC investigation. Tammie Doan replied and said she was available to meet with a facilitator. I had spoken with EEOC counselor by phone and she told me to wait for her to get back with me before setting up a meeting and that I did not have to find a facilitator but that CREO is the one who provides a facilitator. I reported to EEOC counselor I was worried that I would be bullied by management and that management would once again railroad me out of my rights see email to EEOC counselor dated July 14, 2014 that recorded

1

2

discussion. James Ekeroma emailed Tammie Doan and Mireille Hanft about an incident of strong perfume in the women's restroom that took my breath away.

3

4

36. July 23, 2014 left another reasonable accommodation request and medical documentation on Tammie Doan's keyboard. On July 25, 2014, Tammie Doan confirmed receipt.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

37. July 28, 2014 Social Security Memorandum SSA Medical Officer "Dr. Young describes Ms. Tom's upper respiratory symptoms likely secondary to exposures to environmental irritants. Dr. Young further states, 'Removal of environmental irritants will help with her symptoms'. Although available medical documentation establishes Ms. Tom having a condition affecting major life activity of breathing, clinical severity of the condition is unclear. Current documentation suggests a relatively low level of severity based on the outlined treatment plan." and "Even if Ms. Tom is eventually found to be an individual with a disability per the RA, the requested accommodation of scent free work environment is impractical in most public buildings. Furthermore, Ms. Tom is unlikely to avoid similar exposures if she visits public places such as shopping malls, restaurants, grocery stores and numerous others." The doctor notes my disability affects a major life activity and fails to understand that avoidance is the primary treatment of my disability per my physician's letter dated July 7, 2015. This memorandum does inform Defendant that my disability effect my breathing a my major life activity and that limiting the accommodations Defendant provide me to just working in SSA's public buildings would not likely provide me with a fragrance free working environment I needed because of my disability. ROI 7-14 page 4 of 5 and 5 of 5

22

38. August 2014 provided more medical documentation

23

24

25

26

39. August 07, 2014 filed formal EEOC complaint on SF-14-0624 filed request for hearing 2014 / EEO case 550-2015-00104X, Went to hearing 01 2017 and appealed to OFO on July 14, 2017 and request for reconsideration March 02, 2019 and was denied so I filed civil suit

27

28

40. August 21, 2014 Email conversation between Leslie Kern my third line supervisor at the time and me about my reasonable accommodations request for a scent free work

environment. Leslie Kern stated "I am not aware of any claim of harassment and I recommend you speak to your Module Manager and or CREO if you feel you have been harassed by any employee. The Agency takes all claims of harassment seriously and will investigate this issue separately from your RA request. There is not a specific Agency policy regarding the use of fragrance in the workplace. As stated in the notice you received, the Agency is not able to provide a scent free workplace for any employee." And "As the FHFB is a building which is used by many people, we cannot accommodate a scent free workplace. You may contact CREO directly for more information." I had informed Leslie Kern of that Tammie Doan my first line manager had me move away from the co-worker who harassed me and that I did not refuse to move to cubicles in fact I had moved five times already. I asked Leslie Kern if she was made aware of the policies I found SSA had on how to accommodate an employee with a fragrance sensitivity, that I had emailed Tammie Doan. I told Leslie Kern that she had been lied to, because at time did module ten (10) management told staff to be considerate of their fragrance usage and there was an email related to what food should or should not be cooked in the module, that email was to reasonably accommodate another employees disability. Leslie Kern claims SSA takes harassment seriously but she took no action to stop the harassment she just told me to tell someone else the problem what management was one of my harassers. ROI exhibit 7-14 for email between Leslie Kern and me and ROI exhibit  08-01 and exhibit 08-04 and exhibit 08-05 and exhibit the employee who was causing another employees disability to be triggered when they eat oatmeal was told if they eat oatmeal and it effected the disabled employee that "if it happens again, this will lead to disciplinary action such as reprimand or suspension." In my case I was told I could not get a fragrance free environment and that the rights of co-workers to wear fragrances out weight my right to a healthy and safe working environment that accommodated my disability.

41. November 2019 provided more medical documentation not to avoid strong scents under needs and restrictions

42. November 19, 2014 email from Annett Brooks-Norman acting as AFGE Local 1122 Executive Vice President to protect the rights of fragrance wearing staff claiming any attempt to prevent or alter an employee's perfume usage even to improve the health and safety of other staff was a violation of the rights of staff to wear fragrances. The message in this email contradicts Ratification Copy of the 2005 SSA/AFGE National Agreement **Article 9 Health and Safety** "Section 1. General B. The Administration and the Union agree to cooperate in a continuing effort to avoid and reduce the possibility of and/or eliminate accidents, injuries and health hazards in all areas under the Employer's control." (bolded for emphasis) and Ratification Copy of the 2005 SSA/AFGE National Agreement **Article 18 Equal Employment Opportunity** "Section 10. Reasonable Accommodations for Employees with Disabilities subsection, G. Both parties agree that in many cases, changes in the work environment enable persons with disabilities to more effectively perform their job duties. Alterations may be, but not limited to: 3.Maintaining hazard-free pathways." (bolded for emphasis) And because of management abiding by Annett Brooks-Noman's assertions that the right of employees to wear perfume out weighted the rights of other staff from enjoying an environment that would be free of fragrances and chemicals I was forced to rely on management abiding by **Article 31 Time and Leave** Section 3. "Excused Absences B. When management determines that exposure to unsafe or unhealthy working conditions which cannot be immediately corrected may result in the likelihood of illness or injury, employees will either be assigned work in a safe and healthy area in the same office or deployed to another installation or granted an excused absence." (bolded for emphasis) if I was approved to telework I would have been protected and provided an safe and healthy area to work.

43. November 26, 2014 Reasonable Accommodations request for full time telework denied by Marcus Smith on December 11, 2014 because the SSA Medical Officer wanted me to have my allergist provide the medical information, but it was my allergist that provided the requested information and the primary treatment is avoidance. I brought the issues to

1
2

Marcus Smiths attention and to my knowledge, he did not relay it to SSA's medical officer.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

44. December 22, 2014 email to Mireille Hanft Subject: Issue about incorrect information released about me to others: It has come to my attention that Mod 11 employees were told I was allergic to peppermint and that they could not use it due to my allergy to it. I find it odd that they would be told I was allergic to peppermint even though I am not and that they would be restricted in using it. Because at no point have they been told to restrict their use of perfume and other products that change the air quality such as air fresher's. I also find it odd as Rolanda personally came to me and told me that you were contacted by mod 11 management and were told that my peppermint use cause that entire mod to become sick and that I was not allowed to use peppermint at all because of it. Now I am not sure why mod 11 and I were lied to but I would like some clarification. As to why I was personally named in a mod 11 meeting. That is a violation of my right to keep my personal health issues private. Not to mention the fact that it is a lie. I am very upset to find out that I was made a villain to an entire mod for something I am not actually allergic to. When I had asked Rolanda whom I made sick she said it was confidential and that I was just never allowed to use peppermint ever again. Thinking about it, it's odd that she would protect "mod 11" I am not sure it was actually a mod 11 employee who complained and not me when I brought to her attention the fact that scents such as perfume and other air contaminants (such as air fresheners) made me sick. I find this to be an odd double standard that had cause me both physical and emotional pain. As it makes me wonder whom else was told it did and what else was said about me to others behind my back. I have been approached by other employees inquiring about my allergy to scents, at the time I thought nothing of it but know knowing that members of management are telling employees about fictions conditions I have makes me worried. My privacy has not been guarded as it is supposed to be and I now worry who may or may not have been given access to my medical records; that I have given to management upon their request. At this point I very upset to be the talk of the town. As such talk

could cause me to miss out on promotions or in being selected on projects and other unforeseen ramifications. I am very upset and need the public conversations about me to stop. Especially when management has been who is disclosing information about my personal life/health to fellow employees. We are expected to safe guard the public's information, why are we not safe guarding employees personal information?

45. January 2015 provided more medical documentation 3 provided on includes other needs and restrictions recommending accommodation to perfume free environment due to my disability.

46. February 2015 provided more medical documentation 6 one with comment requesting I be provided with an area free of perfume and strong cleaner smell, one is FMLA form

47. March 2015 provided more medical documentation 12 in total one document requested that I not be placed in an environment where I am exposed to strong perfumes or other odors that may trigger my chronic medical condition.

48. March 10, 2015 During the first conference call with the EEOC AJ, the SSA's Counsel, my Union representative and I, SSA's Counsel stated that SSA had no issue with approving my Reasonable Accommodations Request for Telework full-time so long as I could prove I was disabled. Because the SSA's Counsel said that the SSA could provide me the requested Reasonable Accommodation of Telework the EEOC AJ put the case in abeyance for two months so that the SSA can provide me with documentation so that SSA could confirm I am disabled and for SSA to develop a reasonable accommodation plan for me.

49. March 19, 2015 Email to Mireille Hanft asking that she put her direct order in writing because she refused to allow me to use a cubical that was not contaminated and she refused. "I was told yesterday that my fan was making a module 1 employee sick and therefore was required to move. This morning I was informed that I would need to return to module 10 because management decided I was not disabled. I packed up my things and left module 1 to return to module 10. When I arrived I waited to find out where I would be placed and was informed by James Ekeroma that you would have to approve my

location. I asked that since you decided I had determined and stay with in module 10 that I be permitted to sit in a cubical that I have never tried before and that I be permitted to use the laptop since the cubical did not have a computer. James Ekeroma went to Mireille and asked if it could work there for today she said that I would not be possible because I could not spike in that cubical, even though today is not a spike day and that it was just for today until we worked on find a healthier and safer location. After James Ekeroma told me of your verbal denial, I decided to talk to you directly since you are both my first and second line manager and the decision is yours to make. You told me that you ordered me to choose one of the cubicles I have already tried and that I could not telework. I told you that since I am at work using the laptop would not be considered telework since I am still in the building. You said that I could not and that I had to choose between my old cubical or Shannon's old cubical or Lora's old cubical. I told her that I had been placed there numerous times and that I have had attacks ever time. You then demanded that I had to choose between my old desk and Shannon's old desk. I asked that you put your demands in writing and that you send a copy of your demand to my union representative. You said you would not. I told you that I would go and see if I could have my union representative come and be present since you were unwilling to speak with me about the matter and that you were refusing to put your demands in writing. While I was trying to get in contact with my union representative you had Alex walk by and report back to you where I was and you then walked by. Shortly thereafter you returned with James and told me that you order me to select one of the two cubicles. I again requested that you put your demands in writing and send a copy to my union representative and you responded with "I gave you a direct order and if you don't do it I can charge you with misconduct." You are constantly threating and berating me. I asked you if I did not have the right to ask you to put your demands in writing and you turned your back to me and walked away. I don't understand why you feel you need to constantly mistreat me and why you feel you don't have to respond to my questions/requests, and why all of a sudden you decided I was "not disabled". "

50. March 19, 2015 I reported to EEOC AJ in an email dated March 19, 2015 that I was informed by SSA management that management decided to revoke the reasonable accommodation being moved to a healthy and safe cubical, I was relocated to a cubical on the first floor and that morning the cubical I was in had been contaminated and I requested to be placed in another cubical. After the search for another cubical to work in was completed I started to clean the vacant cubical and was informed that the fan I used to keep the air circulating in my area caused an employee in the opposite cubical in module 1 to become sick and that for the sake of the other employees health I would be removed and returned to the fifth floor where my module is located and that SSA management decided I was not disabled and that they were terminating my Reasonable Accommodation that placed me in a cubical on outside of my module. SSA management forced me back to the fifth floor into cubicles I had already tried and were known to be contaminated with fragrances and chemicals despite their actions caused detriment to my health and safety. This is the second time SSA management decided to put the health and rights of other employees over my health and safety, the first time was when SSA management asked me to move away from my harasser (see ROI exhibit 7-15 page 18 of 22 and ROI exhibit 7-15 page 15-16 of 22) and SSA management said that my harasser and other employees had the right to wear and use fragrance products and that I had to be responsible for my own health and stay away from fragrances by moving to get away from fragrances, which I have been trying to do from the beginning and why I asked for the reasonable accommodation of telework. I also tried numerous times to get SSA management to work with me instead of harassing me, the onetime SSA offered sitting down with a facilitator to discuss SSA managements never ending harassment; SSA management soon after rescinded their offer because I filed an EEO complaint that "Using a facilitator at this point would be contradictory to the formal request." Instead of telling CREO telling SSA management to stop harassing me CREO did nothing and just let my complaint go through the EEO complaint process without addressing the on slot of harassment I have suffered at SSA managements hands. See ROI exhibit 7-15 page 15 of

22 and see ROI exhibit 7-15 pages 5-6 of 22 and ROI exhibit 7-19 page 2 of 6 and ROI exhibit 7-19 page 5 of 6 which states "During the investigation into the complaint, it may be necessary for management to undertake interim measures to stop any potential harassment and protect the alleged victim. Interim measures include may include: • scheduling changes so the parties avoid contact with each other, • moving the alleged harasser to another work location; or • placing the alleged harasser on administrative leave pending the conclusion of the investigation. Interim measures do not include transferring, involuntary moving, or otherwise burdening the employee who complained of the harassment since such measures could constitute unlawful retaliation ". Looking at the ROI and other exhibits SSA's actions in my case shows SSA has forced me to move away from my harassers and have failed to effectively accommodate my specific medical needs from the beginning. EEOC AJ responded to my report stating she could not do anything to help me because "…have not yet made an evidentiary determination…" and she advised SSA's Counsel to talk with SSA management and find out what was going on and provide legal advice to SSA management.

51. April 1, 2015 my Union Representative sent an email to SSA's Counsel reminding them that SSA management rescinded my Reasonable Accommodation and that SSA managements actions were based on what they felt was best for the unit and not best for my health, he also reported that since the move back to the fifth floor I started missing significantly more days of work and that SSA's Counsel had still not met it's obligation to provide me with the documents SSA needs so that SSA could finally find me disabled as my treating physicians determination so I could finally be provided an effective Reasonable Accommodation.

52. April 2, 2015 After my Union Representative reminded SSA's Counsel of their obligation they finally sent me a Reasonable Accommodation Medical Inquiry Form they said "OGC has been working closely with CREO to come up with an appropriate document to provide your doctor. We believe the attacked document provides the clearest explanation of the documentation CREO and your managers need to complete the RA

process." SSA's Counsel does not address SSA's managements revoking of the approved reasonable accommodation that placed me in a cubical outside of my module or the fact that no efforts were being done to develop and implement a reasonable accommodations plan as ordered by EEOC AJ during our initial conference call.

53. April 2015 provided completed Medical Inquiry Form in Response to an Accommodation Request provided to me by Defendants Counsel Tina Saladino as per EEOC AJ.

54. May 10, 2015 I sent an email rebutting SSA's Counsel claims that the SSA management made any attempt to develop or implement a reasonable accommodations plan for me as ordered by EEOC AJ during our March 10, 2015 conference call or that SSA management or CREO contacted me or my Union Representative after I provided SSA's Counsel the completed Reasonable Accommodation Medical Inquiry Form on April 7, 2015. In the May 10, 2015 email I attached my rebuttal to SSA's false claims that they interacted with me and their false claims including the false claim that SSA management offered me a position that would allow me to telework three to four days a week and SSA's claim that did not accept the job that would have allowed me to telework three to four days a week, it is important to note that SSA's Counsel does not dispute my rebuttal of SSA's false claims and my assertions that the report was essentially full of false statements to the EEOC AJ. It is also important to note that SSA's document show that SSA had no issues with me increasing my telework days, further proof there is no hardship suffered by SSA when they allow qualified disabled employees to telework full time, see exhibit Communications with EEOC AJ and Agency Counsel, me, my Counsel for EEO case - exhibit 6. The fact SSA management and SSA's Counsel were willing to make false statements/outright lie to EEOC AJ shows SSA is willing to provided falsify information to make it appear they are abiding by the law and EEOC AJ orders. The lies made to EEOC AJ shows SSA statements should not be taken at face value and that SSA should be required to back up their claims with documented evidence like I have done before SSA word is taken as fact because the evidence at hand shows SSA's word is not trustworthy and should not be given the benefit of the doubt.

55. May 26, 2015 my Union Representative sent an email to EEOC AJ clarifying the issues he was trying to bring to her attention notably the fact that SSA's Counsel, my Union Representative and me have had no communications beyond my receipt of the Reasonable Accommodations Medical Inquiry Form and my sending back the completed Reasonable Accommodations Medical Inquiry Form. He also raised issues with the false statements SSA's Counsel sent to EEOC AJ, and me. Also, that without SSA's Counsel contact there was no possibility for both parties to attempt to develop and implement a reasonable accommodations plan as ordered by the EEOC AJ, and that because SSA management made no attempts to accommodate me in the two months the case was in abeyance we should move forward with the case. I also sent an email to EEOC AJ to confirm absolutely no contact between SSA's Counsel or CREO staff occurred between my Union Representative and I occurred to develop and implement a reasonable accommodation plan as ordered by EEOC AJ had occurred. The only contact was SSA's Counsel sent me a form they said if completed would provide SSA with the necessary information they to determine I am disabled. The initial conference call with the EEOC AJ, SSA's Counsel claimed the only reason I was not approved for the requested reasonable accommodation of telework was because the SSA was not able to find I was disabled, which is why the EEOC AJ put the case in abeyance so that the Agency could find I was disabled and develop and implement a reasonable accommodations plan so that I could be approved for the requested reasonable accommodation of telework. Neither my Union Representative or I were contacted during the two months SSA claimed to be working toward developing or implementing a reasonable accommodations plan. It is important to note that SSA's Counsel never disputed the fact we were not contacted. I also asked EEOC AJ that since SSA's Counsel claimed I was offered a position to work via telework three to four days a week that I be permitted to telework three to four days a week while the discovery process was under way, since SSA's Counsel claimed to have made the offer I was accepting it. I never received a response from SSA's Counsel or CREO on my acceptance of their alleged offer to work via

telework three to four days a week, see exhibit Communications with EEOC AJ and Agency Counsel, me, my Counsel for EEO case – exhibit 8. The very fact SSA claimed to be able to increase my telework up to four days a week is evidence that telework is an effective reasonable accommodation and that no hardship is suffered by the SSA, it is important to note I could have changed my work schedule to 4/11 which meant I worked four days a week eleven hour days which would have enabled me to work 100% via telework which is the reasonable accommodations I have been asking for since 2014.

56. June 6, 2015 I responded to EEOC AJ's email asking were the parties were as far discovery and SSA's Counsels request to put the case on hold again and SSA's Counsel's request that I amend my EEO case to include the request for the reasonable accommodations of telework. In my written response attached to the email, I showed that my request for the reasonable accommodations request for telework was already well documented in the Report of Investigation (ROI) and I also disputed the fact that a change of my first line managers was material to the reasonable accommodations and case process, since my second line manager Mireille Hanft was the manager making the reasonable accommodations decisions. It is important to note that during the initial conference call with EEOC AJ, SSA's Counsel and my Union Representative, I; I had asked for reasonable accommodations of telework and SSA's Counsel said I could be approved for the reasonable accommodations of telework as long as I was disabled. I also contested the issues of the case being limited or reduced because SSA's Counsel claimed the issues I raised were not already covered in the Report of Investigation. I pointed out that SSA's Counsel was again misrepresenting the facts to EEOC AJ and that the case should not be prevented from moving forward no more delays should be granted, because I continued to suffer attacks due to SSA's inactions and refusal to provide me with an effective reasonable accommodation during the delays that had already been imposed by EEOC AJ. EEOC AJ put the case in abeyance to give the SSA time to obtain the medical documentation SSA claimed to have needed to render a disability finding and so that SSA could develop and implement a reasonable accommodation plan. SSA failed to abide by

EEOC AJ's orders and did not use the time to develop or implement a reasonable accommodations plan as ordered. SSA management had made no attempts to provide me with an effective reasonable accommodation instead they revoked reasonable accommodations which caused me further physical, emotional and financial harm and duress. It is important to note that SSA's Counsel did not dispute the facts I raised as being false or dispute my report of the true actions SSA's management took. Once again proving SSA's Counsel and SSA management provided false statements and lied to EEOC AJ without hesitation, and that SSA at all levels were acting in bad faith and were not credible witness of facts and events as they actually occurred.

57. June 9, 2015 I received a response form EEOC AJ on my request for her to step in and force the SSA to honor its offer to allow me to telework three to four days a week which they alleged to have offered me per SSA's Counsel email dated May 8, 2015 "Pursuant to your March 10, 2015 order, we are providing the attached updated regarding 'where the parties are as far as developing and implementing a reasonable accommodation plan for Ms. Tom'" attached document dated May 8, 2015 see exhibit Communications with EEOC AJ and Agency Counsel, me, my Counsel for EEO case – exhibit 6 on last page. EEOC AJ told me that she could not order the SSA to do anything because she did not have the authority to do so because she did not find they had violated anything and suggested my Union Representative and I continue try and work something out with the SSA, see exhibit Communications with EEOC AJ and Agency Counsel, me, my Counsel for EEO case – exhibit 10. My Union Representative and I constantly tried to get SSA management, CREO and SSA's Counsel to work with us to provide me with an effective reasonable accommodation but the SSA limited the reasonable accommodations they would provide me to accommodations within SSA occupied buildings on non-telework pilot days, SSA did not make a good faith effort to provide me with an effective reasonable accommodation of telework which the Agency had available and I was aware SSA had provided to other qualified disabled benefit Authorizers, SSA refused to allow me to try telework as a reasonable accommodation they limited the reasonable

1    accommodations I was approved for in regards to my physically located to locations

2    within SSA occupied building. James Dokko my third line supervisor who was

3    responsible for my reasonable accommodations request for telework testified that he

4    never explored where a Benefit Authorizer could telework full time as a reasonable

5    accommodation but he believed it was possible, per MSPB Hearing Transcript day 2

6    James Dokko page 20 lines 20-25 and page 21 lines 1-12. It is important to note that

7    SSA's National Reasonable Accommodations Coordinator (NRAC) based their decision

8    solely on SSA's management's recommendation and did not do their job and confirm

9    managements claims answering the 800 number was an essential job function and that

10   Benefit Authorizers could not be approved for the Reasonable Accommodation of

11   Telework "Ms. Stenzel stated she does not recall if 800 calls were determined to be an

12   essential function of the job or to the extent to which she considered the issue." See

13   exhibit Articles and Emails – exhibit 10 "Statement From NRAC decision maker…" SSA

14   based their denials of my reasonable accommodations based on James Dokko's opinion

15   that my requests should be denied, the fact he acknowledges never having explored

16   where or not a qualified disabled Benefit Authorizer could be approved for the

17   Reasonable Accommodation of telework proves that SSA management was not following

18   actual policy or laws when SSA issued denials to my reasonable accommodations request

19   for telework. It also proves that SSA did not following reasonable accommodations

20   policy and ADAAA or the Rehabilitation Act of 1973 SSA was not trying to

21   accommodate my known limitations because they continued to require that on my non-

22   telework days I work in buildings they knew were not fragrance and chemical free per

23   MSPB Hearing Transcript day 2 James Dokko page 3 lines 14-18 and page 6 lines 21-25

24   and page 7 lines 1-25 and page 8 lines 1-25. The only reason I was teleworking was

25   because I was accepted into the pilot telework program. On days I was not covered under

26   the pilot telework program SSA required I work in the SSA occupied building(s) SSA

27   knew are not fragrance or chemical free per MSPB Hearing Transcript day 1 Kris

28   Chamrernlaksa page 23 lines 11-13 and page 24 lines 23-25 through page 25 lines 1-5,

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 36 of 156

1     per MSPB Hearing Transcript day 1 Carmelita Rivera page 105 lines 5-25 and page 106

2     lines 1-6 and page 121 lines 21-23, per MSPB Hearing Transcript day 1 James Dokko

3     page 206 lines 13-23 and page 220 lines 18-25 and page 221 lines 1-21 and page 227

4     lines 1-25, per MSPB Hearing Transcript day 2 James Dokko page 3 line 14-18 and page

5     8 line 1-25, per MSPB Hearing Transcript day 2 Debby Ellis page 118 lines 17-20 and

6     page 122 lines 13-15 and page 137 lines 12-18 and page 137 line 5-11 and page 144 lines

7     2-18. Although SSA's Counsel reported in their May 8, 2015 update that I was offered to

8     telework three to four days a week they never allowed me to telework beyond what was

9     allowed under the pilot telework program parameters even though they knew since 2014,

10    that SSA buildings could not provide me with an effective reasonable accommodation of

11    a fragrance and chemical free environment per SSA Medical officer ROI exhibit 18 page

12    2 and Leslie Kern Operations Manager ROI exhibit 7-14 "The SSA Medical Officer also

13    noted that even if you are eventually found to be an individual with a disability under the

14    Rehabilitation Act, your request accommodation is impractical in most public buildings.

15    As the FHFB is a building which is used by many people, we cannot accommodate a

16    scent free work place. You may contact CREO directly for more information." proving

17    that SSA's has been aware since at least 2014 that any accommodation that forced me to

18    work in an SSA occupied building would not provide me with a fragrance and chemical

19    free environment, the logical next option should have been to have me telework since my

20    working environment would be my home which is fragrance and chemical free and

21    would have been in line with SSA policy Reasonable Accommodations Request

22    Involving Fragrance Sensitivity Policy exhibit My Appeal to the Office of Federal

23    Operations Decision - Supplemental Exhibit 9 for copy of policy. It also proves that the

24    SSA's allegations that SSA believed to have effectively accommodated me within the

25    building is a lie and SSA's claims contradict SSA's Medical Officer's determination that

26    SSA occupied building and other public places could not provide me with fragrance or

27    chemical free environment, James Dokko acknowledges that he was aware of SSA's

28    Medical officers assessment of SSA occupied buildings inability to provide me with a

1   fragrance and chemical free environment, James Dokko agreed with SSA Medical

2   Officers assessment per MSPB Hearing Transcript day 1 page 220 lines 18-22. The fact

3   the one available reasonable accommodation of telework that would provide me with a

4   fragrance and chemical free environment is the only reasonable accommodation the SSA

5   refused to allow me to try despite SSA knowing SSA occupied buildings could not

6   provide me with a fragrance and chemical free environment and SSA allowing other

7   Benefit Authorizers to telework five days a week, shows SSA did not act in good faith

8   and that they did not make abide by the ADAAA and Rehabilitation Act of 1973 to

9   provide me with an available effective Reasonable accommodation and that SSA did not

10  provide me with a reasonable accommodations that would accommodate my known

11  limitations, even though they knew I am a qualified disabled employee per SSA Final

12  Agency Decision (FAD) dated January 30, 2019 see labeled page 6 on upper right hand

13  side  included in my initial civil complaint "To establish a *prima facie* case of disability

14  discrimination under Rehab Act, an individual must show (1) she is an "individual with a

15  disability," (2) she is qualified for the position held or desired;..." and "Regarding the

16  second prong, while the record does not contain evidence pertaining to Complainant's

17  performance, there is no doubt that she was in her position for roughly ten years.

18  Therefore, we find she is qualified for the position she held and established the second

19  prong of her case. See Kohner v. Dep't of Transp., EEOC Appeal No. 0120110334, 1

20  (sept. 14, 2012) (affirming AJ's decision finding complainant was a 'qualified' individual

21  with a disability by virtue of successfully performing his job)." My successful

22  performance appraisals are also included in my initial civil complaint. It is important to

23  note that SSA's National Reasonable Accommodations Coordinator (NRAC) based their

24  decision solely on SSA's management's recommendation and did not do their job and

25  confirm managements claims answering the 800 number was an essential job function

26  and that Benefit Authorizers. NRAC also failed to confirm my reports that SSA was

27  already approving Benefit Authorizers the Reasonable Accommodation of Telework

28  proving answering SSA's 800 number was not an essential function as SSA management

1   alleged to NRAC "Ms. Stenzel stated she does not recall if 800 calls were determined to

2   be an essential function of the job or to the extent to which she considered the issue." See

3   exhibit Articles and Emails – exhibit 10 "Statement From NRAC decision maker..." If

4   SSA NRAC had done their job and based their decisions on an independent review of

5   SSA policies and practices, NRAC would have found out that SSA had approved 20+

6   other qualified disabled Benefit Authorizers the Reasonable Accommodation of telework

7   since 2016 NRAC would have also found ample evidence showing not only had SSA

8   determined that Benefit Authorizer could perform the essential job functions while

9   working 100% via telework. NRAC would have also found when SSA approved

10   qualified disabled Benefit Authorizers the Reasonable Accommodation of telework SSA

11   suffered no hardship! Evidence I provided Office of Federal Operations definitively

12   proves that allowing a Benefit Authorizer to telework five days a week would not cause

13   the SSA any hardship, the fact is SSA has approved over 20 qualified disabled Benefit

14   Authorizers the Reasonable Accommodation of Telework since at least 2016 and SSA

15   has approved over 100 Benefit Authorizers Article 39 Work At Home by Exemption

16   since at least 2015, important to note that there is one Benefit Authorizer who is in the

17   pilot program who is virtually working "1 of these BAs is actually a longer term virtual

18   detail" see exhibits provided in my initial complaint dated May 17, 2019 labeled

19   "Agency's Response to Appellant's Request for Production #6 as amended in the Board's

20   April 25, 2019 Order" and dated May 3, 2019"Agency's Response to Appellant's

21   Request for Production #6 as amended in the Board's April 25, 2019 Order" proving SSA

22   can permit disabled Benefit Authorizer and or non-disabled Benefit Authorizer to

23   telework full time without harm to the SSA. The documents also prove there is no lawful

24   reason SSA refused to provide me with the reasonable accommodation of telework. My

25   report to EEOC AJ prove SSA's management took actions that triggered my disabilities

26   instead of taking actions to develop and implement a reasonable accommodations plan as

27   they were ordered to do by the EEOC AJ during the initial conference call and that SSA

28   has lied about being willing to allow me to telework three to four days a week. I believe

the reason SSA lied about offering me a job that would enable me to telework three to four days a week to make SSA appear as though SSA was abiding by EEOC AJ's orders trying to reasonably accommodate me and make it appear to EEOC AJ that I was not working with SSA. I begged SSA to honor it's fictitious offer to allow me to telework three to four days a week and they never honored the fictions offer and never responded to my requests for them to honor my acceptance, proves SSA lied about the offer to enable me to telework three to four hours a week. Based on SSA's actions it appears to me that SSA did not intend to abide by EEOC AJ's order to develop and implement a reasonable accommodations plan just make it appear as though SSA made an effort to. It is important to note that SSA's Medical Officer told SSA management on July 2014 almost a year before this case was bright to EEOC AJ's attention that "Even if Ms. Tom is eventually found to be an individual with a disability per the RA, the requested accommodation of scent free work environment is impractical in most public buildings. Furthermore, Ms. Tom is unlikely to avoid similar exposures if she visits public places such as shopping malls, restaurants, grocery stores and numerous others." see ROI exhibit 18 page 2 of 2. So SSA's refusal to the approve the RA of telework the one reasonable accommodation that would enable me to work outside of an SSA occupied building and would actually provide me with a fragrance and chemical free environment proves SSA had no intention making a good faith effort to develop and implement an effective reasonable accommodation plan. Every time I begged SSA to honor SSA's alleged offer to allow me to telework three to four days a week my please went unanswered and I was forced to continue to suffer physically, mentally and financially.

58. June 10, 2015 EEOC AJ sent an email and the email contained the document "Order Settling Discovery Schedule" which found that I was not required to amend my request to include my request for telework as a reasonable accommodation because that request was included in the complaint already. EEOC AJ notes "The Agency is required to engage in the interactive process and propose alternatives if Complainant's requested accommodation is not viable; telework was a very obvious alternative. Ms. Tom is not

required under the ADAAA to continuously file new, formal paperwork every time a new option is considered" and EEOC AJ noted that the efforts to implement a reasonable accommodations plan has been unsuccessful   she does not note that my Union Representative and I reported no communications occurred with SSA's Counsel or CREO to try and develop and implement a reasonable accommodation plan as ordered in March 10, 2015 conference call but EEOC AJ did referred us to mediation to try and get SSA to the table to talk with me and my Union Representative to try and resolve my needs for an effective reasonable accommodation as fast as possible.

59. June 11, 2015 approved reasonable accommodation of not being required to attend mandatory group training and granted one on one training instead.

60. June 2015 provided more medical documentation 3 in total, one states that it is not recommended that I drive after taking Benadryl. And another states that I have demonstrated a consistent hypersensitivity/irritant-based reaction including throat tightness and skin/eye irritation/burning sensation after fragrance and fume exposure at work. If I am unable to avoid these chemicals at work and am able to work from home. My physician advises that such an option would provide the best solution for the parties involved.

61. June 22, 2015 submitted RA request to telework full time. James Dokko from this day forward took responsibility for my reasonable accommodations requests. I was denied on June 23, 2016 over a year later by Debby Ellis even though I had been moved numerous times and was unable to stay in the building to work a 20-hour week since about April 2015 Debby Ellis still found the provided reasonable accommodations were as effective as the requested reasonable accommodation of telework. I had 580 hours of LWOP in 2015 when she made her decision to deny my reasonable accommodation of full time telework I had lost an additional 377 hours of LWOP, I could have worked.

62. July 2015 provided more medical documentation it states that I have demonstrated a consistent hypersensitivity/irritant-based reaction including throat tightness and skin/eye irritation/burning sensation after fragrance and fume exposure at work. Primary treatment

for this condition is avoidance rather than medications. The duration may be indefinite. If she experiences adverse reactions to chemicals and fume exposure at work, it is my advise that she be removed from the environment quickly to help in resolution of her symptoms. If she is unable to avoid these chemicals at work and is able to work from home, it is my advise that such an option would provided the best solution for the parties involved.

63. July 16, 2015 I was approved the reasonable accommodation of Liberal Leave, not required to attend group meetings in person and was provided one-on-one updates instead and co-workers were instructed to communicate with me electronically instead of in person to reduce my exposure to contaminants in the building as a reasonable accommodations because of my disability sensitivity to environmental irritants.

64. August 5, 2015 I was approved as a reasonable accommodation to start phase 2 of the pilot telework program increasing from Telework one day a pay period to one day a week.

65. August 10, 2015 from James Ekeroma subject FW:08-10-2015-Level 2 day shows that teleworkers were allowed to stay home and work at home even though the day was a high spike day.

66. August 17, 2015 I was provided 1740 Respirator mask as a reasonable accommodation.

67. August 26, 2015 SSA's Counsel, my Union Representative and I with the assistance of a mediator agreed to among other things excuse me from answering SSA's 800 number aka SPIKE, I was on the priority list when telework program expanded and the approved reasonable accommodation of Liberal leave would continue also I would not be asked to provide a additional doctors documentation when I was absent from work because my disability sensitivity to environmental irritants was aggravated. See exhibits in my appeal to the Office of Federal Operations Decision supplemental exhibit 6 starting on the fourth page email subject: Interim Agreement in Tom v SSA numbers 4, 5 and 6. It is important to note that SSA's Counsel agreed to excuse me from answering SSA's 800 number aka SPIKE proving that it is not an essential function of the Benefit Authorizer job because

SSA's Counsel would not have agreed to any reasonable accommodation that did not meet reasonable accommodations policy. I would like it noted that the SSA did not abide by the agreement whole mediated agreement and that each time  I raised reported SSA did not abide by the agreement I could not get anyone from SSA to talk to me or my Union Representative about SSA breaching the mediated agreement I was also unable to get the EEOC AJ to get SSA to honor the mediated agreement. I was forced to file multiple EEO cases in addition to this case, I have nine additional cases against SSA (my last EEO case was bifurcated creating the tenth case) because of the continued disability discrimination, harassment, abuse of authority, retaliation, and SSA's refusal to provide me with an effective reasonable accommodation. Also in the same supplemental exhibit 6 on the second page is the start the document produced by SSA's Counsel to EEOC AJ dated November 30, 2015 where SSA's Counsel states "Pursuant to the August 27, 2015 interim agreement, we are providing an update regarding where the parties are in developing and implementing a reasonable accommodations plan for Ms. Tom. Since the August 2015 mediation, management has continued to work with Ms. Tom **to provide an effective accommodation for her medical condition.**"(bolded for emphasis) The bolded portion of SSA's Counsel statement proves the SSA found I was a qualified disabled Benefit Authorizer at least as far back as 2015 and based on SSA finding I am a qualified disabled Benefit Authorizer SSA provided me with reasonable accommodations which SSA claimed were effective reasonable accommodations for my medical condition/disability including but not limited to being excused from SPIKE on two separate occasions, provided an air purifier, Liberal Leave, was moved to different locations (over 26) within SSA occupied building to work in, I was allowed to start telework pilot once a week telework and was one of the first employees to be converted to the single device set up. SSA's Counsel acknowledges in documentation provided to EEOC AJ that SSA knows I am a known qualified disabled employee and that SSA would continue to work with me to provide me with an effective reasonable accommodation, SSA Counsel found I am a qualified disabled employee but failed to

note that SSA was informed by an SSA Medical Officer that SSA buildings would be unable to provide me with a scent free work environment echoed by SSA Operations Manager Leslie Kern per. ROI exhibit 7-14 "The SSA Medical Officer also noted that even if you are eventually found to be an individual with a disability under the Rehabilitation Act, your request accommodation is impractical in most public buildings. As the FHFB is a building which is used by many people, we cannot accommodate a scent free work place. You may contact CREO directly for more information." Ms. Kern notes that CREO was also aware since 2014 that SSA would be unable to provide me with a scent free workplace in the building, meaning CREO and SSA management should have concluded telework would be a viable reasonable accommodation that should have been offered since it was an available reasonable accommodation, which caused SSA no hardship to provide see exhibits provided with my initial complaint which shows over 120 Benefit Authorizers were excused from SPIKE and allowed to telework full time five days a week for months and years as early as 2015. It is important to note that the first laptop I was given when I was selected for the pilot telework program was a shared laptop that I received when I started pilot telework back in January 2014, and the second laptop was a single device set up laptop I received in 2015 more than year after the first laptop, important to note the second laptop was replaced soon after I had reported issues with it proving SSA can provide laptops that don't affect my disability and that the first laptop would have been replaced regardless because SSA converted from PC's to laptops see January 19, 2017 EEOC Hearing Transcript Volume 2 page 320 lines 2-25 and page 321 lines 1-10 and Exhibit 1 James Dokko's Declaration #26 in Table of Contents Exhibits not in ROI that are referenced to in. SSA provided the second laptop to me soon after I reported problems with the first laptop proving that SSA can provide me with laptops that have not been contaminated with fragrances and chemicals if SSA took the proper precautions also important to note the second laptop was perfectly fine like the first laptop it was not contaminated. When I received the second laptop I asked for permission to keep the second laptop with me to prevent the second laptop from being

1      contaminated while the laptop was left in the building while I was out sick which is how

2      the first laptop became contaminated, my request to keep the second laptop with me was

3      denied. Had SSA allowed me to take the second laptop home when I went home sick I

4      would have never needed a third laptop! Unlike the first two laptops SSA provided me

5      the third laptop SSA gave me was contaminated since the first day I received it and was

6      clearly used, see MSPB Hearing Transcript day 1 James Dokko page 163 lines 11-18 and

7      MSPB Hearing Transcript day 2 James Dokko page 68 lines 3-19 and page 69 line 18-22

8      and page 70 lines 1-21 and page 73 lines 3-25 page 74 lines 1-3 and lines 18-24, see

9      hearing testimony see January 19, 2017 EEOC Hearing Transcript Volume 2 James

10     Dokko page 320 lines 2-16 and page 321 lines 1-10 and lines 19-25 and page 322 lines 1-

11     25 and page 323 lines 1-25 and see exhibit 2 in Table of contents of exhibits not in ROI

12     that are referenced in, that shows I started pilot telework in 2014 and see exhibit table of

13     contents of exhibits not in ROI that are referenced in exhibit 1 page 5 #26 which shows I

14     received the second laptop in December 2015. It is important to note that I was not

15     allowed to take the second laptop "first single device set up" laptop with me when I went

16     home; had I been allowed to take the second laptop home I would not have needed a third

17     laptop because the second laptop would been in my home which is a fragrance and

18     chemical free environment. James Dokko acknowledges that I requested to be allowed to

19     take the second laptop home so that it would not be contaminated like the first one had

20     been when the laptop was left in the building which is a chemical and fragrance

21     environment, per MSPB Hearing Transcript day 2 page 69 lines 18-22 and James Dokko

22     acknowledges that I had reported the second laptop was contaminated after having if for a

23     few months and that I had reported the third laptop was contaminated since the first day I

24     received it per MSPB Hearing Transcript day 2 page 70 lines 1-17. I would like it noted

25     that all SSA staff was going to be provided a single device set up per January 19, 2017

26     EEOC Hearing Transcript Volume 2 James Dokko testimony page 321 lines 4-10 "So

27     around that time we were going through a workstation replacement, so we were replacing

28     all of our desktops computers with laptops, which is called a single device setup, which

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 45 of 156

1   would be a laptop you put in a dock on a desk and use that as your desktop. If you did

2   telework, you would undock that laptop and use that same laptop to telework.". It is

3   important to note that Debby Ellis states that management received medical

4   documentation that informed SSA that my condition was sever, per MSPB Hearing

5   Transcript day 2 Debby Ellis page 133 lines 5-12. See ROI exhibit 7-4 page 25 of 29 it

6   defines Reasonable Accommodation as a modification or adjustment to a job or change in

7   the working environment for qualified disabled employees to enjoy the same benefits and

8   privileges as employees without disabilities and Undue Hardship is a specific

9   accommodation that would require significate difficulty or expense. It is important to

10   note that SSA had determined I was a qualified disabled employee per documents

11   provided by SSA's Counsel to EEOC AJ providing an update pursuant to the March 10,

12   2015 EEOC AJ order dated May 8, 2015 in exhibit 6 of Communications with EEOC AJ

13   and Agency Counsel, me and my Counsel for EEO case and in a Final Agency Decision

14   dated January 30, 2019 page 6 of the decision, included as an exhibit with my initial

15   complaint. SSA providing me with reasonable accommodations is further evidence that

16   SSA found I am a qualified disabled employee among other things SSA provided me

17   with an air purifier that was over one thousand dollars (see James Dokko declaration #18

18   exhibit Table of Contents of Exhibits not in ROI that are referenced in), I was moved

19   over 26 times and was provided masks and glove, Liberal Leave and I was approved the

20   maximum advanced sick leave the maximum advanced annual leave, the maximum

21   FMLA leave and LWOP I was also approved for the voluntary leave transfer program.

22   SSA only provides reasonable accommodations to qualified disabled employees per ROI

23   exhibit 7-4 page 25 and per MSPB Hearing Transcript day 1 Carmelita Rivera page 133

24   lines 10-15. Because SSA provided over 20 other qualified disabled Benefit Authorizers

25   with the reasonable accommodation of Telework full time and SSA approved 100 Benefit

26   Authorizers Article 39 approval and has one non-disabled Benefit Authorizer who was

27   working "a long term virtual detail" proves there is no undue hardship on SSA to allow

28   Benefit Authorizer to telework full time especially if the Benefit Authorizer who is

1   asking for full time telework is a qualified disabled employee see MSPB Hearing
2   Transcript day 2 page 153 lines 16-22. Debby Ellis acknowledges that Benefit
3   Authorizers were allowed to telework on SPIKE days proving SPIKE is not an essential
4   function of the Benefit Authorizer job as she originally claimed to EEOC AJ at the
5   January 19, 2017 hearing, see MSPB Hearing Transcript day 2 page 153 lines 16-22 and
6   155 lines 10-25 and page 156 lines 1 and page 157 lines 4-7 lines 23-25 and page 158
7   line 1 and lines 13-17 and page 159 lines 3-25 and page 160 lines 5-10 and see exhibit
8   provided with initial complaint from SSA Counsel dated May 17, 2019 and May 3, 2019.
9   Per January 19, 2017 EEOC Hearing Transcript Volume 2 page 356 lines 8-14 no one in
10  SSA has the authority to excuse an employee from performing an essential function of
11  their job. Per January 19, 2017 EEOC Hearing Transcript Volume 2 page 300 lines 8-25
12  and page 301 lines 1-3 Debby Ellis acknowledges that module managers decide who
13  SPIKE's or does not SPIKE, further evidence that SPIKE is not an essential function of
14  the job because SSA management can decide who does and does not SPIKE. I would
15  also like it noted that I was found to be a qualified disabled employee more than once
16  first when I was approved the air purifier (costing $1,200.00) and because I received
17  successful performance appraisals throughout my 10 year career per SSA Final Agency
18  Decision (FAD) dated January 30, 2019 see labeled page 6 on upper right hand side, a
19  copy of my successful performance appraisals and the FAD dated January 30, 2019 are
20  included in my initial complaint exhibits and see January 19, 2017 EEOC Hearing
21  Transcript Volume 2 page 284 lines 6-25 and page 285 lines 1-10. Unfortunately, the
22  reasonable accommodations SSA provided me were not working per EEOC AJ's own
23  statement "If Complainant is credible and her symptoms are genuine, then the current
24  accommodations are not working and the Agency must consider full-time teleworking.
25  To justify not allowing Complainant to telework full time, the Agency must demonstrate
26  undue hardship" see exhibit Communications with EEOC AJ and Agency Counsel, me,
27  my Counsel for EEO case – exhibit 15 and see exhibit Communications with EEOC AJ
28  and Agency Counsel, me, my Counsel for EEO case – exhibit 12 on page 10 the

1    reasonable accommodation decision from Debby Ellis that shows she denied my

2    reasonable accommodations request for permanent telework but I was approved other

3    reasonable accommodations request to be moved within SSA occupied buildings and she

4    lists the other approved and provided reasonable accommodations including but not

5    limited to moving me to different floors and different cubicles, allow me to telework two

6    days a week  just ahead of the other pilot teleworkers, an air purifier, excused from

7    performing SPIKE, face masks; I was also provided the Reasonable Accommodations of

8    Liberal Leave eventually provided gloves. SSA is well aware I am a qualified disabled

9    employee and SSA is required to provide me with a effective reasonable accommodation

10   that would enable me to return to work full time per Rehabilitation Act of 1973 and 29

11   C.F.R. 1630.1 provides that the primary purpose of Title I of the ADA, as amended by

12   the ADAA, is to provide equal employment opportunities for individuals with disabilities

13   as long as SSA does not suffer an undue hardship. SSA should provide reasonable

14   accommodations that permitted me to keep working rather than choosing to force me to

15   take leave as a reasonable accommodation. Leave removes an employee from the

16   workplace and therefore denies the employee the opportunity to keep working which is

17   not a reasonable accommodation, which is why I continued to begged SSA to approve

18   my reasonable accommodations request for telework, it was clear after moving me

19   around over 26 times to different locations within SSA occupied buildings did not

20   provide me with a fragrance and chemical free work environment, a fact SSA's Medical

21   Officer determined in 2014 "Even if Ms. Tom is eventually found to be an individual

22   with a disability per the RA, the requested accommodation of scent free work

23   environment is impractical in most public buildings. Furthermore, Ms. Tom is unlikely to

24   avoid similar exposures if she visits public places such as shopping malls, restaurants,

25   grocery stores and numerous others." which SSA was told, see ROI exhibit 18 page 2 of

26   2. SSA's Leslie Kern Operations Manager confirmed SSA Medical Officer's

27   determination stating "As stated in the notice you received, the Agency is not able to

28   provide a scent free workplace for any employee." see ROI exhibit 07-14 page 2 of 5.

SSA's Medical Officer assessment of my disability is accurate, public places don't provide fragrance or chemical free environments which is why I am homebound and why SSA's calls for me to take public transportation to work so that I can then ask for leave in person is extremely unreasonable and puts me in physical harm because I would not survive the ride to the building and would have to call out sick because I could not survive the drive in and I could be raped or killed once I lost consciousness. In 2014 I brought my formal requests for an effective Reasonable Accommodation to SSA and since 2014 to now 2019 my quality of life has plummeted because SSA's has refusal to provide me with an effective Reasonable Accommodation of telework which they provided to more than 120 other qualified disabled Benefit Authorizers. SSA's refusal to effectively accommodate me has made my disability to worsen and caused me to also need reasonable accommodations for vertigo, migraines with aura and sensitivity to environmental irritants. Although the disabilities I now need accommodated have increased SSA continues to believe the accommodations they have been providing me since 2015 are still equally effective as the reasonable accommodation of telework, which no reasonable person would conclude.   Since my initial formal reasonable accommodations request made in 2014 the continued assaults on my immune system triggering my disability sensitivity to environmental irritants my health worsened and I was subsequently diagnosed with vertigo in 2015 and my migraines with aura became much worst. If SSA had acted in accordance with the Rehabilitations Act of 1973, ADAA and Reasonable Accommodations Policy in my case as they had for the 120 plus other qualified disabled Benefit Authorizers whom were approved to telework full time five days a week, I would not have had to take leave, I would not have ended up with vertigo and my migraines with aura would not have gotten worst and I would never have been fired for taking sick leave.

68. September 2015 I was moved into a converted conference room and was provided with draft guards for the bottom of the door as a reasonable accommodation.

69. September 2, 2015 Defendant approved my reasonable accommodations request for an air purifier for my exclusive use costing $1,200.00.

70. September 2015 through January 2016 I was excused from SPIKE aka answering SSA's National 800 number.

71. October 28, 2015 requested approval under Article 39 Work at home by exception. Denied by Mireille Hanft on November 30, 2015 because I asked for approval beyond 12 months and was out right denied and was told to reapply and ask for a shorter period of time.

72. October 2015 Defendant ask Buildings Maintenance if it would be possible to close the air vents into the room and to prevent air flow from other parts of the building from entering the room, Buildings Maintenance informed management it was not possible and that closing vests would create a build of $CO_2$. Which means I was breathing the same recycled air and the air in the room was no different than any other location in the building.

73. November 03, 2015 Defendant approved my reasonable accommodation request for masks.

74. November 30, 2015 I sent an email to EEO AJ to dispute the false statement SSA's Counsel claimed occurred during mediation and also after mediation was conducted. SSA's Counsel lied about multiple facts which I noted in my written rebuttal  starts on page 3 of exhibit Communications with EEOC AJ and Agency Counsel, me, my Counsel for EEO case – exhibit 12. SSA's Counsel has provided false information to EEO AJ on at least three occasions this event being the third time. SSA management and Counsel has acted in bad faith see exhibits 3, 10 and 14 of Communications with EEOC AJ and Agency Counsel, me, my Counsel which show on at least three separate occasions SSA's Counsel and SSA management lied to the EEOC AJ and should be proof SSA's Counsel and management should not be taken at their word. SSA and SSA's Counsel does not dispute my rebuttal to any of the false claims they made proving that SSA knew they had been caught in a lie, the fact EEOC AJ continued to allow SSA's Counsel and SSA staff

1    to lie to her emboldened them to continue to lie with impunity as evidence by the lies

2    SSA staff made during the EEO hearing see supplementary exhibit 7 in My appeal to the

3    Office of Federal Operations Decision.  The documents in exhibit Communications with

4    EEOC AJ and Agency Counsel, me, my Counsel for EEO case exhibit 14 and exhibit 12

5    page 13 of 15 foot note 1, shows SSA management acted in bad faith when in October

6    2016 they revoked the approved Reasonable Accommodation of Liberal Leave and then

7    threatened me with being charged with AWOL, SSA management told me that because

8    the approved Reasonable Accommodation of Liberal Leave was revoked SSA would now

9    be within their right to refuse to approve my LWOP requests and charged me with

10   AWOL which caused me physical, emotional and financial harm, I was already under a

11   lot of duress and living under the constant threat of losing my job increased the strain on

12   my mind and body. SSA management failed to provide me with an effective reasonable

13   accommodation which is why I was forced to take leave as in the first place. SSA was

14   aware that even with the air purifier I was reporting having problems of fragrances and

15   chemicals in the offices I was provided see MSPB Hearing Transcript day 2 page 130

16   lines 22-25. SSA chose to provide the Reasonable Accommodation of Liberal Leave

17   instead of approving my Reasonable Accommodation of Telework because James Dokko

18   SSA manager stated "we provided an accommodation that **I feel was appropriate**, which

19   was a locked office, air purifier, air guard, flexible leave" (bolded for emphasis) see

20   MSPB Hearing Transcript day 1 page 206. It is important to note that SSA was perfectly

21   fine with me taking sick leave so long as I reported to SSA's building and aggravated my

22   disabilities and then asked for permission to go home sick per MSPB Hearing Transcript

23   day 1 page 227 lines 2-25 and 228 lines 1-25 and page 229 line 1.Although James Dokko

24   acknowledges that SSA cannot protect me from scents and can only limit my exposure in

25   SSA buildings (see MSPB Hearing Transcript day 2 page 6 lines 21-25 and page 7 lines

26   1-4). James Dokko stood by his decision to continue to refuse to recommend I be allowed

27   to telework which would have enabled me to eliminate my exposure to chemical and

28   fragrances in my environment even though James Dokko was told by my first line

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 51 of 156

supervisor Kris Chamrernlaksa that Kris recommended that I be approved for telework five (5) days a week  see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. James Dokko made his own medical determinations, which he used to base his recommendations to upper SSA management. James Dokko's own medical determinations that SSA could provide me with a reasonable accommodation with in SSA's buildings that would be as effective as telework in providing me with a fragrance and chemical free work environment contradicted SSA's Medical Officers determination that SSA buildings could not provide me with a scent free environment (see ROI 18 page 2) and the medical recommendations my doctors made to provide me with a fragrance and chemical free environment (see medical documentation pages 31,36,45,46,48,52 and 98). James Dokko was wrong to deny my reasonable accommodations request for telework, ignoring Kris recommended that I be approved for telework five days a week (see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11) and without ever having determined if SSA was able to provided Benefit Authorizers telework five days a week as an RA or under Article 39 James Dokko also notes that there are still journeyman level Benefit Authorizers who are still not SPIKE trained more than 2 years after the EEOC hearing (see MSPB Hearing Transcript day 1 page 205 lines 7-25 and page 206 lines 1-14) and James Dokko instead based his decision on what he felt "accommodation that I feel was appropriate" James Dokko claims to have followed my doctors recommendations to isolate the air flow from other areas of the building and provide air from outside and then James Dokko takes it back when he  testifies "Oh, I'm not aware. All I know is -- is that the air flow -- we did not make any changes to our air intake system, no." see MSPB Hearing Transcript day 1 page 208 lines 13-25 and page 209 lines 1-9. SSA revoked approved reasonable accommodation of Liberal Leave, which SSA gave me instead of approving my reasonable accommodation of telework. Because SSA revoked the reasonable accommodation of liberal leave which was supposed to be just as effective as telework SSA I asked SSA to approve my request for the effective reasonable accommodation of telework, which would have returned me to

1    work full time, SSA at James Dokko's recommendation continued to deny my reasonable

2    accommodation request of telework. SSA management refused to allow me to have union

3    representation when we discussed SSA revoking the approved reasonable

4    accommodation of Liberal Leave approved in lieu of telework and changes in the

5    working environment even though I asked twice to be provided Union Representation

6    proving SSA does not uphold the rights of employees and SSA does not abide by

7    ADAAA or the Rehabilitation Act of 1973 or SSA policies in place to protect employees.

8    SSA management acknowledges that SSA is unable to prevent my exposure to fragrances

9    and chemicals that all SSA could do in the buildings was try and limit my exposure,

10   proving SSA was aware I was being exposed while I was in SSA buildings and therefore

11   proving the provided reasonable accommodations in the buildings are not as effective as

12   the reasonable accommodation of telework would have been, because in my home I can

13   eliminate my exposure to fragrances and chemicals see MSPB Hearing Transcript day 2

14   page 6 lines 21-25 page 7 lines 1-4. I proved I could work from home full time and

15   perform the essential functions of my job from July 26, 2016 through August 15, 2018 I

16   worked 100% via telework once a week under the pilot telework program and received

17   successful performance appraisals, my first line manager had told Carmelita Rivera and

18   James Dokko that based on my work I should be allowed to telework five days a week

19   per MSPB Hearing Transcript day 1 page 26 lines 16-25 and page 27 lines 1-11. SSA's

20   inactions, delays and refusal to approve my requested reasonable accommodation of

21   telework because SSA believed the approved reasonable accommodation of the air

22   purifier (see MSPB Hearing Transcript day 2 page 44 line 4-7) was effective, forced me

23   to take sick leave instead of allowing me to work full time. SSA used the sick leave SSA

24   forced me to take against me when SSA ultimately fire me unlawfully for taking sick

25   leave, even though I was in reasonable accommodations talks with management  during

26   the period of time SSA proposed to remove me and that the reasonable accommodations

27   James Dokko offered me was a variation of the failed accommodation James Dokko was

28   just moving me around in the same building environment under the mistaken belief it

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 53 of 156

1   would be more effective (please note I had already been placed on the third floor before

2   being moved to the 4th floor), see MSPB Hearing Transcript day 2 page 81 lines 6-20.

3   James Dokko acknowledges he was the SSA manager responsible for my reasonable

4   accommodations requests instead of my first line manager/supervisor, per MSPB Hearing

5   Transcript day 1 page 146 lines 5-19, it is important to not had my first line supervisor

6   been responsible for my reasonable accommodations request he would have approved me

7   to telework full time, extremely important to note my first line informed both my second

8   line Carmelita Rivera and third line James Dokko of his recommendation see MSPB

9   Hearing Transcript day 1 page 26 lines 16-25 and page 27 lines 1-11. SSA forced me to

10  take leave I was never provided an effective reasonable accommodation of telework, SSA

11  instead approved the reasonable accommodations of a room, an air purifier, door guard

12  "air guard" and flexible leave I was required to walk through a building that was not

13  fragrance and chemical free and although there are journeyman level Benefit Authorizers

14  who did not have to answer SSA's 800 number aka spike at all. James Dokko never

15  inquired as to where or not telework was an available Reasonable Accommodation I

16  could have been given instead of terminating me see MSPB Hearing Transcript day 2

17  page 20 lines 20-25 and page 21 lines 1-3 and MSPB Hearing Transcript day 1 page 205

18  lines 17-23, James Dokko always recommended that I be denied the reasonable

19  accommodation of telework every time because of the information he had but James

20  Dokko acknowledges never confirming his claims if SSA approved my request for

21  telework would eliminate an essential function of my job or that SSA did not approve

22  other qualified disabled Benefit Authorizers with telework five days a week either as an

23  RA or under Article 39, James Dokko is aware there are Journeyman level Benefit

24  Authorizers who have completed the mandatory nine month training and passed their

25  three day review who do not answer SSA's 800 number aka SPIKE – the Benefit

26  Authorizer's were still not trained even though it has been more than two years since the

27  EEOC hearing, see MSPB Hearing Transcript day 1 page 205 lines 7-25 and page 206 1-

28  23 and page 217 lines 5-19 and page 218 lines 6-22 and see MSPB Hearing Transcript

day 1 page 30 lines 5-25 and page 31 lines 1-2. Had SSA management approved my request to telework five days a week I would not had to take leave and I would never have been fired for taking sick leave for being disabled see MSPB Hearing Transcript day 1 page 45 lines 20-25 and page 46 lines 1-2. In January 19, 2017 EEOC Hearing Transcript Volume 2 page 248 lines 9-25 and page 249 lines 1-25 and page 250 lines 1-13 Debby Ellis testified that Benefit Authorizers are trained to answer SSA 800 number SPIKE during the nine month training and later acknowledge that there were fully trained Benefit Authorizers who were not trained to answer SSA 800 number SPIKE during the nine month training claiming that the change in training was recent and that no matter what by spring of 2017 the Benefit Authorizers would be trained, which is a lie I was hired in 2008 and during my nine month training I was not trained to answer SSA's 800 number, answering SSA 800 number was not part of the three day test either, in fact training to answer SSA's 800  number is an additional training given to journeymen level Benefit Authorizers about two months long, Kris also testified Debby Ellis's claims were false per MSPB Hearing Transcript day 1 page 30 lines 5-25 and page 31 lines 1-2 and January 19, 2017 EEOC Hearing Transcript Volume 2 page 353 lines 3-9 and see supplementary exhibit 4 and supplementary exhibit 5 in the exhibits in My appeal to the Office of Federal Operations decision. I begged SSA management to abide by reasonable accommodations policy and provide me with an effective reasonable accommodation of telework to no avail. SSA management's refusal to approve my reasonable accommodation request for telework and chose instead to approve the reasonable accommodation of flexible leave "Liberal Leave" which forced me to take leave as an reasonable accommodation instead of an accommodation that would allow me to keep working full time, management later revoked liberal leave but continued to approve flexible leave through the EEO hearing in January 2017 and then refused to approve leave unless  I went to the building and triggered my disability, see MSPB Hearing Transcript day 1 page 205 lines 24-25 and page 206 lines 1-14 and page 227 lines 2-25 and 228 lines 1-25 and page 229 line 1. After the EEO hearing was held SSA

management started to post AWOL on my record I believe in retaliation to blacken my record unjustly to wrongfully terminate me under the pretense I was not fired for being a known disabled employee who needed an effective reasonable accommodation to return to work full time, SSA manager Carmelita River acknowledged she would have still proposed my removal even if she had posted LWOP instead of AWOL because I did not show up for work in the building but Carmelita Rivera acknowledged location of work can be an employee's home, per MSPB Hearing Transcript day 1 page 88 lines 2-5 see page 108 line 23-25 and page 109 line 1. SSA management has control over reasonable accommodations and leave approval SSA had no lawful reason for denying my reasonable accommodations request of telework especially since my first line supervisor Kris Chamrernlaksa that Kris recommended that I be approved for telework five days a week (see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. SSA management manipulated events so that I would max out my leave so that SSA could post AWOL under false pretenses as a way unjustly blacken my record so that when I was fired it would appear as though I was not fired for being a qualified disabled employee who was denied an effective reasonable accommodation to cover up the disability discrimination I endured at SSA's hands so SSA could fire me for fake AWOL charges SSA management unjustly posted to my leave record instead of LWOP. Proof the AWOL SSA put on my record were not real/fake AWOL is that I worked telework up until my last day was approved to work credit and over time while SSA posted AWOL on my record, it is also important to note that credit and over time is only given to employees in good standing and an employee who is really AWOL is not in good standing and not allowed to telework, see MSPB Hearing Transcript day 1 page 116 lines 14-25 and page 117 lines 4-25 and page 118 lines 1-4 and page 46 lines 11-25 and page 47 line 1 and page 48 lines 12-25 and page 49 lines 7-14 and see exhibit 8 in Articles and Emails. SSA knows that I am a qualified disabled employee, my performance was excellent and that because there was no undue hardship defense to explain why SSA refused to approve my reasonable accommodation request for telework, see MSPB

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 56 of 156

1    Hearing Transcript day 2 page 153 lines 16-22 and page 89 lines 11-22 and page 95 lines

2    3-19. I believed SSA management looked into other ways SSA could fabricate a reason

3    to wrongfully terminate me, AWOL was the only available option SSA management had,

4    in which SSA could abuse their authority and unjustly blacken my record my work record

5    with fake AWOL, see MSPB Hearing Transcript day 1 page 116 lines 14-25 and page

6    117 lines 4-25 and page 118 lines 1-4. SSA provided more than 20 other qualified

7    disabled Benefit Authorizers telework as a reasonable accommodation since at least 2016

8    and more than 100 Benefit Authorizers under Article 39 Work at Home by Exemption

9    since at least 2015. I believe that SSA management determined the only way they could

10   fire me was under false pretenses of being AWOL because of the stigma that comes with

11   having AWOL on your record, since SSA management can manipulate what reasonable

12   accommodations are and are not approved and what leave will and will not approve SSA

13   management had me at a disadvantage from the beginning. The only protection I had was

14   I am a qualified disabled employee who was approved the reasonable accommodation of

15   Liberal Leave, when active prevented SSA from unjustly blackening my record with

16   AWOL and because SSA acknowledges I was successfully performing my job, see

17   MSPB Hearing Transcript day 1 page 91 lines 4-6 and page 183 lines 2-6 and page 197

18   lines 4-6 and MSPB Hearing Transcript day 2 page 44 lines 8-10 and page 50 lines 12-18

19   see exhibits Articles and Emails exhibit 4 which is the SSA/AFGE National Agreement

20   Article 21 Performance which discusses how SSA managers are to grade their staff and

21   no were in Article 21 does it say that an employee who receives a "Level 3 – Successful

22   Contribution" rating would be found not to be  performing the essential functions of their

23   job and January 19, 2017 EEOC Hearing Transcript Volume 2 page 109 lines 3-16. SSA

24   management was aware I working 100% via telework once a week under the pilot

25   telework program and was not able to work in SSA's physical building due to my

26   disabilities because the building could not provide me with a fragrance and chemical free

27   environment even with the air purifier in the room my disability was still triggered, SSA

28   Medical Officer had determined SSA could not provide me with a scent free environment

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 57 of 156

in the SSA building, see MSPB Hearing Transcript day 1 Kris Chamrenlaska page 25 lines 18-25 and page 26 line 1 and lines 23-25 and page 27 lines 1-8 and MSPB Hearing Transcript day 1 James Dokko page 206 lines 13-23, page 220 lines 18-22, page 197 lines 4-25 and MSPB Hearing Transcript day 2 page 6 lines 21-25 page 7 lines 1-4 and page 130 lines 22-25 and ROI exhibit 18 page 2. I was hired as a Benefit Authorizers in August 2008 and I completed my nine month training and my three day review and became a journeyman level BA in 2010 and throughout that I was not trained to answer SSA 800 number aka SPIKE a few years past before I was trained to proving answering SSA 800 number aka SPIKE also SPIKE is about a two month training proving SPIKE is not an essential function of the Benefit Authorizers per MSPB Hearing Transcript day 1 page 4 line 16 and page 5 lines 7-11 and page 30 lines 9-25 and page 31 lines 1-2 and January 19, 2017 EEOC Hearing Transcript Volume 2 page 353 lines 3-6. Debby Ellis defines what a journeyman level employee is "By the time you are a journeyman level, you're expected to be able to do all the major duties and sustain those job duties" see January 19, 2017 EEOC Hearing Transcript Volume 2 page 65 lines 12-14. Evidence answering SSA 800 number aka SPIKE is not an essential job function is that answering the 800 number is not part of the Benefit Authorizer nine month training and is not part of the Benefit Authorizers three day test; Benefit Authorizers have to pass to move from trainee status to journeyman level and SPIKE training is only given to a Benefit Authorizer becomes a journeyman level also SPIKE is about two months of training, see MSPB Hearing Transcript day 1 Kris Chamrenlaska page 5 line 9 and page 29 lines 21-25 and page 30 lines 1-25 and page 31 lines 1-2 and see exhibit my appeal to Office of Federal Operations Decision supplementary exhibit 5 and January 19, 2017 EEOC Hearing Transcript Volume 2 page 353 lines 3-6. SSA management has complete control over whether reasonable accommodations are approved or denied and whether leave is approved or denied and whether or not SSA revokes approved reasonable accommodations without cause or explanation, throughout this entire process I have been at SSA managements mercy and although SSA knows I am a qualified disabled employee

SSA refused to allow the reasonable accommodation of telework that is available to Benefit Authorizers and would provide me with a fragrance and chemical free environment. I received successful performance appraisals while I was working 100% via telework once a week under the pilot telework program see MSPB Hearing Transcript day 2 James Dokko page 50 lines 3-16 see exhibits Articles and Emails exhibit 4 which is the SSA/AFGE National Agreement Article 21 Performance which discusses how SSA managers are to grade their staff and no were in Article 21 does it say that an employee who receives a "Level 3 – Successful Contribution" rating would be found not to be performing the essential functions of their job and January 19, 2017 EEOC Hearing Transcript Volume 2 page 109 lines 3-16. SSA management acknowledge that I was not removed from SSA because of my performance but for being out sick which SSA management considered misconduct see MSPB Hearing Transcript day 2 James Dokko page 89 lines 11-22 and MSPB Hearing Transcript day 1 Kris Chamrenlaska page 61 lines 5-25 and page 62 lines 1–2 and Carmelita Rivera acknowledges knowing I need a fragrance and chemical free environment and that the building is not a fragrance and chemical free environment and neither are other areas proving SSA's claims I could have taken a taxi, or other public transportation to and from work was a bad faith effort to make it appear it was my fault I was not working full time and not SSA's failure to approve an available effective reasonable accommodation also SSA was aware that even with the air purifier I was still unable to work in the room because of the fragrances and chemicals, see MSPB Hearing Transcript day 1 page 105 lines 5-12 page 42 lines 1-6 and MSPB Hearing Transcript day 2 page 130 lines 22-25. SSA had been provided medical documentation from my doctors that stated I needed a fragrance and chemical free environment because of my disability per MSPB Hearing Transcript day 1 Kris Chamrenlaska page 62 lines 17-25 and page 63 lines 1-9. SSA acknowledges the air quality test ordered by SSA did not provide relevant information as to where the building was healthy or safe for someone with sensitivity to environmental irritants because the test only tested for carbon dioxide, temperature and humidity and only tested for human

comfort and not health, which proves SSA misrepresented the validity of the findings of the air quality test they ordered in relation to how healthy and safe the building is to work in especially for someone who has sensitivity to environmental irritants see MSPB Hearing Transcript day 2 page 54 lines 3-8 and page 55 lines 7-10 and page 56 lines 15-20 and page 137 lines 5-11. SSA was aware that simply entering and exiting the building would put me into contact with fragrances and chemicals and that my medical documentation informed management that I needed a fragrance and chemical free environment due to my sensitivity to environmental irritants per MSPB Hearing Transcript day 1 Kris Chamrenlaska page 25 lines 18-25 and page 26 line 1.

75. December 2, 2015 I requested a reconsideration of Mireille Hanfts' November 30, 2015 denial of my Article 39 request on June 23, 2016 over six months later James Dokko denied my request because he said the article is for temporary medical conditions and I allegedly did not demonstrate a medical condition that impacted my ability to commute to work, even though my disabilities included, vertigo, migraines with aura and sensitivity to environmental irritants.

76. December 8, 2015 I was given the second laptop it was a single device set up laptop and would replace my desk top PC, it was perfectly clean and I had no issues same experience I had with the first laptop in the beginning. I had requested that I be allowed to take this laptop home with me and not leave it in the building so that I could prevent it from being contaminated like the first one was but I was initially denied. Only after this laptop was contaminated was I allowed to take it home every day.

77. January 2016 provided more medical documentation

78. January 2016 reasonable accommodation for gloves was approved because second laptop was contaminated while it was left in the building, while I was out sick.

79. February 24, 2016 Alex Urbanski the module 10 secretary sent a SKYPE communication to staff asking what we were working and doing the communication a co-worker told Alex Urbanski they was sorry for not responding sooner because he was picking up their computer because they were going to be teleworking and Alex Urbanski replied "make

sure it doesn't have acid or anything like that on it that will burn your fingers ...      " the

co-worker replied "lol... is that a new addition?" Alex Urbanski replied "that's the

comment on the timesheet this morning. i'm waiting to see when she's going to take SL

even though she's working from home..." I was overwhelmed when I saw this

communication the Module secretary was cracking jokes about my disabilities to staff he

use to do it in the module when he thought I was not listing but he apparently is so

comfortable with making fun of my disabilities and my situation he felt comfortable

enough putting it in a conversation where other staff could see him mock my disabilities.

Proof my personal medical information was being disseminated and that people were

making fun of my situation, mocking me while I suffer because Defendant would not

effectively accommodate me I spend most of the day in tears. I still cry when I think

about it because the way I have been treated I can only conclude that they no longer see

me as a person just an object to mock and ridicule for a laugh.

80. March 6, 2016 was moved from third floor conference room to fourth floor office and

given third laptop which was used and contaminated since the first day and the hallway to

the fourth floor office was engulfed in a very strong chemical odor as was the area

outside the office and the office was also engulfed in a very strong chemical odor so

strong I was unable to stay James Dokko accompanied me to the forth floor office and

allowed me to go home sick without signing in and completing the electronic timesheet

and informed my supervisors via email that he allowed me to go home sick due to the

chemical odor and he instructed me to code the electronic timesheet the next day. The

room and the laptop were contaminated since the day I received both on March 6, 2016.

81. March 22, 2016 filed formal EEOC complaint on SF-16-0264 filed request for hearing 09

2016 - pending final decision on SF-19-0294 with EEOC AJ in abidance.

82. June 27, 2016 SSA pilot telework program was expanded to phase 2 which increased

telework days from once a week to twice a week for technicians that did not SPIKE aka

answer SSA's national 800 number and the first time Benefit Authorizers would not be

allowed to telework on Mondays and management would require Benefit Authorizers to

come in on scheduled SPIKE answer SSA's national 800 number, prior to this date Benefit Authorizers telework day was not canceled we were allowed to telework and were not called in to SPIKE.

83. July 5, 2016 provided more medical documentation which states There isn't any formal system for rating the severity of environmental irritants sensitivity. Because of this, it is hard for me to say whether you have moderate or severe symptoms (because there is no definition of what moderate or sever symptoms actually means). I suppose if I were to consider the degree that this is affecting your life, the I would rate it as severe. However, if the definition of severe has to include multiple hospitalizations or a history of intubation, then you would not fit that criteria. Hence you can see the difficulty. I have not performed allergy skin prick  test for you on perfumes or any chemicals. My reasoning are as follows – allergy skin prick test only detects IgE-mediated allergy reactions and would not detect hypersensitivity or irritant reactions to environmental irritants. Also, I do not consider it safe to perform skin prick test on relatively toxic chemicals, such as bleach or household cleaners.

84. August 5, 2016 Email to Steve Breen asking him to reconsider the reasonable accommodations denial and take into account SSA policy "Reasonable Accommodation Requests Involving Fragrance Sensitivity" before he makes is decision. He still denied my reasonable accommodations request.

85. September 2016 more medical documentation 2 provided in other needs and restrictions it states I am unable to drive, but I could work from home and an FMLA form

86. October 12, 2016 James Dokko called me to tell me that the mediated agreement would be terminated effective immediately and that he was revoking the approved reasonable accommodation of Liberal leave. I asked who made the decision and he did not answer and I asked who I could appeal to and he did not answer. I asked about what was going on with my reasonable accommodations request to telework full time and a new laptop because the laptop I was given on March 2016 was used and contaminated and due to my disabilities sensitivity to environmental irritants, migraines with aura, I am unable to

commute to the building either by driving or other forms of transportation and the building is fragrance and chemical free, the request was submitted to my first line Jennifer Stonebreaker on September 11, 2016 she sent it to James Dokko and he sent the request to Carmelita Rivera because James Dokko said Carmelita had to approve my request at her level first then she needed to send it to him. Carmelita River sent it back to James Dokko for processing and on October 12, 2016 James Dokko was finally getting ready to send the request to Grace Kim the Regional Commissioner of SSA. The unnecessary delay of sending my reasonable accommodations request back and forth wrongfully delayed me from receiving a desperately needed reasonable accommodations and against reasonable accommodations policy which requires a reasonable accommodation request to be processed within 30 days and if it is going to take longer Defendant is required to notify employee, the only reason I found out was because I kept on asking what was taking so long. Defendant violated reasonable accommodations policy by revoking an approved reasonable accommodation that was still needed and failing to replace it with another reasonable accommodation that is as effective or more effective. I submitted another reasonable accommodations request because James Dokko told me I had to in order for my reasonable accommodations request made September 11, 2016 processed.

87. October 14, 2016 I sent an email to EEOC AJ about James Dokko revoking the approved reasonable accommodation, revoking the agreement and refusing to allow me union representation when James Dokko changed reasonable accommodations and changed working conditions. I am writing to inform you that my Operations Manager James Dokko informed me (via telephone call) effective October 12, 2016 the Agency would no longer honor the approved reasonable accommodation of "liberal leave" which was also listed in the mediated agreement August 26, 2015 and there was no end date. He refused to tell me what had caused the change and who made that decision. He told me that I would be subject to regular leave policy and that once I have exceeded the allowed LWOP under FMLA that management was with in their right to refuse to approve LWOP

1    as it is their right to approve or deny it and charge me with AWOL. I told him that by

2    charging me with AWOL the Agency would eventually use it to punish me, but he told

3    me that it would not and that AWOL is the same as LWOP both under FMLA and not

4    under FMLA. I told him that was not true because if it was then management would have

5    no issue with continuing to grant me LWOP both under FMLA and not under FMLA. I

6    would like it noted that when he asked me to have the telephone meeting with him on

7    October 12, 2016 I requested that my union representative be on the call but he declined

8    because he said that the conversation would not involve disciplinary issues and that he

9    would not be discussing changed to reasonable accommodations and a change to my

10   current working situation.  This was an obvious lie since he told me he was removing my

11   reasonable accommodation of "liberal leave".  I explained to Mr. Dokko that I wanted my

12   union representative on the line because I wanted to have someone that has a working

13   knowledge of policies so that I would be protected from basically more misinformation.

14   Mr. Dokko still refused to permit me to have my union representative present, even

15   though it had been allowed before. I told him that "liberal leave" was an approved

16   reasonable accommodation and that I wanted to know who made the decision to

17   terminate the approved reasonable accommodation and why all of a sudden it is being

18   taken away. He refused to say more than it was a temporary accommodation and that he

19   was going to send an email to my first and second line managers that I would no longer

20   have "liberal leave" as a reasonable accommodation and be subject to regular leave

21   policy which he said would require that I provide additional medical documentation,

22   under the "liberal leave" I was not required to provide additional medical documentation.

23   I would like it noted that on the request for Summary Judgment document that the

24   Agency submitted has "liberal leave" listed as one of the approved reasonable

25   accommodations see page 19 listed under the "STATEMENT OF MATERIAL

26   UNDISPUTED FACTS" as fact number 88. Please also see Mr. Dokko's affidavit

27   document labeled "James Dokko Decl. for MSJ.PDF" page 3 number 10 a where he

28   states "10. Beginning on July 16, 2015 through the present, management a. Provides Ms.

Tom with liberal leave as an accommodation for her allergies, and does not require her to provide medical documentation for same day sick leave requests" and Defendant's written update to EEOC AJ dated November 30, 2015 that stated "In addition to the accommodations described above, management has provided Ms. Tom with liberal leave usage[1]; an adjusted workload[2]; and earlier expanded telework.[3]" and foot notes "[1]Ms. Tom is not asked to provide management with a doctor's note when she cannot report or remain at work due to her medical condition. [2]Ms. Tom has been temporarily relieved of the SPIKE workload pending the appropriate wiring of her office space. [3]Management allowed Ms. Tom to take advantage of the expanded telework pilot program before the rest of her module." The Defendant proved again that they do not honor their agreements and that they are willing to deceive Honorable Judge Virginia Mellema MaGee by only allowing an approved reasonable accommodation to last long enough for it to be true when they filled a request for summary judgment but then take it away once they feel it is safe to do so. It appears that their sole intent is to deceive the court and cause me unwarranted mental distress the August 26, 2015 agreement was made to alleviate distress I am already under physical and emotional stress. What Mr. Dokko is doing is the exact opposite he is now negating the Agency's mediated agreement August 26, 2015 and previously approved reasonable accommodations it appears James Dokko is going out if his way to distress me. I am not sure what their end game is, by change everything on a whim and denying me my right to representation always trying to make me appear uncooperative and management who is not disabled is allowed to working from home James Dokko is allowed to work from home twice a week and so was my former first line supervisor. My second line supervisor has been allowed to work from home full time for at least a month now due to a temporary condition. This is unjustifiable harassment refusing to allow me a union rep who could witness to their under handed maneuvering and refusing to provide me with any information related to their decision hiding behind their authority not having to do so. I don't know their end game and they are causing me stress. If their sole reason is to cause me distress they are experts. The other thing they

1    are very good at is violating my right to representation while they are disciplining me and

2    calling is something else point in fact they are threatening me with AWOL claiming it

3    will not cause issues including disciplinary actions including firing me. This is just like

4    the situation when I was allowed to sit on the 2nd floor and then all of a sudden

5    management decided on a whim that I was not disabled in their eyes and was forced to

6    return to my unit and contaminated cubical (even though they have no medical

7    background and I was being removed because they said my fan was causing another

8    employee's disability to be aggravated – total discrimination and a double standard for all

9    other employees vs me). Unfortunately the Agency is constantly making up policy's

10   apparently just for me and refuse to provide justification and information related to the

11   policy. They also change things as they go along and refused to allow me to have my

12   union representative present when they are discussing changes with me down playing by

13   saying we are not discussing issues that could or would relate to disciplinary actions but

14   the result of that they have to say does end up involving disciplinary actions and the

15   conversations include things that are not right and are changing and making up policy. I

16   was also told that they were shuffling my article 39 Work at home by exemption

17   paperwork between my first, second and third line manager for a month before they

18   contacted me for more information so that they could then send it to the Regional

19   Commissioner for a final decision. I am unfortunately at their mercy and they are taking

20   full advantage of their power over me. They continue to abuse their authority and deny

21   me my rights per "the agreement" August 26, 2015 approved by the Agency's attorneys

22   and myself. Please also see the email form Ms. Tina Saladino dated November 30, 2015

23   titled "Tom v. SSA, EEOC No. 550-2015-00204x – Settlement Update" document

24   labeled "Jennifer Tom – Update Email 11 30 15.PDF" page2 paragraph 5 "In addition to

25   the accommodations described above, management has provided Ms. Tom with liberal

26   leave usage …" That email was also sent with the intent to deceive the court to believe

27   that the case had been resolved which was not and unfortunately is still not true. I wanted

28   to let Honorable Judge Virginia Mellema MaGee  know that they are now taking away

1    reasonable accommodations they have started with "liberal leave" and allowing me the

2    right to union representation.

3    88. October 2016 more medical documentation FMLA leave due to illness

4    89. October 31, 2016 EEOC AJ decided that there were two issues she felt needed live

5    testimony (1) my credibility because SSA has two defenses either I do not have a

6    disabling condition or if I am disabled they don't believe there is evidence that says the

7    accommodations provided are not effective. EEOC AJ puts it "In other words, according

8    to the Agency, Ms. Tom is either imagining her symptoms or is fabricating them." (2)

9    Undue Hardship EEOC AJ "If Complainant is credible and her symptoms are genuine,

10    then the current accommodations are not working, and the Agency must consider full-

11    time teleworking. To justify not allowing Complainant to telework full-time, the Agency

12    must demonstrate undue hardship. In its MSJ, SSA did not address the undue hardship of

13    full-time telework because the Agency contends the other accommodations provide are

14    effective." see exhibit Communications with EEOC AJ and Agency Counsel, me, my

15    Counsel for EEO case – exhibit 15. SSA management acknowledges there is no undue

16    hardship for SSA to have approved me for telework full time as a reasonable

17    accommodation or for SSA to provide me with a clean laptop like they did the first two

18    times I was given laptops the first in 2014 and the second in 2015 were clean and I had

19    no problem working on them but that SSA did not take the same steps with the third

20    laptop they did with the first two, to make sure that third laptop I was given was handled

21    by the one SYSCO – technical support staffer who is known to be fragrance and chemical

22    free to ensure that the third laptop was not contaminated during the first phase of imaging

23    the laptop and not contaminated while it was "rebox" and left sitting in an unsecure area

24    in the building for weeks to months before it was selected and imaged for the second time

25    and given to me, per MSPB Hearing Transcript day 2 page 153 lines 16-22 and see

26    MSPB Hearing Transcript day 2 page 74 lines 1-2 and 18-23 and page 76 lines 20-25 and

27    see January 19, 2017 EEOC Hearing Transcript Volume 2 page 321 lines 24-25 and page

28    322 lines 1-25 and page 323 lines 1-20 and MSPB Hearing Transcript day 2 page 68 lines

3-19 and page 69 lines 14-22 and page 70 lines 1-21 and page 71 lines 11-20 and page 72 lines 14-21 and page 73 lines 6-9 and lines 15-25

90. November 28, 2016 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

91. December 05, 2016 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

92. December 2016 provided more medical documentation 2 total, one states Jennifer Tom is under my care for migraines with aura. Ms. Tom reports having certain scent being triggers for her migraines. Scents being triggers of migraines is a phenomenon well documented in the literature. The other is a work status report

93. January 2017 Defendant manager Debby Ellis acknowledges that if an employee is not performing the essential functions of their job they would not be allowed to participate in the pilot telework project and that if a reasonable accommodations is above $100 dollars the reasonable accommodation would have to be approved by Civil Rights and Equal Opportunity and would have included a finding of the employee being a qualified disabled employee. Debby Ellis also notes that the Benefit Authorizer job is one of the hardest jobs within SSA and has a nine (9) month training program.

> Q. Would they be put on a performance improvement plan? Or what would the opportunity be if you can no longer do an essential function and we're going to give you, you know, a chance to improve, are you allowed to telework during that time period?
> A. Because **we're still under pilot, you have to be in good standing to be able to telework. If you are on any type of leave restriction or have any disciplinary action, you cannot telework; you'd be removed from telework.** But we do offer performance assistance if you need training. If you need to be retrained so you can do the essential functions of your job, we would help you with that. (bolded for emphasis)
> EEOC hearing transcript Vol. 2, pg. 295:3-16
> JUDGE MAGEE: Well, let me ask you this: We've had testimony that Complainant's second-line supervisor told a lower-level supervisor to walk Complainant around and try and find her a cubicle. And we've had testimony that she was offered an office and that she was offered an **air purifier.** Would it be your understanding that the medical officer had already said she is a qualified individual with a disability for that to happen? (bolded for emphasis)

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 68 of 156

THE WITNESS: That would be the general assumption, but I never saw a medical officer's

EEOC hearing transcript Vol. 2 page 289:15-25

Q. Who makes the determination of how much -- like what's -- how much you can spend on an accommodation, financially?

A. I'm not aware that there is a finance limitation for providing reasonable accommodation, but depending upon what you are -- what my delegated authority, somebody else's delegated authority would be, **traditionally** what happens is, if it's a reasonable accommodation under a $100, I fund it from my budget. **And then depending on if it's over $100, it goes to headquarters if it's equipment,** or if it's services, our CREO office oftentimes will provide it. They'll provide it only if it's just a couple of hundred. **But some things are term designated to go to headquarters to fund. They have the budget. We have a centralized office of Civil Rights and Equal Opportunity has the reasonable accommodation organization under it.** (bolded for emphasis)

EEOC hearing transcript Vol. 2 page 285:1-10

**And the benefit authorizer position is probably the most complex position within the entire Agency.** We have nine months of classroom training, and then it's on-the-job training, because they're dealing with complex issues and calculations. (bolded for emphasis)

EEOC hearing transcript Vol 2 page 242:12-16

Defendant's manager James Dokko testified that I was approved an air purifier as a reasonable accommodation provided by Civil Rights and Equal Opportunity. James Dokko testifies that he was informed by union representative of the fragrances I encountered, James Dokko notes that he also detected some of the scents but not all. James Dokko also admits that the laptop I received last was part of large batch of laptops being imaged to convert the Payment Center from desktop PC's to single device laptop set up. James Dokko also explains there is no way for one to know who handled the laptop during the first phase and how long it was left in the elements of the building which is not fragrance and chemical free.

Q. Okay. And **so who determined whether or not Ms. Tom could get an air purifier**? Who made the (bolded for emphasis)

EEOC hearing transcript Vol.2 page 335:24-25

determination she could get one?

A. **I worked with our Civil Rights and Equal Opportunity staff.** (bolded for emphasis)

Q. And who specifically did you work with?

A. Probably the whole staff. It may have been Gina Portillo, but I work with the whole CREO staff.

EEOC hearing transcript Vol.2 page 336:1-6

Q. Okay. So when will be the last resort?

1

2

A. After I've exhausted all different options. Currently, the room that she has, she actually

hasn't tried out that room **ever since we installed a lock in the room**. The first day I gave her the key -- well, I did not give her the key directly. Her first-line supervisor, I knew he was coming in. He provided her with a key, a key to the room. And since that time, she has not reported to

3

4

5

the building, so she actually hasn't tried that exact room with a lock. (bolded for emphasis)

6

JUDGE MAGEE: What floor is that on?

7

THE WITNESS: The fourth floor.

EEOC hearing transcript Vol 2 page 338:4-16

8

Q. Okay. Has Mr. Pineda ever -- does Mr. -- has Mr. Pineda ever come to you, when he was still working there, did he ever come to you and say he detected a fragrance smell in Ms. Tom's area?

9

10

A. He may have. It's been a while since I actually spoke with Mr. Pineda in regards to this. I know Ms. Tom has reported scents. I've smelled

11

EEOC hearing transcript Vol 2, pg.349:19-25

12

some of the scents that she has reported, not all.

EEOC hearing transcript Vol 2, pg.350:1

13

THE WITNESS: There's two phases of setting up our laptops. So we get a brand-new box, brand-new laptop, then our sysco staff could do the **first phase of imaging, basically putting on the generic Social Security profiles on the laptop, and they would rebox up** the laptop. Now, once a laptop is to be reassigned to an employee, a sysco -- so the sysco that I asked to do it is a non-cologne-wearing sysco which Ms. Tom has worked with and has asked, you know, to do the imaging piece of it. And so the second installation was done by someone who does not wear cologne or perfume. (bolded for emphasis)

14

15

16

17

18

19

JUDGE MAGEE: **Okay. So someone does the first installation?** (bolded for emphasis)

20

THE WITNESS: **Yes.** (bolded for emphasis)

21

JUDGE MAGEE: **Do you have any idea who that** (bolded for emphasis)

EEOC hearing transcript Vol. 2, pg.322 ;9-25

22

**person was?** (bolded for emphasis)

23

THE WITNESS: **No. So, basically, the entire staff, we have thousands** -- we have approximately a thousand employees. We have a thousand laptops. And so **I'm not sure exactly how many syscos we have, but all of them would do the first** set of imaging for the laptop. (bolded for emphasis)

24

25

JUDGE MAGEE: Okay. And then for the second set, you know it was someone that Ms. Tom would be okay with?

26

THE WITNESS: Yes.

27

JUDGE MAGEE: Okay.

28

BY MS. SALADINO:

Q. **And do you know how much time passes between the first setup and the second setup?** (bolded for emphasis)

A. Well, for that -- for the first SDS laptop I provided Ms. Tom, that was during the initial phase, **so it probably would have been at most a couple of weeks, maybe a month.** (bolded for emphasis)

Q. Sorry. Let me rephrase the question. So when you were talking about the syscos, do you know how much time elapses between the first sysco putting the program on to the laptop until the second sysco –

EEOC hearing transcript Vol. 2, pg.323;1-25

A. I wouldn't be able to tell you that time.

EEOC hearing transcript Vol. 2, pg. 324;1

Q. Okay. You testified that the second person -- the sysco person, you don't know who did it, but who worked the laptop when they -- there's two stages to the laptop. And you said the second stage -- you testified the second stage, the person is perfume free, fragrance free; is that correct? Or that Ms. Tom approved that he was fragrance free and odor flee -- fragrance or chemical free.

A. Yes. The person who did the second phase of both the last two laptops I provided Ms. Tom, the same sysco performed the imaging of those two laptops, yes.

Q. Who would determine -- **could you ask for the first person to refrain from using chemicals or fragrance and, like, wearing gloves or something?** (bolded for emphasis)

A. **You know, as management, we could always request someone to wear gloves.**

Currently, all of our laptops in the Western Program Service Center has gone through the

first phase, and so right now there's no way to know who imaged the first phase of any of the laptops. (bolded for emphasis)

EEOC hearing transcript Vol. 2; pg. 355;4-24

Defendant's manager James Ekeroma testifies to seeing my disability triggered while being in the building and the fact that he was aware of co-workers spraying perfume around my area.

Q. And in the course of you guys walking around, did Ms. Tom ever get sick?

A. Yeah. Yeah, I do recall one time we were on a floor -- I think it was the fourth floor. We were on a floor, and she wasn't feeling well. I had to take Ms. Tom outside to get some air.

Q. Okay. So how long did you guys go outside?

A. Ten minutes, I think. I could be off on time. It was quite a while, but we stood out there

EEOC hearing transcript Vol. 2, pg. 200;17-25

until she was comfortable to walk back into the building.

Q. Do you recall, was she upset?

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 71 of 156

A. Yeah, if I remember correctly, she just needed to come outside. I think it was starting to interfere with her respiratory.

Q. So she was having trouble breathing?

A. She was telling me that, so I felt it was the best course of action to go outside.

Q. So where did you guys go afterwards? After she felt better, did you go back into the building?

A. Yeah, we definitely came back into the building. Memory gets me here. I think I probably went upstairs and reported to Miri about the happenings.

EEOC hearing transcript Vol. 2, pg. 201;1-15

Q. Yes. When Miri -- Ms. Hanft was your first-line supervisor and you were working in that same area, **were there employees who sprayed perfume**? (bolded for emphasis)

A. It wasn't something I was aware of a lot, **but these were -- it was there, yeah**. (bolded for emphasis)

EEOC hearing transcript Vol. 2 page 206:13-17

My union representative testifies to their witnessing my disabilities being triggered while being in the building and that there was an incident where the chemicals in my area was so strong that it effected them and they had to leave work sick as well they noted it was not an isolated incident.

Q. Have you ever witnessed Ms. Tom -- Tom's reaction to a strong fragrance?

A. Yes, she had some visual -- it was visual. She was red, beet red; her breath, having a tough time breathing. She was -- you can just tell that she wasn't herself. She -- in our discussions I asked her what's wrong. She just said, I got to go down to the doctor, I got to -- you know...

EEOC hearing transcript Vol. 2, pg. 368:17-25

And so at times she would just be curt, not being able to discuss what was going on, but had to get out in order to take care of what was ailing her.

Q. And how many times approximately did you witness Ms. Tom having a reaction to fragrance?

A. Two on the fifth floor, two times on the fifth floor, because I had -- I had had some kind of reaction myself. And then once when I was -- when I had taken lunch, went off the building and I came back in and she was on her way out, she was just flush with -- you know, not -- looking like she was about to pass out.

EEOC hearing transcript Vol 2, pg. 369:1-25

Q. Did you ever experience a strong smell in Ms. Tom's work area?

A. Yes. It was -- as a matter of fact, it almost -- I was overcome by this -- by this smell. I got sick. I almost passed out. I had to return to my area and ask my -- my manager that I was going to go home. I just was overcome by this chemical issue. And it's not the first time.

EEOC hearing transcript Vol 2, pg. 365:18-25

It is clear based on the evidence above management is already aware I am a qualified disabled employee. And that the RA's management as provided me with RA have proven

to be ineffective as none of them provided me with a chemical or fragrance free environment and enabled me to return to work full time and enjoy the same benefits and privileges as non-disabled coworkers.

94. January 09, 2017 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

95. January 20, 2017 filed formal EEOC complaint on SF-17-0039 filed request for hearing 06 2017 - pending final decision on filed formal EEOC complaint on SF-19-0294 with EEOC AJ in abidance.

96. January 23, 2017 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

97. February 2017 provided more medical documentation diagnosis vertiginous syndrome

98. February 21, 2017 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

99. March 2017 provided more medical documentation 2 documents diagnosis vertiginous syndrome one states other needs and or restrictions unsafe to drive due to vertigo

100.    April 03, 2017 filed formal EEOC complaint on SF-17-0411 filed request for hearing 04 2018 - pending final decision on filed formal EEOC complaint on SF-19-0294 with EEOC AJ in abidance

101.    April 7, 2017 EEOC AJ rendered an flawed a decision that found I had not proven I was a qualified disabled individual with a disability and because of that EEOC AJ did not find a violation of the Rehabilitation Act on either my harassment of failure to accommodation claims. EEOC AJ was also wrong when she claimed I did not respond to SSA's Statement of Material Undisputed Facts see supplemental exhibit 8 under My appeal to the Office of Federal Operations Decision in- Appellant Brief in Support of Appeal. EEOC AJ errored in not giving proper weight to the fact I received successful performance appraisals and that I was working 100% via telework once a week under the pilot telework program since July 26, 2017 and not as a reasonable accommodation, SSA acknowledges that I was teleworking because of the pilot telework program and not as a

reasonable accommodation per MSPB Hearing Transcript day 2 page 162 lines 3-4. EEOC AJ errored in giving less credit to my treating physicians Dr. Young who I was referred to after being seen by the two emergency room doctors, the two emergency room doctors are the only doctors whom I saw that claim my condition have psychological component and suggested a multidisciplinary intervention the second doctor who claimed I had anxiety do not have psychological degrees and neither of them called for a consult for a doctor who is trained in diagnosing mental health conditions before making their snap judgements and neither of the emergency room doctors spent at most 2 minutes with me, both emergency room doctors referred me back to my treating physician Dr. Young who specializes in allergies and neither emergency room doctor ever referred me to mental health. It is also important to note that the first doctor did note a mild reaction what he fails to note is how long I was in contact with the fragrances and chemicals it was no more than a few minutes and I saw him hours after the initial contact so by the time I saw him I was partially recovered, the second emergency room doctor I saw over five hours since I was exposed to fragrances and chemicals and management was still demanding I provide medical documentation so that my leave would be approved. I went to my treating physician Dr. Young who specializes in allergies after both emergency room doctors named in EEOC AJ decision referred me to him to confirm his original diagnosis and both times Dr. Young reaffirmed his diagnosis and did not refer me to mental health. EEOC AJ erred in finding more credibility with the two emergency room doctors who don't specialize in allergies or psychology  diagnosis that my condition has a psychological component and not finding my treating physical Dr. Young who specialize in allergies and did not find my condition was psychological, had he, Dr. Young would have referred me to mental health, which he never did. Dr. Young re affirmed his diagnosis of my disability  in doctors letter after both visits in which he affirmed the treatment of my disability sensitivity to environmental irritants is avoidance see exhibit Medical Documents pages 31-32,36,42,43,45,46,48,52 and 68-87. EEOC AJ also errored in claiming that I did not get sick during the hearing please see the exhibit "Appellant's

Brief in Support of Appeal" for the full appeal against EEOC AJ decision. I would like it noted that when I got to the hearing building I went straight through to the hearing room and did not leave the hearing room with the exception of a handful of times during the two day hearing to go to the restroom and when we left to go home, also that I was covered from head to foot and wore a mask, scarf that covered everything but my hands and eyes. EEOC AJ did not note I spent the breaks in the hearing room the one room in building that had not been cleaned with chemicals per the EEOC AJ orders and the hallway connecting to the hearing room was not as well traveled as clamed and defiantly not like the hallways in the SSA building. EEOC AJ never asked how I was doing had she I would have told her I was sick and I was having a hard time following the hearing and by the end of each day even though I did not leave the hearing room with the exception of when I went to the restroom, I was sick from exposure to the fragrances in the restroom and that I was starving and was extremely weak from not being able to eat or drink all day. EEOC AJ errored in claiming it was not possible for SSA to provide me with a clean laptop which is not true I received three laptops the first two laptops were clean and not contaminated until they were contaminated while left in the building, however the third laptop was contaminated since the first day, it is important to note that SSA acknowledge that the first two laptops were initially not an issue, SSA also acknowledged it would not be an undue hardship on SSA to buy a new laptop and have it imaged by the one employee who is known to be fragrance and chemical free, see MSPB Hearing Transcript day 1 James Dokko page 163 lines 11-18 and MSPB Hearing Transcript day 2 James Dokko page 68 lines 3-19 and page 69 line 18-22 and page 70 lines 1-21 and page 73 lines 3-25 page 74 lines 1-3 and lines 18-22, see hearing testimony see January 19, 2017 EEOC Hearing Transcript Volume 2 James Dokko page 320 lines 2-16 and page 321 lines 1-10 and lines 19-25 and page 322 lines 1-25 and page 323 lines 1-25 and see exhibit table of contents of exhibits not in ROI that are referenced in exhibit 2 that shows I started pilot telework in 2014 and see exhibit table of contents of exhibits not in ROI that are referenced in exhibit 1 page 5 #26. EEOC AJ made a medical

determination she determined that if I do have an anxiety disorder if I received treatment for anxiety I might get better, which is contradictory to what my treating physician Dr. Young who has a degree to treat people with my disability who has stated that the treatment for my condition "Primary treatment for this condition is avoidance rather than medications." Written July 7, 2015 after the two emergency room doctor's visits, see page 46 of exhibit Medical Documents. EEOC AJ errored in giving more weight to Debby Ellis's statements answering SSA 800 number aka SPIKE is an essential job function based on Debby Ellis's testimony that SPIKE training was part of the nine month training Benefit Authorizers even though right after Debby Ellis's testimony she acknowledged there were fully trained/journeyman level Benefit Authorizers who completed the nine month training were not SPIKE trained see January 19, 2017 EEOC Hearing Transcript Volume 2 page 248 lines 9-25 and page 249 lines 1-25 and page 250 lines1-13 and page 251 lines 12-14 and MSPB Hearing Transcript day 1 page 30 lines 5-25 and page 31 lines 1-2. EEOC AJ also heard testimony that SPIKE training is about two months so it would be impossible for SPIKE training to have been included in the nine month training, see January 19, 2017 EEOC Hearing Transcript Volume 2 page 353 lines 3-6 and MSPB Hearing Transcript day 1 page 30 lines 5-25 and page 31 lines 1-2 and supplemental exhibit 5 in My appeal to the Office of Federal Operations Decision, a pamphlet and a video that was not presented was sufficient evidence to prove answering SSA 800 number aka SPIKE is an essential job function. EEOC AJ ignored the fact Debby Ellis acknowledged that she lied when she claimed that answering the answering SSA 800 number aka SPIKE was part of the Benefit Authorizers nine month training she was caught in the lie at the hearing see January 19, 2017 EEOC Hearing Transcript Volume 2 page 248 lines 9-25 and page 249 lines 1-25 and page 250 lines 1-13. EEOC AJ overlooked Debby Ellis lie and still found Debby Ellis's testimony was worth more weight than my testimony that Benefit Authorizers don't learn to answer SSA's 800 number aka SPIKE during the nine month Benefit Authorizers training and that only after a Benefit Authorizer becomes a journeyman level employee does SSA give a Benefit

Authorizer SPIKE training see January 18, 2017 EEOC Hearing Transcript Volume 1 page 28 lines 1-22 and Kris Chamremlaksa also acknowledges that Benefit Authorizers do not receive training to answer SSA's 800 number aka SPIKE until after they become journeyman level and that there are still Benefit Authorizers who were journeyman level that were still not SPIKE trained even though Debby testified in January 19, 2017 on page 250 lines 9-13 that by spring 2017 all the journeyman level Benefit Authorizers would be trained, see MSPB Hearing Transcript day 1 page 5 line 9 and page 30 lines 5-25 and page 31 lines 1-2 and see supplementary exhibit 4 and supplementary exhibit 5 in the exhibits in My appeal to the Office of Federal Operations decision showing that answering SSA 800 number aka SPIKE is not part of the nine month training and only after a Benefit Authorizer reaches journeyman level status does SSA train Benefit Authorizers to answering SSA 800 number aka SPIKE. EEOC AJ errored in claiming that James Dokko went beyond his legal requirement and excused me from SPIKE and that because I was trained to SPIKE I could not be excused, it is important to note that SSA Counsel agreed to excuse me from SPIKE in our mediated agreement also because Debby Ellis acknowledges that module managers decide who SPIKE's or does not SPIKE, further evidence that SPIKE is not an essential function of the job because SSA management can decide who does and does not SPIKE, see January 19, 2017 EEOC Hearing Transcript Volume 2 page 300 lines 8-25 and page 301 lines 1-3 and supplemental exhibit 6 page 6 in exhibit My appeal to the Office of Federal Operations Decision in – Appellant Brief in Support of Appeal. It is important to noted that James Dokko acknowledges that he never explored where or not it was possible for a Benefit Authorizer to telework full time as a reasonable accommodation or if other Benefit Authorizer were allowed to telework fill time he did not think it was relevant to find out before making his recommendation to deny my requests for telework, see MSPB Hearing Transcript day 2 page 20 lines 20-25 and page 21 lines 1-3 and page 204 lines 17-25 and page 205 lines 1-23. Debby Ellis later acknowledged that Benefit Authorizers could telework full time and there was no way for SSA to isolated air I received air from

outside the building's recirculated air system, it's important to note that Debby Ellis acknowledged that even with the air purifier the room I was still having issues with fragrances and chemicals proving even with the air purifier the room was not fragrance and chemical free, see page MSPB Hearing Transcript day 2 page 130 lines 22-25. The air quality tests were not testing to see if the air was safe for my disability or any employees disability, Debby Ellis testified "It's not specific to any particular person within either an autoimmune system or any type of sensitivity. I don't think it's geared to that. I would -- I would agree with you." see MSPB Hearing Transcript day 2 page 130 lines 2-25 and page 131 lines 1-25 and page 132 lines 1-25 and page 133 lines 1-25 (uses in conjunction with Medical Document exhibit page 48) and page 134 lines 1-25 and page 135 lines 1-25 and page 136 lines 1-25 and page 137 lines 1-11 and page 121 lines 10-14 and page 122 lines 2-15 and page 124 lines 2-5; 15-25 and page 125 lines 1-17 and page lines 1-13 and page 127 lines 1-13 and page 128 lines 13-25 and page 129 lines 1-25. My disabilities had gotten worst because SSA continued to refused to provide me with the reasonable accommodation of telework because SSA decided a mask (that only covers my mouth and nose), air purifier and leave approval was an effective reasonable accommodation, SSA acknowledges "I see that Dr. Young has indicated, you know, irritant effects to nose, eyes." SSA did not take any action to protect my eyes, Debby Ellis acknowledges that since 2014 the disabilities I needed to be effectively accommodated increased to include vertigo, migraines with aura and sensitivity to environmental irritants, see MSPB Hearing Transcript day 2  page 141 lines 5-6 and page 142 lines 1-19. Debby Ellis acknowledges that SSA is responsible for provide a reasonable accommodation to all known physical and mental limitations of a medical condition but she states "So we're not obligated to do anything and everything. We have to do what's reasonable and effective to remove the barriers so that an employee can do their job." The evidence proves the reasonable accommodations SSA provided me did not enabled me to return to work full time, SSA provided me with reasonable accommodations that allowed me to take leave which is not an effective accommodation,

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 78 of 156

see MSPB Hearing Transcript day 1 page 205 lines 24-25 and page 206 lines 1-12 and page 227 lines 2-25 and 228 lines 1-25 and page 229 line 1. SSA acknowledges that I received successful performance appraisals it is important to note that since August 2016 through my termination August 2018 I worked 100% via telework once a week under the pilot telework program, I asked Debby Ellis if I was allowed to try telework as a reasonable accommodation it would have enabled SSA to determine if it was an effective reasonable accommodation and she stated that SSA would not test the viability of a reasonable accommodation if the accommodation was of site "We don't -- we don't normally, you know, kind of test a reason -- we test if it's on site if it's reasonable and effective, but we don't say, let's go test this and then test that and then test this." MSPB Hearing Transcript day 2 page 142 lines 20-25 and page 143 lines 1-18 and see exhibit 9 in "Table of Contents of Exhibits not in ROI that are referenced in". Debby Ellis acknowledges that SSA occupied buildings would not be able to provide me with a fragrance and chemical free environment and she dodges answering my question as to the fact I would be more able to avoid chemicals and fragrances in my own home than in any SSA occupied place see MSPB Hearing Transcript day 2 page 144 lines 2-16. Debby Ellis testifies that SSA would not have suffered a hardship if they approved me the reasonable accommodation of telework "I don't know what true hardship the agency would have suffered." MSPB Hearing Transcript day 2 page 153 lines 16-22. Debby Ellis acknowledges that SSA has approved Benefit Authorizers with full time telework five days a week and that the Benefit Authorizers who were approved for full time telework were not required to SPIKE and were allowed to telework on SPIKE days see MSPB Hearing Transcript day 2 page 153 lines 23-25 and page 154 lines 1-25 and page 155 lines 1-25 and page 156 line 1. Debby Ellis lied when she claimed that Benefit Authorizers approved for Article 39 Work At Home by Exemption were not required to perform the essential functions of their job, Article 39 Work At Home by Exemption does not excuse employees from performing the essential functions of their job. Debby Ellis is incorrect in claiming that approval for Reasonable Accommodations of telework

differs from Article 39, because Article 39 approval excuses an employee from performing the essential functions of their job; see Article 39 in supplemental exhibit 7 under exhibit Opposition to Agency's Motion for Summary Judgement and  MSPB Hearing Transcript day 2 page 156 lines 2-25 and page 157 lines 1-3. James Dokko testified that no one at SSA has the authority to excuse an employee from performing the essential functions of their job, proving approval for Article 39 does not excuse an employee from performing the essential functions of their job, see January 19, 2017 EEOC Hearing Transcript Volume 2  page 356 lines 8-14. Debby Ellis acknowledges that module managers decide who does and does not SPIKE, further proof that SPIKE is not an essential function of the job if managers can decide who does and does not SPIKE it cannot be deemed essential if the work can be transferred to other staff, see January 19, 2017 EEOC Hearing Transcript Volume 2 MSPB Hearing Transcript day 2 page 153 lines 18-25 and page 300 lines 8-25 and page 301 lines 1-3 also see exhibits 2-4 in "Table of Contents of Exhibits not in ROI that are referenced in" and ROI exhibit 22 page 6 of 12 top of page talks about job restructuring the fact Debby Ellis states "...But just to clarify, that doesn't mean that a benefit authorizer or a customer service rep has to be on the phone the whole eight hours of a level 1 day. The manager decides at the module level, at the individual module level, the workload balancing." January 19, 2017 EEOC Hearing Transcript Volume 2 page 300 lines 12-17 And "... it's up to our individual managers." January 19, 2017 EEOC Hearing Transcript Volume 2 page 301 line 1, shows that module managers have the authority to select who does and does not SPIKE and further evidence James Dokko was well within his authority to excuse me from SPIKE, see exhibits 2-4 "Table of Contents of Exhibits not in ROI that are referenced in". Debby Ellis acknowledges that SSA could approve a Benefit Authorizer the reasonable accommodation of full-time telework and that there is enough Benefit Authorizer work that would enable a Benefit Authorizer to work full time she acknowledges that Benefit Authorizers were excused from SPIKE under Article 39 she also acknowledges that SSA uses the same reasonable accommodations policy throughout SSA, see MSPB Hearing

1    Transcript day 2 page 157 lines 4-7 and lines 16-25 and page 158 lines 1-17. Debby Ellis

2    acknowledges that SSA has the same reasonable accommodation (RA) policy "The RA

3    policy is -- is national. It came out from central office, so we don't have regional-specific

4    policies. So the answer is, yes, we all share the same, you know, written policy and

5    guidance.",  she also acknowledges that documents provided by SSA's Counsel show that

6    SSA has approved Benefit Authorizers the Reasonable Accommodation of telework full

7    time and that the Benefit Authorizers were able to perform the essential functions of their

8    job while working full time telework, see exhibits provided in my initial complaint dated

9    May 17, 2019 labeled "Agency's Response to Appellant's Request for Production #6 as

10    amended in the Board's April 25, 2019 Order" and dated May 3, 2019"Agency's

11    Response to Appellant's Request for Production #6 as amended in the Board's April 25,

12    2019 Order" and MSPB Hearing Transcript Day 2 page 158 lines 24-25 and page 159

13    lines 1-25. Debby Ellis testimony shows that my SSA managers who decided my

14    reasonable accommodations request for telework based their denials on their preference

15    to approve RA's that kept a qualified disabled employee in the building instead of

16    allowing them to telework as an RA, my SSA managers believe that approving the RA of

17    telework as a last resort, my SSA management preferred keeping the qualified disabled

18    employee in the building even if the keeping the qualified disabled employee in the

19    building caused harm to the employee because Debby Ellis believed it was better "...my

20    personal belief is morale is -- is higher when you got people collocated together..."MSPB

21    Hearing Transcript day 2 page 161 lines 15-25 and page 162 lines 1-25 and page 163

22    lines 1-16. James Dokko acknowledges that SSA management does not have the

23    authority to excuse an employee from an essential function of their job per MSPB

24    Hearing Transcript day 2 page 200 lines 15-17 and Debby Ellis acknowledges that

25    Benefit Authorizers other than me were excused from SPIKE see MSPB Hearing

26    Transcript day 2 page 155 lines 10-25 and page 156 lines 1-16, Article 39 does not

27    excuse an employee from performing their essential functions see Article 39 in

28    supplemental exhibit 7 under exhibit Opposition to Agency's Motion for Summary

Judgement. Debby Ellis acknowledges SSA approved Benefit Authorizers with the reasonable accommodation of full time telework see MSPB Hearing Transcript day 2 page 159 lines 18-25. James Dokko testifies that he only has the authority to recommend a denial or approval of telework full time and that he recommended to the NRAC to deny my RA request for telework "I stated that you were not a qualified individual with a disability based on your requested accommodation." James Dokko acknowledges that SSA provided me with reasonable accommodations proving I was a known qualified disabled employee, see MSPB Hearing Transcript day 1 page 191 lines 1-25 and page 192 lines 1-5. It is important to note that SSA's National Reasonable Accommodations Coordinator (NRAC) based their decision solely on SSA's management's recommendation and did not do their job and confirm managements claims answering the 800 number was an essential job function and that Benefit Authorizers could not be approved for the Reasonable Accommodation of Telework "Ms. Stenzel stated she does not recall if 800 calls were determined to be an essential function of the job or to the extent to which she considered the issue." See exhibit Articles and Emails – exhibit 10 "Statement From NRAC decision maker…" James Dokko definition of qualified disabled employee "So a qualified individual basically, you know, has a medical condition that limits one or more life activities, and the employee is still able to do the essential functions of their job." James Dokko acknowledges that he is aware I have medical condition but he says that "For your request for telework full time, I do not find that you are a qualified individual with a disability." Which is contradictory to his early statement that SSA provided me with reasonable accommodations, SSA cannot find I am a qualified disabled employee for some reasonable accommodations request and not for others, especially since the reasonable accommodation I was asking for SSA was already providing to other qualified disabled Benefit Authorizers proving SSA had already determined Benefit Authorizers could perform the essential functions of the job at home, see MSPB Hearing Transcript day 1 page 193 lines 6-17 and see exhibits in my initial complaint dated May3, 2019 and May 17, 2019 provided to me by SSA's Counsel. It is

important to note that SSA was aware that I was working 100% from home via telework once a week under the pilot telework program from July 26, 2016 through my termination on August 15, 2018 without SPIKING a single day during that time and I continued to receive successful performance appraisals. SSA knew  I was teleworking under the pilot telework program about once a week and not teleworking as a reasonable accommodation see MSPB Hearing Transcript day 1 page 107 lines 16-20; I did not have a disciplinary record and I was in good standing, see exhibits 1 and 6 in Termination documents and MSPB Hearing Transcript day 1 page 197 lines 4-9 and proof I was in good standing see MSPB Hearing Transcript day 1 page 46 lines 11-25 and page 47 line 1 and page 48 lines 12-24 and page 49 lines 7-14 and page 116 lines 14-25 page 117 lines 1-25 and page 118 lines 1-10. The fact I was working 100% via telework under the pilot program and not as a reasonable accommodation about once a week from July 26, 2016 through August 15, 2018 and received successful performance appraisals without SPIKING a single day proves I am a qualified disabled employee, James Dokko's acknowledges I was approved for reasonable accommodations, but he  deemed I am not a qualified disabled employee if I ask for telework, despite the fact first line supervisor Kris Chamrernlaksa that Kris recommended that I be approved for telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. James Dokko believes that an employee is deemed to be a qualified disabled employee based on the type of reasonable accommodation the employee is requesting which is against the Rehabilitation Act of 1973 and ADAAA. EEOC AJ errored in her decision to ignore the fact I was receiving successful performance appraisals without being provided an effective reasonable accommodation, both my attorney and I raised the fact that I am a qualified disabled employee by virtue of my successful performance of my job per case law: *Lavern B. v. Dep't of Housing and Urban Development,* EEOC No. 0720130029 (EEOC OFO 02/12/15) and *Kohner v. Dep't of Transportation* EEOC Appeal No. 0120110334, 1 (September 14, 2012) *Latarsha A. v. Federal Energy Regulatory Commission,* EEOC Appeal Nos. 0120123215, 0120131079 (Mar. 15, 2016) had SSA

1    allowed me to telework five (5) days a week like the 20+ other qualified disabled Benefit

2    Authorizers as a reasonable accommodation, 100+ other disabled Benefit Authorizers

3    under Article 39 and one (1) Benefit Authorizer who worked virtually, there is no

4    evidence I could not have continued to work full time in fact my first line supervisor Kris

5    Chamrernlaksa that Kris recommended that I be approved for telework five days a week,

6    see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11 and exhibits

7    provided in my initial complaint dated May 17, 2019 labeled "Agency's Response to

8    Appellant's Request for Production #6 as amended in the Board's April 25, 2019 Order"

9    and dated May 3, 2019"Agency's Response to Appellant's Request for Production #6 as

10   amended in the Board's April 25, 2019 Order" My performance appraisals showed that

11   from 2014 through my termination in August 15, 2018 I had been meeting expectations

12   and the evidence shows that SSA could have approved telework as a reasonable

13   accommodation but refused to unlawfully based on my SSA management's preference to

14   keep me in the work place see MSPB Hearing Transcript day 2 page 162 lines 5-22.

15   Proof of SSA's bad faith effort to effectively accommodate me, James Dokko the SSA

16   manager responsible for recommending approval or denial of my reasonable

17   accommodation of telework NEVER explored if it was possible for a Benefit Authorizer

18   to be approved to telework as a reasonable accommodation and James Dokko ignored my

19   first line supervisor Kris Chamrernlaksa that Kris recommended that I be approved for

20   telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and

21   lines 9-11, MSPB Hearing Transcript day 2 page 20 lines 20-25 MSPB AJ asks "As

22   someone who is a benefit authorizer in your office, can you -- is there any situation in

23   which you can permanently approve as a reasonable accommodation -- assuming the

24   medical documentation supports it -- someone permanently teleworking five days a week

25   as a reasonable accommodation?" James Dokko testified "I've never explored that.

26   Would it be -- could that be a possibility, possibly? Personally, I do not believe so. But at

27   this time --"MSPB Hearing Transcript day 2 page 21 lines 1-3. It is important to note I

28   was in reasonable accommodations talks with James Dokko since 2015 when he became

1   Operations Manager over my module and in the approximately five (5) years he handled

2   my reasonable accommodations request for telework full time and he never determined if

3   telework was an accommodation available for Benefit Authorizers, however James

4   Dokko continued to recommend SSA deny my reasonable accommodations requests even

5   though my first line supervisor Kris Chamrernlaksa that Kris recommended that I be

6   approved for telework five days a week (MSPB Hearing Transcript day 1 page 27 lines 5-

7   6 and lines 9-11) because James Dokko believed if I was approved for telework would

8   remove an essential function of my job, I was denied an effective available reasonable

9   accommodation of telework based on James Dokko's false assumption SSA did not

10  approve Benefit Authorizers the RA of telework an assumption he never confirmed per

11  MSPB Hearing Transcript day 2 page 21 lines 1-3. It appears to me that I was also denied

12  the reasonable accommodation because of Debby Ellis's preference to keep employees in

13  the building as appose to being isolated, see MSPB Hearing Transcript day 2 page162

14  lines 5-22.

15  EEOC AJ did not give proper wait to James Ekeroma an Assistant Module Manager

16  testimony he witnessed my disability being triggered and he personally walked me

17  outside so that I could try and recover from the exposure and he also notes that I was

18  provided reasonable accommodations and that moving around the building SSA's way of

19  reasonably accommodating me, per January 19, 2017 EEOC Hearing Transcript Volume

20  2 page 200 lines 7-25 and page 201 lines 1-25 and page 202 lines 1-25 and page 203 lines

21  1-10. James Ekeroma acknowledges that there were staff that sprayed of perfumes

22  January 19, 2017 EEOC Hearing Transcript Volume 2 page 206 lines 9-16. I was subject

23  to adverse employment actions including but not limited to loss in pay, forced leave and

24  decline to my health, loss of quality of life, loss of future income and my job. I was

25  denied equal rights and was treated adversely to other qualified disabled employees, SSA

26  accommodated another qualified disabled Benefit Authorizer in my module who had an

27  adverse reaction to oatmeal odor and she was effectively accommodated and the odor

28  was eliminated from their working area see ROI exhibit 8-5 and ROI exhibit 8-4 and SSA

accommodated a module 1 employee by removing me and the fan I used away from her working area see exhibit 3 under Communications with EEOC AJ and Counsel, me, my counsel for EEO case.

EEOC AJ rendered a flawed decision because she based her decision solely based on SSA management's testimony, despite the fact on more than one occasion SSA management acknowledged they provided false testimony. EEOC AJ admitted in a telephone conference all with SSA Counsel, my attorney on my other EEOC cases and me that she solely based her decision on the facts SSA management claimed were true at hearing and not on the evidence I provided which proved that I was performing the essential functions of the Benefit Authorizer job while working 100% via telework once a week under the pilot telework program and not as a reasonable accommodation since July 26, 2016 through the hearing January 2019 and because I continued to receive successful performance appraisals without a reasonable accommodations proved I am a qualified disabled employee. EEOC AJ errored because she did not give proper weight to the fact I received successful performance appraisals 100% from home via telework once a week under the pilot telework program without a reasonable accommodation proved I am a qualified disabled and that SPIKE is not an essential functions of the Benefit Authorizer job. EEOC AJ ignored the fact that SSA management testified fully trained Benefit Authorizers who were journeymen level Benefit Authorizers who completed the nine month training did not answer SSA's 800 number aka SPIKE at all, see January 19, 2017 EEOC Hearing Transcript Volume 2 page 249 lines 7-25 and page 250 lines 1-13. EEOC AJ also ignored the fact SSA management testified that SPIKE training is about two months so it is impossible for a Benefit Authorizer to have completed their training if they missed two months of training, see January 19, 2017 EEOC Hearing Transcript Volume 2 page 353 lines 3-7. EEOC AJ also ignored the fact Debby Ellis acknowledged that module managers decided who was selected for SPIKE proving it is not an essential job function because managers at SSA decided who did or did not do the work per January 19, 2017 EEOC Hearing Transcript Volume 2 page 300 lines 8-25 and page 301

lines 1-3. Debby Ellis also acknowledged that she lied when she claimed Benefit Authorizers were trained to answer SSA 800 number during the nine month training and she claimed that no matter what by Spring 2017 the Benefit Authorizers who were not trained would be another lie because the Benefit Authorizers were still not trained in 2019 see January 19, 2017 EEOC Hearing Transcript Volume 2 page 248 lines 9-25 and page 250 lines 1-13 and MSPB Hearing Transcript day 1 page 30 and lines 5-7 and page 205 lines 7-10. See supplemental exhibits 4 and supplemental exhibit 5 in "My appeal to the Office of Federal Operations Decision in" which show that there were Benefit Authorizers who were not trainees (journeyman level) who were still not SPIKING in August 2018 and that the Benefit Authorizer training manuals do not include training on how to answer SSA's 800 number aka SPIKE. Further proof Debby Ellis lied about Benefit Authorizers were trained to SPIKE during the nine month Benefit Authorizer training is the fact that SPIKE training is about two months long, no reasonable person would claim a Benefit Authorizer completed the nine month training if the training was not actually completed, also Benefit Authorizers do not loss their pay grade because they were not SPIKE trained as Debby Ellis alleged, see January 19, 2017 EEOC Hearing Transcript Volume 2 page 248 lines 9-25 and page 249 lines 1-25 and page 250 line 1 and page 353 lines 3-6 and MSPB Hearing Transcript day 1 page 218 lines 20-25 and page 219 lines 1-11. SSA manager Kris Chamrernlaksa testified "I was hired in September of 2010 as a Benefit Authorizer" confirmed that Benefit Authorizer trainees do not learn to SPIKE during their nine month training or during their three day review and that in June 2019 there were still journeyman level Benefit Authorizers who were still not SPIKE trained proving Debby Ellis lied to EEOC AJ and because EEOC AJ rendered her decision based on Debby Ellis's lies when she testified that SPIKE is an essential function of the Benefit Authorizer job she claimed SPIKE training was part of the initial nine month Benefit Authorizer training and that only recently SPIKE training was removed was a lie, per the facts I included and my testimony that I was hired in 2008 and SPIKE training was only given after a BA attained journeyman level status there was

no sudden business decision to change training, SSA management confirmed my testimony, see MSPB Hearing Transcript day 1 page 29 lines 21-25 and page 30 lines 1-25 and page 31 lines 1-2. Debby Ellis testified that SPIKE is an intentional overflow of work from the Teleservice Centers who's primary job it is to answer SSA's 800 number and that the Payment Center employees help with the intentional overflow not just the Benefit authorizers. SSA testified that if Benefit Authorizers are answering the phones the Benefit Authorizer work does not get done proving that the Benefit Authorizers primary job function is not answering SSA's 800 number, also SSA managers acknowledge that SSA managers in the modules decide which employees take SPIKE calls, Debby Ellis also states that even on a level 1 SPIKE day not all staff is on the phone all day, per January 19, 2017 EEOC Hearing Transcript Volume 2 page 247 lines 5-25 and page 248 lines 1-25 and page 300 lines 8-25 and page 301 lines 1-3. James Dokko acknowledged at the EEOC hearing that we had not reached the last resort and that he did offering me another job or reassignment and that would not happen until "After I've exhausted all different options" see January 19, 2017 EEOC Hearing Transcript Volume 2 page 337 lines 16-25 and page 338 lines 1-5. I would like it pointed out it is disingenuous for EEOC AJ to state in her EEOC Hearing Decision that my attorney and I did not dispute SSA's undisputed facts at the hearing because EEOC AJ extremely limited my attorneys ability to ask questions relating to just the two topics she agreed to hold the hearing under "(1) Complainant's credibility: The Agency takes issue with the subjectivity of Ms. Tom's reported symptoms and argues both that (1) Complainant does not have a disabling condition and (2) even if she does, there is no objective evidence that the accommodations provided are not sufficient. In other words, according to the Agency, Ms. Tom is either imagining her symptoms or is fabricating them. As such, a credibility determination is required, which precludes summary judgment. (2) Undue hardship: If Complainant is credible and her symptoms are genuine, then the current accommodations are not working, and the Agency must consider full-time teleworking. To justify not allowing Complainant to telework full-

time, the Agency must demonstrate undue hardship. In its MSJ, SSA did not address the undue hardship of full-time telework because the Agency contends the other accommodations provided are effective. " Please see supplemental exhibit 8 for the response to SSA's undisputed facts and supplemental exhibit 7 which shows the contradictory testimony at EEOC AJ hearing held in 2017 in exhibit "My appeal to the Office of Federal Operations Decision in" my attorney was not allowed to argue SSA's undisputed facts.

SSA refused to provide me a Benefit Authorizer with Reasonable Accommodation of Telework that would have provided me with a fragrance and chemical free work environment and a new clean laptop despite the fact SSA would have suffered no hardship see MSPB Hearing Transcript day 2 page 74 lines 21-23 and page 153 lines 16-22. James Dokko was told by my first line supervisor Kris Chamrernlaksa that Kris recommended that I be approved for telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. SSA manager James Dokko acknowledged he was aware that SSA's Medical officer had determined SSA building would be unlikely to provide me with a fragrance and chemical free environment in 2014 and he agreed see MSPB Hearing Transcript day 1 page 220 lines 18-22 and ROI exhibit 18 page 2. SSA provided me with Reasonable Accommodations that required that I work in an SSA building that is not fragrance and chemical free and has been under renovations and construction since 2014 to date, see MSPB Hearing Transcript day 1 page 23 lines 11-13 and page 25 lines 22-25 and page 26 line 1 and page 105 lines 5-12 and page 106 lines 1-6 page 206 lines 13-14 and page 56 lines 6-25 and page 57 lines 1-6 and page 184 lines 21-22. SSA also acknowledges that none of the facilities/buildings SSA could have relocated me to would be fragrance and chemical free and none of the facilities/buildings they placed me in would be able to provide me with a restroom or location where I could eat that was fragrance and chemical free see MSPB Hearing Transcript day 2 page 3 lines 14-18 and page 6 lines 21-25 and page 7 lines 1-7 and page 8 line 1-5. SSA does not deny having provided over 20 qualified disabled Benefit

Authorizers the Reasonable Accommodations of Telework since at least 2016. SSA does not deny having proved over 100 qualified Benefit Authorizers with approval under Article 39 Work at Home by Exemption since at least 2015, which allows employees to telework five (5) days a week for up to a year with the possibility of continued approval under Article 39. SSA subjecting me to Disability Discrimination 42 U.S.C. § 12112(b)(5) because SSA refused to my requests for approval of the Reasonable Accommodation of Telework despite knowing that SSA buildings could not provide me with a fragrance and chemical free work environment denying me the ability to continue to work full time like other qualified disabled benefit Authorizers who were approved the reasonable accommodation of telework and approval under Article 39. SSA also refused all request to allow me to try Reasonable Accommodation of Telework on a limited basis to prove I could Telework five (5) days a week, which proves SSA was not acting in good faith and that I was treated me less favorably than the 20+ other qualified disabled Benefit Authorizers who were approved for the available Reasonable Accommodation of Telework full time and less favorably than the 100+ qualified Benefit Authorizers who were approved for Work at Home By Exemption. SSA does not dispute the fact that there is at least one Benefit Authorizer who is not disabled who was approved to work "a long term virtual detail". SSA acknowledges that while I was employed I was a good employee in good standing, qualified to perform the essential functions of my job, and throughout my career I have received successful performance appraisals. SSA acknowledges that from August 2016 through August 18, 2018 my last day, I worked 100% solely via telework once a week under the pilot telework program and I did not telework as a reasonable accommodation. Under the Pilot Telework program during the period between August 2016 through August 18, 2018 I worked once a week with the exception of a three month period in 2017 where I worked twice a week along with the other pilot Telework Benefit Authorizers. SSA does not dispute the fact that in July 2014 SSA employee a Medical Officer informed the SSA management and CREO "Even if Ms. Tom is eventually found to be an individual with a disability per the RA, the

requested accommodation of scent free work environment is impractical in most public buildings. Furthermore, Ms. Tom is unlikely to avoid similar exposures if she visits public places such as shopping malls, restaurants, grocery stores and numerous others." see ROI exhibit 18 page 2 of 2. Leslie Kern Operations Manager confirmed the Medical Officer's claims stating "As stated in the notice you received, the Agency is not able to provide a scent free workplace for any employee." see ROI exhibit 07-14 page 2 of 5. Ms. Kern's assessment of possible Reasonable Accommodations is inaccurate as she seems not to know that Telework is a possible Reasonable Accommodation which would provide any employee with fragrance and chemical free environment. Agency's Medical Officer and Ms. Kern's statements are proof that SSA has known since July 2014 that any accommodation SSA provided me which required me to work in an SSA occupied building that did not have a standing fragrance and chemical free policy would not be an effective Reasonable Accommodation. SSA chose to approved me the following Reasonable Accommodations including but not limited to gloves, face masks, excused from Spiking/answering the Agency 800 number, air purifier in 2015, start once a week telework ahead of the other Benefit Authorizers in the Pilot Telework program, one on one training instead of attending group training, one on one meetings instead of attending group meetings, moved me over 26 times (including locations on all six (6) floors in cubicles and rooms) and Liberal Leave and flex leave which allowed me to take leave without having to provide medical documentation for each day I was out sick due to my disability and on days I had to leave work early due to my disability being aggravated instead of the Reasonable Accommodation of telework. SSA refusal to provide me with an effective Reasonable Accommodation of Telework even though SSA has approved more than 20 other qualified disabled Benefit Authorizers because SSA believed the approved Reasonable Accommodations of Liberal Leave, gloves, masks, and an air purifier in a building that is under construction since 2014 that not fragrance and chemical free was an effective alternative to the reasonable accommodation of telework despite by my first line supervisor Kris Chamrernlaksa that Kris recommended that I be

approved for telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. SSA does not dispute the fact that I was providing SSA with quality work while I was working 100% via telework once a week under the pilot telework program since July 26, 2016 through August 15, 2018 and received successful performance appraisals. SSA does not dispute the fact that there were Benefit Authorizers who completed the Benefit Authorizer training and passed their three day examination who have never Spike/answer the 800 number and that SPIKE training is about two months, which proves answering SSA 800 number is not part of the Benefit Authorizer nine month training and not a skill that is required for a Benefit Authorizer to become a journeyman level employee; Debby Ellis testified at the EEO hearing that **"By the time you are a journeyman level, you're expected to be able to do all the major duties and sustain those job duties."**(bolded for emphasis) proving SPIKE is not an essential function of the Benefit Authorizer job, see MSPB Hearing Transcript day 1 page 29 lines 21-25 and page 30 lines 1-25 and page 31 lines 1-3 and January 19, 2017 EEOC Hearing Transcript Volume 2 page 250 lines 21-25 and page 251 lines 1-14 page 353 lines 3-6. SSA denied me access to an available effective reasonable accommodations, full pay, continued employment, fringe benefits for example the ability to qualify for bonuses, the ability to earn and keep a positive leave balances, keep my job, as well as the benefit of not worsening my health condition and reducing my quality of life into the future. SSA allowed a co-worker I named as one of my harassers to work hand in hand with management on how SSA would handle my reasonable accommodations requests and what documentation I have to provide see ROI exhibit 20 page 6 of 22 email #3 and ROI exhibit 11-01. SSA management also participated triggering my disability by wearing perfume and forcing me to meet with them in meetings and also humiliated me in meetings one incident my SSA manager asking me in a group meeting to move and sit right next to the co-worker I had reported as being my harasser and someone they knew to wear perfume that triggered my disability when I declined SSA managers request she and laughed out loud before my peers and it made both me and the co-worker visibly

upset and I found the incident very humiliating and just another attempt by SSA management to make an already difficult situation worst see ROI exhibit 20 page 4 of 22. I would like it noted that nothing came of my reports of SSA managerial harassment, SSA management was allowed to continue to harass me because the investigator also an SSA manager believed each incident was isolated and that it would be inappropriate to add up/compile the incidents of harassment committed by the same SSA manager together to show that there was an ongoing pattern of harassment. The record shows that SSA management believed that employees rights to wear and use fragrances and chemicals were more important than my right to a fragrance and chemical free/a healthy and safe working environment for me and that SSA management decided it would be better to have me to move away from my harasser to resolve the issue and for me to take my health in my own hands and move away from fragrances instead of removing fragrances away from me which is against policy. See ROI exhibit 20 pages 13 of 22 through 22 of 22 and see exhibit My Appeal to the Office of Federal Operations Decision - Supplemental Exhibit 9 for the SSA policy Reasonable Accommodations Request Involving Fragrance Sensitivity Policy. Reasonable Accommodations Request Involving Fragrance Sensitivity Policy is found on SSA's intranet Center for Disability Services-Consultation Corner, it lists what accommodations SSA can provide: "If possible, eliminate the offending odor or chemical; Alert the employee when you detect fragrances or chemical odors; Change Desk location; Allow the employee to work from home; Temporary/permanent transfer; Reassignment." SSA determined that they could not eliminate fragrances and chemical odors back in 2014, SSA did not alert me to fragrance and chemical odors, SSA moved over 26 times throughout the building and still SSA refused to allow me to work from home as a Reasonable Accommodation even though I had proven I was capable of working full time via telework and earn successful performance appraisals. My first line manager was asked if he would have allowed me to telework five (5) days a week he said based on the quality of my work he would have see MSPB Hearing Transcript day 1 page 26 lines 16-25 and page 27 lines 1-6. It is

important to note there were journeyman level Benefit Authorizers who are still not SPIKE trained and were not SPIKE trained in 2018 either per MSPB Hearing Transcript day 1 page 30 lines 5-8. Reading my response above you can see SSA's conduct is discriminatory with respect to my disabilities and that SSA management based their decisions on their beliefs and not on based what reasonable accommodation I needed to effectively accommodate my disabilities.

MSPB Hearing Transcript day 2 page 20 lines 20-25 MSPB AJ asks James Dokko "As someone who is a benefit authorizer in your office, can you -- is there any situation in which you can permanently approve as a reasonable accommodation - - assuming the medical documentation supports it -- someone permanently teleworking five days a week as a reasonable accommodation?"

MSPB Hearing Transcript day 2 page 21 lines 1-3 James Dokko say: "I've never explored that. Would it be -- could that be a possibility, possibly? Personally, I do not believe so. But at this time --".

I was in reasonable accommodations talks with James Dokko since 2015 when he became Operations Manager over my module and in the approximately five (5) years he handled my reasonable accommodations request for telework full time and he never determined if telework was an accommodation available for Benefit Authorizers, however James Dokko continued to recommend SSA deny my reasonable accommodations requests because he falsely believed if I was approved for telework would remove an essential function of my job. James Dokko was told by my first line supervisor Kris Chamrernlaksa that Kris recommended that I be approved for telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. I was denied based an effective available reasonable accommodation of telework based on James Dokko's false assumption SSA did not approve Benefit Authorizers the reasonable accommodation of telework five days a week. It is important to note that SSA's National Reasonable Accommodations Coordinator (NRAC) based their decision solely on James Dokko's recommendation and did not do their job and confirm James Dokko's that

claims answering the 800 number was an essential job function and that Benefit Authorizers could not be approved for the Reasonable Accommodation of Telework "Ms. Stenzel stated she does not recall if 800 calls were determined to be an essential function of the job or to the extent to which she considered the issue." See exhibit Articles and Emails – exhibit 10 "Statement From NRAC decision maker…"

With regard to the SSA's assertion that SSA effectively reasonably accommodated me when SSA denying my reasonable accommodation request of full time telework opting instead to  approved reasonable accommodations of air purifier that was over one thousand dollars, moved over 26 times and was placed in an office, was provided masks glove, Liberal Leave and flexible leave, none of the reasonable accommodations provided enabled me to return to work full time, proves SSA did not respond expeditiously to my request for an effective reasonable accommodation. Even though my first line supervisor Kris Chamrernlaksa recommended that I be approved for telework five days a week SSA still refused to approve my reasonable accommodations request for telework opting instead to fire me for being out sick, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11 and MSPB Hearing Transcript day 1 page 95 lines 3-14. EEOC Enforcement Guidance on Reasonable Accommodation, at Question 10 (Oct. 17, 2002). Therefore, the Commission has held that failure to respond to a request for accommodation in a timely manner may result in a finding of discrimination. See Shealy v. EEOC, EEOC Appeal No. 0120070356 (April 18, 2011); Villanueva v. Department of Homeland Security, EEOC Appeal No. 01A34968 (August 10, 2006). In this case, I am claiming that SSA's inaction and delays drove me out of the workplace for a significant period of time, which SSA used as an excuse to terminate me even though SSA knew I am a qualified disabled employee who was still in reasonable accommodation talks with SSA management up until my termination, it is important to note that my first line supervisor Kris Chamrernlaksa recommended that I be approved for telework five days a week instead of being terminated, see  MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11 and MSPB Hearing Transcript day 2 page 81 lines 6-20 and page 92 lines

3-14.  SSA management continued to claim that reasonable accommodations and termination based on being out sick were two different issues but they are not separate had I been provided an effective reasonable accommodation I would not have been out sick. After all, I had not received the requested reasonable accommodations from SSA, and SSA's inaction had negatively impacting my health causing me to also need reasonable accommodations for vertigo and migraines with aura in addition to my original disability sensitivity to environmental irritants. SSA's inactions also affected my quality of life and future quality of life. Faced with negative impacts on my declining health, I had no choice but to ask for leave while I tried to get SSA to work with me to provide me a new reasonable accommodation and not the same accommodation located in a different area. Further, SSA had may opportunities since 2014 to mitigate the negative impact on me through SSA's National Reasonable Accommodation Coordinator (NRAC), but instead of the NRAC employee doing their own independent review of SSA policy to determine if SSA had decided if Benefit Authorizers could perform the essential functions of their job from home via telework as a reasonable accommodation the NRAC decision maker just blindly accepted James Dokko's recommendation to deny my request. "Ms. Stenzel stated she does not recall if 800 calls were determined to be an essential function of the job or to the extent to which she considered the issue." See exhibit Articles and Emails – exhibit 10 "Statement From NRAC decision maker…" . James Dokko ignored my first line supervisor Kris Chamremlaksa recommended that I be approved for telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. SSA used the sick leave they forced me to take as an excuse to halt the interactive process and terminate me for being absent from work instead of working with me to provided me with reasonable accommodations that would return me to work full time see MSPB Hearing Transcript day 2 page 81 lines 6-20. I would have need for leave for the foreseeable future as a consequence of James Dokko's belief "we provided an accommodation that I feel was appropriate, which was a locked office, air purifier, air guard, flexible leave when you are in the building." Even though SSA

acknowledges that I still had fragrance and chemical odors in the room with the air purifier, and James Dokko acknowledges that SSA is unable to prevent my exposure to fragrances and chemicals in SSA buildings all SSA could do was try and limit my exposure in the buildings, proving SSA was aware I was being exposed while I was in SSA buildings and therefore proving the provided reasonable accommodations in the buildings are not as effective as the reasonable accommodation of telework is, because in my home I can eliminate my exposure to fragrances and chemicals see MSPB Hearing Transcript day 2 page 6 lines 21-25 page 7 lines 1-4 and page 130 lines 22-25. SSA's failure to provide me with an effective reasonable accommodation of telework even after James Dokko was told by my first line supervisor Kris Chamrernlaksa recommended that I be approved for telework five days a week, plus the fact SSA has provided to over 20 other qualified disabled Benefit Authorizers without hardship to SSA proves there is disability discrimination and retaliation for filing EEO complaints. Therefore, SSA cannot credit itself for providing me with leave that I likely would not have needed if SSA had promptly and appropriately responded to my please for an effective reasonable accommodation and has followed my first line's recommendation for approving me to work telework five days a week.

Absent undue hardship, SSA should provide my reasonable accommodation request for full time telework that would have permit me to keep working rather than choosing to force me to take leave as a reasonable accommodation. 29 C.F.R. 1630.1 provides that the primary purpose of Title I of the ADA, as amended by the ADAA, is to provide equal employment opportunities for individuals with disabilities. Leave removes an employee from the workplace and therefore denies the employee the opportunity to keep working with reasonable accommodation. Please also note that a reasonable accommodation must be effective. If a reasonable accommodation – full time telework -- permits an employee to perform the essential functions of their position, then that accommodation is effective and leave is not effective in permitting immediate performance of essential functions of a position.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 97 of 156

While an employer may choose between effective accommodations, forcing an employee to take leave when another accommodation would permit an employee to continue working is not an effective accommodation. See Mamola v. Group Mfg. Services, Inc., 2010 WL 1433491 (D. Ariz. April 9, 2010) (unpaid leave may not be a reasonable accommodation when an employee specifically requests another accommodation that would allow him or her to perform the essential functions of the position without missing work); Woodson v. Int'l Bus. Machines, Inc., 2007 WL 4170560, at 5 (N.D. Cal. Nov. 19, 2007) (leave is sufficient as a reasonable accommodation only if other accommodations in a job would be ineffective). In this case, the SSA failed to provide me with my requested accommodations that would have allowed me to continue working full time, even though my first line supervisor recommendation that I be approved for telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. Consequently, I was forced to take leave, much of it unpaid and was eventually unlawfully removed from my position due to SSA's continued refusal to approve my reasonable accommodations request for telework despite the fact I was already working 100% via telework once a week under the pilot telework program since July 26, 2016 through August 15, 2018. During July 26, 2016 through August 15, 2018 I teleworked about once a week and received successful performance appraisals SSA management acknowledged I was not being terminated for my performance but because I was out sick. James Dokko also ignored my first lines recommendation to approve me for telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. James Dokko never explored if it was possible for a Benefit Authorizer to be approved for the reasonable accommodation of telework, thus proving James Dokko did not try everything before approving my termination, see

      MSPB Hearing Transcript day 2 page 20 lines 20-25 - James Dokko

      JUDGE RIBAS: As someone who is a benefit authorizer in your office, can you -- is there any situation in which you can permanently approve as a reasonable

1    accommodation -- assuming the medical documentation supports it -- someone

2    permanently teleworking five days a week as a reasonable accommodation?

3    MSPB Hearing Transcript day 2 page 21 lines 1-3 – James Dokko

4    THE WITNESS: I've never explored that. Would it be -- could that be a

5    possibility, possibly? Personally, I do not believe so. But at this time –

6    MSPB Hearing Transcript day 1 page 205 lines 17-25 – James Dokko

7    Q Did you inquire as to whether or not benefit authorizers within the Western

8    Payment Program Service Center had been approved to telework five days a

9    week?

10    A I did not inquire, and it's the Western Program Service Center.

11    Q Why did you not inquire?

12    A There was no reason for me to inquire.

13    Q Wouldn't it have been important to know whether or not the Agency has a

14    policy of providing other benefit authorizers the

15    MSPB Hearing Transcript day 1 page 206 lines 1-14

16    reasonable accommodation of five days a week prior to making your

17    recommendation to make sure you went in line with Agency policy?

18    A So like I stated in regards to reasonable -- in regards to your specific reasonable

19    accommodation request, I evaluated all the medical documentation I received, our

20    conversations that we've had, and I -- based on your documentation, the

21    accommodations we provided were appropriate and actually recommended by

22    your doctor, and we provided an accommodation that I feel was appropriate,

23    which was a locked office, air purifier, air guard, flexible leave when you are in

24    the building.

25    Q Is the building fragrance and chemical free?

26    A No.

27    MSPB Hearing Transcript day 1 page 61 lines 22-25 – Kris Chamrernlaksa

28    Q Was management aware I was out sick?

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 99 of 156

1    JUDGE RIBAS: If you can answer the question, you can answer the question; if

2    you cannot, you have to state you cannot answer.

3    MSPB Hearing Transcript day 1 page 62 lines 1-2 – Kris Chamrernlaksa

4    THE WITNESS: The -- the reason you gave us was because you were sick, so

5    yes.

6    MSPB Hearing Transcript day 1 page 91 lines 4-6 – Carmelita Rivera

7    Q Isn't it true that my performance appraisals have been successful?

8    A Yes, that's true.

9    MSPB Hearing Transcript day 1 page 115 lines 8-12 – Carmelita Rivera

10   Q So you're saying that you had no responsibility as the manager suggesting my

11   removal to take any action to provide me with an effective accommodation?

12   A I was only responsible for my decision on the AWOL. All the reasonable

13   accommodations were handled by James.

14   MSPB Hearing Transcript day 1 page 116 lines 14-25 – Carmelita Rivera

15   Q I don't -- okay. I don't think you're understanding my question. Does an

16   employee have to be in good standing in order to telework?

17   A Sure, yes.

18   Q What was -- my last day of employment, did I telework?

19   A I believe you did.

20   Q While I was being charged with AWOL, was I approved to earn credit hours?

21   A You were. You were. You worked 11 hours a day.

22   Q Okay. And while the Agency was approving benefit authorizers to telework

23   two days a week in 2017 for approximately three months, did I also earn

24   overtime?

25   MSPB Hearing Transcript day 1 page 117 lines 1-25 – Carmelita Rivera

26   A I don't remember if you requested to work overtime or not. I mean, what pops

27   in my head is that you worked credit most of the time that you worked after your

28   eight hours.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 100 of 156

1   Q But an employee has to be in good standing for the approval of a credit or

2   overtime; is that correct?

3   A Yes.

4   Q And an employee charged with actual AWOL would not have been approved;

5   is that correct?

6   A Yes. Yeah, I guess. Yes.

7   JUDGE RIBAS: Ms. Tom, do you mind if I try to -- I think I understand what

8   you're getting at. Do you mind if I try to ask the witness a question? You can tell

9   me if this is --

10   MS. TOM: Absolutely. Please go ahead.

11   JUDGE RIBAS: I think what Ms. Tom is trying to ask is how can you

12   simultaneously approve her for telework and overtime and claim she was being

13   AWOL within the same week?

14   Is that fair to say? Is that what you're trying to get at?

15   MS. TOM: Yes.

16   BY MS. TOM:

17   Q How can I be granted --

18   JUDGE RIBAS: How can --

19   BY MS. TOM:

20   Q -- a benefit of being a good standing employee, if you're

21   MSPB Hearing Transcript day 1 page 118 lines 1-4 – Carmelita Rivera

22   claiming that I was misbehaving?

23   A We didn't go that route as far as her, you know, being -- penalizing her

24   telework for that. I just solely went on her being absent from work.

25   MSPB Hearing Transcript day 1 page 91 lines 19-25 – Carmelita Rivera

26   Q So prior to issuing this notice, you never attempted to reasonably accommodate

27   me?

28   A I was not involved in your reasonable accommodation, Jennifer -- Ms. Tom.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 101 of 156

Q But you listed having considered all of the available options prior to proposing my termination?

A The proposal for removal was based on AWOL.

MSPB Hearing Transcript day 1 page 127 lines 4-6 - Carmelita Rivera

Q Are you aware I was not reporting to the building due to a medical condition?

A I am.

The witness is looking at ROI exhibit 18 pages 1 and 2 states "Even if Ms. Tom is eventually found to be an individual with a disability per the RA, the requested accommodation of scent free work environment is impractical in most public buildings. Furthermore, Ms. Tom is unlikely to avoid similar exposures if she visits public places such as shopping malls, restaurants, grocery stores and numerous others." for this testimony

MSPB Hearing Transcript day 1 page 139 line 22 – Carmelita Rivera

"A Yes, Nadeem Sadeke, MD. Medical Officer Headquarters.

MSPB Hearing Transcript day 1 page 140 lines 3-7

Q So this is a Social Security medical officer's determination; is that correct?

A Yes.

Q And what does he determine as far as the building's ability to provide me with the accommodation that I need?

MSPB Hearing Transcript day 1 page 140 lines 23-25 – Carmelita Rivera

Q I'm only asking you with regards to this document. As far as it states that as far back as 2013, the Agency was aware that the building wouldn't be able to provide me with a

MSPB Hearing Transcript day 1 page 141 lines 1-6 – Carmelita Rivera

fragrance and chemical free work environment and had you known that, would you still have issued the notice of proposed removal?

A If you were not showing up to work, and we've provided you with the accommodations that you have, I would have still AWOL'd you.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 102 of 156

1       MSPB Hearing Transcript day 1 page 88 lines 2-5 – Carmelita Rivera

2       Q During that period of time, if that leave had been approved as leave without pay

3       instead of AWOL, would you still have issued this notice?

4       A If you had not shown up to work? Maybe.

5       MSPB Hearing Transcript day 1 page 105 line 5-12 – Carmelita Rivera

6       Q It did, but -- okay. So are you aware that I needed a fragrance- and chemical-

7       free environment?

8       A Oh, yes. I am aware of that.

9       Q And is the building a chemical- and fragrance-free environment?

10      A I would assume no, just like any other place. There's not a whole lot of areas

11      that are chemical and fragrance free, as far as I know.

12      MSPB Hearing Transcript day 1 page 220 lines 18-22 – James Dokko

13      Q Are you aware that the Social Security medical officer had determined that it

14      would be unlikely for the building to provide me with a fragrance and chemical

15      free environment?

16      A **I believe that is correct, and I believe my testimony also stated that.**(bolded

17      for emphasis)

18      MSPB Hearing Transcript day 2 page 50 lines 8-16 – James Dokko

19      JUDGE RIBAS: Okay. So was the -- do during this time frame of July 21st, 2016,

20      through August 2018 -- is that the time frame you're concerned about, Ms. Tom?

21      MS. TOM: Yes, Your Honor.

22      JUDGE RIBAS: Okay. Was Ms. Tom successfully performing her position?

23      THE WITNESS: So Ms. Tom -- she received a performance (sic) that was

24      considered meeting her performance, correct.

25   Please see exhibits Articles and Emails exhibit 4 which is the SSA/AFGE National

26   Agreement Article 21 Performance which discusses how SSA managers are to grade their

27   staff and no were in Article 21 does it say that an employee who receives a "Level 3 –

28   Successful Contribution" rating would be found not to be  performing the essential

functions of their job and see January 19, 2017 EEOC Hearing Transcript Volume 2 page

109 lines 3-16.

MSPB Hearing Transcript day 2 page 81 lines – James Dokko

Q Did you try to provide me with a reasonable accommodation in alternative of

terminating me?

A So the termination and the reasonable accommodation, those are two separate

things. Now, the reasonable accommodation, you know, as I stated, you know,

before my prior testimonies of everything that I've offered, everything that we've

been trying out, including that third room, which you did not try -- now, your

removal was based on conduct. It was based on absence without leave.

MSPB Hearing Transcript day 2 page 89 lines 11-22 – James Dokko

Q Why do you believe that removing a -- removing an employee who has had 10

years of successful performance with the agency, who has been cash awarded for

performance would improve the efficiency of the agency?

A So, Ms. Tom, as I stated earlier, you were removed for a conduct issue, not

your performance. I admit when you are working, you're a good employee. I do

not deny that. And, you know, your management team agrees with that. You were

based on a uniformly applied conduct rule that you violated that is job related, and

that's the reason why you were removed from service. You weren't removed from

service because you did a bad job.

MSPB Hearing Transcript day 2 page 143 lines 6-8 – Debby Ellis

Q To the best of your knowledge, I have received successful performance

appraisals; is that correct?

A To the best of my knowledge, yes.

MSPB Hearing Transcript day 1 page 26 lines 16-18 - Kris Chamrernlaksa

Q Okay. So if you could have approved me to telework five days a week based on

the quality of my work, would you have?

A Yes, I would.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 104 of 156

MSPB Hearing Transcript day 1 page 26 lines 23-25 - Kris Chamrernlaksa

Q Did management ever ask you, as my first line supervisor, whether or not you

believed that instead of terminating me offering me the ability to telework five

days a week or the

MSPB Hearing Transcript day 1 page 27 lines 1-6 - Kris Chamrernlaksa

fulltime should have been tried before proposing my termination?

A Yes, I was asked.

Q And what was your answer?

A Pretty much that the quality of your work would -- would be good and that

you'd be okay to telework five days a week,

MSPB Hearing Transcript day 1 page 27 lines 9-11 - Kris Chamrernlaksa

Q Who did you give that recommendation to?

A Carmelita and James Dokko. Carmelita Rivera and James Dokko.

So based on the evidence and testimony I was denied the reasonable accommodation of telework for no lawful reason, I am a qualified disabled employee who received successful performance appraisals while working 100% via telework once a week under the pilot telework program from July 26, 2016 through August 15, 2018 (when I was wrongfully terminated) under SSA's pilot telework program and without an reasonable accommodation. Although SSA was made aware by SSA's Medical Officer back in 2014 (see ROI exhibit 18) that "...the requested accommodation of scent free work environment is impractical in most public buildings. Furthermore, Ms. Tom is unlikely to avoid similar exposures if she visits public places such as shopping malls, restaurants, grocery stores and numerous others." SSA still insisted on providing reasonable accommodations that required I work in SSA occupied buildings SSA knew were not fragrance and chemical free even though SSA had moved me over 26 times since 2014 and because of SSA's delays in providing me with an effective reasonable accommodations my health continued to decline to the point where I went from needing one disability sensitivity to environmental irritants accommodated to needing a total of

three disabilities accommodated sensitivity to environmental irritants, vertigo and migraines with aura see MSPB Hearing Transcript day 1 page 23 lines 14-19 and page 104 lines 20-23. Despite SSA knowing that the reasonable accommodations SSA had provided me had been ineffective SSA continued to stand by James Dokko's assessment that he had effectively accommodated me when he "provided an accommodation that I feel was appropriate, which was a locked office, air purifier, air guard, flexible leave when you are in the building" even though James Dokko received a recommendation from my first line supervisor Kris Chamrernlaksa that I be approved for telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11. EEOC AJ told SSA in her email dated October 31, 2016 that "If Complainant is credible and her symptoms are genuine, **then the current accommodations are not working, and the Agency must consider full-time teleworking.** To justify not allowing Complainant to telework full-time, the Agency must demonstrate undue hardship.  In its MSJ, SSA did not address the undue hardship of full-time telework because the Agency contends the other accommodations provided are effective." (bolded for emphasis) SSA was notified by EEOC AJ that the accommodations that SSA had been providing me were not working but SSA continued to provide variations of the exact same reasonable accommodations that had proven to be ineffective (SSA just move me from one spot to another spot in a building that is not fragrance and chemical free that uses a recirculated air system), SSA continued to claim they would be unable to determine if new variation of the same failed accommodation was ineffective unless I tried it, see MSPB Hearing Transcript day 2 page 13 lines 22-25 and page 14 line 1.

EEOC AJ only ruled I was not a qualified disabled employee because of SSA's Managements lied in their testimony that I could not perform all the essential job functions of my job if I was approved for the reasonable accommodations of telework which is not true because SSA has approved over 20 other qualified disabled Benefit Authorizers the RA of telework since 2016 and over 100 disabled Benefit Authorizers Article 39 Work at Home by Exemption, see exhibits provided in my initial complaint

dated May 17, 2019 labeled "Agency's Response to Appellant's Request for Production #6 as amended in the Board's April 25, 2019 Order" and dated May 3, 2019"Agency's Response to Appellant's Request for Production #6 as amended in the Board's April 25, 2019 Order" EEOC AJ also errored in not giving proper weight to the fact I received successful performance appraisals while working 100% via telework once a week under the pilot telework program from July 26, 2016 through August 15, 2018 (when I was wrongfully terminated) under SSA's pilot telework program and by virtue of the fact I received successful performance appraisals without a reasonable accommodation I am a qualified disabled employee per case law: *Lavern B. v. Dep't of Housing and Urban Development*, EEOC No. 0720130029 (EEOC OFO 02/12/15) and *Kohner v. Dep't of Transportation* EEOC Appeal No. 0120110334, 1 (September 14, 2012) *Latarsha A. v. Federal Energy Regulatory Commission*, EEOC Appeal Nos. 0120123215, 0120131079 (Mar. 15, 2016). EEOC AJ also errored in not taking into account the fact SSA management lied under oath during the hearing multiple times and SSA Counsel also lied to EEOC AJ in communications prior to hearing, see supplemental exhibit 7 in exhibit "My appeal to the Office of Federal Operations Decision in" to see the breakdown of discrepancy's in facts presented by SSA and the exhibits 6,7,8 and 9 in exhibits Communications with EEOC AJ and Agency Counsel, me, my Counsel for EEO case.

102.      May 2017 more medical documentation Work Status Report under other needs and/or restrictions unsafe to drive due to vertigo.

103.      June 2017 more medical documentation 3 documents Work Status Report diagnosis migraines w aura Reason for off work: unsafe to drive or transport and unable to drive due to vertigo. She can work from home.

104.      June 23, 2017 filed formal EEOC complaint on SF-17-0526 filed request for hearing 04 2018 - pending final decision on SF-19-0294 with EEOC AJ in abidance

105.      August 08, 2017 email from Debby Ellis Subject: INFO & ACTION: DCO Telework Pilot which informed staff that if they have been teleworking for at least 120

days, they would be able to telework 2 days per week from the week of 8/13/17 through 10/13/17.

106.     August 16, 2017 through October 11, 2017 I worked twice a week under the pilot telework program and earned both credit hours and overtime.

107.     August 23, 2017 Email to Debby Ellis and James Dokko asking that they take into consideration SSA policy "Reasonable Accommodation Requests Involving Fragrance Sensitivity" and grant my request to work from home because the building was still undergoing construction and seismic retrofitting, my request was still denied.

108.     September 25, 2017 Kris Chamrernlaksa send me a notice telling me that management has revoked my liberal leave LWOP approval and would no longer honor it and has invalidated my medical documentation and that I have to provide new medical documentation by October 10, 2017 despite knowing that due to my disabilities of chemical sensitivity, migraines with aura and vertigo I have been unable to get to work in the building since about July 21, 2016. I was told in the same letter I could reapply for the reasonable accommodation of LWOP liberal leave approval, which is wrong management knows I continue to need the reasonable accommodation it is against policy to invalidate medical documentation and take away a needed reasonable accommodation, management should provide at least a more effective reasonable accommodation to replace the revoked reasonable accommodation. The medical documentation that was invalidated had me excused through December 2017, I was reevaluated every 3 months and every 6 months I provided more medical documentation.

109.     September 05, 2017 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

110.     October 02, 2017 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

111.     October 10, 2017 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

112.        October 11, 2017 I sent an email to CREO Manager, Carmelita Rivera, Kris Chamrernlaksa and others about the continued denial of sick leave even though I complied with managements demands that I provide more medical documentation after they decided to void the current medical documentation on file. Please do not unjustifiably charge me with AWOL again. Per Article 31 Section 7. Leave Without Pay I have a right to LWOP under FMLA. Which is what James told me and I would like to know why that is no longer being followed and whom made that determination. The actions taken by management to decide to not follow policy and to place me in a position in which I face AWOL, suspension and/or termination is wrong and against my rights and policy. The actions being taken greatly affect my pay. I am a disabled employee it is not my decision to be disabled or to deny me an effective RA. Management has the authority to provide me with an effective RA so that I can return to work full time. I find the abuse of authority and disregard for policy harassing and discriminatory. This is the last week in the pay period and I do not what to have to fight to get AWOL removed from this pay period as well. I need the harassment, retaliation and discrimination to stop. I am a person and your actions cause me a great deal of duress and I am disabled adding stress to an already bad situation is uncalled for and an extremely bad faith action against someone who is just asking for help. Essentially you are kicking me while I am already down and I have no defense other the fact I have rights and I am hoping someone will step in and start making sure those rights are protected and all that harassment stops once and for all. Per managements demands and under duress and fear for my job (and loss of pay), I have submitted additional medical documentation on 10/03/2017 to support current medical documentation on file, which had me out through 12/2017. And the new medical documentation I recently submitted prompted Mr. Dokko to have me submit yet another RA request to telework full time due to my Vertigo. Please explain to me why management has decided to deny my leave request on 10/06/2017 three days after new medical documentation was submitted and two days after I was prompted to file for a new RA request, without notice that the medical documentation I provided was deemed

by management to not sufficient for leave approval. And why management to date has not notified me that the new medical documentation is not sufficient to them and for what reasons they are denying my leave requests. The only indication I have from management that my medical documentation is not sufficient is a comment on my leave slip. How is it the medical documentation I submitted was deemed worthy of filing for another RA request to be allowed to full time telework by management also be deemed not be sufficient enough to approve my leave by management??? The decisions being made by management are effecting my pay and my employment, and are extremely stressful, confusing and hostile and discriminatory. Which is discriminating and harassing due to the fact all of a sudden my medical documentation is now not acceptable by management, but had been for years past. What has changed? It appears to me that the one thing that has changed is management is determined to terminate my employment by any means necessary (including violating my rights as a disabled individual, making up policies, braking polices and creating a situation where they can force AWOL unjustifiably to unjustly blacken my record. And take retaliatory, intimidation, harassing actions against me and abuse their authority to name a few things). It appears to me that management has made a medical determination that my treating physician's letters no longer have merit and therefore management has decided to make the medical decisions itself, by making a determination that I appears to me to in effect deem me not to be disabled and or have a disability sever enough for them to accommodate. All of these managerial decisions are to my detriment by loss of pay and employment via charging me with AWOL unjustifiably. Based on the letters from management notifying me that not only will I be charged with AWOL for being disabled and unable to commute to work but also that I would be suspended and/or terminated if AWOL persisted. Based on management's actions they have made charging me with AWOL a fact I cannot avoid no matter what documentation I supply, since they control whether or not the documentation is sufficient and they continue to decide it is not to suit their agenda of terminating my employment unjustifiably. It appears to me that management has shown it is not interested in working

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 110 of 156

with me even though they are fully aware of my disabilities and my ability to perform my job while at home and has elected to unjustifiably (void my medical documentation) force me AWOL on my record so that they can suspend and/or terminate my employment unjustly and without just cause. At every turn I have complied with management's demands under extreme duress and have been put under constant treat of being placed on AWOL unjustifiably and eventually terminated. This has created a hostile work environment and extreme duress, I am disabled and I am being punished for it, by management's continual refusal to provide me with an effective RA. It appears to me management has abused it's power (authority) to prevent me from being given an effective RA so that they could box me into a corner and force AWOL on me so that they can fabricate a reason to terminate a disabled employee (which is a complete effect on my pay). It is also apparent that no matter what medical documentation I supply management has no intension of accepting it and has no interest in working with me to help me return to work full time via the use of an effective RA. I would like to know who is responsible for the decisions in my case and why harassment and discrimination is being allowed to continue.

113.    October 19, 2017 filed formal EEOC complaint on SF-17-0799 filed request for hearing 04 2018 - pending final decision on SF-19-0294 with EEOC AJ in abidance.

114.    October 2017 more medical documentation Work Status Report 3 documents one is FMLA

115.    November 13, 2017 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

116.    November 27, 2017 I sent an email to Gina Portillo and DCHR.OPE.CADS.NRAC.REVIEW@ssa.gov as a rebuttal to the review prepared by Abdul Farah which included a copy of the denial notice and a copy of SSA's policy on "Reasonable Accommodation Requests Involving Fragrance Sensitivity". Part of the rebuttal "I want it noted that I was found to be disabled with sensitivity to environmental irritants which I was told would be used in addition to my vertigo and migraines with

aura disability when my RA request was being processed. I would like to know who determined I was not disabled, was it management? Also I would like it noted that management verbally has agreed they know I am disabled and per my approved RA's management has acknowledged my disabilities. So the finding "you are not disabled" is contradictory to managements actions also for over a year management approved my leave under FMLA due to my vertigo and migraine with aura, management's decision to stop approving leave under FMLA (both under FMLA and LWOP in lieu of FMLA) after I had my EEO hearing which is more than coincidental and managements choose to continue to ask for more medical information after the acknowledge they are well aware of my disability and the limitations I suffer due to my disabilities to me shows their intent to harass me, by abuse of authority by constantly demanding more and more medical documentation even though their questions have been asked and answered numerous times. Management has failed to acknowledge that it is management's decision not to provide me with an effective RA that would allow me to return to work full time telework full time, which is what has opened me up for management to pretend I have a leave issue when I actually have a lack of an effective RA issue. Also management told me that they were only interested in talking about my vertigo and migraines with aura and not my disability sensitivity to environmental irritants which also still needs to be effectively accommodated.  I would also like it noted that some of my approved RA's were stopped abruptly without warning and without the ability to appeal the decision or even know who made the decision to revoke/stop my approved RA's or why the decision was made, the timing was done prior to and after my EEO hearing was held. And the aggressive harassment, retaliation increased after I went to hearing and has continued to increase as time goes on. I am trying to return to work full time and help not just me but everyone the workload needs all hands on deck and I am good at the BA job that has never been in dispute. I am in extreme dire need and have been so in years sensitivity to environmental irritants (aka chemical sensitivity), migraines with aura and vertigo." Which I wanted considered before the decision was made and to get someone from the NRAC to contact

1   me because Abdul Farah could not answer my questions but also did not accurately

2   represent the discussion we had.

3   117.    December 1, 2017 spoke with Abdul Farah NRAC Review Team he was

4   supposed to take my statement and answer any of my questions. He could not answer any

5   of my questions I asked him where in reasonable accommodations policy did it allow

6   management to revoke an approved reasonable accommodation that was still needed, or

7   where in policy management could remove an approved reasonable accommodation with

8   out giving the employee the name of the decision maker and refuse to give the qualified

9   disabled employee the right to appeal the revoking of an approved reasonable

10   accommodation. He told me to send an email to NRAC department and I did and never

11   received a response I called and left a message on Abdul Farah NRAC Review Team's

12   answering and he never returned my call. Abdul Farah NRAC Review Team told me that

13   before a final decision was made someone else would call me to answer the questions he

14   could not answer and that never happened either. He also misrepresented what I reported

15   to him.

16   118.    December 4, 2017 email showing that there are Benefit Authorizers (BA) who are

17   "non-spikers" and they are allowed to work BA work.

18   119.    December     4,     2017     I     sent     an     email     to

19   DCHR.OPE.CADS.NRAC.REVIEW@ssa.gov which said "I was told I could request a

20   copy of SSA's Medical officers report on my request below. I had been told that they

21   would be considering all my disabilities sensitivity to environmental irritants, migraine

22   with aura and vertigo. I had also requested that management notify SSA's medical officer

23   that I was found disabled with sensitive to environmental irritants prior to their decision

24   being made."

25   120.    December 11, 2017 email showing that there are Benefit Authorizers (BA) who

26   are "non-spikers" and they are allowed to work BA work.

27   121.    January 03, 2018 email showing that there are Benefit Authorizers (BA) who are

28   "non-spikers" and they are allowed to work BA work.

122.  January 02, 2018 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

123.  January 8, 2018 Tamara F. Stenzel National Reasonable Accommodation Coordinator NRAC rubber stamped James Dokko's recommendation I be denied again the reasonable accommodation of full time telework she did not mention the fact I was found to be disabled and that the current accommodations did not accommodation all my disabilities just a piece meal approach, she notes due to my sensitivity to environmental irritants I needed to be away from fragrances and chemicals but suggest I could take public transportation as though it would be fragrance and chemical free which any reasonable person would not conclude and SSA's Medical Office actually confirmed I would not be able to avoid fragrances in public locations see ROI 7-14 page 5 of 5. It is important to note that Tamara F. Stenzel is not a doctor and had she called me I could have let her know that I was found to be disabled by the EEOC AJ and that SSA's Medical officer had already determined I would be unable to find public transportation that would provide me with a fragrance and chemical free environment and that Leslie Kern had determined that SSA would be unable to provide me with a fragrance and chemical free work environment in an SSA occupied building per ROI 7-14 page 1 of 5, which is why I requested that the decision maker contact me before making a decision based on just what management said.

124.  January 8, 2018 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

125.  January 16, 2018 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

126.  January 22, 2018 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

127.  February 2018 more medical form FMLA

128.  February 5, 2018 showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 114 of 156

129.     February 12, 2018 email showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

130.     February 20, 2018 email about SPIKE showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

131.     February 2018 medical documentation that states: In response to your question about whether or not there is a test to look for contaminants on your laptop computer, I am not aware of any medical test that can look for contaminants on a computer at this time. The practical solution, if you do suspect some sort of contaminates on your laptop, is to get a different one from your employer. (ideally a new one)

132.     March 05, 2018 showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

133.     April 2, 2018 email from Kris showing that there are Benefit Authorizers (BA) who are "non-spikers" and they are allowed to work BA work.

134.     April 12, 2018 filed formal EEOC complaint on Sf-18-0328 filed request for hearing 09 2018 - pending final decision on SF-19-0294 with EEOC AJ in abidance.

135.     April 23, 2018 Email from Kris showing SPIKE downgraded for May 7, 2018 **"The PC is no longer Spiking on May 7, 2018"**

136.     May 11, 2018 Carmelita Rivera issued Notice of Proposed Removal for being out sick because I was not provide an effective reasonable accommodation even though Carmelita Rivera never attempted to provide me with a reasonable accommodation first because she stated it was James Dokko's job to process my reasonable accommodations requests. I have been in reasonable accommodations talks with James Dokko since 2015 to no avail.

137.     March 2018 more medical documentation FMLA form

138.     June 5, 2018 I submitted an appeal to the proposed removal to James Dokko: "Since my EEO hearing in January 2017 management started changing leave policy and practices. I am going to break down the time line of the changes, it is important because it shows management actions were a scheme in which managements goal was trying to

figure out a way to post AWOL to my record and make it impossible for me to have it removed under FMLA which I have a right to being a qualified disabled employee, management diligently manipulated policy so that by September 2017 they realized if they claimed to need more medical documentation to approve my LWOP that management could claim no medical documentation was sufficient enough so that they were free to charge me with just AWOL indefinitely instead of LWOP and then terminate my employment for being a qualified disabled employee and no true other reason. The events show how management made many frequent changes to their advantage so that they could blacken my record the only way they could via AWOL, since management has the power to make up a reason to deny leave requests for a qualified disabled employee who does not have sick or annual leave available.

Prior to my EEO hearing in 2017 and since Mr. Dokko took over the Operations Managers (OM) position in 2015, I was told to make sure my medical documentation was up to date and was told to make sure I had a conversation with my first line to ensure that if for some reason I was not reachable and the time sheet had to be closed that my manager would know what type of leave I wished to take to ensure I would not be charged with AWOL and I was told that as long had update medical documentation I was to submit my leave slips upon my return to work, while I worked with Mr. Dokko for a fully effective RA. Since Mr. Dokko's instruction I had made sure that when my first line changed I would have make sure that they were aware of the instructions Mr. Dokko had given me and ensured that my first line was aware of my request for leave and my very strong desire not to use AWOL while I worked with management toward a fully effective RA. Mr. Charmerenlaksa has been my first line since about October 2016 and he and I had a conversation when he started and he was well aware of my request for leave I ask in this order Sick, Advance Sick, Annual, Advance Annual, FMLA, LWOP if I was not reachable. In February 1, 2017 I had emailed my first line and told him that I was asking for sick leave if it was available if I did not have any more I asked for annual leave. Two days later February 3, 2017 my second line Ms. Rivera contacted me claiming my first

line was out and she needed to talk to me to ensure my paycheck would go out in time she also took the opportunity to ask me personal questions which I answered for fear of retaliation if I did not answer her questions. It came to light that Ms. Rivera lied about my first line being out on Friday February 3, 2017 and that she had to talk to be to ensure my pay check was paid on time as I received an email from my first line on Friday February 3, 2017 and the fact that my time sheet was processed on the following Monday February 6, 2017 which is evidence of misconduct on Ms. Rivera's part to gather information from me under false pretenses.  In early February 2017 I was informed that I would start receiving advance sick leave on an accruing basis because I had maxed the hours of advance sick leave and could not have more hours of advance sick leave beyond what I earned each pay period. My first line instructed me to continue to request sick leave and I would be granted the sick leave I accrued and the rest would be changed to LWOP. I followed his instructions and continued to request sick leave and whatever was not covered by the advance sick leave was converted to LWOP as I was told it would. After that on March 16, 2017 my first line sent me an email claiming he did not know what leave I wanted and that he would put AWOL as a place holder if I did not contact him by 9:30am because that was the deadline to certify time sheet, I found out that time for the deadline for time sheets was not the true deadline. I then reminded my first line that for years he followed the policy Mr. Dokko had me set up and my requests for leave had not changed and that I never ask for AWOL that if I did not have sick or annual or FMLA then I asked for LWOP while I wait for a fully effective RA. Later in March 2017 management posted AWOL for March 24, 2017 through March 28, 2017 and March 30, 2017 and 2 hours on March 31, 2017 because management claimed they did not know what type of leave I requested even though there was a sick leave request on file. Both my first line and second line state the charge of AWOL for March 24, 2017 through March 28, 2017 and March 30, 2017 and 2 hours on March 31, 2017 was put as a placeholder so that my time sheet could be processed and that when I returned to work and submitted a new leave request LWOP was removed under FMLA act and that the

AWOL did not stay on my record. In March 2017 management acknowledges that it was acceptable to submit leave requests when I returned to work and that under FMLA policy my LWOP requests were approved even after management incorrectly charged me with AWOL instead of LWOP for the period sick leave did not cover. Ms. Rivera states my LWOP was approved for March 24, 2017 through March 28, 2017 and March 30, 2017 and 2 hours on March 31, 2017 under the Family Medical Leave Act (FMLA). Then in August 14, 2017 my first line informed me that leave policy changed again and that I would be required to call in each day I was out sick even though in the past that was not required as there was an understanding of what leave I was requesting and I was submitting my leave requests upon my return to work and because I had valid up to date medical documentation stating I would be out sick unless I was accommodated. My first line had informed me that the change was being done because upper management told them to and that unless he told me otherwise I had to call in or my leave would be posted as AWOL. On August 14, 2017 I brought to my first lines attention that there was no policy that required an employee who was out sick with medical documentation on file excusing them from work due to illness every day they were out sick (example a woman on maternity leave was not required to do so) and that my leave was not unaccepted as I had the medical documentation on file, my first line eventually changed to say that then with the medical documentation on file I did not have to call in every day as previously instructed. Then on August 17, 2017 management told me policy was again changing and that management had decided it would no longer approve leave request that were submitted when an employee returned from being out of the office, even though it was a complete break of what had been policy in March 2017 just five (5) months before. Then in September 2017 management again decided to change policy again, I received a notice dated September 25, 2017 from my first line informing me management decided to invalidate my medical documentation good through December 2017 used to approve my LWOP requests under FMLA through October 9, 2017, which is a shocking difference from March 2017 again just five (5) months ago when management honored FMLA leave

requests. Management also informed me that the current medical documentation was only going to stay valid through October 9, 2017 and that to avoid AWOL I had to provide more medical documentation. The notice also informed me that my other RA telework one day a week would continue. I supplied yet more medical documentation on October 3, 2017 to management and even with the new medical documentation management charged me with AWOL effective October 10, 2017. Ms. Rivera informed me in an email that due to the exhaustion of your 480 hours of FMLA, AWOL has been posted, implying that the AWOL for October 6, 2017 through October 13, 2017 was done because Ms. Rivera could not approve FMLA but she also refused to approve LWOP in lieu of FMLA like she did in March of 2017. I also provided medical documentation on Friday October 20, 2017 and Monday October 23, 2017 I submitted additional medical documentation for October 20, 2017 through October 24, 2017 due to a potentially contagious illness and my LWOP leave requests were still denied by Ms. Rivera claiming to need yet more medical documentation. The evidence above is clear of management frequently was changing leave policy after I had my EEO hearing in January 2017 and is evidence that there was active manipulation of policies which is against policies and done in an attempt to fire a qualified disabled employee for no other reason than being disabled and for filing EEO complaints asking for a fully effective RA which is retaliation and against the law.

September 25, 2017 Defendant sent me a notice acknowledging that I am qualified disabled employee who suffers from "chemical sensitivity, migraines with aura, and vertigo." The notice notifies me that the medical documentation I have on file will be invalidated and LWOP would no longer be approved as a reasonable accommodation but that I could reapply for the reasonable accommodation of LWOP. I am required to provide additional medical documentation to re-substantiate my known disabilities, see Kris Charmerenlaksa notice "Re: Notification to Return to Duty" which clearly states an acknowledgement of my disabilities and said limitations: "You have been unable to maintain consistent attendance to work since July 21, 2016 due to a variety of **medical**

**issues including but not limited to: chemical sensitivity, migraines with aura and vertigo. Since July 21, 2016, you have been approved on Leave-Without-Pay (LWOP) based on medical documentation that you have provided** and permitted to telework one day a week." (emphasis added) The statement is clear evidence the Agency is well aware of the fact I am a qualified disabled employee and therefore the Agency is required to make available to me reasonable accommodation(s) which is effective for my specific disability needs. After my EEO hearing in January of 2017 I have been accused by management of intestinally creating an illness that prevents me from commuting to work even though management has acknowledged that I am disabled, and time and time again I have supplied medical documentation to support my disabilities and limitations and continual need for a fully effective RA. After my EEO hearing in January 2017 management also started to alter leave policy over a period of months finally culminating in management's decision to abuse it's authority by claimed that they suddenly were in need of yet more medical documentation or my LWOP could not be approved knowing they could claim all medical documentation was not sufficient and that no one would epos them because it is apparent to me the goal of management is not to provide me with a fully effective RA but to terminate my employment in the hopes that it will also end the EEO cases and a final act of retaliation against me for filing those EEO complaints. It is important to note that in the notice dated September 25, 2017 "Re: Notification to Return to Duty" states that management suddenly decided that past and current medical documentation was no longer sufficient/valid in managements eyes for just continued approval of my LWOP requests. Management's sudden decision to invalidate my current and past medical documentation, because management suddenly decided to change what it deems to be acceptable to approve my LWOP or FMLA requests; while also deeming my medical documentation to be sufficient for my other partially effective RA (telework once a week) is evidence of a change policies, and is not permitted by policies, regulations or law. Management is request for additional medical documentation is a scheme to make it appear as though they are justified in denying my LWOP requests and

charge me with AWOL. Evidence that the request for more medical documentation is a scheme is that the medical documentation is only deemed insufficient/invalid for the continual approval of my approved RA LWOP request but sufficient for the continued approval of my other approved RA (telework once a week) based on the same medical documentation provided. Therefore there is substantial evidence that the medical documentation I have provided is more than sufficient and should continue to be sufficient for the continued approval of my LWOP requests. Managements knowledge that I continue to need RA's and that I am still in talks with management for a fully effective RA is also evidence I am working to return to work full time. The approved partially effective RA (telework once a week) substantial evidence management is aware that there is a need for additional telework days8; it is also evidence that the Agency does not suffer any undue hardship in allowing me to telework.

Ms. Rivera is incorrect in stating my behavior is serious misconduct and am the reason I am not working full time, the reason I am not working full time is because management has just provided me with a partially effective RA's, Mr. Charmerenlaksa clearly states I was provided a partially effective RA's (teleworking once a week) and a second RA approval of LWOP request. Requiring an employee to take sick leave is not a fully effective RA. There is no evidence the Agency has suffered any strain on operations during the time in question or evidence I am not ability to provide high quality work; especially since I continue to receive successful performance appraisals and have for the past nine (9) years and eight (8) months of my employment. The contradiction of management suddenly deciding my medical documentation is sufficient to provide me with one RA (telework once a week) but not sufficient for the continual approve of my other RA (approval of LWOP requests) is evidence of management's intentional and malicious acts of retaliation against a qualified disabled employee who has filed EEO cases. It is also evidence that management has chosen to blacken my record to create a reason to terminate my employee instead of providing me with a fully effective RA. Ms. Rivera is mistaking in the believe that I can be removed from the Agency under Chapter

75 of title 5 of United States Code part 752 of title 5 of the federal regulations subpart D §752.403 (a)1 and (b)2 and 5 U.S.C. 23023. Because the regulation is clear in that it cannot be used to terminate an employee in a protected class and I am qualified disabled employee which is a protected class. Further terminating a fully qualified disabled employee instead of providing them with a fully effective RA would not in any way improve the efficiency of the Agency, the act would do the opposite. If Ms. Rivera believed my behavior was serious misconduct why didn't she take actions of progressive discipline reprimand to suspension back in October 2017 when she chose to start denying my LWOP requests an charge me with AWOL instead; against FMLA policy per Ms. Rivera's own comments, instead of Ms. Rivera claiming in an email dated October 13, 2017 that the reason I was being charged with AWOL was due to the exhaustion of FMLA because I had 480 hours of FMLA on record. From October 2017 through March 2018 there was no discipline showing that management did not find my behavior serious or misconduct. Also management continues to assign me high priority workloads even after October 2017 when management chose to start denying my LWOP requests and chose to only charge me with AWOL, which shows that management has full confidence in my ability to work any case I am assigned and that management can rely upon me to work via telework even after management charged me 70 specifications of AWOL. The fact there was no progressive discipline shows management did not deem my being out sick sever enough to reprimand me or suspend me prior to their decision to suggest my removal for being disabled. There has been a great deal of time between the first charge of AWOL in October 2017 and March 2018 when management decided to suddenly claim my being out sick while I work with management toward a fully effective RA, about six (6) months have passed without any warning I would be removed from employment. I was working as I had for about two (2) years without any knowledge I would be put up for removal. There is no explanation why all of a sudden things changed yet again, especially since I continued to perform my duties at a successful performance level and nothing had changed. Also per the notice my first line sent September 25, 2017

"Re: Notification to Return to Duty" states that my LWOP6 will be approved through October 9, 2017 but I was charged with AWOL starting in October 6, 2017 to date. Also should have been approved LWOP6 for October 20, 2017 through October 24, 2017 due to a potentially contagious illness, but was still charged with AWOL even though I have never before had a disciplinary record in the nine (9) years and eight (8) months of my employment and would not still not if management abided by FMLA policy like they used to and did back in March 2017.

My successful performance appraisals are evidence management has faith in my ability to perform my job, my ability to work with others and the fact I continue to be assigned high priority workloads to date is further evidence that management does have faith in my ability to work via telework my remaining approved partially effective RA. There is no consistency with the proposed penalty against me as there has been no progressive discipline and I was not given any warning that anything would change since in the six (6) months between October 2017 and March 2018 prior to receiving the notice of prosed removal I was working as usual without any warning that would suddenly change, no reprimand no suspension no warning of an upcoming removal. Management went from charging me with AWOL as a place holder in October 2017 under the guise of my FMLA being maxed out to then in March 2018 calling for my removal from employment, and no matter how much medical documentation provided it was not sufficient enough to allow my approved RA of LWOP approval to continue but was sufficient for my other RA of telework once a week (partially effective). It is also not consistent for management to withhold a fully effective RA from a qualified disabled employee. Ms. Rivera does not that my being out sick has not harmed the Agency's reputation and there is also no evidence my being out sick has harmed the Agency at all.

Ms. River is mistaken when she says she sent me a letter dated September 25, 2017 I do not have a notice from her on that date, I do have the letter from my first line Mr. Charmerenlaksa statement in the notice dated September 25, 2017 "Re: Notification to Return to Duty" which clearly states an acknowledgement of my disabilities "You have

been unable to maintain consistent attendance to work since July 21, 2016 due to a variety of medical issues including but not limited to: chemical sensitivity, migraines with aura and vertigo. Since July 21, 2016, you have been approved on Leave-Without-Pay (LWOP) based on medical documentation that you have provided and permitted to telework one day a week." (emphasis added) which clearly states my medical documentation is sufficient for one of my approved RA's telework once a week (partially effective) but not sufficient to continue my other approved RA of approval of my LWOP based on FMLA policy (partially effective). Which is evidence management is aware my medical documentation is sufficient and cannot explain why management chose to claim it invalid for LWOP leave requests. The only conclusion I can make is that the reason to invalidate my medical documentation just for LWOP leave requests to allow management to fabricate an issue with my employment/blacken my record so that I could be removed unjustifiably for being a qualified disabled employee. And also appears to be further retaliatory action by management against me for filing EEO complaints. Ms. Rivera also does not mention that I had asked her and other managers what had changed, why management decided to change leave policy on my yet again denying my medical documentation for LWOP request suddenly and without warning. And that Ms. Rivera tried to claim that I was being charged with AWOL due to my FMLA reaching 480 hours in an email she sent me in October 13, 2017, which contradicts what she claims in the notice of prosed removal. Ms. Rivera also does not acknowledge that she changed policy she followed to approve my LWOP requests which is against policy and that it is the Agency's delay in providing me with a fully effective RA is the result of me being out sick and that the delay is unreasonable based on the law. Ms. Rivera is mistaken I cannot return to work full time if management provided me with a fully effective RA (full time telework aka work from home) I have proven I am a diligent worker when I am allowed as per my successful performance appraisals for the past nine (9) years eight (8) months of my employment, and there is evidence there is no undue hardship suffered by the Agency if I telework. Ms. Rivera also fails to mention that she delegated authority to

process RA request to Mr. Dokko in an email dated November 1, 2017 stating "James Dokko is handling your RA request. If you have any questions on the RA, please contact him." which is evidence Ms. Rivera has not considered all options available before proposing my termination, or she was made aware management decided not to provide a qualified disabled employee a fully effective RA against policy, even though my Union Representative and I are still in RA talks with Mr. Dokko to date.

In the "Notice of Proposed Removal" page 8 of 10 Ms. Rivera states "You have provided medical documentation regarding your medical condition including your ability to commute. **While I empathize with your circumstances,** the agency must have someone available for duty in your position." (emphasis added) Ms. Rivera errors in citing my ability to commute as she notes on an email dated November 1, 2017 "**I understand that you have trouble driving,** but **commuting to work is not part of the Benefit Authorizer position description.**"(emphasis added) There is clear evidence that Agency's management is aware I am disabled and that I am a qualified disabled employee as I have been approved to telework once a week (partially effective RA) and I continue received successful performance appraisals and have since I was hired back in August 2008. There are employees who were allowed to work from home full time for many months due to their in ability to commute which shows there has not been equal treatment. Ms. Rivera is or should be aware of full time telework as an RA or under Article 39 (Work at Home by Exception) and since she does not contest I am a qualified disabled employee she cannot claim there is no other potion for her but to propose my removal as she has not offered or provided me with Article 39 or the RA of full time telework. She has just permitted me to work from home once a week via telework which is clearly partially effective as I continue to receive successful performance appraisals and she continues to have me work high priority workloads to date shows she knows or should know I am able to do the BA job via telework. Ms. Rivera shows her doubts I am disabled in an email dated November 1, 2017 "Do you not suffer migraines on Wednesdays? Can your doctor verify that your migraines and dizziness occur only on the

days of FMLA you are requesting: Monday, Tuesday, Thursday and Friday and for how long they last?" this is not the first time a manager expresses their doubts about my doctors diagnosis and my limitations due to my disabilities I have been told on more than one occasion if I wanted to work full time I would be implying I could just flip a switch and be free from my disabilities and able to drive and tolerate fragrances and chemicals.

Ms. Rivera also fails to mention the unhealthy and unsafe working environment in the building due to the ongoing construction since 2014, the rodent infestation and multiple positive Legionella tests. There are many reports of odors filling the building effecting employees including but not limited to an email dated July 26, 2016 "Today's building evacuation was caused by smoke from a failing electrical motor inside the air handler that provides conditioned air to the west corridors (nearest the parking lot) on all floors." and email dated January 30, 2017 stating "Many have noted and reported a tar-like odor in Hagel Building today.  The source was waterproofing work for the Marina Plaza renovation project." The building has been cited by OSHA due to the rodent infestation which makes the building unhealthy and unsafe for a healthy employee and defiantly unhealthy and unsafe for a disabled employee; that in addition to the ongoing construction while employees are at work is a mitigating circumstances that needed to be mention but Ms. Rivera does not mention the state of the building and the continual construction, or even the fact that employees are being moved around the building to allow construction to be performed floor to floor.

CONCLUSION Given the foregoing, I believe that the Agency's removal of me from employment cannot be sustained, the Agency must justify its penalty by clear and convincing evidence in line with Chapter 75 of title 5 of United States Code part 752 of title 5 of the federal regulations subpart D §752.403 (a) and (b) which is has not been done. And proposed removal is against Chapter 75 of title 5 of United States Code part 752 of title 5 of the federal regulations subpart D §752.403 (b) which clearly states "An agency may not take an adverse action against an employee on the basis of any reason prohibited by 5 U.S.C. 23023" I am under a protected class as I am a known qualified

disabled employee, which is not disputed. The evidence above shows that since my EEO hearing in January 2017 management has been acting in bad faith by manipulating and changing policies at whim so that they could figure out a way to charge me with AWOL and keep it on my record to unjustifiably blacken my record. Once management figured out a way to black my record under false pretenses management believed it finally figured out a way to terminate me a qualified disability employee so that they would not have to provide me with a fully effective RA. In addition the blackening of my record was also a retaliatory act because I have filed EEO complaints. Additional evidence of the Agency's bad faith actions is that management is forcing me to take leave instead of approving me with a fully effective RA that would allow me to return to work full time. I request you eliminate any reference to this disciplinary action from all records personal etc. excluding none."

139.    June 23, 2018 filed formal EEOC complaint on SF-18-0604 filed request for hearing 10 2018 - pending final decision on SF-19-0294 with EEOC AJ in abidance.

140.    August 06, 2018 email from Kris showing non-spiking BA's and a **distinction between non-spiking BA's and trainees.**(bolded for emphasis)

141.    August 8, 2018 Decision to Remove From Federal Service James Dokko affirms Carmelita Rivera's proposed removal even though James Dokko is aware, he and I am were in reasonable accommodation talks and that I am out sick due to my disabilities not being effective reasonably accommodated. James Dokko remarked that he saw my termination due to being out sick because I did not have an effective reasonable accommodation and our discussions on what reasonable accommodations to provide me so I could go back to work as separate issues! I don't believe any reasonable person would not see that reasonable accommodation talks are directly related to a proposed removal when the reason the person is proposing removal is because the employee is out sick because of their known disabilities, which is exactly my cases. The fact James Dokko did not take into account Carmelita Rivera knew I was disabled and never tried to provide me with a reasonable accommodation before proposing my removal is ridiculous,

especially since all my supervisors including Carmelita, James and Kris all agree I was performing quality work and my job performance was never an issue, and the only issue was I was out sick because of my disabilities which I have been desperately trying to get effectively accommodated since 2014.

142.    August 18, 2018 filed formal EEOC complaint on SF-18-0924 on November 5, 2018 EEOC Dismissed case without a formal investigation on December 17, 2018 EEOC AJ asked Defendants Councel Tina Saladino "to see if she could get CREO to rescind the dismissal of Complainant's removal complaint so it can be properly processed as a mixed case under 29 C.F.R. Section 1614.302(d)" on December 20, 2018 disissal was partially rescinded only one of the three accepted issues was approved to continue and was bifurcated creating new case number SF-19-0294. I appealed the other issues being dropped still no formal investigation completed and SSA filed to have case dismissed - appeal to EEOC April 18, 2019, September 9, 2019 response to dismiss request on September 29, 2019 OFO found the cases were similar and wanted to dismiss the case and November 6, 2019 my request for reconsideration of the dismissal was accepted- on October 3, 2019 I appealed the decision because the decision is incorrect and does not properly apply EEOC regulations 29 C.F.R. § 1614.107(a)(1), because the issues are not the same in that the prior EEO complaints do not include accepted issues of my Physical and Mental Disability Sensitivity to environmental irritants, vertigo, migraines with aura and dyslexia in the complaint but EEO case SF-18-0924 does. The issues in the prior EEOC cases SF-17-0411-SSA, SF-17-0526-SSA, SF-17-0799-SSA,SF-18-0328-SSA and SF-18-0604-SSA ONLY represent issues based on PHYSICAL DISABLTY Sensitivity to environmental irritants, however the EEOC case SF-18-0924-SSA before OFO represents issues based on PHYSICAL AND MENTAL DISABLTIES Sensitivity to environmental irritants, vertigo, migraines with aura and dyslexia and therefore SF-18-0924 is not identical to any of the prior EEOC cases as claimed in this decision. Decision to uphold decision to dismiss was issued March 12, 2020 which I am including in my civil suite.

143. August 2018 medical document noting I was diagnosed with fibromyalgia in February 2015. I have chronic pain and that fibromyalgia is a chronic conditions and there is no expected date of full or partial recovery. Due to the chronic condition, it can impact my live activities both on and off the job.

144. September 2018 medical documentation noting that I suffer from traumatic brain injury, migraine with aura and chronic migraine. I also suffer from dizziness and episodic disorientation. I am unable to drive more than 2-3 blocks at a time. Also notes my hypersensitivity to fragrances and certain lighting. Given the limited improvement with many treatment trials, my physician is not optimistic I would completely recover. He goes on to say that I might be able to continue working if I was given the needed accommodations like an environment near restroom, be able to control my lighting, taking into account my inability to drive long distances and an environment free from triggering fragrances. Please note that 1 city block to mile is about 0.05 mile so I am limited to 0.1-0.15 mile or 2-3 blocks, and the Social Security Field Office is not fragrance and chemical free and is 11 miles away from my home according to MapQuest which is significantly more than my disability limitations.

145. October 05, 2018 filed formal EEOC complaint on SF-19-0294 no formal investigation was conducted and a second Final Agency Decision was issued dated January 30, 2019 where I was found to be a qualified disabled employee but the decision maker did not make a decision as to where or not I was denied a reasonable accommodation and said it would be determined under EEOC case SF-18-0604. I emailed OCREO telling them it was wrong that no formal investigation was conducted in this case and that information was left out and I was wrongfully denied an formal investigation in OCREO's email reply February 12, 2019 EEOC informed me that the formal investigation for SF-18-0604 was used even though it did not cover the period leading up to my removal and did not investigate the reasoning behind the removal decision and if I did not agree with the decision I had to appeal to MSPB and I file an appeal to MSPB filed on 03-10-2019 so that I did not miss the deadline, Defendant's

Counsel Tina Saladino attempted to get the case dismissed from MSPB under the guise there would be a formal investigation and that a new final agency decision would be made she included SSA's Claudia Postell Associate Commissioner of Office of Civil Rights and Equal Opportunity Declaration stated that there would be a formal investigation completed on this case by March 25, 2019 she signed the declaration on Friday March 22, 2019 she also affirmed including an attachment "is a true and correct copy of OCREO records that confirm the supplemental investigation was ordered." I filed an appeal to the request to dismiss this case noting that the copy of OCREO records that confirm the supplemental investigation was ordered exhibit shows that the case was bifurcated from SF-18-0924 and that Zero (0) hours and Zero (0) money was spent to formally investigate SF-19-0294 proving that SSA had no real intent of performing a formal investigation because the deadline for the investigation was Monday 03-25-2019 and nothing was done as of Friday 03-22-2019 there was absolutely no way a formal investigation could be conducted over the weekend the deadline for the formal investigation Monday 03-25-2019 came and went and no formal investigation was conducted. an unauthorized investigation was attempted and I was denied the right to respond I was given a deadline to file a reply to the unauthorized investigation starting March 28, 2019 the EEOC investigator Suzanna Sotello called me I asked if she was aware that the deadline for the investigation was March 25, 2019 and she said she was aware but was going to do the investigation any way, I told her that is not lawful and that no extension was given by CREO or me for an unsanctioned investigation to be conducted. never the less the EEOC investigator Suzanna Sotello decided to conduct an unauthorized investigation and sent me an email on April 5, 2019 with a deadline to supply rebuttal statements by April 12, 2019 I again reminded the EEOC investigator Suzanna Sotello that she was conducting an unsanctioned investigation without authority and asked that they provide proof that there was authorization called OCREO and my local CREO and emailed both OCREO and my local CREO I eventually received a call on April 9, 2019 from someone in the OCREO office and she told me that the

unsanctioned "investigation" was already closed and I would get a copy of it in the mail I told the woman that it was surprising since I had an email from EEOC investigator Suzanna Sotello and a deadline to respond by April 12, 2019 and the fact that she closed the unsanctioned investigation before my deadline and without responding to my requests for verification she received approval after the March 25, 2019 deadline appeared to me fraud was committed. CREO created a fraudulent ROI that only had management's statements from the unsanctioned investigation that was prematurely closed prior to April 12, 2019 my deadline to provide rebuttal management statements. The fraudulent ROI was used to produce a third fad in this case on July 19, 2019 which again was a decision to dismissed this case even though it was appealed to MSPB and no MSPB decision had been made yet!- appeal to EEOC September 5, 2019 I am including this in my civil suite

146. October 24, 2018 OPM approved my disability application I was found to be disabled from my position as a Benefit Authorizer due to migraines with aura and vertigo, my benefits started effective August 16, 2018.

147. January 30, 2019 Defendant found I am known qualified disabled employee per SSA Office of Civil Rights and Equal Opportunity Final Agency Decision and that decision acknowledged that I was working 100% via telework under the pilot telework project which was not a reasonable accommodation and I continued to receive successful performance appraisals, definitive evidence to the EEOC decision maker I am a qualified disabled Benefit Authorizer and therefore entitled to an effective reasonable accommodation.

148. April 2, 2019 I sent a settlement demand for the MSPB case and on April 8, 2019 Defendant declined without offering a counter offer. This is not the first time Defendant declined to try and come to a settlement instead of taking this case to court.

149. June 25, 2019 The Office of Federal Operations (OFO) failed to go through the evidence I provided in my appeal and in my request for reconsideration, despite the fact I provided evidence that showed SSA approved over 20 Benefit Authorizers the RA of telework since 2016 and over 100 disabled Benefit Authorizers Article 39 Work at Home

by Exemption since 2015, see exhibits provided in my initial complaint dated May 17, 2019 labeled "Agency's Response to Appellant's Request for Production #6 as amended in the Board's April 25, 2019 Order" and dated May 3, 2019"Agency's Response to Appellant's Request for Production #6 as amended in the Board's April 25, 2019 Order". OFO ignored the fact that Debby Ellis lied when she said Benefit Authorizers received SPIKE training during the Benefit Authorizer nine month training, testimony provided by James Dokko acknowledged that SPIKE training was an additional 2 months, see January 19, 2017 EEOC Hearing Transcript Volume 2 page 248 lines 9-25 and page 249 lines 1-25 and page 250 lines 1-13 and page 353 lines 3-6. Debby Ellis admitted she lied and that there were Benefit Authorizers who were not trained to SPIKE during the nine month Benefit Authorizer training, it would have been impossible to complete the Benefit Authorizer nine month training and the two month SPIKE training in nine months, Debby Ellis claimed the Benefit Authorizers who were still not SPIKE trained would be by spring of 2017 no matter what, I provided evidence to the OFO that the Benefit Authorizers who were still not SPIKE trained were still not trained by August 2018, see supplemental exhibit 4 in My Appeal to the Office of Federal Operations Decision in.

SSA failed to abide by Article 31 "Time and Leave - Section 3. Excused Absences - B. When management determines that exposure to unsafe or unhealthy working conditions which cannot be immediately corrected may result in the likelihood of illness or injury, employees will either be assigned work in a safe and healthy area in the same office or deployed to another installation or granted an excused absence." SSA management acknowledges that SSA is unable to prevent my exposure to fragrances and chemicals that all SSA could do in SSA buildings was try and limit my exposure, proving SSA was aware I was being exposed while I was in SSA buildings SSA acknowledges that even with the air purifier the room continued to have fragrance and chemical odors that triggered my disability and therefore proving the provided reasonable accommodations in the buildings are not as effective as the reasonable accommodation of telework is, because in my home I can eliminate my exposure to fragrances and chemicals see MSPB

Hearing Transcript day 2 page 6 lines 21-25 page 7 lines 1-4 and page 130 lines 22-25 and see supplemental exhibit 11 "emails showing building under construction and hazards" in exhibit My appeal to the Office of Federal Operations Decision and see January 19, 2017 EEOC Hearing Transcript Volume 2 page 365 lines 18-25 and page 366 lines 1-7 and page 366 lines 19-25 and page 367 lines 1-25 and page 1-5 and page 380 lines 12-22.

Even though the OFO had definitive evidence SSA lied under oath on the key points EEOC AJ used to render her decision in SSA's favor. EEOC AJ heard testimony from my union representative about the fact SSA had approved an employee telework for a year EEOC AJ did not give his testimony proper weight and EEOC AJ gave SSA officials James Dokko and Debby Ellis too much weight given multiple times SSA officials James Dokko and Debby Ellis were caught in a lie during the hearing testimony, however EEOC AJ did not give weight to SSA officials James Ekeroma testimony he witnessed my disability being triggered, see January 19, 2017 EEOC Hearing Transcript Volume 2 page 200 lines 17-25 and page 201 lines 1-9 and page 364 lines 9-22 and page 368 lines 17-25 and page 369 lines 1-13 and page 370 lines 6-20 and see supplemental exhibit 7 in exhibit My appeal to the Office of Federal Operations Decision. The most important fact SSA lied about was not being able to approve my reasonable accommodation of telework because it would remove an essential function of the job and that I was the only employee who was excused from SPIKE, **the fact is SSA was approving qualified disabled Benefit Authorizers with telework as a reasonable accommodation SINCE 2016 none of the Benefit Authorizers who were approved for the reasonable accommodation of telework or approved for Article 39 were required to SPIKE and were allowed to telework full time.** Even with the facts laid out for the OFO at their feet, the OFO still decided to uphold EEOC AJ's hearing decision on the initial appeal and on the request for reconsideration. I have lost over $249,118.89 in lost income just through November 8, 2019, if I were to retire at 66 I would have lost an estimated total of $3,023,929.66 assuming an estimated cost of living

increase of 2% not including step increase or future bonus or future 401K losses see

exhibit TSP documents and Lost wage Calculations to see how I arrived at these

numbers. SSA's actions have not only effected my health and ability to support myself,

SSA's actions have affected my quality of life past, present and future, see exhibits 7 and

8 in Termination Documents. I have to live with the consequence of SSA's refusal to act

timely in 2014 to my request for an effective reasonable accommodation of telework. The

fact James Dokko ignored SSA's Medical Officers determination that SSA would be

unable to provide me with a scent free environment in SSA' buildings (which James

Dokko acknowledged being aware of and agreeing with SSA's Medical Officers

assessment, see MSPB Hearing Transcript day 1 page 220 lines 18-22), my treating

physicians multiple recommendations accommodation of telework if SSA was unable to

provide me with a fragrance and chemical free environment since 2014 and

recommendation of my first line supervisor Kris Chamremlaksa that I be approved for

telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and

lines 9-11. The most depressing thing is that SSA provides qualified disabled Benefit

Authorizers the reasonable accommodation of telework and the fact James Dokko

ignored SSA's Medical Officer determination that SSA could not provide a fragrance and

chemical free environment made in 2014 and the recommendation of my treating

physicians since 2014 and my first line supervisor Kris Chamrernlaksa that I be approved

for telework five days a week, proof there was no lawful reason for SSA to have denied

the reasonable accommodations of telework or for SSA to have fired me instead of

effectively accommodating me, SSA managers acknowledge I am a good employee and

that my work "…I admit when you are working, you're a good employee. I do not deny

that. And, you know, your management team agrees with that…" MSPB Hearing

Transcript day 2 page 89 lines 16-18 And "..You weren't removed from service because

you did a bad job." MSPB Hearing Transcript day 2 page 89 lines 21-22. If James Dokko

did not ignore SSA's Medical Officer's determination and my treating physicians

decision and my first line supervisor Kris Chamrernlaksa recommendation to approve my

request to telework five days a week or if James Dokko allowed my first line supervisor to issue his recommendation to the NRAC I would have been approved for telework five days a week based on the quality of my work, see MSPB Hearing Transcript day 2 page 26 lines 16-25 and page 27 lines 1-6. James Dokko still decided to terminate unlawfully terminate my employment even though my first line supervisor Kris Chamrernlaksa recommended SSA approve my request to telework five days a week instead of being terminated and even though SSA was in reasonable accommodations talks with me proving I am a known qualified disabled employee and the current accommodations were not working, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11 and MSPB Hearing Transcript day 2 page 95 lines 3-10, the only reason I was not working full time was because SSA's decided to continue to deny me the requested available reasonable accommodation of telework, despite the fact SSA was already providing the reasonable accommodation of telework to 20 other qualified disabled Benefit Authorizers since at least 2016 and my first line supervisor would have approved me for telework five days a week if he was allowed to make the recommendation to the NRAC. The facts show I was still in good standing up until the day I was terminated because I was allowed to continue to telework under the pilot telework program and was approved to work credit and over time while working 100% via telework once a week under the pilot telework program since July 26, 2016, see MSPB Hearing Transcript day 1 page 46 lines 11-25 and page 47 line 1 and page 48 lines 12-25 and page 49 lines 7-14 and page 116 lines 14-25 and page 117 lines 1-25 page 118 lines 1-6 and page 107 lines 16-20. It is also important to note that I did not have a disciplinary record prior to my removal on August 15, 2018, see MSPB Hearing Transcript day 2 page 87 lines 17-19. All the facts provided prove SSA wrongfully terminated me a qualified disabled employee who SSA refused to provide an available reasonable accommodation of telework despite SSA having been informed by SSA's Medical Officer SSA in 2014 (ROI 18 page 2) could not provide me with a scent (fragrance and chemical free) environment in SSA's building which SSA management agreed was an accurate assessment of SSA's inability to provide

me with a fragrance and chemical free environment in SSA's building and my treating physicians (see exhibit medical documentation) continual recommendations for SSA to provide me with a fragrance and chemical free environment and if SSA could not provide me with fragrance and chemical free environment in SSA's building that I be allowed to telework and the fact that SSA received the recommendation from my first line supervisor Kris Chamrernlaksa that SSA should have approved my request for telework five days a week instead of terminating me because I was producing quality work while working 100% via telework once a week under the pilot telework program since July 26, 2016 and continued to receive successful performance appraisals. It is important to note NRAC did not determine if SPIKE was an essential job function they based their decision on the recommendation James Dokko made (see exhibit 11 in exhibits Articles and Emails), EEOC AJ and OFO made their decisions solely based on SSA managements statements and not based on facts, James Dokko's recommendation to deny my request for telework as a reasonable accommodation was based on James Dokko's claims SSA could not provide a qualified disabled Benefit Authorizer the reasonable accommodation of telework, James Dokko made his recommendation to deny my request for the reasonable accommodation of telework on his beliefs not policy or medical recommendations, James Dokko and without ever investigating where SSA had provided other qualified disabled Benefit Authorizers the reasonable accommodation telework five days a week because he did not believe there was a reason for him to inquired if SSA provided telework as a reasonable accommodation to qualified disabled   Benefit Authorizers,

> JUDGE RIBAS: As someone who is a benefit authorizer in your office, can you --
> is there any situation in which you can permanently approve as a reasonable
> accommodation -- assuming the medical documentation supports it -- someone
> permanently teleworking five days a week as a reasonable accommodation?
> MSPB Hearing Transcript day 2 page 20 lines 20-25

THE WITNESS: "I've never explored that. Would it be -- could that be a possibility, possibly? **Personally, I do not believe so.**" (bolded for emphasis)

MSPB Hearing Transcript day 2 page 21 line1-3

Q Did you inquire as to whether or not benefit authorizers within the Western Payment Program Service Center had been approved to telework five days a week?

A **I did not inquire**, and it's the Western Program Service Center. (bolded for emphasis)

Q Why did you not inquire?

A **There was no reason for me to inquire.** (bolded for emphasis)

MSPB Hearing Transcript day 1 page 205 lines 17-25.

SSA management acknowledge I was not terminated for because of the quality of my work but for being out sick, SSA management acknowledges that we were in Reasonable Accommodations talks even through my termination, SSA split hairs throughout my EEOC cases they do not dispute I was in need of an effective reasonable accommodation that returned me to work, SSA refused to provide me with an effective reasonable accommodation that would have returned me to work instead SSA chose to provide the reasonable accommodation of flexible leave, SSA made their decision to deny my reasonable accommodations because of James Dokko's beliefs and James Dokko's medical determinations that contradicted SSA's Medical Officer and my treating physicians recommendations and my first line supervisors recommendations, see MSPB Hearing Transcript day 2 page 95 lines 3-14 and MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11 and page 205 lines 17-25 and page 206 lines 1-12 and ROI 18 and medical documentation exhibit pages 7-12,17,18,20,23,31,32,36,42,43,45-49,52,54-58,60,61,63-65,70,72,76,78,79,82,86-90,92-94,96-99. SSA did not make a good faith effort to provide me with an effective reasonable accommodation SSA was informed by EEOC AJ on October 31, 2016 that the accommodations provided were in effective and that SSA had to prove undue hardship to justify not providing me with the reasonable

accommodation of telework (see exhibit 15 in Communications with EEOC AJ and Agency Counsel, me, my counsel for EEO case) EEOC AJ's decision was solely based on SSA management's claims SSA was unable to provide any Benefit Authorizer the reasonable accommodation of telework and because SSA did not excuse other Benefit Authorizers from SPIKE both statements were proven to be false during the hearing as Debby Ellis acknowledged that there were Benefit Authorizers how did not SPIKE at all and that SSA managers decided who did and did not SPIKE proving SPIKE is not an essential job function. Not to mention the fact SSA has been allowing benefit Authorizes to telework five days a week since 2015 under Article 39 work at home by exemption and since 2016 as a reasonable accommodation in addition to the fact there are journeyman level Benefit Authorizers who do not SPIKE in June 2019 more than two years after the EEOC hearing even though Debby Ellis testified they would be SPIKING by Spring 2017. In an SSA decision SSA found I was a qualified disabled employee which explains why SSA provided me with reasonable accommodations including but not limited to an air purifier costing $1,200.00, Liberal Leave and Flexible Leave,  SSA Final Agency Decision dated January 30, 2019 (see exhibits in initial filing) noted I am a known qualified disabled employee verified by the fact I received successful performance appraisals without having been provided a reasonable accommodation exhibit 9 in Articles and Emails which shows SSA provided me with reasonable accommodations. The issue is EEOC AJ based her decision on James Dokko and Debby Ellis's testimony alone a fact the EEOC AJ expressed during a conference call with SSA Counsel, my attorney for seven other EEO cases and me and that she believed management was giving her accurate information at that time and that since the January 18-19, 2017 hearing SSA's ability to provide telework as an accommodation could have changed, the true is I provided evidence during the hearing and after to the OFO that Debby Ellis and James Dokko lied under oath and that because the EEOC AJ did not give proper weight to my successful performance appraisals and did not take into account the fact she heard testimony that SSA excused nondisabled journeyman level Benefit Authorizers for over a

year from SPIKE duties and that SSA managers decide who does and does not SPIKE was ample evidence that SSA was fully capable of providing me with telework as a reasonable accommodation and that I proved I was a qualified disabled employee. OFO received actual evidence I obtained from SSA's Counsel showing SSA approved over 100 Benefit Authorizers telework full time under Article 39 since at least 2015 and over 20 Benefit Authorizers the reasonable accommodation of telework since at least 2016, however the OFO upheld the EEOC AJ's decision citing SSA's claims if I was allowed to telework it would remove an essential function, a claim unsubstantiated by the evidence SSA's Counsel provided me which shows SSA has been able to provide over 100 Benefit Authorizers telework full time under Article 39 since at least 2015 and over 20 Benefit Authorizers the reasonable accommodation of telework since 2016, SSA is a very large Federal Agency, if SSA can provide over 120 Benefit Authorizers telework five days a week under Article 39 and as a reasonable accommodation SSA cannot claim to be unable to provide me with the same reasonable accommodation of teleworking five days a week, the very fact other Benefit Authorizers were approved for telework five days a week under Article 39 and as a reasonable accommodation proves SSA has determined that the essential functions of the Benefit Authorizer job can be performed 100% from home via telework once a week under the pilot telework program, and see exhibits in my initial complaint dated May3, 2019 and May 17, 2019 provided to me by SSA's Counsel. It appears to me that the OFO and EEOC AJ did not look at the facts my attorney and I presented to them and solely based their decision in favor of SSA because both the EEOC AJ and OFO did not believe SSA would lie under oath and believed that SSA's word was good enough even though SSA managements testimony contradicted one another and in more than a handful of times SSA managers had to acknowledged that they had provided a false statement and had to talk back their claims. EEOC AJ also ignored the fact SSA's Counsel provided her with false statements about SSA's progress in developing and implementing a reasonable accommodations plan, there are numerous occasions SSA was caught lying to the EEOC AJ and yet she found their testimony more

credible that the facts I provided, the OFO also blindly agreed with SSA's assertions despite facts SSA's Counsel produced that completely contradicted SSA's claims telework was not an available reasonable accommodation for Benefit Authorizers. No one who looked into this case based their decision on the facts, their decisions were based on SSA managements false testimony, because the EEOC AJ and OFO blindly repeated SSA management claims SSA management uses their blind endorsement to further bolster my SSA managements claims I could not be approved for telework as a reasonable accommodation because it would remove an essential function of my job, whoever SSA refuses to explain how SSA is able to provide over 120 qualified disabled Benefit Authorizers telework as a reasonable accommodation or under Article 39 without those Benefit Authorizers being excused form an essential function of the job, which is complete hypocrisy and evidence of disability discrimination, retaliation, hostile work environment and the extreme abuse of authority. This entire case shows SSA officials SSA management, and SSA Counsel lie with impunity, in my case at least and from my own personal experience SSA officials lie even under oath without consequences and EEOC and the OFO render their decisions based on SSA's word alone regardless of the evidence presented. SSA officials acknowledged I am a good employee who did good work and that SSA cannot provide me with a fragrance and chemical free environment in the SSA buildings SSA can only limit exposure in the buildings, a reasonable person would conclude that since SSA can provide a qualified disabled Benefit Authorizer the reasonable accommodation which would place them in a building where the environment can be controlled and provide the qualified disabled Benefit Authorizer the fragrance and chemical free environment SSA should have approved telework instead of wrongfully terminating a qualified disabled Benefit Authorizer because SSA refused to approve the effective reasonable accommodation of telework. I was already working 100% from home via telework once a week under the pilot telework program since July 26, 2016 the only issue was I was teleworking only under the pilot telework program which limited telework to once a week, SSA could have had me working full time if SSA had followed

reasonable accommodations policy, The Rehabilitation Act of 1973 and the ADAAA which SSA did for over 20 other qualified disabled Benefit Authorizers. I was with SSA for ten years received awards and was selected for details and I needed SSA to provide me with an effective reasonable accommodation so I could return to work five days a week, which would have benefited both the SSA and me.

150.     June 2019 during MSPB hearing Defendant's management (Carmelita Rivera, Kris Chamrernlaksa and James Dokko) acknowledges the fact I worked 100% via telework once a week under the pilot telework program and not as a reasonable accommodation from July 27, 2016 through August 15, 2018 (my last day) and continued to receive successful performance appraisals. I was approved to work credit hours from July 27, 2016 through August 8, 2018 and was approved for overtime hours from August 17, 2017 through September 28, 2017.

151.     June 2019 during MSPB hearing Defendant admits if it were not for the termination documentation management placed on my record, I would have no disciplinary record.

152.     Defendant admits that if I was charged with actual AWOL management would not have approved my request to work credit hours or overtime hours.

153.     May 2019 Defendant's Attorney Tina Saladino provided evidence that since about 2016 Defendant approved over 20 qualified disabled Benefit Authorizers the reasonable accommodation of Telework (I am aware of other qualified disabled Benefit Authorizers who were approved for the reasonable accommodation of telework prior to 2014, but was unable to obtain that information from Defendant).

154.     May 2019 Defendant's Attorney Tina Saladino provided evidence that since about 2015 Defendant approved over 100 qualified disabled Benefit approval under Article 39 Work at Home by Exception of full time telework.

155.     May 2019 Defendant's Attorney Tina Saladino provided evidence that Defendant allowed over 500 Benefit Authorizers who were not disabled to Telework twice a week under the Defendants Pilot Telework Program since about August 2015.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 141 of 156

156.     May 2019 Defendant's Attorney Tina Saladino provided evidence that Defendant approved one (1) non-disabled Benefit Authorizer to work virtually under the pilot Telework program "1 of these BAs is actually working a long term virtual detail" since about August 2015.

157.     January 2017 and June 2019 Defendant's management acknowledge that my request for telework as a reasonable accommodation and my request for a clean laptop imaged by one technical support staff member known to be fragrance and chemical free during both phases of installing SSA software on the laptop and handed to me was not denied due to expense, resource limitations, difficulty or hardship.. MSPB hearing dated June 4, 2019 page 74 lines 18-23 and page 153 lines 16-22

158.     June 2019 Defendant's manager acknowledges that I was provided reasonable accommodations based on the medical documentation I proved because of my disabilities.  EEOC Hearing date January 19, 2017 page 153 lines 12-15.

159.     June 2019 Defendant's manager acknowledges that qualified disabled Benefit Authorizers approved for Telework as a reasonable accommodation or under Article 39 Work at Home by Exception are excused from answering SSA's National 800 number. MSPB Hearing dated June 4, 2019 page 155 lines 1-25 and page 156 line 1 and page 157 lines 4-7 page 157 lines 16-22 and page 158 lines 13-17 and page 159 lines 3-25 and page 160 lines 1-10.

160.     January 2017 Defendant's management acknowledges that an employee who is attains journeyman level status means "you're expected to be able to do all the major duties and sustain those job duties" EEOC Hearing date January 19, 2017 page 251 line 13-14.

161.     January 2017 and June 2019 Defendant's management acknowledges that Benefit Authorizer training is a nine (9) month training program that does not include training on answer SSA's National 800 number aka Spike and that training on answer SSA's National 800 number aka Spike is a separate training about two (2) months outside of the Benefit Authorizer's nine (9) month training program, per MSPB Hearing dated June 3,

2019 page 30 lines 9-25 and page 31 lines 1-2 and page 34 lines 13; and  EEOC Hearing date January 19, 2017 page 242 lines 12-16 and page 249 lines 6-25 and page 250 lines 1-13 and page 353 lines 3-6.

162.    January 2017 Defendant's management acknowledges training is "training is standard across the country" EEOC Hearing date January 19, 2017 page 223 lines 2-10 and lines 20-23.

163.    January 2017, June 2019 and April 2019 Defendants Attorney Tina Saladino provided document titled "Agency's Combined Response To Appellant's Interrogatories, Requests Of Admission, And Requests For Production" and Defendant's management acknowledges that for a Benefit Authorizer Trainee to transition from being a Benefit Authorizer Trainee to becoming a journeyman level Benefit Authorizers, the Benefit Authorizers Trainee must pass a three day examination/review and that the three day examination/review consists of does not include answering SSA's National 800 number aka Spike. "A "3-day review" is a 3-day evaluation of a technical trainee's ability to work independently. During a Benefit Authorizer Trainee (BAT) 3-day review, the BAT is assigned a variety of cases that are at most 30 days old. Once a BAT completes a case, they route the case to an assigned Operations Specialist (OS) or Post-Entitlement Expert (PETE) for review. At the close of business each day, BATs submit a list of completed cases, with detailed information on actions taken. The reviewer then reviews each case for accuracy. currently, the passing standards for the 3-day review are an average of 8 cases per day with a minimum overall average accuracy of at least 89%." per MSPB Hearing dated June 3, 2019 page 30 lines 9-25 and page 31 lines 1-2 and page 34 lines 13; and  EEOC Hearing date January 19, 2017 page 242 lines 12-16 and page 249 lines 6-25 and page 250 lines 1-13 and page 353 lines 3-6.

164.    January 2017 and June 2019 Defendant's management acknowledges that since about 2015, Defendant has at least 30 journeyman level Benefit Authorizers who to date who have never been trained to answer SSA's National 800 number aka Spike, who

never answer SSA's National 800 number and still receive their full pay, benefits and successful performance appraisals.

165.    June 2019 James Dokko admits to taking responsibility for recommending that my reasonable accommodations request be denied. (MSPB Hearing Transcript June 3, 2019 page 190 line 9.

166.    June 2019 Defendant manager James Dokko admits none of the Defendants office buildings would provide me with a fragrance and chemical free work environment, restroom and place to eat. Also substantiated by SSA Medical Officer ROI exhibit 18 page 2 of 2 and Leslie Kern ROI exhibit 07-14 page 2 of 5. MSPB Hearing Transcript June 4, 2019 page 144 lines 2-8.

167.    Defendant does not contest knowing due to my disabilities I required a fragrance and chemical free environment to prevent triggering my disabilities and that SSA offices were incapable of providing me with a fragrance and chemical free environment.  ROI exhibit 07-14 page 2 of 5 and ROI exhibit 18 page 2 of 2.

168.    June 2019 Defendant's manager acknowledges that initially I needed a reasonable accommodation for the disability of sensitivity to environmental irritants and now require reasonable accommodations due to sensitivity to environmental irritants, migraines with aura and vertigo. MSPB Hearing Transcript page 142 lines 10-19.

169.    June 2019 Defendant admitted there would be no hardship to provide me with telework as a reasonable accommodation. MSPB Hearing Transcript page 160 lines 5-10.

170.    James Dokko admits that the first two laptops in 2014 and 2015, I received I reported were not contaminated and I was able to use them without triggering my disabilities.

171.    James Dokko admits to denying my request to take the second laptop home each night to prevent the second laptop from being contaminated while in the building.

172.    James Dokko admits to approving the my request to take the second laptop home after it was contaminated to prevent further contamination.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 144 of 156

173.    James Dokko admits to replacing the first and second laptops soon after I reported the laptops had become contaminated while the laptops were left in the building.

174.    Defendant admits that I reported right away that the third laptop was contaminated since the first day I received the laptop and that I reported the third laptop was clearly used.

175.    James Dokko admits not being able to confirm who handled the third laptop prior to the second phase of uploading SSA software and admitted that the laptop was left in the building in an area not protected against fragrances and chemicals.

176.    James Dokko admitted that we were still engaged in the interactive reasonable accommodations talks during the June 2020 hearing.

177.    September 30, 2019 MSPB Judge failed to go through the evidence and accept the evidence I provided in my appeal to MSPB as facts that supported I was wrongfully terminated. Even though I provided evidence that the EEOC AJ found I was disabled with sensitivity to environmental irritants in April 2017 and OPM found me to qualify for disability retirement with the disabilities migraines with aura and vertigo in August 2018 and that despite James Dokko's testimony SSA has been approving the reasonable accommodation of Telework to Benefit Authorizers since 2016 and Article 39 Work at home by Exception since 2015. And that there was a flaw in the decision to separate my requests for an effective accommodation and proposing terminating me for being out sick, management should have handled the two issues in tandem since an effective reasonable accommodation was available and would have enabled me to return to work full time.

Q I'm sorry. So your recommendation was to deny my request as a -- for full-time telework as a reasonable accommodation because you believed that spiking is an essential job function of the benefit authorizer; is that correct?

MSPB Hearing transcript June 3, 2019 page 191 lines 22- 25

A No. I stated that you were not a qualified individual with a disability based on your requested accommodation.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 145 of 156

1      MSPB Hearing transcript June 3, 2019 page 192 lines 1-5

2      Q Are -- that's not the question. Do I fit the -- your description of disabled?

3      A For your request for telework full time, I do not find that you are a qualified

4      individual with a disability.

5      MSPB Hearing transcript June 3, 2019 page 193 lines 14-17

6      Q Were you made aware that the ALJ judge from the hearing that you were at last

7      time found me to be disabled?

8      A I do not believe that the judge found you a qualified individual with disability.

9      In fact, I believe the judge stated that if only full-time telework would be the only

10     accommodation that would be appropriate for you, that you would not be a

11     qualified individual with a disability.

12     MSPB Hearing transcript June 3, 2019 page 194 lines 19-25

13     JUDGE RIBAS: Okay. So did you -- well, if this -- do -- are you aware of the

14     decision? Have you read it?

15     THE WITNESS: I have read it. I do not recall on the basis of disability because

16     the important thing for me was is she a qualified individual with disability when

17     we're dealing with reasonable accommodations. And it was my understanding that

18     the judge ruled that if Ms. Tom felt that only full-time telework would be

19     appropriate, that Ms. Tom would not be a qualified individual with a disability.

20     MSPB Hearing transcript June 3, 2019 page 195 lines 17-25.

21     JUDGE RIBAS: As someone who is a benefit authorizer in your office, can you --

22     is there any situation in which you can permanently approve as a reasonable

23     accommodation -- assuming the medical documentation supports it -- someone

24     permanently teleworking five days a week as a reasonable accommodation?

25     MSPB Hearing June 4, 2019 page 20 lines 20-25

26     THE WITNESS: I've never explored that. Would it be -- could that be a

27     possibility, possibly? Personally, I do not believe so. But at this time --

28

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 146 of 156

JUDGE RIBAS: Okay. Why? Why? Can you explain? You said it's a possibility, but you don't believe so. Could you explain the two?

MSPB Hearing June 4, 2019 page 21 lines 1-8

MSPB AJ did not give proper consideration to Defendant's manager James Dokko testimony as to the primary reason for denying the reasonable accommodation of telework and a new laptop. James Dokko testified he  believed I was not qualified disabled Benefit Authorizer because I requested reasonable accommodation of Telework, James Dokko believed that the type of accommodation requested determined if an employee was disabled, ie I am a qualified disabled Benefit Authorizer for RA approval of masks, gloves, air purifier, moved from work space to work space, liberal leave but not for telework and a clean laptop. James Dokko admits I was not denied telework as a reasonable accommodation because of  SPIKE aka answering SSA's national 800 number because it is not an essential function. James Dokko admitted to the MSPB AJ he **never took the time to find out if SSA  approve Benefit Authorizer for telework** and yet he continued to deny my requests since 2015 under the guise his decisions were founded in a firm understanding of what reasonable accommodations SSA provided to Benefit Authorizers. Given the fact James Dokko admitted he based his denials on his assumptions and not policy and Rehabilitation Act of 1973 the MSPB AJ should have taken into account the documented evidence SSA approved over 20 Benefit Authorizers the RA of telework since 2016 and over 100 disabled Benefit Authorizers under Article 39 Work at Home by Exemption since 2015 and found I was wrongfully denied an available reasonable accommodation because James Dokko improperly assumed I could not continue to be considered a qualified disabled Benefit Authorizer because I requested Telework as a reasonable accommodation. see exhibits provided in my initial complaint dated May 17, 2019 labeled "Agency's Response to Appellant's Request for Production #6 as amended in the Board's April 25, 2019 Order" and dated May 3, 2019"Agency's Response to Appellant's Request for Production #6 as amended in the Board's April 25, 2019 Order" came from SSA's counsel.  I am equally entitled to the reasonable

accommodation of Telework full time and was wrongfully denied it because James Dokko was an ill-informed manager who did not bother to research where he was correctly administering policy. To add insult to injury because of James Dokko's improper denials I was not only denied an effective reasonable accommodation, my health deteriorated, extreme emotional distress,  and continue to suffered extreme financial hardship, I was also wrongfully terminated under Chapter 75 of title 5 of United States Code part 752 of title 5 of the federal regulations subpart D §752.403 (b) which clearly states "An agency may not take an adverse action against an employee on the basis of any reason prohibited by 5 U.S.C. 23023" I am under a protected class as I am a known qualified disabled employee, which is not disputed. MSPB AJ ignored the fact that Debby Ellis lied when she said Benefit Authorizers received SPIKE training during the Benefit Authorizer nine month training, testimony provided by James Dokko acknowledged that SPIKE training was an additional 2 months, see January 19, 2017 EEOC Hearing Transcript Volume 2 page 248 lines 9-25 and page 249 lines 1-25 and page 250 lines 1-13 and page 353 lines 3-6. Debby Ellis admitted she lied and that there were Benefit Authorizers who were not trained to SPIKE during the nine month Benefit Authorizer training, it would have been impossible to complete the Benefit Authorizer nine month training and the two month SPIKE training in nine months, Debby Ellis claimed the Benefit Authorizers who were still not SPIKE trained **would be by spring of 2017 no matter what**, I provided evidence to the MSPB AJ that the Benefit Authorizers who were still not SPIKE trained were still not trained in 2018. (bolded for emphasis) MSPB Hearing June 4, 2019 page 30 lines 5-25 and page 31 lines 1-2.

Even though the MSPB AJ had definitive evidence SSA lied under oath on the key points MSPB AJ still took Defendant's word over the evidence and render her decision in SSA's favor. The most important fact SSA lied about was not being able to approve my reasonable accommodation of telework because it would remove an essential function of the job and that I was the only employee who was excused from SPIKE, **the fact is SSA was approving qualified disabled Benefit Authorizers with telework as a reasonable**

**accommodation SINCE 2016 none of the Benefit Authorizers who were approved**
**for the reasonable accommodation of telework or approved for Article 39 were**
**required to SPIKE and were allowed to telework full time.** Even with the facts laid
out for MSPB AJ at her feet, MSPB AJ still decided to blindly agree with SSA that SSA
lawfully denied me an available effective reasonable accommodation of telework even
though it would have not caused SSA any undue hardship and the RA of telework would
have returned me to work full time therefore removing all future need for leave due to my
disabilities. MSPB AJ also ignored the testimony that my first line manger Kris
Chamrernlaksa recommended that I be allowed to telework full time instead of being
terminated.

      Q Did management ever ask you, as my first line supervisor, whether or not you

      believed that instead of terminating me offering me the ability to telework five

      days a week or the

      MSPB Hearing June 3, 2019 page 26 lines 23-25

      fulltime should have been tried before proposing my termination?

      A Yes, I was asked.

      Q And what was your answer?

      A Pretty much that the quality of your work would -- would be good and that

      you'd be okay to telework five days a week, unfortunately you could not help with

      spiking, which is an essential duty of your position.

      Q Who did you give that recommendation to?

      A Carmelita and James Dokko. Carmelita Rivera and James Dokko.

      MSPB Hearing June 3, 2019 page 27 lines 1-11

MSPB AJ ignored the fact James Dokko acknowledged that the only reason I was fired
was because Carmelita Rivera chose to post AWOL instead of LWOP, even though the
evidence proved the AWOL was not real AWOL because even with the AWOL on my
time record I was considered to be in good standing and was not disciplined for the
alleged misconduct of being out sick due to my disabilities not being effectively

1    accommodated. MSPB ignored Carmelita Rivera and James Dokko both believed they

2    did not have to provide me with an effective reasonable accommodation before proposing

3    my termination even though they both knew I was in active reasonable accommodation

4    talks with James Dokko. The testimony shows James Dokko was not concerned with my

5    being out sick due to my disability so long as it was coded as LWOP and not AWOL.

6       Q That's not my question. If Ms. Rivera had posted that period of time under

7       leave without pay, would you have supported my removal from the agency?

8       A So it's actually based on an employee's request. So the manager is not posting

9       leave without pay. Since it is a leave category, an employee does have to request

10      it. And so if Ms. Tom (sic) would have approved your leave -- basically, if she

11      would have approved your leave without pay, you would have been in an

12      approved-leave category, which then wouldn't have been a conduct issue. So no,

13      you would not have been removed for that particular reason.

14      MSPB Hearing June 4, 2019 page 94 lines 1-11

15      Q Mr. Dokko, did you discuss with Ms. Rivera whether or not she considered

16      providing me with another accommodation opposed

17      MSPB Hearing June 4, 2019 page 94 lines 24-25

18      to my termination -- opposed to proposing my termination?

19      A No.

20      Q Do you believe that management should have tried to provide an

21      accommodation before proposing my termination to accommodate my disability -

22      - or my medical conditions?

23      A Ms. Tom, as I stated earlier, these are two separate issues. Now your

24      reasonable-accommodation process, we were currently -- you know, it's an

25      interactive process that is continuing. And in regards to your termination, that was

26      based on conduct. That was based on your absence without leave.

27      Q Isn't it true, though, if management had allowed me to telework five days a

28      week, there would have been no issue with my leave?

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 150 of 156

1   A I wouldn't be able to speculate that.

2   MSPB Hearing June 4, 2019 page 95 lines 1-25

3   Q Can any benefit authorizer earn credit hours or is it a privilege?

4   A Any journeyman-level benefit authorizer who can work independently and are

5   in good standing without any disciplinary actions can work, granted that there is

6   work to be worked.

7   Q Is that also true for overtime?

8   A Overtime is more tied into a budget allocation, so usually, the terms are the

9   same, granted it's been allocated to us.

10   Q Okay, so you would have to be in good standing in order for management to

11   recruit you to work overtime?

12   A Correct.

13   Q Okay. Do you recall approving credit hours and overtime for me during the

14   period of time where benefit authorizers were allowed to work two days a week?

15   MSPB Hearing June 3, 2019 page 46 lines 11-25

16   A I do.

17   MSPB Hearing June 3, 2019 page 47 lines 1

18   Q Based on the approval of credit and overtime, I'm -- I was in good standing

19   with the Agency and didn't have any issues that prevented the Agency from

20   approving me to work credit and overtime?

21   JUDGE RIBAS: Isn't that correct? You always need to ask it in --

22   MS. TOM: Isn't that correct; I'm sorry.

23   THE WITNESS: Yes.

24   MSPB Hearing June 3, 2019 page 49 lines 7-14

25   Q Can you read number 3, the question and answer, please?

26   A Number 3 says "the employee's past disciplinary record";

27   MSPB Hearing June 3, 2019 page 83 lines 24-25

28   you have no disciplinary history, no prior disciplinary history.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 151 of 156

1   Q So -- I'm sorry; go ahead?

2   A It says you have no prior disciplinary history.

3   Q And did I have a disciplinary record when this notice was issued?

4   A No.

5   MSPB Hearing June 3, 2019 page 84 lines 1-7

6   Q You acknowledged that I have no disciplinary record, even when this notice

7   was created and sent?

8   JUDGE RIBAS: Isn't that correct?

9   BY MS. TOM:

10   Q Isn't that correct?

11   A Correct.

12   MSPB Hearing June 3, 2019 page 84 lines 16-21

13   SSA management fired me for being out sick due to my disabilities, there is no mistaking

14   the fact SSA's refusal provided me with available effective reasonable accommodation of

15   telework was the sole reason I was not working full time five days a week and that if SSA

16   was able to provide telework full time five days a week to over 20 other qualified

17   disabled Benefit Authorizers and over 100 other qualified disabled Benefit Authorizers

18   there is no lawful reason I would be denied. Especially since I have tried other reasonable

19   accommodations including moving around in an SSA occupied building since 2014, air

20   purifier, masks, gloves, liberal leave, etc, and they had been ineffective (EEOC AJ even

21   acknowledged SSA was not effectively accommodating me see exhibit 15 in

22   communications package). In 2014, SSA's Medical Officer informed Defendant of their

23   conclusion that SSA could not provide me with an effective accommodation of a scent

24   free environment in SSA buildings. Therefore, it is disingenuous for MSPB AJ to claim

25   SSA acted in good faith and by refusing to provide the one reasonable accommodation

26   that would actually provide me with a workspace that would be fragrance and chemical

27   free that would enable me to return to work full time. MSPB AJ failed to note SSA tried

28   variations of the exact same accommodation room with air purifier and approve sick

1    leave even though those accommodations had proven ineffective, so ineffective I was

2    terminated for the use of sick leave because I had not yet been provided an effective

3    reasonable accommodation. I lost step increases because of the LWOP I was forced to

4    take, the LWOP also changed the Federal Service Computation date used to calculate

5    grade and step increases as well as my retirement and I have lost over $249,118.89 in lost

6    income just through November 8, 2019, if I were to retire at 66 I would have lost an

7    estimated total of $3,023,929.66 assuming an estimated cost of living increase of 2% not

8    including step increase or future bonus or future 401K losses see exhibit TSP documents

9    and Lost wage Calculations to see how I arrived at these numbers. SSA's actions have

10   not only effected my health and ability to support myself; SSA's actions have affected

11   my quality of life past, present and future and caused me extreme emotional distress for

12   the loss of my health, independence and being brought to the brink of bankruptcy. I have

13   to live with the consequence of SSA's refusal to act timely, I have been trying since 2014

14   to obtain an effective reasonable accommodation of a fragrance and chemical free work

15   environment. MSPB AJ did not give proper weight to James Dokko ignoring the

16   recommendation of my first line supervisor Kris Chamrernlaksa that I be approved for

17   telework five days a week, see MSPB Hearing Transcript day 1 page 27 lines 5-6 and

18   lines 9-11. Had I been able to find work elsewhere I would have the problem I had was

19   SSA management were the ones that provided references for the jobs I applied to and the

20   SSA manager I had at the time Mireille Hanft wanted me to stay in the module so that I

21   could share my job knowledge. The most depressing thing is that SSA provides qualified

22   disabled Benefit Authorizers the reasonable accommodation of telework and the fact

23   James Dokko ignored the recommendation of my first line supervisor Kris

24   Chamrernlaksa that I be approved for telework five days a week, proof there was no

25   lawful reason for me to have been denied the reasonable accommodations of telework or

26   for me to have lost my job. Especially since SSA managers all acknowledge I am a good

27   employee and I am good at my job "…I admit when you are working, you're a good

28   employee. I do not deny that. And, you know, your management team agrees with

that…" MSPB Hearing Transcript day 2 page 89 lines 16-18 And "..You weren't removed from service because you did a bad job." MSPB Hearing Transcript day 2 page 89 lines 21-22. If James Dokko did not ignore my first line supervisor Kris Chamrernlaksa recommendation to approve my request to telework five days a week or if James Dokko allowed my first line supervisor to issue his recommendation to the NRAC I would have been approved for telework five days a week based on the quality of my work. see MSPB Hearing Transcript day 2 page 26 lines 16-25 and page 27 lines 1-6. James Dokko still decided to terminate my employment even though my first line supervisor Kris Chamrernlaksa recommendation to approve my request to telework five days a week instead of being terminated and because it was in reasonable accommodations talks with SSA see MSPB Hearing Transcript day 1 page 27 lines 5-6 and lines 9-11 and MSPB Hearing Transcript day 2 page 95 lines 3-10, the only reason I was not working full time was because SSA's decided to continue to deny me the requested available reasonable accommodation of telework, despite the fact SSA was already providing the reasonable accommodation of telework to 20 other qualified disabled Benefit Authorizers and my first line supervisor recommended I be approved. The facts show I was still in good standing up until the day I was terminated because I was allowed to continue to telework under the pilot telework program and was approved to work credit and over time (during the period I received over time I was teleworking twice a week under the pilot telework program) while working 100% via telework once a week under the pilot telework program see MSPB Hearing Transcript day 1 page 46 lines 11-25 and page 47 line 1 and page 48 lines 12-25 and page 49 lines 7-14 and page 116 lines 14-25 and page 117 lines 1-25 page 118 lines 1-6 and page 107 lines 16-20. It is also important to note that I did not have a disciplinary record prior to my removal on August 15, 2018, see MSPB Hearing Transcript day 2 page 87 lines 17-19. SSA failed to abide by Article 31  Time and Leave - Section 3. Excused Absences - B.   When management determines that exposure to unsafe or unhealthy working conditions which cannot be immediately corrected may result in the likelihood of illness or injury,

employees will either be assigned work in a safe and healthy area in the same office or deployed to another installation or granted an excused absence. SSA management acknowledges that SSA is unable to prevent my exposure to fragrances and chemicals that all SSA could do in SSA buildings was try and limit my exposure, proving SSA was aware I was being exposed while I was in SSA buildings SSA acknowledges that even with the air purifier the room continued to have fragrance and chemical odors that triggered my disability and therefore proving the provided reasonable accommodations in the buildings are not as effective as the reasonable accommodation of telework is, because in my home I can eliminate my exposure to fragrances and chemicals see MSPB Hearing Transcript day 2 page 6 lines 21-25 page 7 lines 1-4 and page 130 lines 22-25.

7.     The alleged discrimination occurred on or about since 2013 through 2018 (year I was wrongfully terminated) first Formal EEOC filed August 2014 (informal filed June 2014), and consolidated complaint was Formal EEOC filed August 2018 this case was bifurcated I filed on October 5, 2018 on the bifurcated case. Note I filed numerous allegations of discrimination and have ten (10) EEOC cases. Seven (7) of the ten (10) EEOC cases are pending a final decision on EEOC case SF-19-0294 with EEOC AJ in abidance.

8.     I filed charges with the Federal Equal Employment Opportunity Commission regarding defendant's alleged discrimination conduct on or about since 2014 - 2018 for all complaints. Please note the other consolidated complaint was bifurcated and Defendant tried to get these case dismissed after MSPB hearing was held but before MSPB made a decision.

9.     The Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter (copy attached), which was received by me on or about June 25, 2019 first complaint, and consolidated complaint was bifurcated the Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter (copy attached), which was received by me on or about November 07, 2019 and 03-12-2020. The consolidated complaint MSPB and Office of Federal Operations Notice-of-Right-to-Sue letter (copy attached), which was received by me on or about 09-30-2019, 11-07-2019.

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 155 of 156

10.   Plaintiff hereby demands a jury for all claims for which a jury is permitted:

Yes ____      No____

11.   WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, costs, back pay, front pay, physical pain and suffering; emotional distress and suffering, diminished quality of life past present and future, change termination to disability retirement, code edible for rehire on SF50, lost benefits, correction to Federal Service Computation date to hire date, removal of LWOP, AWOL, Advance Sick and Advance Annual leave changed to administrative leave, remove notice of proposed removal from my record, remove notice of approved termination from my record, remove any and all disciplinary actions from my record, retraining of staff on how to process reasonable accommodations requests and on stopping harassment and retaliation, punitive damages, maximum pain and suffering, I ask for $30,000,000.00 to be made whole and attorney fees, all costs to be paid by Defendant, et al.

Respectfully submitted,

Date: _June 2, 2020_      Sign Name: _Jennifer M Tom_

Print Name: _Jennifer Tom_

I will be emailing and mailing a copy of this request to:

Wendy M. Garbers

Assistant United States Attorney

Counsel for Defendant Andrew Saul Commissioner of Social Security Administration

Email: wendy.garbers@usdoj.gov

TITLE OF DOCUMENT: Consolidated Amended Complaint   CASE NO.: 19-cv-06322-JST
Page 156 of 156

Table of contents of exhibits

Exhibit A - Right to File SF-14-0624

Exhibit B - Right to File SF-18-0924

Exhibit C - Right to File SF-19-0294

Exhibit D – Right to File MSPB Termination

Exhibit E - EEOC FAD January 30, 2019 – Found I am a qualified employee

Exhibit F – SSA RA policy Fragrance and examples

Exhibit G – SSA Anti- Harassment policy and examples

*Exhibit A*
*Right to file*
*SF-14-0624*



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Jennifer Tom, a/k/a
Lavonia M.,[1]
Complainant,

v.

Nancy A. Berryhill,
Acting Commissioner,
Social Security Administration,
Agency.

Request No. 2019002750

Appeal No. 0120172221

Hearing No. 550-2015-00104X

Agency No. SF140624SSA

<u>DECISION ON REQUEST FOR RECONSIDERATION</u>

Complainant timely requested that the Equal Employment Opportunity Commission (EEOC or Commission) reconsider its decision in <u>Lavonia M. v. Soc. Security Admin.</u>, EEOC Appeal No. 0120172221 (Feb. 15, 2019). EEOC regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision issued pursuant to 29 C.F.R. § 1614.405(a), where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. <u>See</u> 29 C.F.R. § 1614.405(c).

During the period at issue, Complainant worked as a Benefits Authorizer, GS-9, within Module 10 of the Agency's Western Program Service Center in Richmond, California.

On August 6, 2014, Complainant filed a formal EEO complaint. Complainant claimed that the Agency discriminated against her and subjected her to a hostile work environment based on disability (sensitivity to fragrances and other chemicals) when:

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

1. since May 12, 2014, various management officials had been denying Complainant reasonable accommodation requests for a fragrance-free work environment; and

2. Between December 2013 and July 2014, various management officials had subjected Complainant to a hostile work environment because of her physical disability (chemical sensitivity) when:

   a. since December 2013, Complainant's co-workers continued to spray perfume in the office despite having knowledge of her allergic reaction to scents;

   b. on May 30, 2014, management informed Complainant that she had to move her desk, but did not take any action to prevent her co-worker from spraying perfume in Complainant's presence;

   c. on June 3, 2014, Complainant's manager willingly wore perfume during a meeting, which caused Complainant to have an allergic reaction; and

   d. on July 23, 2014, Complainant was forced to move to another location due to irritants emanating from the floor and permeating the room.

On January 18 and 19, 2017, the assigned EEOC Administrative Judge ("AJ") held a hearing where five witnesses, including Complainant testified. On April 7, 2017, the AJ issued a decision in favor of the Agency finding no discrimination. The AJ determined that documentation supported that Complainant had a disability. The AJ, however, found that Complainant's request for full-time telework would cause an undue hardship on the Agency because Complainant would not have been able to perform an essential function of her job. The AJ explained that Complainant's position as a GS-9 Benefits Authorizer required that she perform Spike duties, which consisted of answering the Agency's toll-free 800 number when the Agency had an increased number of calls. The AJ determined that these duties could not be performed outside of the workplace because these phone calls required special, proprietary telephone equipment. Such telephone equipment was hard-wired into the Federal building where Complainant worked. The AJ acknowledged that Complainant's manager temporarily waived these duties when he allowed Complainant to telework fulltime pending the resolution of the instant EEO complaint. The AJ clarified, however, that Spike duties remained an essential function of Complainant's position. Regarding a request for reassignment, the AJ determined that Complainant had established that there were no vacancies during the relevant time period into which she could have been reassigned.

On May 8, 2017, the Agency issued a final order affirming the AJ's decision. In EEOC Appeal No. 0120172221, we affirmed the AJ's decision and the Agency's final order. The decision concluded that the evidence of record established that Spike duties were an essential function of Complainant's position and she could not perform these duties from an alternate location.

The decision further determined that Complainant had not shown that there were other funded positions available to which she could have been reassigned. Therefore, the decision concluded Complainant failed to demonstrate that the Agency violated the Rehabilitation Act.

In the instant request for reconsideration, Complainant submits a brief expressing disagreement with the appellate decision and reiterates arguments previously made on appeal. The Commission emphasizes that a request for reconsideration is not a second appeal to the Commission. Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), Chap. 9 § VI.A (Aug. 5, 2015); see, e.g., Lopez v. Dep't of Agric., EEOC Request No. 0520070736 (Aug. 20, 2007). Rather, a reconsideration request is an opportunity to demonstrate that the appellate decision involved a clearly erroneous interpretation of material fact or law, or will have a substantial impact on the policies, practices, or operations of the Agency. Complainant has not done so here.

After reviewing the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(c), and it is the decision of the Commission to deny the request. The decision in EEOC Appeal No. 0120172221 remains the Commission's decision. There is no further right of administrative appeal on the decision of the Commission on this request.

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0610)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission. The**

4                                           2019002750

court has the sole discretion to grant or deny these types of requests. Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations


June 25, 2019
Date



Exhibit B
Right to file
SF-18-0924



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Jennifer M. Tom, a/k/a
Davina W,[1]
Complainant,

v.

Andrew M. Saul,
Commissioner,
Social Security Administration,
Agency.

Request No. 2020000730

Appeal No. 2019000982

Agency No. SF-18-0924

<u>DECISION ON REQUEST FOR RECONSIDERATION</u>

Complainant requested that the Equal Employment Opportunity Commission (EEOC or Commission) reconsider its decision in EEOC Appeal No. 2019000982 (September 24, 2019). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision issued pursuant to 29 C.F.R. § 1614.405(a), where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. See 29 C.F.R. § 1614.405(c).

In her underlying complaint, Complainant alleged that the Agency: (1) failed to reasonably accommodate her based on her disability from June 2014 through August 2018; (2) subjected her to harassment based on her disability and reprisal for prior EEO activity from June 2014 through August 2018, in terms of leave, telework, reasonable accommodation, and removal; and, (3) subjected her to discrimination based on her disability and reprisal for prior EEO activity when it terminated her employment on August 15, 2018. The two previous Commission decisions, EEOC Appeal Nos. 2019000982 and 2019005549 (November 7, 2019), on this matter clearly articulate the facts of record and the instant decision incorporates them by reference herein.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

In our prior decision, the Commission agreed with the Agency with regard to issue 3 that the Merit Systems Protection Board (MSPB) accepted jurisdiction over Complainant's appeal regarding her termination. Therefore, we found Complainant's argument that the Agency's investigation was insufficient was not properly before the EEOC. With regard to issues 1 and 2, we found these claims were identical to the claims Complainant raised in other pending EEO complaints. The Commission affirmed the Agency's final decision with regard to issues 1 and 2.

In her request for reconsideration, Complainant contends the Commission erred in affirming the dismissal because the subject complaint was not the same claim as her other complaints. Complainant argues the issues in the prior Agency Nos. SF-17-0411-SSA, SF-17-0526-SSA, SF-17-0799-SSA, SF-18-0328-SSA, and SF-18-0604-SSA[2] only alleged discrimination based on her physical disability in the form of sensitivity to environmental irritants. However, Complainant contends the complaint at issue in this matter, Agency No. SF-18-0924-SSA, alleges discrimination based on both physical and mental disability in the form of sensitivity to environmental irritants, vertigo, migraines with aura and, specifically, dyslexia. For these reasons, Complainant contends SF-18-0924 is not identical to any of her prior EEO complaints and should not have been dismissed.

In response, the Agency opposes the request for reconsideration and argues Complainant has failed to meet the criteria for reconsideration. The Agency explains that Complainant's instant request for reconsideration and the underlying appellate decision, EEOC Appeal No. 201900982, both relate to Agency No. SF-18-0924, which concern the processing of the pre-removal EEO complaints. With respect to those claims directly related to Complainant's removal, the Agency contends the Commission properly dismissed such claims under 29 C.F.R. § 1614.107(a)(4) because they are covered by the claims raised at the MSPB. The Agency argues the sufficiency of the investigation on these claims is not before the Commission because the MSPB process allows a mechanism for discovery on those claims.

With respect to those claims that do not directly relate to Complainant's removal, the Agency states because the underlying alleged conduct taken by the Agency against Complainant is the same regardless of whether Complainant is claiming discrimination based on only physical disabilities, or both physical and mental disabilities, a new investigation, with subsequent rights to a hearing, is not required. Rather, the Agency argues the new reasons for the same alleged discriminatory conduct should be raised by Complainant before the AJ after abeyance as part of the discovery process. The Agency argues, pursuant to 29 C.F.R. § 1614.109(d) and MD-110, Chap. IV-B-2, discovery may supplement the record and the regular discovery process can address any additional bases that Complainant believes also applies.

---

[2] Our internal records reveal that these complaints as well as Agency Nos. SF-16-0264-SSA and SF-17-0039-SSA were ordered to be held in abeyance by an EEOC AJ on April 19, 2019, pending an MSPB decision on Complainant's removal which the EEOC AJ stated would need to address whether Complainant could have been accommodated by the Agency, and whether, as a consequence, she is a qualified individual with a disability.

The Agency further contends the AJ who will preside over the complaints held in abeyance will ultimately determine if further investigation is necessary, and if so, will remand to the Agency for further processing regarding the mental disabilities alleged. Regardless, the Agency argues Complainant failed to demonstrate that this Commission's decision was based on a clearly erroneous interpretation of material fact or law to grant her request for reconsideration.

Accordingly, after reviewing the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(c), and it is the decision of the Commission to deny the request. We agree with the Agency's position that Complainant's claim alleging discrimination based on mental disability is part of the complaints being held in abeyance before an EEOC AJ. After the EEOC AJ resumes processing the EEO complaints that are before her, Complainant should provide the AJ with a copy of this decision to ensure that the AJ treats issues 1 and 2 of the present complaint as being part of the EEO complaints before her. The decision in EEOC Appeal No. 2019000982 remains the Commission's decision. There is no further right of administrative appeal on the decision of the Commission on this request.

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0610)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision.  You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision.  If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title.  Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests.

4                                                    2019005446

Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations

March 12, 2020
Date

Exhibit C
Right To File
SF-19-0294



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Jennifer M. Tom, a/k/a
Virginia V.,[1]
Complainant,

v.

Andrew M. Saul,
Commissioner,
Social Security Administration,
Agency.

Appeal No. 2019005549

Agency No. SF-19-0294-SSA

### DECISION

On August 21, 2019, Complainant filed a timely appeal with the Equal Employment Opportunity
Commission (EEOC or Commission) from a final Agency decision (FAD) dated July 19, 2019,
dismissing her complaint of unlawful employment discrimination in violation of Section 501 of
the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 et seq.

### BACKGROUND

At the time of events giving rise to this complaint, Complainant was employed by the Agency as
a Legal Administrative Specialist (Benefit Authorizer) GS-0901-9 at the Western Program Service
Center in Richmond, California.

On October 5, 2018, Complainant filed an equal employment opportunity (EEO) complaint
alleging the Agency:

1. failed to provide her with a reasonable accommodation for her disability from June 2014-
   August 2018;

2. subjected her to harassment based on her disability and reprisal for prior EEO activity
   from June 2014-August 2018, in terms of leave, telework, reasonable accommodation, and
   removal; and

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name
when the decision is published to non-parties and the Commission's website.

3.  subjected her to disparate treatment disability discrimination based on her disability and reprisal for prior EEO activity when it terminated her employment on August 15, 2018.

Complainant alleged that because the Agency failed to provide her the reasonable accommodation of full-time telework, she was forced to take paid leave, then unpaid leave, and finally, was charged large amounts of AWOL.

The Agency dismissed the complaint on November 5, 2018, for stating the same claims already raised in prior EEO complaints. One of these claims concerned the Agency's May 11, 2018, proposal to remove her, which was sustained by the Agency effective August 15, 2018. The FAD contained appeal rights to the EEOC, not the Merit Systems Protection Board (MSPB).

On December 20, 2018, the Agency's EEO office, per advice of the EEOC Administrative Judge (AJ) who was handling prior EEO complaints by Complainant, rescinded the part of the November 5, 2018 FAD that addressed Complainant's termination.

Thereafter, based on the EEO investigation conducted on an earlier EEO complaint on the proposed removal, the Agency's EEO office issued a FAD on January 30, 2019, re-docketed as Agency No. ATL-**19-0294-SSA**, finding that Complainant was not discriminated against based on disability and reprisal when she was terminated on August 15, 2018. This FAD was later rescinded in February 2019.[2] The FAD contained appeal rights to the MSPB, which Complainant nevertheless exercised on March 10, 2019.

The MSPB accepted the appeal, and in June 2019, held a hearing. Meanwhile, the Agency issued its FAD dated July 19, 2019, again on Agency No. SF-**19-0294-SSA**. Citing EEOC regulations, the Agency dismissed the removal claim because the matter was being adjudicated by the MSPB. This FAD only addressed the removal claim. The instant appeal followed.

While the instant appeal was pending, the MSPB, on September 30, 2019, issued an initial decision (MSPB No. SF-0752-19-0286-I-1) sustaining Complainant's removal and finding that she was not discriminated against based on her disability and reprisal for prior EEO activity. The initial decision was scheduled to become final on November 4, 2019, unless Complainant filed a petition for review with the Board. In the initial decision, the MSPB gave Complainant various petition/appeal options, including rights to file a petition for review with the Board or appeal to the EEOC only on her discrimination claims.

---

[2] Complainant complained to the Agency's EEO office that an EEO investigation was not conducted on her removal. For this reason, the EEO office rescinded the January 30, 2019 FAD. Nevertheless, despite the Agency's protestations, the MSPB declined to dismiss Complainant's appeal without prejudice. The MSPB reasoned that rescinding of the January 30, 2019 FAD was irrelevant because more than 120 days passed since Complainant filed her EEO complaint on October 5, 2018.

In the instant appeal, Complainant argues that the Agency's July 19, 2019 FAD on "Agency case SF-19-0294-SSA aka [sic.] MSPB... Number SF-0752-19-0286-I-1" is now moot because the MSPB issued its decision. She argues that the Agency should rescind its FAD on "Agency case SF-19-0294-SSA AKA [sic.] MSPB... Number SF-0752-19-0286-I-1... and just adopt the MSPB... decision so I can appeal the decision as one whole case." She argues that "... I know the MSPB decision is flawed and I will be appealing but that appeal should have no effect on the Agency using the MSPB decision as the decision for the whole case now." Complainant's term "one whole case" presumably refers to her claims leading up to her termination.

In opposition to the appeal, the Agency argues that the FAD should be affirmed.

<u>ANALYSIS AND FINDINGS</u>

The removal portion of Complainant's EEO complaint constituted a "mixed case" - a claim of discrimination on an action over which the MSPB has jurisdiction. 29 C.F.R. § 1614.302(a)(1). Under our regulations, after a mixed case complaint is accepted, the Agency shall conduct an EEO investigation, and then issue a FAD on the mixed portion adjudicating the discrimination claims with appeal rights to the MSPB, not the EEOC. <u>Id</u>. Aside from the question of whether the Agency complied with our regulations requiring the conduct of an EEO investigation on the mixed case complaint, which we need not decide here, the Agency's January 30, 2019 FAD, which only addressed Complainant's removal claim, properly contained appeal rights to the MSPB, which Complainant timely exercised.

The MSPB accepted jurisdiction over Complainant's appeal, sustaining the removal and finding no discrimination. In response to Complainant's concerns, we advise that unlike a decision by an AJ in the EEOC process, the Agency does not have authority to "adopt" or reject an initial decision by an AJ with the MSPB. Instead, the Agency's only options are to file a petition for review with the Board and file a brief responding to any petition/appeal made by Complainant. Further, while Complainant can exercise her petition/appeal rights provided by the MSPB, her mixed removal claim cannot be reunited in the administrative process with the rest of her actionable or live claims. <u>See</u> <u>generally</u>, 29 C.F.R. § 1614.302(a)(1). This does not prevent Complainant from simultaneously claiming, for example, if she files a petition/appeal in a forum which hears discrimination claims (as specified in the MSPB initial decision's appeal rights) that her removal was discriminatory because the Agency failed to reasonably accommodate her with telework, resulting in AWOL and that her removal grew out of harassment.

Accordingly, the July 19, 2019 FAD is AFFIRMED.

4                                                           2019005549

## STATEMENT OF RIGHTS - ON APPEAL
## RECONSIDERATION (M0617)

The Commission may, in its discretion, reconsider the decision in this case if the Complainant or the Agency submits a written request containing arguments or evidence which tend to establish that:

1.  The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.  The appellate decision will have a substantial impact on the policies, practices, or operations of the Agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision. A party shall have **twenty (20) calendar days** of receipt of another party's timely request for reconsideration in which to submit a brief or statement in opposition. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at Chap. 9 § VII.B (Aug. 5, 2015). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission. Complainant's request may be submitted via regular mail to P.O. Box 77960, Washington, DC 20013, or by certified mail to 131 M Street, NE, Washington, DC 20507. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The agency's request must be submitted in digital format via the EEOC's Federal Sector EEO Portal (FedSEP). See 29 C.F.R. § 1614.403(g). The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0610)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint.**

5                                                          2019005549

## RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests. Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations

November 7, 2019
Date

Exhibit D
Right To File
MSPB -Termination

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### WESTERN REGIONAL OFFICE

JENNIFER M. TOM,

               Appellant,

v.

SOCIAL SECURITY
    ADMINISTRATION,

               Agency.

DOCKET NUMBER
SF-0752-19-0286-I-1

DATE: September 30, 2019

Jennifer M. Tom, Antioch, California, pro se.

Scott J. Borrowman, San Francisco, California, for the agency.

Tina R. Saladino, San Francisco, California, for the agency.

**BEFORE**
Tamara Ribas
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

On March 10, 2019, the appellant timely filed an appeal after filing a formal equal employment opportunity (EEO) complaint and challenged the agency's action of removing her from the position of Benefits Authorizer, effective August 15, 2018. Initial Appeal File (IAF), Tab 1; *id.*, Tab 10; *see* 5 C.F.R. § 1201.154(b)(2). The Board has jurisdiction over this appeal under 5 U.S.C. §§ 7511-7513, and 7701(a). An in-person hearing was held on June 3-4,

2019.[1]  IAF, Tabs 47 and 48 (Hearing Transcripts 1 and 2 (HT1 and HT2)).  For the reasons discussed below, the agency's action is AFFIRMED.

## ANALYSIS AND FINDINGS

Background

The appellant was employed by the agency as a Benefit Authorizer.  IAF, Tab 11 at 143.   From November 2015 through February 2016, Kris Chamrernlaksa, Assistant Module Manager, indirectly supervised the appellant, and then became her direct supervisor in October 2016.  HT1 at 8.   Carmelita Rivera, Module Manager, was the appellant's second-line supervisor during the relevant time period, and James Dokko, Operations Manager, was the appellant's third-line supervisor during the relevant time period.  HT1 at 66-67 and 142-44.

The appellant was working in a module of the Western Processing Center that processed Social Security Administration (SSA) benefits cases using the agency's proprietary system.  HT1 at 4, 6, and 7.  A benefit authorizer performs primarily a variety of post-entitlement actions and handles the 1-800 number for teleservice.  HT2 at 102. The appellant's work location was the Frank Hagel Federal Building (FHFB).  *See* IAF, Tab 30 at 13.

In January 2014, the agency created a telework pilot program, and the appellant began teleworking one to two days per week.[2]  HT1 at 161-62.  As of the date of the hearing, the telework program was still in a pilot phase.  HT2 at 9. In mid-2014, the appellant began complaining of allergic reactions to an insecticide being used in the FHFB, a cleaner that was used in the FHFB, and a co-workers' perfume, although no physical adverse actions were found upon

---

[1] The appellant appeared by video from her home via a GoToMeeting software application.

[2] There is reference in the record that the appellant was allowed to telework two days a week for a three-month period. *See* HT1 at 199; HT2 at 48.

examination. IAF, Tab 32 at 41-56; *id.*, Tab 13 at 66.  Nevertheless, throughout 2014 and well into 2015,[3] the appellant either visited the emergency room or scheduled appointments to be examined by doctors regarding her complaints of adverse reactions to cleaners, perfume, fragrances, or other irritants in the workplace; the vast majority of time, the appellant's symptoms had subsided prior to being examined, but she was prescribed or recommended that she take various medications, including Benadryl. *Id.*, Tab 32 at 80-105, 145-47, and 156-169; *id.*, Tab 14 at 63-67, 74, and 79-81.

On November 26, 2014, the appellant requested a reasonable accommodation that she be allowed to work from home,[4] but the request was denied by Marcus Smith, Acting Operations Manager, because the agency's Medical Officer could not conclude that the appellant had a disability, because she had provided insufficient medical documentation; therefore, she was instructed to provide documentation that describes her impairment and its nature, severity and duration, and the extent that the impairment limits activities. IAF, Tab 13 at 127-28.

---

[3] The record shows there were a few issues with the FHFB building.  In May 2014, there was a demolition incident in the west plaza of the FHFB in which the equipment caused odors in the building, which was immediately addressed. HT1 at 56; IAF, Tab 4 at 104.  There was an ongoing rodent problem in 2014 and 2015.  IAF, Tab 4 at 101-02.  And in August 2017, the FHFB began undergoing construction related to a seismic retrofit, which continued through the date of the hearing, and required moving employees, including the appellant, to different locations throughout the building. *Id.* at 107.  However, as discussed later, the appellant no longer worked in the building by 2017.

[4] It is not clear from the documentation, but presumably, the request was that the appellant work from home full-time.  Previously, on July 23, 2014, the appellant requested a reasonable accommodation that she be provided a scent-free work environment, but the agency's Medical Officer found the medical documentation did not support that she had a disability and that even if she had a disability, it would not be able to provide a scent-free environment in a public building and the appellant would in any event be exposed to scents outside the work environment, such as in shopping malls and grocery stores. IAF, Tab 31 at 155-56.

On April 7, 2015, the appellant's medical doctor, Ted Young,[5] completed a Medical Inquiry Form In Response to An Accommodation Request, stating that the appellant had a medical impairment as follows: "Ms. Tom appears to have increased sensitivity to airborne irritants such as perfumes and cleaning agents." IAF, Tab 13 at 68.  He indicated that this condition affected her speaking, thinking and working.  *Id.* at 69.  He suggested an accommodation of "the removal of airborne irritants as much as possible from the work environment." *Id.* at 70.

On June 15, 2015, Dr. Sidhartha Gurung, who had previously treated the appellant, recommended that the appellant not drive while taking Benadryl.  IAF, Tab 14 at 86.  On June 16, Dr. Young provided a medical note stating that if the appellant was unable to avoid fragrance and fume exposure while at work, then the best solution would be for her to work from home.  *Id.* at 87.  On July 7, Dr. Young provided a similar medical note encouraging avoidance of chemicals, rather than medication, and he noted the duration of the appellant's medical condition may be indefinite.  *Id.* at 90.

On September 25, 2015, Dr. Young provided the following information as a suggestion for a reasonable accommodation:

> From the viewpoint of my specialty, I do not have any way to determine if the symptoms are organic or psychosomatic in nature.
>
> If organic, consideration can be made for a room which has isolated air flow from other area [sic] from the building (possibly airflow from outside of building).  Or possibly work from home.

IAF, Tab 34 at 48.

Beginning in June 2015, Dokko became responsible for responding to the appellant's requests for a reasonable accommodation, and for the purpose of

---

[5] Dr. Young is the appellant's allergist.  HT1 at 225.

consistency, he continued to handle her requests for reasonable accommodation throughout the remainder of her employment with the agency, except for the issue of whether she could telework, since the National Reasonable Accommodation Coordinator (NRAC) oversaw this type of accommodation request. HT1 at 146 and 149. As reasonable accommodations, the appellant requested on June 22, 2015, that her work location be moved to the second floor, and that she be able to telework full time. *Id.*; IAF, Tab 13 at 130.

The agency then engaged in an on-going interactive process. *See* IAF, Tab 13 at 130-31. With respect to moving the appellant's office, Dokko offered the appellant three separate enclosed offices with locks installed on the doors, although she tried out only two of the offices. The first office she tried out was located on the third floor, east side of the building, and the appellant stayed there for 7 months beginning in August 2015. HT1 at 147 and 156. The appellant then complained of being affected by scents and odors and also claimed someone was entering her office, although Dokko did not believe anyone else had access to the appellant's office.[6] *Id.* at 157. Regarding the next enclosed and locked office provided to the appellant, she used it for four months, immediately after the first private office, but she had the same complaints of scents and odors as with the first office and again believed someone was entering her office and spraying a foreign scent or chemical in her office, although again, Dokko did not observe any evidence of this. *Id.* at 157-58. The appellant did not try out the third office. HT1 at 156.

Regarding the measures Dokko took to remove irritants and chemicals, he testified that the agency sent out an email to the staff requesting that they not use perfume, and the civil rights and EEO staff provided hidden disabilities training. HT1 at 158; *see* IAF, Tab 34 at 57. Dokko also provided the appellant with two

---

[6] The appellant, Dokko, and the facilities staff were the only ones who had a key to the enclosed, locked offices. HT1 at 152-53.

different types of draft guards around the bottom and sides of her office door. HT1 at 147-48. He provided the appellant with two different face masks and an air purifier. *Id.* at 152. The air purifier was for the appellant's exclusive use and the specific model was recommended by the appellant's allergist. *Id.* at 153. It was called a Multigas GC Air Purifier that could cover over 1,000 square feet, which was larger than the appellant's office, and it was selected by the appellant. *Id.* at 154-56. It cost $1,199.00 and was equipped with four gas phase filter cartridges that guaranteed to "completely remove gasses, odors, and chemicals." IAF, Tab 34 at 52-53. The agency also replaced the filters two times. HT1 at 156. Furthermore, the agency had the air quality tested and the results were normal.[7] *Id.* at 158-59. In addition to these measures, Dokko testified that the appellant's enclosed offices were close to bathrooms,[8] the lighting in the offices could be customized, and she could take breaks or leave if she felt sick while working in the building. *Id.* at 159.

Other measures were taken as well. The appellant was provided one-on-one training, as opposed to group trainings, and she was provided new laptops and gloves, as she claimed it would take her a week – until her next telework day – to recover from the symptoms of using the laptop. HT1 at 160 and 162-63. The agency provided her new laptops in 2015 and in 2016. *Id.* at 165. With the second laptop, the appellant identified an Information Technology (IT) individual who did not wear cologne, and that individual opened the computer box, set up the laptop with the requisite security and proprietary programs and install the appellant's profile on it, and then handed it to Dokko, who kept it stored in a

---

[7] The air quality test was limited to temperature, humidity, carbon monoxide, meter readings, and a record of activities, but it did not specifically measure the presence of chemicals or fragrances. HT2 at 54-56.

[8] The second office was 30 feet away from a bathroom, and the third office that the appellant did not try out was 10 feet from a bathroom. HT2 at 85.

secure location until he handed it over to the appellant. The appellant then took that laptop home with her each night after work. *Id.* at 163-64. In her examination of Dokko, the appellant insinuated that the laptop that she was issued in 2016 became contaminated, but Dokko did not see any evidence that the laptop had been contaminated. HT2 at 74-75.

Additionally, Dokko offered the appellant part-time work, which she declined, and he offered her a secured, private office space in the Oakland Federal building, which she again declined due to the cost of parking and her concerns that the public could enter the building and that her first and second line managers would not be able to offer her direct assistance. HT1 at 148; HT2 at 4. He also suggested that she work in the agency's field office located in Antioch, where the appellant lived, but she refused, stating she was unable to drive across town. HT1 at 148; HT2 at 7.

It is undisputed that the reasonable accommodation the appellant ultimately wanted was to telework 5 days a week. On June 23, 2016, Debbie Ellis, Assistant Regional Commissioner,[9] denied the appellant's request to telework full time, because the medical documentation did not show that the various accommodations the agency had provided the appellant were ineffective and did not support full-time telework. IAF, Tab 13 at 130-32; HT2 at 104-05. The appellant requested reconsideration, and on August 4, 2016, Ellis denied the request for the same reason. IAF, Tab 34 at 24-26; HT2 at 111-12. The appellant again requested a reasonable accommodation of full-time telework on October 13, 2016, and Ellis again denied the request on February 9, 2017, because not only did the medical documentation fail to support full-time telework as a reasonable

---

[9] Ellis is currently the Acting Deputy Regional Commissioner, San Francisco Region. HT2 at 100.

accommodation, but it also did not indicate that the accommodations the agency had provided to date were ineffective.[10] IAF, Tab 34 at 10-11; HT2 at 108.

Throughout 2015 and 2016, while the agency was working with the appellant on her reasonable accommodation request, she also requested to work at home by exception pursuant to the collective bargaining agreement. Article 39 of that agreement allows an employee to work at home up to 12 months when the employee has a medical condition that makes it difficult to commute to work but can otherwise perform his or her job duties at home. IAF, Tab 31 at 110; *see also* IAF, Tab 13 at 134. In 2015, the appellant requested work at home by exception, which was denied, and then she requested reconsideration, which Dokko denied on June 23, 2016, because the appellant's medical documentation did not support that the appellant had difficulty commuting to work. *Id.* The appellant continued to request work at home by exception in 2017, and on April 5, 2017, Dokko again denied these requests, because the appellant's medical documentation did not address the appellant's ability or inability to commute to work. *Id.*, Tab 31 at 64. The appellant again requested work at home by exception on June 20 and 22, 2017, and Dokko again denied it on July 21, 2017, because the medical documentation did not support the request. *Id.*, Tab 31 at 63-64; HT2 at 78.

The last day the appellant worked at the FHFB was July 21, 2016, when the appellant stated she was unable to drive. HT1 at 160. Thereafter, the appellant was on approved leave without pay (LWOP) based on medical documentation she provided, and she was allowed to telework one day a week, but by September 2017, she had used 480 hours of leave under the Family Medical Leave Act (FMLA), and she had maxed out advanced annual leave of 160 hours and

---

[10] Ellis explained that if a reasonable accommodation is going to be denied, the recommended denial must first be reviewed by the NRAC for a determination. HT2 at 113. A reassessment was conducted by Stephen Breen, Regional Commissioner, reviewed Ellis' 2017 decision, and he likewise denied the request for accommodation. *Id.* at 114 and 178.

advanced sick leave of 104 hours. *Id.* at 14 and 17; IAF, Tab 33 at 4-75. She also teleworked one day a week, and would sometimes accrue credit hours that she would use. HT2 at 45-46. The only other time the appellant entered the FHFB was to renew her federal employee badge in August 2017. *Id.* at 11-12.

Meanwhile, beginning in 2017, Rivera began handling the appellant's time and attendance. HT1 at 68. Senior agency officials instructed management officials agency-wide to scrutinize administrative forms of leave, such as LWOP, more carefully, prompting Chamrernlaksa, the appellant's first-line supervisor, to review the medical documentation supporting the appellant's LWOP. Chamrernlaksa found that the appellant's medical documentation, while stating that she could not drive, did not address the appellant's inability to use other forms of transportation to come to work. HT1 at 15-16. Consequently, Chamrernlaksa issued the appellant a September 25, 2017 Notification to Return to Duty in which the appellant was instructed to either submit sufficient supporting documentation by October 10, or return to duty on October 10. IAF, Tab 11 at 275-76. Chamrernlaksa also informed the appellant that her continued absence without supporting medical documentation could result in her being placed in an absence without leave (AWOL) status, and continuing AWOL occurrences could result in disciplinary action, including removal. *Id.* Finally, he notified the appellant that she could request LWOP as a reasonable accommodation. *Id.* at 276.

The documentation the agency had on file regarding the appellant was dated June 29, 2017, from Dr. Alben Lui, a neurologist, who stated, "The patient is unable to drive due to vertigo from 06/22/2017 through 12/21/2017. She can work from home." IAF, Tab 14 at 105. The appellant provided updated information from Dr. Lui on October 3, 2017, in which he stated that the appellant "suffers from chronic dizziness which makes it difficult to drive longer distances. She reports she is able to do the work as long as no driving is needed." *Id.* at 107; *id.*, Tab 11 at 274. Chamrernlaksa found this documentation to be

insufficient, because it again did not address the appellant's ability or inability to commute through another form of transportation.   HT1 at 20.   In addition to public transportation, Chamrernlaksa identified alternate transportation methods as taxi, paratransit, Uber, Lyft, a friend, or a family member. *Id.* at 42.

The appellant also again requested LWOP pursuant to the FMLA, but Rivera denied the request on October 13, 2017, because the appellant had already exhausted the maximum 480 hours of FMLA; however, she suggested the appellant sign up for the Voluntary Leave Transfer Program. IAF, Tab 9 at 47.

On May 11, 2018, Rivera issued the appellant a Notice of Proposed Removal, charging her with being AWOL on 70 different dates from October 10, 2017, through February 16, 2018.   IAF, Tab 11 at 173-82.   The appellant provided a written response and an oral response.   *Id.* at 144, 154-56, and 164-172.   On August 8, 2018, Dokko sustained the charge of AWOL and the penalty of removal. *Id.* at 144-153.

This appeal followed, and the appellant claimed the agency discriminated against her on a disparate treatment theory and failed to accommodate her disability, and that the agency retaliated against her for engaging in protected EEO activity. IAF, Tabs 1, 16, and 39.   Additional facts are discussed below.

Applicable Law and Findings

To sustain an adverse action before the Board, the agency must prove by preponderant evidence[11] the factual basis for the misconduct charged, and establish that disciplinary action, based on the proven misconduct, promotes the efficiency of the service. *See* 5 U.S.C. §§ 7513(a) and 7701(c)(1)(B); 5 C.F.R. § 1201.56(b)(1). The "efficiency of the service" requirement includes a showing that some disciplinary action is warranted (the "nexus" requirement) and that the

---

[11] A preponderance of the evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q).

particular penalty imposed by the agency is within the tolerable limits of reasonableness. Thus, three distinct elements must be proven by the agency in any adverse action. *Pope v. U.S. Postal Service*, 114 F.3d 1144, 1147 (Fed. Cir. 1997); *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 302-303 n.67, 307-308 (1981).

When resolving issues of credibility, I am guided by *Hillen v. Department of the Army*, 35 M.S.P.R. 453 (1987). Under *Hillen*, an administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version she believes, and explain in detail why she found the chosen version more credible, considering such factors as: (1) the witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor. *Id.* at 458.

*AWOL*

In order to sustain an AWOL charge, the agency must show by a preponderance of the evidence that: (1) the employee was scheduled for duty; (2) the employee was absent from duty; and (3) either the employee's absence was not authorized or his request for leave was properly denied. *See, e.g., Rojas v. U.S. Postal Service*, 74 M.S.P.R. 544, 548 (1997), *aff'd*, 152 F.3d 940 (Fed. Cir. 1998) (Table), *cert. denied*, 525 U.S. 880 (1998). Proof of one or more specifications supporting a charge is sufficient to sustain the charge. *See Greenough v. Department of the Army*, 73 M.S.P.R. 648, 657 (1997), *review dismissed*, 119 F.3d 14 (1997); *James v. Department of the Air Force*, 73 M.S.P.R. 300, 303 (1997).

The Notice of Proposed Removal alleged the following dates and times the appellant was AWOL in support of the charge:

**Specification No. 1:** On October 10, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 2:** On October 13, 2017, from 6:00a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification Nos. 3-4:** On each workday from October 16, 2017 through October 17, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification No. 5:** On October 19, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 6:** On October 20, 2017, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from Module 10 of the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification Nos. 7-8:** On each workday from October 23, 2017 through October 24, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification Nos. 9-10:** On each workday from October 26, 2017 through October 27, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification Nos. 11-12:** On each workday from October 30, 2017 through October 31, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification No. 13:** On November 2, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 14:** On November 3, 2017, from 6:00a.m. - 8:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 2 hours of AWOL.

**Specification Nos. 15-16:** On each workday from November 6, 2017 - November 7, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification No. 17:** On November 9, 2017, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification Nos. 18-19:** On each workday from November 13, 2017 through November 14, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification Nos. 20-22:** On each workday from November 16, 2017 through November 20, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 24 hours of AWOL.

**Specification No. 23:** On November 21, 2017, from 6:00a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification No. 24:** On November 24, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification Nos. 25-26:** On each workday from November 27, 2017 through November 28, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification No. 27:** On November 30, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 28:** On December 1, 2017, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification Nos. 29-31:** On each workday from December 4, 2017 through December 5, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification Nos. 31-32:** On each workday from December 7, 2017 through December 8, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification Nos. 33-34:** On each workday from December 11, 2017 through December 12, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification Nos. 35-38:** On each workday from December 14, 2017 through December 19, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 32 hours of AWOL.

**Specification Nos. 39-40:** On December 21, 2017 and December 22, 2017 from 6:00 a.m. to 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 10 hours of AWOL.

**Specification No. 41:** On December 26, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 42:** On December 28, 2017, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 43:** On December 29, 2017, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification No. 44:** On January 2, 2018, from 9:00 a.m. - 5:00 p.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you

requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 45:** On January 3, 2018, from 6:15 a.m. - 2:00 p.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 7.75 hours of AWOL.

**Specification Nos. 46-49:** On each workday from January 4, 2018 through January 9, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 32 hours of AWOL.

**Specification No. 50:** On January 11, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 51:** On January 12, 2018, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification No. 52:** On January 16, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 53:** On January 18, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 54:** On January 19, 2018, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you

requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification Nos. 55-56:** On each workday from January 22, 2018 through January 23, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification No. 57:** On January 25, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 58:** On January 26, 2018, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification Nos. 59-60:** On each workday from January 29, 2018 through January 30, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification No. 61:** On February 1, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 62:** On February 2, 2018, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from Module 10 of the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification Nos. 63-64:** On each workday from February 5, 2018 through February 6, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty

station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification No. 65**: On February 8, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 66**: On February 9, 2018, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

**Specification Nos. 67-68**: On each workday from February 12, 2018 through February 13, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 16 hours of AWOL.

**Specification No. 69**: On February 15, 2018, you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 8 hours of AWOL.

**Specification No. 70**: On February 16, 2018, from 6:00 a.m. - 11:00 a.m., you were absent, without authorization, from the Western Program Service Center, your required duty station. While you requested leave for this period, management properly denied your request. You were charged 5 hours of AWOL.

IAF, Tab 11 at 173-78.

The appellant admitted she was scheduled for duty on the above-identified dates and times. HT2 at 208-09. She further admitted that she did not report to work on the aforementioned dates and times. *Id.* at 209. Finally, she admitted that she requested leave for the dates and times in question.[12] *Id.* The

---

[12] The type of leave the appellant requested was LWOP. HT1 at 174.

documentation contained in the record further supports that the appellant was scheduled for duty, did not report for duty, and requested leave for these dates. IAF, Tab 33 at 79-98; *id.*, Tab 40. Thus, the remaining issue is whether the agency properly denied the appellant leave.

It is undisputed, and I find, that the appellant had completely exhausted her sick leave, annual leave, and FMLA leave. It is also undisputed that an employee does not have an entitlement to LWOP. IAF, Tab 9 at 33. There are limited circumstances in which an employee has a right to LWOP, but I find that none of the exceptions identified applied to the appellant. *See id.* at 34. I further find that the appellant was not entitled to work at home by exception pursuant to Article 39, because the medical documentation the appellant submitted did not discuss the appellant's ability or inability to commute by various modes of transportation. The only remaining issue is whether the agency improperly denied her request for reasonable accommodation to telework full time. As discussed below, I find that the agency did not improperly deny her request.

Because I find that the agency properly denied the appellant's requests for LWOP, the specifications are SUSTAINED. Because I have sustained the specifications, the charge of AWOL is likewise SUSTAINED.

Nexus

An agency may take an action against an employee under 5 U.S.C. Chapter 75 only for such cause as will promote the efficiency of the service. *See, e.g., Hatfield v. Department of the Interior*, 28 M.S.P.R. 673, 675 (1985). An adverse action promotes the efficiency of the service, satisfying the nexus requirement, where the grounds for the action relate to either the employee's ability to accomplish his duties satisfactorily or to some other legitimate government interest. *See Fontes v. Department of Transportation*, 51 M.S.P.R. 655, 665 n.7 (1991). Absence without leave is inherently connected to the efficiency of the service. *See Rojas,* 74 M.S.P.R. at 548; *see also Crutchfield v. Department of the Navy*, 73 M.S.P.R. 444, 448 (1997) (unauthorized absence, by its very nature,

disrupts the efficiency of the service).  Additionally, Chamrernlaksa and Rivera testified that anytime the appellant was not working, her workload had to be reassigned to other Benefit Authorizers.  HT1 at 17-18 and 77.  In some cases, this caused delays in the authorizations provided to the customers.  *Id.* at 79.  I find the agency has proved nexus by preponderant evidence.

Affirmative Defenses

The appellant claims her removal was based on discrimination under a disparate treatment theory and because the agency failed to accommodate her, she claimed it was in retaliation for filing an EEO complaint.  The agency's decision may not be sustained if the appellant shows harmful error in the application of the agency's procedures in arriving at such decision or shows that the decision was based on a prohibited personnel action, such as harmful procedural error or unlawful discrimination.  5 U.S.C. § 7701(c)(2).  The appellant bears the burden of proof by preponderant evidence on these issues.  *See* 5 C.F.R. § 1201.56(b)(2)(i)(C).

Pursuant to the Americans with Disabilities Act Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) (ADAAA), the appellant may prove that she has a disability by showing that she (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(1), 29 C.F.R. § 1630.2(g)(1),(2),(3).  The definition of disability is construed in favor of broad coverage.  42 U.S.C. § 12102(4)(A).

A physical or mental impairment is any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, or any mental or psychological disorder.  29 C.F.R. § 1630.2(h).  The test for whether a disability substantially limits the ability of an individual to perform a major life activity is applied as compared to most people in the general population.  29 C.F.R. § 1630.2(j).  Major life activities include but are not limited to activities such as caring for oneself, performing manual tasks, eating,

lifting, bending, concentrating, communicating, and working, including the operation of a major bodily function. 42 U.S.C. § 12102(2).

An individual need not prove that she is significantly restricted in order to show that a disability substantially limits a major life activity. 42 U.S.C. § 12101 note.   An impairment that substantially limits one major life activity need not limit others.   One that is episodic or in remission is a disability if it would substantially limit a major life activity when active.   The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures other than ordinary eyeglasses or contact lenses. 42 U.S.C. § 12102(4).

A "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.  However, an individual is not excluded as a qualified individual with a disability if she has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use; is participating in a supervised rehabilitation program and is no longer engaging in such use; or is erroneously regarded as engaging in such use, but is not engaging in such use. 42 U.S.C. § 12114(a),(b).

In the second method of proving a disability, an individual "has a record of" a disability if she has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.  This may include individuals who were treated for a disease but no longer have it as well as individuals who were misdiagnosed with a substantially limiting impairment even though they did not actually have that impairment. S. Rep. No. 116, 101st Cong., 2d Sess. 23.  The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities. *Id.*  Whether an individual has such a record is

to be broadly construed.  If the individual has such a record, the agency need not have relied on that record for the individual to be covered under this test.

With regard to the third method of proving disability, an individual meets the requirement of being "regarded as having such an impairment" if she establishes that she has been subjected to a prohibited action because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.  However, the "regarded as" test shall not apply to impairments that are transitory and minor.  A transitory impairment is an impairment with an actual or expected duration of six months or less.  42 U.S.C. § 12102(3).

The Board has held that a mixed motive analysis is appropriate in disability discrimination claims arising under the ADAAA and that the appellant need not prove that but for the discrimination, the action would not have been taken.  Pursuant to 29 C.F.R. § 1630.2(l)(3), liability under the ADAAA is established only when the appellant proves by a preponderance of the evidence that the agency discriminated on the basis of disability, as defined by 42 U.S.C. § 12112.  Further, under a mixed motive analysis, the appellant's remedy is limited if the agency demonstrates, by clear and convincing evidence, that it would have taken the same action absent the discriminatory motive.  *See Southerland v. Department of Defense*, 119 M.S.P.R. 566, ¶ 23 (2013).

Nothing in the ADAAA or in 42 U.S.C. chapter 126 shall provide the basis for a claim by an individual without a disability that she was subject to discrimination because of the lack of disability.  42 U.S.C. § 12201(g).

To establish a prima facie case of disability discrimination based on a failure to accommodate, the appellant must show: (a) that she is an individual with a disability under 29 C.F.R. § 1630.2(g) and that the action appealed to the Board was based upon her disability; and (b) that she is a qualified individual with a disability; that is, that she satisfies the requisite skill, experience, education, and other job-related requirements of the position she holds or desires

and can perform the essential functions of the position with or without reasonable accommodation. *See* 29 C.F.R. §§ 1630.2(m), 1630.3. After the appellant has established a prima facie case, the burden shifts to the agency to demonstrate that reasonable accommodation would impose an undue hardship on its operations. Thereafter, the burden shifts back to the appellant to show that the agency's reasons are a pretext for discrimination.

An agency need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability solely because she is regarded as having a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12201(h).

At the outset, I find that the appellant has a disabling medical condition of migraine with aura and vertigo. In this regard, I note that the Office of Personnel Management awarded the appellant disability benefits based on these conditions. IAF, Tab 30 at 26. I will also assume without finding that the appellant has a disability of chemical sensitivity.[13]

But the appellant has failed to prove that she was a *qualified* individual with a disability. Chamrernlaksa testified that while he believed the appellant could perform all of her duties teleworking 5 days a week, he specifically noted that she would not be able to spike at home, which is an essential function of her job. HT1 at 27. Spiking occurs when there are heavy call volumes to the agency's 1-800 number from customers, during which benefit authorizers are required to take those calls. *Id.* at 31; HT2 at 102. Spiking can happen every day in a month or only one day in a month, but it is unpredictable. HT1 at 32. Additionally, Dokko and Rivera testified that spiking was an essential function of

---

[13] Dr. Young stated that he could not determine whether the appellant's symptoms, referring to chemical sensitivity, were organic or psychosomatic in nature. IAF, Tab 34 at 48. And the appellant explained that when she spoke with Dr. Young about it, he informed her it was an "undecided situation." HT2 at 224.

her job, and she was not able to perform that function when she was not in the workplace. HT2 at 50 and 109. Finally, there was training that the appellant had to attend in person. HT1 at 81.

The appellant argued through her examination of witnesses that spiking is not an essential element of her position, because other benefit authorizers do not spike. But as Chamrernlaksa explained, the only benefit authorizers who do not spike are those who have not yet been trained on that particular duty. HT1 at 30. And as Dokko explained, the only reason those individuals had not yet been trained was due to a resource issue, apparently due to the on-going construction and space issues. *Id.* at 34 and 218-19. Once a benefit authorizer was trained to spike, they are required to do so as an essential function of the position. *Id.* at 219. I find that spiking is an essential function of the appellant's position.[14]

But even if the appellant was a qualified individual with a disability, I find that she has not shown that the agency failed to accommodate her. The appellant, in her examination of witnesses, implied that the agency was required to provide her a fragrance or scent-free environment. However, the medical documentation did not support such an accommodation, and such an accommodation would not be possible in a public building. I find the agency took all effective measures to provide the appellant with a scent-free work area; namely, by providing her an enclosed, private and locked office with door guards and an industrial strength air purifier. Additionally, the agency provided the appellant with masks to wear in the hallways when she needed to use the restroom. Moreover, the appellant did not provide any documentation indicating that the appellant's chemical sensitivity would be immediately triggered upon entering a hallway or the front door of the FHFB, and she did not provide any medical documentation that stated that the

---

[14] It should be noted that employees who qualify for the work at home by exception pursuant to Article 39 are excused from spiking during that limited time period. HT2 at 156.

aforementioned accommodations were ineffective.  HT2 at 106-07, 124-25, and 129-131.

The appellant has consistently argued that she was entitled to work from home 5 days a week,[15] but the medical documentation did not state that this was the only accommodation that would be effective.  In fact, I find it would not have been an effective accommodation, because the appellant claimed that the second laptop she was issued in 2016 became contaminated, and she would not use it.[16] HT2 at 90.  Thus, Dokko did not have any indication that the appellant would be able to telework 5 days a week if she could not perform her work on the government laptop.  *Id.*  As mentioned above, Dokko did not find any signs of contamination, and it would not be possible for the appellant to use her own computer, because for security reasons, the proprietary application could only be downloaded onto the agency's laptop.  HT1 at 165.

As far as a request for reassignment, Dokko asked the appellant several times if she wanted him to initiate a search, but he understood that she would not engage in the discussion, so he did not conduct a job search for the purpose of reassignment.  HT1 at 171; HT2 at 57 and 64.  The appellant disputed that she declined reassignment to another position, stating that she requested to return to the debt department where she previously worked.  HT2 at 203-05.  However, a review of their email exchanges shows that Dokko repeatedly informed the appellant that he would initiate a job search if she made an affirmative statement that she wanted him to, but she did not do so.  IAF, Tab 11 at 260-273.

---

[15] Ellis testified that if a benefit authorizer had her laptop equipped with the proper security and technology to take spike calls and perform other work, then that employee could telework full time, assuming the medical documentation supported the accommodation.  Thus, potentially, a benefit authorizer could perform all the essential functions of the job at home if using a government issued laptop.  HT2 at 161.

[16] Or more accurately, she would use the laptop on her telework day and then state that she would become ill and it would take her several days to more than a week to recover and be able to perform work again.  HT2 at 93.

Additionally, the appellant was not credible in her testimony and was inconsistent and evasive. For example, she was given an opportunity to identify where in the record she requested reassignment to the debt department, but she did not attempt to do so. HT2 at 205. She further denied that she had declined relocation to the third office, but she admitted that she never went to the third office. *Id.* at 203. Moreover, she was evasive in answering even the most basic questions, such as whether she was required to report to duty on the dates identified in the Notice of Proposed Removal. *Id.* at 205-09. It was only when she was asked why she would request leave on days she was not scheduled to work that she reluctantly admitted she was scheduled to work:

> Q: Okay. So why would you request leave for a day that you weren't scheduled to work?
>
> A: That's a good – okay. I guess, then – yes, to your question?

HT2 at 209. Thus, while the appellant testified that she did not decline an offer of reassignment, I do not credit her testimony. *Hillen*, 35 M.S.P.R. at 458. I find the appellant has not shown that she was a qualified individual with a disability requiring her to telework full time, and I further find she did not show the agency failed to accommodate her medical conditions.

### *Disparate Treatment Based on Disability*

The appellant also claimed she was discriminated on the basis of her disability through a disparate treatment theory and that comprised a hostile work environment. IAF, Tab 39. The appellant may establish a prima facie case of prohibited discrimination on the ground of disparate treatment by introducing evidence to show that: (1) she is a member of a protected group; (2) she suffered an appealable adverse employment action; and (3) the unfavorable action gives rise to the inference of discrimination. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). As to the third element, an employee may rely on any evidence giving rise to an inference that the unfavorable treatment at

issue was due to illegal discrimination. *See, e.g., Davis v. Department of the Interior*, 114 M.S.P.R. 527, ¶ 7 (2010), and cases cited therein.[17] Thus, a prima facie case of disparate treatment discrimination can be established by any proof of actions taken by the employer that show a "discriminatory animus," where "in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).

Once the appellant has established a prima facie case, the burden shifts to the agency to articulate a legitimate nondiscriminatory reason for its actions. Finally, if the agency articulates such a reason, the *McDonnell Douglas* framework disappears and only the ultimate burden remains,[18] meaning that the burden is on the appellant to show that the agency's proffered explanation constitutes a pretext for discrimination. To do so, the appellant can rely on "any combination of (1) evidence establishing her *prima facie* case; (2) evidence she presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to her, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (citing *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)) (en banc).

Thus, while evidence to make out the appellant's prima facie showing as well as her showing of pretext may include proof that the employer treated

---

[17] Although *Davis*, which includes a burden shifting component for the appellant to prove pretext, has not been overruled, the Board's notation in *Gardner v. Department of Veterans Affairs*, 123 M.S.P.R. 647, ¶ 34 n.5 (2016), implies that the Board may likely review disability discrimination claims under a *Savage v. Department of the Army*, 122 M.S.P.R. 612 (2015) analysis.

[18] The Board has held that if the record is complete and the agency has articulated a legitimate nondiscriminatory reason for its action, the AJ need not analyze whether the appellant made a prima facie showing of discrimination. *See, e.g., Bowman v. Department of Agriculture*, 113 M.S.P.R. 214, ¶ 7 (2010).

similarly situated employees differently, *see Buckler v. Federal Retirement Thrift Investment Board*, 73 M.S.P.R. 476, 497 (1997), an appellant may also prevail by introducing evidence that the employer lied about its reason for taking the action or evidence of: (1) inconsistency in the employer's explanation; (2) failure to follow established procedures; (3) general treatment of employees in the protected category or those who engage in protected activities; and/or (4) incriminating statements by the employer. *See Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 495 (D.C. Cir. 2008); *Davis*, 114 M.S.P.R. 527 at ¶ 8.

In determining whether a work environment is abusive or hostile, the totality of the circumstances must be considered, including: psychological injury; interference with work performance; the frequency of the discriminatory misconduct; its severity; whether it was physically threatening or humiliating or a mere offensive utterance; whether the conduct was verbal or physical; whether the harasser was a co-worker or supervisor; and the number of persons at whom the harassment was directed. Alleged harassing conduct must be subjectively perceived by the victim as hostile or abusive and it must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. *Vivens v. Department of the Interior*, 92 M.S.P.R. 256, 262-63 (2002) (discussing a hostile work environment in the context of sexual harassment).

The appellant relied on agency responses in discovery showing that there are some benefit authorizers throughout the country who telework full time. *See* IAF, Tab 30 at 27-39. These responses show that in the Atlanta and Chicago regions, 22 benefit authorizers in each region teleworked 5 days a week through the work at home by exception, and in the New York region, 18 benefit authorizers teleworked 5 days a week through work at home by exception. *Id.* at 30, 33-34, and 36. All of these employees teleworked for limited periods of time, as opposed to permanently, and as witnesses explained above, the appellant did not meet the requirements of work at home by exception. With respect to other

regions granting benefit authorizers full-time telework as a reasonable accommodation, this also occurred (*see id.* at 31-32, 37, and 39), but the problem with the appellant's situation was that her medical documentation did not support full-time telework, and the appellant would not use her government-issued laptop, so she could not perform the spiking duties, an essential function of her job. Additionally, Dokko testified that he was not aware of any benefit authorizer in the Western Program Center who was allowed to telework full time for any reason. HT1 at 205.

In sum, the appellant has not shown that the individuals who were allowed work at home by exception were outside of her protected group, *i.e.*, did not have a disability, and the documentation does show that some benefit authorizers had a disability that warranted the accommodation of full-time telework. The appellant has not provided any evidence to show that she was discriminated against based on her disability, and thus, she cannot show that she was subjected to a hostile work environment.

### *Retaliation for Engaging in Protected EEO Activity*

For cases involving other allegations of discrimination and retaliation for engaging in EEO activity, the Board has adopted the analytical framework of *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), for determining whether reversal of the action is warranted under 5 U.S.C. § 7701(c)(2)(B). *Savage v. Department of the Army*, 122 M.S.P.R. 612 (2015). First, the Board will inquire whether the appellant has shown by preponderant evidence that the prohibited consideration was a motivating factor in the contested personnel action. *Savage*, ¶ 49. Such a showing is sufficient to establish that the agency violated 42 U.S.C. § 2000e-16 (Title VII); thereby committing a prohibited personnel practice under 5 U.S.C. § 2302(b)(1). However, the *Mt. Healthy* test assures that an employee who belongs to a protected group is not thereby granted immunity from the ordinary consequences

of misconduct or poor performance. *Savage*, ¶ 50 (citing *Mt. Healthy*, 429 U.S. at 285-86).

If the appellant meets her burden, the inquiry shifts to whether the agency has shown by preponderant evidence that the action was not based on the prohibited personnel practice, *i.e.*, that it still would have taken the contested action absent the discriminatory or retaliatory motive. If the agency satisfies this inquiry, its violation of 42 U.S.C. § 2000e–16 will not require reversal of the action. *Savage*, ¶ 51.

The appellant claimed that after she engaged in protected EEO activity in January 2017, the agency retaliated against her to the degree of creating a hostile work environment. IAF, Tab 35. The appellant argued that the agency not allowing her to telework 5 days a week or work at home by exception were forms of retaliation. There was evidence that during some unidentified time period, Rivera was able to work at home by exception. Rivera testified that during that time period, she had a specific medical condition with her foot lasting a specific period of time. She was completely immobile and could not walk or bear any weight on her foot. HT1 at 129-131. It is not apparent whether Rivera had previously engaged in EEO activity, but I find that even if she had not, Rivera's situation was completely unlike the appellant's situation and it is not evidence of retaliation against the appellant.

The appellant also alleged that not providing her a reasonable accommodation of full-time telework was retaliation and that continually placing her in an AWOL status was retaliation. Again, I find the agency's reasons for not allowing a reasonable accommodation of full-time telework were entirely due to the appellant's lack of supporting medical documentation and the fact that she could not perform the essential functions of her position at home. With respect to marking the appellant AWOL, I find that the agency did nothing improper. The directive to scrutinize leave came from individuals on a national level and applied to everyone in the agency. Given that LWOP is not a right and the appellant had

completely exhausted all forms of leave, the agency was well within its discretion to place the appellant in an AWOL status. The appellant has not provided any evidence that this was in retaliation for her protected activity.

In sum, I find the appellant has failed to prove her affirmative defenses by preponderant evidence.

Penalty

Where the charges are sustained, the Board will modify an agency's chosen penalty only if the agency failed to weigh the relevant factors or if the agency's decision clearly exceeded the limits of reasonableness. *Douglas*, 5 M.S.P.R. 280, 306-07 (1981). When circumstances require modification of the penalty, the Board will mitigate the agency's penalty only to the extent necessary to bring it to the maximum reasonable penalty. *Lentine v. Department of the Treasury*, 94 M.S.P.R. 676, ¶ 6 (2003).

Here, I have sustained the charge of AWOL. In evaluating the penalty, the Board will consider, first and foremost, the nature and seriousness of the misconduct and its relation to the employee's duties, position and responsibilities, including whether the offenses were intentional or frequently repeated. *See Rackers v. Department of Justice*, 79 M.S.P.R. 262, 282 (1998), *aff'd*, 194 F.3d 1336 (Fed. Cir. 1999) (Table). In upholding the removal, Dokko concurred with Rivera's aggravating and mitigating factors. IAF, Tab 11 at 150 and 178-180. This included that the appellant's AWOL were repeated, serious, directly impacted her duties as a benefit authorizer, and adversely affected operational and staffing requirements. *Id.* at 178-79. The appellant was also on notice that if she did not report to work and she was marked AWOL, she could be disciplined. *Id.* at 180.

There were mitigating factors, such as the appellant's satisfactory performance, lack of prior discipline, and her professional working relationship with co-workers in her more than nine years of employment, but Rivera could no longer rely on the appellant to perform work. IAF, Tab 11 at 179-180.

Additionally, the appellant's medical condition was a mitigating factor, but given the issues the appellant had with her laptop, there was no reason to believe the appellant could telework more than one day per week. *Id.* at 180; HT1 at 183-84. Finally, Dokko considered lesser forms of discipline, but since he had no reason to believe that the appellant would ever report to duty, he did not believe lesser forms of discipline would be effective. HT1 at 186. I find the agency weighed the relevant factor and I see no reason to disturb the agency's decision that removal was a reasonable penalty.

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:                    _____/S/_____
                                  Tamara Ribas
                                  Administrative Judge

### NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

### NOTICE TO APPELLANT

This initial decision will become final on **November 4, 2019**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the

date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two

members are appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

### Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To

constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record.  A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first.  If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt.  You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your

burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the

applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general.** As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals<br>
for the Federal Circuit<br>
717 Madison Place, N.W.<br>
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____, 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012.**  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and you wish to challenge the Board's rulings on your whistleblower claims only, excluding all other issues, then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.   The court of appeals must receive your petition for review within **60 days** of the date this decision becomes final under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The

Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx



*Exhibit E*
*FaD Found*
*Qualified disabled*

# SOCIAL SECURITY

January 30, 2019

***VIA UNITED PARCEL SERVICE–1Z75R91EA896963402***

Jennifer Tom
2101 Mangrove Ct.,
Antioch, CA 94509

Re: SF-19-0294-SSA
Filed: October 5, 2018

Dear Ms. Tom:

Enclosed is the Social Security Administration's final decision, with appeal rights, on the Complainant's discrimination complaint. Also enclosed is a copy of the Merit System Protection Board (MSPB) Appeal Form 185. You should use MSPB Appeal Form 185 if you choose to appeal this decision to the MSPB.

Sincerely,

*Moshe Glickman /s/*
(for)   Claudia J. Postell
EEO Director
Office of Civil Rights and Equal Opportunity

Enclosures:
Final Agency Decision
MSPB Appeal Form 185

cc:
Nelson Arcilla, CREO Manager

SOCIAL SECURITY ADMINISTRATION    BALTIMORE, MD 21235-0001



# SOCIAL SECURITY
*Via United Parcel Service to Complainant*

Complainant

v.

**Nancy A. Berryhill,**
**Acting Commissioner,**
**Social Security Administration**

**Case No.: ATL–19–0294–SSA**

**Date of Filing: October 5, 2018**

**FINAL AGENCY DECISION**

**January 30, 2019**

## Statement of the Claim

Complainant alleged that the Social Security Administration (SSA or Agency) subjected her to disparate treatment based on disability (physical and mental) and reprisal (prior EEO activity) when, on August 15, 2018, she was removed from employment with the Agency.

## Procedural History

On August 13, 2018, Complainant requested Equal Employment Opportunity (EEO) counseling. The EEO Counselor sought to resolve Complainant's allegations, to no avail. On September 25, 2018, the EEO Counselor issued to Complainant the Final EEO Counseling Report and Notice of Right to File a Formal Complaint of Discrimination. Complainant filed this formal complaint on October 5, 2018, pursuant to Title 29 Code of Federal Regulations (C.F.R.) § 1614. On November 5, 2018, the Agency dismissed Complainant's allegations as stating the same claim as her previous complaint, SF-18-0604-SSA, which was already pending before the EEOC. On December 17, 2018, the EEOC AJ before whom Complainant's previous EEO complaints were pending asked the Agency to rescind the dismissal of the above-cited claim. Therefore, on December 20, 2018, the SSA accepted the complaint pursuant to the Equal Employment Opportunity Commission's (EEOC's or Commission's) Regulations found in 29 C.F.R. § 1614. (Exhibits A1–3)

The SSA had already conducted a formal investigation of the complaint based on the proposed removal Complainant raised in her SF-18-0604-SSA complaint. That investigation occurred between August 10 and October 4, 2018. By letter dated October 16, 2018, we sent Complainant the Report of Investigation (ROI), which included the investigative summary. The United Parcel Service delivered the ROI to Complainant's home on October 19, 2018.

**SOCIAL SECURITY ADMINISTRATION   BALTIMORE, MD 21235-0001**

The complaint was properly processed as a "mixed case complaint" pursuant to Title 29 Code of Federal Regulations (C.F.R.) § 1614.302(d).  A "mixed case complaint" is a complaint of employment discrimination filed with a federal agency based on race, color, religion, sex, national origin, age, disability, genetic information, or reprisal related to or stemming from an action that may be appealed to the Merit Systems Protection Board (MSPB).  The complaint may contain only a claim of employment discrimination or it may contain additional non-discrimination claims that the MSPB has jurisdiction to address.  A "mixed case appeal" is an appeal filed directly with the MSPB that alleges that an agency action that can be appealed is effected, in whole or in part, because of discrimination based on race, color, religion, sex, national origin, age, disability, genetic information, or reprisal.  Therefore, Complainant does not have the right to a hearing before an EEOC Administrative Judge.  Since the complaint contains a mixed case claim, the SSA is issuing this final decision in accordance with 29 C.F.R. §1614.302.

## Statement of the Facts

**Complainant** (former Benefit Authorizer/GS-9) was a Benefit Authorizer in the SSA Western Payment Program Service Center (WPSC), Richmond, CA.  Complainant has been in her current position from August 2008 to August 15, 2018.  According to her Position Description, in addition to other tasks, Complainant makes final determinations on a full range of post adjudicative actions, adjusts established benefits, makes payments through the system, and initiates and responds to telephone contacts including the 800 number.

Complainant stated her immediate supervisor is **Responsible Management Official 1 (RMO1)** (Assistant Module Manager/GS-12) and her second-line supervisor is **RMO2** (Module Manager/GS-13).  Complainant stated she has filed seven prior EEO complaints.  Complainant contends RMO1 and **RMO3** (Operations Manager/GS-14) were aware of her EEO activity because they were named in her complaints as responsible RMOs.  Complainant stated she believes RMO1, RMO2, and RMO3 discriminated against her based on her EEO activity.

Complainant stated she received discrimination and harassment training early 2018.

**RMO1** is Assistant Module Manager, Module 10 in the WPSC in Richmond, CA.  He stated he has been with the agency since September 2010 and in his current position since November 2015.  RMO1 stated his first-line supervisor is RMO2 and his second-line supervisor is RMO3.  He stated he is Complainant's first-line supervisor.

RMO1 testified he first became aware of Complainant's EEO activity November 2015 when he started in the unit.  He testified that in March 2017 he became involved in Complainant being charged as absent without leave (AWOL).  RMO1 testified he received Disability Awareness Training and Diversity Awareness training in 2017 and No Fear Act Training in 2016.  RMO1 testified that he did not discriminate against Complainant.  **(Exhibit 8)**

**RMO2** is Module Manager in the WPSC in Richmond, CA.  She stated she has been with SSA since September 2001 and in her current position since March 2016.  RMO2 stated her first-line supervisor is RMO3.  She stated her second-line supervisor is the Deputy Assistant Regional Commissioner.  RMO2 stated she is Complainant's second-line supervisor.  RMO2 stated she became aware of Complainant's EEO activity some time in 2016 or 2017 when Complainant mentioned it and she started receiving affidavits to complete.  She stated she was made aware of

Complainant's disability shortly after starting work at WPSC. RMO2 stated she has received training addressing discrimination and harassment since 2006. RMO2 stated she did not discriminate against Complainant. **(Exhibit 9)**

**RMO3** is the Operations Manager with the WPSC in Richmond, CA. RMO3 stated he has been in his current position since May 2015. He stated his first-line supervisor is the Acting Deputy Assistant Regional Commissioner and his second-line supervisor is the Assistant Regional Commissioner. RMO3 stated he is Complainant's third-line supervisor. RMO3 stated he became aware of Complainant's EEO activity in or around June 2015 when he became involved in one of her prior EEO complaints. He stated he has received Reasonable Accommodation for Managers and Employer of Choice for Employees with Disabilities (ECED) Access to Success, and Disability Awareness Training for Managers in October 2017. RMO3 stated he did not discriminate against Complainant. **(Exhibit 10)**

**Complainant** testified she was terminated by RMO3, effective August 15, 2018. **(Exhibit 29)**

Complainant testified RMO1, RMO2, and RMO3 were involved in the decision to issue a proposed to removal. Complainant alleged RMO2 mentioned the notice from RMO1 dated September 2017 where RMO1 informed her that the medical documentation on file was being invalidated as the reason for the proposed removal. Complainant alleged that on October 3, 2018 she provided management with the requested medical documentation and that in an email dated October 13, 2018 RMO2 acknowledged that the new medical documentation was acceptable for continued leave approval. Complainant testified her service record is excellent and was unblemished prior to RMO2 charging her with AWOL. Complainant testified she received five awards, was selected for two details, was handpicked for a special project, and developed training material. Complainant alleged RMO2 noted that she received successful performance appraisals and had no prior disciplinary record. Complainant alleged she was fired for being a qualified disabled employee who was denied a fully effective RA.[1] Complainant contends that management believed that by firing her it would put an end to the EEO cases and the investigation in to their unlawful actions. **(Exhibit 7)**

**RMO1** testified RMO2 recommended the Proposal to Remove to RMO3, the approving official. He stated his general knowledge of the reason the Proposal to Remove was issued was due to excessive AWOL. RMO1 testified Complainant is separated from the agency and does not know if she is employed elsewhere. **(Exhibit 8)**

**RMO2** stated she made the decision to issue a Proposal to Remove because Complainant had excessive unapproved absences that negatively affected her ability to perform the essential duties of a Benefit Authorizer. She testified Complainant requested to work at home full-time, but that telework is only available one day a week as part of a national pilot program for eligible Benefit Authorizers. RMO2 alleged she relied on the Douglas Factors in making her decision. RMO2 stated Complainant's EEO activity was not a factor in her decision. RMO2 testified Complainant is no longer employed by SSA. **(Exhibit 9)**

**RMO3** stated RMO2 made the decision to issue the Notice of Proposed Removal. He testified the Notice of Proposed Removal was issued to "promote the efficiency of the service" and issued in accordance with Chapter 75 of Title 5 of the United States Code and Part 752 of Title 5 of the

---

[1] The underlying reasonable accommodation claim is being processed under SF-18-0604.

Code of Federal Regulations, Subpart D, and Article 23 of the National AFGE/SSA Agreement. He alleged in proposing the level of discipline, RMO2 considered aggravating and mitigating factors, known as the Douglas Factors. RMO3 testified he does not know what is meant by extended telework and cannot respond to Complainant's allegation regarding extended telework to avoid being AWOL. RMO3 testified Complainant is no longer employed by the Agency. **(Exhibit 10)**

## Applicable Law

### Equal Employment Statutes & Protected Classes

#### The Rehabilitation Act of 1973, as amended (Rehab Act)

The Rehab Act prohibits employment discrimination against federal employees with disabilities. 42 U.S.C. § 12112(a) (2012). The Rehab Act incorporates the standards of the ADA Amendments Act (ADAAA) of 2008. These standards prohibit discrimination *against a qualified individual on the basis of disability.* § 12112(a). To prove membership in this class, a complainant must show s/he (1) has an impairment that substantially limits one or more major life activities, (2) has record of such an impairment, or (3) is regarded as having such an impairment. Ghee v. U.S. Postal Serv., EEOC Appeal No. 01832865, 2 (Feb. 25, 1986).

Major life activities include, but are not limited to, the general activities of "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" as well as the operation of major bodily functions, including "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." § 12102 (2)(A)-(B). Impairments that would affect a major life activity when active are disabilities even if those impairments are episodic or in remission. § 12102 (4)(D). However, minor impairments do not qualify as disabilities. § 12102 (3)(B). Determination of whether or not an activity is a "major life activity" should not include any reference to whether it is of "central importance to daily life." 29 C.F.R. § 1630.2(i).

The EEOC has promulgated regulations providing that the standard for evaluating "substantially limits" should be broadly construed such that the limitation need neither "significantly" nor "severely" restrict a major life activity in order to satisfy the standard. § 1630.2(j)(1). The evaluation should contain reference to the condition, manner, or duration under which a major life activity is performed in comparison to how it is performed by most people in the general population. § 1630.2(j)(4). Furthermore, the ameliorative effects of mitigating measures, with the exception of ordinary eyeglasses or contact lenses, shall not be considered; disability shall be determined based on the extent of limitations prior to using mitigating measures. § 1630.2 (j)(5).

#### Retaliation

An employer may not discriminate against any individual because of *disability.* 42 U.S.C. § 12112(a) (2012). This Act also makes it unlawful for employers to retaliate against an employee for opposing unlawful employment discrimination, filing a discrimination claim with the EEOC, or participating in an investigation of such a claim. 42 U.S.C. § 12203(a).

**Disparate Treatment**

McDonnell Douglas Standard - Burden Shifting

Discrimination complaints based on a theory of disparate treatment and brought pursuant to Title VII, the ADEA, and the Rehab Act are examined under the three-part analysis first enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Loeb v. Textron, Inc., 600 F.2d 1003, 1010 (1st Cir. 1979) (applying the burden-shifting scheme from McDonnell to claims brought under the ADEA); Psak v. Dep't of the Interior, EEOC Appeal No. 0120110118, 3 (Apr. 18, 2013) (applying the burden-shifting scheme from McDonnell to claims brought under the Rehab Act).

The three-part analysis first requires the complainant to establish a *prima facie* case of discrimination. McDonnell, 411 U.S. at 802. In order to establish such a case, a complainant must present facts that, if unexplained, reasonably give rise to an inference of discrimination. See McDonnell, 411 U.S. at 802. See also Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978) (clarifying that the inference is simply a presumption that the adverse employment action is "more likely than not based on the consideration of impermissible factors" if not otherwise explained). The burden then shifts to the agency to articulate a legitimate, nondiscriminatory reason for its actions. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citing McDonnell, 411 U.S. at 802). Once the agency has met its burden, the complainant bears the ultimate responsibility to persuade the fact finder by a preponderance of the evidence that the reasons offered by the agency were not its true reasons, but were, instead, a pretext for discrimination. McDonnell, 411 U.S. at 804; Burdine, 450 U.S. at 253; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515-16 (1993).

*Prima Facie* – Disability

Section 501 of the Rehab Act prohibits employment discrimination against otherwise qualified federal employees with disabilities based on those disabilities. 29 U.S.C. § 791 (2012). The Rehab Act incorporates the standards of the ADA Amendments Act (ADAAA) of 2008. The ADAAA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2012).

To establish a *prima facie* case of disability discrimination under the Rehab Act, an individual must show (1) s/he is an "individual with a disability;" (2) s/he is qualified for the position held or desired; (3) s/he was subjected to an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination. Hatchett v. U.S. Postal Serv., EEOC Appeal No. 01994120, 1 (Nov. 16, 2001).

A complainant must demonstrate management was aware of the complainant's disability to satisfy a *prima facie* case for disability discrimination. Wright v. Dep't of Defense, EEOC Appeal No. 01A14136, 2 (Jan. 11, 2002) (affirming EEOC Administrative Judge's finding that "complainant failed to establish a *prima facie* case of disability discrimination because the responsible management officials were unaware of complainant's impairment at the time of the [adverse employment action]"). However, a complainant may instead establish that s/he is regarded as having an impairment if the individual can demonstrate that s/he has been subjected

to a prohibited action because of an actual or perceived physical or mental impairment. 42 U.S.C. § 12102(3)(C).

*Prima Facie* – Retaliation/Reprisal

To establish a *prima facie* case of discrimination based on retaliation, the complainant must show: (1) s/he engaged in protected activity; (2) the agency was aware of the protected activity; (3) subsequently, s/he was subjected to adverse treatment by the agency; and (4) there is a nexus between the adverse treatment and the prior protected activity. Garth N. v. Dep't of the Navy, EEOC Appeal No. 0120142878, 4 (Jan. 24, 2017) (citing Whitmire v. Dep't of the Air Force, EEOC Appeal No. 01A00340, 2 (Sept. 25, 2000)).

To prevail in a retaliation claim, a complainant must show that a reasonable person would have found the challenged action materially adverse. An example of such circumstance would be an action that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination in the future. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).

**Legal Analysis**

*Prima Facie* Analysis

Disability Basis

To establish a *prima facie* case of disability discrimination under the Rehab Act, an individual must show (1) she is an "individual with a disability;" (2) she is qualified for the position held or desired; (3) she was subjected to an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination.

Regarding the **first prong** of her case, the record shows that Complainant suffers from migraine headaches, vertigo, and allergic reactions to perfumes and the odor of certain cleaning supplies,. Therefore, we find that she is an individual with a disability and established the **first prong** of her case.

Regarding the **second prong**, while the record does not contain evidence pertaining to Complainant's performance, there is no doubt that she was in her position for roughly ten years. Therefore, we find that she was qualified for the position she held and established the **second prong** of her case. See Kohner v. Dep't of Transp., EEOC Appeal No. 0120110334, 1 (Sept. 14, 2012) (affirming AJ's decision finding complainant was a 'qualified' individual with a disability by virtue of successfully performing his job).

Regarding the **third prong** of her *prima facie* case, Complainant was terminated from employment with the agency. Therefore, she established that she was subjected to an adverse action and established the **third prong** of her case.

Regarding the **fourth prong** of her case, to establish an inference of discrimination in a disability discrimination case, a complainant must demonstrate a nexus or causal relationship between the disabling condition and the alleged misconduct of the agency. Jones v. U.S. Postal Serv., EEOC Appeal No. 01983491, 2 (Apr. 13, 2000); Schumaker v. Dep't of the Interior, EEOC Request No. 05920874, 6 (Apr. 8, 1993). In this case, Complainant has not provided any evidence suggesting that management's action was based on discriminatory animus. Complainant alleges that her

AWOL charges were the direct result of her disability and, therefore, the removal was issued because of her disability. However, the EEOC has held that a complainant who has an excessive amount of absences must show the nexus between the absences and her disability. Complainant v. Dep't of the Navy, EEOC Appeal No. 012012278, 6 (Jan. 8, 2015). Moreover, when a complainant does not follow agency policy for taking medical leave and is disciplined as a result of her absences, there is no proof of discriminatory motivation toward her disability. Complainant v. Dep't of the Navy, EEOC 012012278. Therefore, Complainant failed to establish the **fourth prong** and failed to establish her *prima facie* case of disparate treatment based on disability.

Retaliation Basis

To establish a *prima facie* case of discrimination based on retaliation, the complainant must show: (1) she engaged in protected activity; (2) the agency was aware of the protected activity; (3) subsequently, she was subjected to adverse treatment by the agency; and (4) there is a nexus between the adverse treatment and the prior protected activity.

Regarding the **first prong** of her case, the record shows that Complainant requested numerous reasonable accommodations and filed multiple EEO complaints. Therefore, she established that she was engaged in protected activity and established the **first prong** of her *prima facie* case.

Regarding the **second prong**, management acknowledged being aware of Complainant's protected activity. Therefore, she established the **second prong** of her case. Regarding the **third prong** of her *prima facie* case, Complainant was subsequently removed from employment with the agency, which is an adverse action. Therefore, she established the **third prong** of her case.

Regarding the **fourth prong**, Complainant does not provide any evidence that management was acting out of any retaliatory intent. However, absent direct evidence of retaliatory intent, a complainant may establish causation by showing temporal proximity between the protected activity and the adverse action. Bennett v. Henderson, 15 F.Supp.2d 1097, 1112 (Aug. 7, 1998). The nexus or causal connection may be evidenced by the adverse action following the protected activity within a period of time and in a manner suggestive of a retaliatory motive. Cline v. Dep't of the Army, EEOC Appeal No. 0120112757, 3 (Aug. 17, 2012). Generally, a nexus may be established if the prior activity and the alleged actions occurred within less than one year of each other. Complainant v. Dep't of the Air Force, EEOC Appeal No. 0120133200, 2 (Dec. 18, 2014) (finding one year in between events "too remote to supply the necessary nexus"). See also Ellison v. U.S. Postal Serv., EEOC Appeal 0120073973, n.4 (Nov. 17, 2009) (affirming AJ's summary judgment, which included the determination that the complainant failed to establish the *prima facie* case for reprisal discrimination because no nexus was created when a year and a half transpired between the prior activity and the alleged adverse treatment).

In this case, the record shows that Complainant was actively involved in her previous EEO complaints when she received the decision to remove her from employment. Therefore, we find that Complainant established the **fourth prong** and established her *prima facie* case of disparate treatment based on retaliation, but not disability.

Management's Justification

If a *prima facie* case is established, the burden shifts to the agency to articulate a legitimate, nondiscriminatory reason for the challenged action. McDonnell, 411 U.S. at 802; Burdine, 450 U.S. at 253-54. The agency's burden is met by simply proffering evidence that raises a genuine

issue of fact as to whether it discriminated against the complainant. This is not a burden of persuasion, but rather a burden of production to "clearly set forth, through the introduction of admissible evidence, the reasons for [its employment decision]." Burdine, 450 U.S. at 254-55. Evidence of a legitimate, nondiscriminatory reason must be sufficient to allow the trier of fact rationally to conclude that the agency's action was not based on unlawful discrimination. Nguyen v. Gen. Servs. Admin., EEOC Appeal No. 0120101852, 3 (Sept. 28, 2011). This burden is not onerous but must "provide a specific, clear, and individualized explanation." Kathy D. v. Dep't of Labor, EEOC Appeal No. 0120141643, 2 (July 19, 2016). An explanation too generalized or vague for a complainant to rebut is insufficient to constitute a legitimate, nondiscriminatory reason. Chong T. v. Dep't of Homeland Sec., EEOC Appeal No. 0120140085, 3 (Jan. 15, 2015).

In this case, management provides the following legitimate, nondiscriminatory reasons for its action. Management explains Complainant's attendance was not dependable. The documentation about Complainant's removal cites 70 separate incidents when Complainant was charged AWOL for taking unapproved leave. See Tolbert v. Dep't of the Air Force, EEOC Appeal No. 0120053343 (Feb. 23, 2007) (finding no harassment where Agency issued disciplinary action based on leave policy). Therefore, we find management articulated a legitimate, nondiscriminatory reason for its action. Complainant v. Dep't of Veterans Affairs, EEOC Appeal No. 0120141713 (Dec. 4, 2014) (upholding termination where testimony, performance documents, and notice of termination "paint a compelling picture of Complainant's performance deficiencies").

Pretext

Once the agency produces evidence of a legitimate, nondiscriminatory reason, the presumption raised by the prima facie case disappears, and the agency will prevail unless the complainant proves, by a preponderance of the evidence, that the legitimate reasons articulated by the agency were not its true reasons but were, instead, a pretext for discrimination. St. Mary's, 509 U.S. at 519; Burdine, 450 U.S. at 256; Pavelka v. Dep't of the Navy, EEOC Request No. 05950351, 3 (Dec. 14, 1995). To prove a reason is pretext for discrimination, a complainant must show that the reason was false and that discrimination was the real reason. St. Mary's, 509 U.S. at 515. Therefore, the fact finder must both disbelieve the employer's articulated reason and believe complainant's explanation that unlawful discriminatory animus motivated the agency's actions. St. Mary's, 509 U.S. at 519.

The more idiosyncratic or questionable the employer's decision, the greater the likelihood of exposing it as a pretext. Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n.6 (1st Cir. 1979). Allegations of pretext may be supported by evidence of discriminatory statements; past dissimilar treatment; past personal treatment attributable to the selecting officer; statistical evidence or comparative data, revealing differences in treatment across protected class lines; unequal applications of agency policy; deviations from standard procedures without justification; and inadequate explanation of inconsistencies in the evidentiary record. McDonnell, 411 U.S. at 804-05; Emilia Z. v. Dep't of Hous. & Urban Dev., EEOC Appeal No. 0120142952, 2 (Feb. 4, 2016). However, in order to prove pretext, it is not enough to simply disagree with the agency's actions. Alexandria P. v. U.S. Postal Serv., EEOC Appeal No. 0120150286, 4 (Oct. 20, 2015). EEO laws "cannot prevent employers from making decisions that their employees disagree with, unless those decisions are rooted in a statutorily proscribed motivation. Emilia Z., EEOC Appeal

No. 0120142952 at 3. Additionally, mere assertions, speculations, unsupported beliefs, or conclusory answers are not enough to establish pretext. Complainant v. Dep't of Homeland Sec., EEOC Appeal No. 01020133401, 3 (May 7, 2015); Complainant v. Dep't of Agric., EEOC Appeal No. 0120130270, 3 (Sept. 18, 2015).

In this case, Complainant failed to prove that management's articulated reason was false, which is the essence of pretext. See St. Mary's, 509 U.S. at 515. As we discussed in the *prima facie* analysis, Complainant insists that her requests for leave should have been approved and that the fact that they were not is proof of discriminatory intent. However, she has not provided evidence that shows a nexus between her absences and her disability. Furthermore, despite establishing her *prima facie* case of retaliation, the EEOC has held that temporal proximity, standing alone, does not meet Complainant's burden of proving by a preponderance of the evidence that management retaliated against her. See Vaughn v. Dep't of Agric., EEOC Appeal No. 0120130948 (Aug. 30, 2013); Maybery v. Dep't of the Navy, EEOC Appeal No. 0120110045 (Jan. 1, 2012); Kennedy v. Dep't of Veterans Affairs, EEOC Appeal No. 0120083120 (Dec. 24, 2008).

Based on a review of the ROI in its entirety, we find management articulated legitimate, nondiscriminatory reasons for its action; and, that the preponderance of the evidence does not support Complainant's claim of unlawful discrimination.

## Decision

Accordingly, we find SSA did not discriminate against Complainant based on disability or reprisal, as alleged.

## Statement of Relief

As Complainant is not a prevailing party, no relief is awarded in connection with this complaint.

## Notice of Rights

Complainant may not file an appeal with the Equal Employment Opportunity Commission (EEOC) at this time. If Complainant is dissatisfied with SSA's decision, an appeal may be filed to the:

**Western Regional Office**
**Merit Systems Protection Board (MSPB)**
**201 Mission Street**
**Suite 2310**
**San Francisco, CA 94105**
**Fax No. 415-904-0580**

Complainant's appeal must be in writing and must be filed within **30 calendar days** of receipt of our decision. If Complainant wants a hearing, Complainant may request it of the MSPB when filing the appeal.

**Complainant must provide a copy of the appeal to SSA when the appeal is filed with the MSPB.** Send a copy of the appeal to:

EEO Director
Office of Civil Rights and Equal Opportunity
ATTN: FAD APPEALS DIVISION
Social Security Administration
P.O. Box 17712
Baltimore, MD 21235-7712

If Complainant appeals to the MSPB and is dissatisfied with the MSPB's final decision, Complainant may then ask the EEOC to review the MSPB's final decision.

Instead of appealing to the MSPB, Complainant may file a civil action in an appropriate U.S. District Court within **30 calendar days** after receipt of SSA's decision.

**Complainant also has the right to file a civil action in an appropriate U.S. District Court:**

* Within **30 calendar days** of receiving the final MSPB decision; or

* If more than **120 calendar days** have passed since filing an appeal with the MSPB and no final decision has been made.

If asks the EEOC to review the final MSPB decision, Complainant has the right to file a civil action in an appropriate U.S. District Court:

* Within **30 calendar days** of receiving the EEOC's decision on the request; or

* If more than **180 calendar days** have passed since filing the request for review with the EEOC and no final decision has been made.

If Complainant decides to file a civil action and does not have or cannot afford the services of an attorney, Complainant may ask the Court to appoint an attorney representation. Complainant may also ask the Court's permission to file the action without payment of costs, fees, or other security. **Granting or denying Complainant's request is within the sole discretion of the Court.** Complainant must file both the request and the civil action <u>WITHIN NINETY (90) CALENDAR DAYS</u> of the date of receipt of the final order or final decision from SSA or the EEOC's final decision. Filing a request for an attorney does not extend Complainant's time in which to file a civil action.

**If Complainant files a civil action, the Acting Commissioner of Social Security, Nancy A. Berryhill, must be named as the defendant. Failure to name the Acting Commissioner may result in dismissal of the case.** If Complainant files a civil action, administrative processing of the complaint will end.


(for)   Claudia J. Postell
        EEO Director
        Office of Civil Rights and Equal Opportunity

*The Office of Personnel: Branching out to meet your needs*

Exhibit F.
SSA RA Policy
Fragrance & example

CENTER FOR
# DISABILITY SERVICES

## Consultation Corner

- **Processing Reasonable Accommodation Requests for a Space Heater** - Guidance for processing requests to use a personal space heater as a reasonable accommodation.
- Reasonable Accommodation Requests Involving Fragrance Sensitivity – Guidance for processing reasonable accommodation requests related to fragrance/chemical sensitivity.
- Relocating and Transporting Laptops - Guidance for processing reasonable accommodation requests related to relocating and transporting laptops.

## Reasonable Accommodation Requests Involving Fragrance Sensitivity

The Center for Disability Services is unaware of any SSA-wide policy regarding the wearing of fragrances in the workplace.  Although maintaining a fragrance-free or chemical-free environment may be difficult, an employee's reasonable accommodation request to provide such an environment must be addressed.

An office providing service to the public may find it impossible to have a fragrance/chemical free workplace.  However, mitigating measures may be possible if the employee has a reaction caused by one particular substance such as a co-worker's perfume or the smell of popcorn.  Often this type of reasonable accommodation request will be implied, so be careful not to overlook or dismiss an employee's "casual" comment regarding fragrance sensitivity.  Recognize that you may have a reasonable accommodation request.

1. Engage in the interactive process to find out the employee's expectations (if the employee does not want to pursue as a reasonable accommodation, the manager could still choose to make general suggestions to the staff about the use of fragrances/chemicals).
2. Get medical documentation to support the request.  Do I have enough information to connect the accommodation with the impairment? May need to consider:
   a. Is there an underlying illness (diagnosis) triggered by exposure to fragrances, chemicals, molds, or other irritants (e.g., asthma)? Does the condition rise to the level of a disability?
   b. What chemicals/fragrances trigger the reaction and in what concentrations?
   c. How does the fragrance/chemical sensitivity impact daily life activities (symptoms/limitations)? What happens physically with exposure?  Do reactions to exposures occur both at work and away from work?  Does reaction occur daily or on an intermittent basis?  Does reaction occur in a variety of circumstances?  What is the duration of illness resulting from the exposure?
   d. Do I need input from the Medical Office?
   e. How do these limitations affect the employee's job performance?  What job tasks are problematic as a result of these limitations?
3. Engage in the interactive process.  Talk to the employee about the types of accommodations that will work.
4. Contact appropriate Facilities/Environmental Health and Occupational Safety staff as needed.  The Office of Environmental Health and Occupational Safety approval is needed for air fresheners, humidifiers, air purifiers, or any other devices that alter air quality.
5. Can you provide the accommodation necessary?  You may need to consider:
   - What impact would the accommodation have on the business process?
   - Does management have control of the environment to make the change?
   - What can you do?
     o If possible, eliminate the offending odor or chemical
     o Alert the employee when you detect fragrances or chemical odors
     o Change desk location
     o Allow the employee to work from home
     o Temporary/permanent transfer
     o Reassignment

- Were there any business process implications preventing you from implementing the required accommodation?

## Information Resources

**The Office of Learning** has a Video On Demand (VOD) entitled *Hazard Communication Training*. You can view it by clicking on the following link: http://learning.ba.ssa.gov/OL/vod/VODdesc.asp?CID=00327907062201515489.

**The Job Accommodation (JAN) Network** has information on how fragrance and chemical sensitivities can be handled in the workplace. View the *Accommodation and Compliance Series: Employees with Fragrance Sensitivity* at http://askjan.org/media/fragrance.html.

**In the SSA Family** featured an article in February 2006 explaining how an office handled an employee's sensitivity to perfumes worn by co-workers. http://personnel.ba.ssa.gov/ope/ces/intheSSAFamily/feb06_mcss.htm



12th Edition Center for Employee Services February 2006

eye  at a

Link to News

Life After SSA: Who Retired in 2005?

Commit to Be Fit in 2006

Celebrating Our Diversity

Suggestion Highlights of December 2005

Medicare Prescription Drug Plan: DVD Available

Link to

Workplace Problem Solving: Use Common Scents

Learning the Heart Way

FEMA Volunteers

Regional Round-Up

We're Calling On You

Link to Workplace

Seniors & Driving: Make it Safe

Curing Your Holiday Debt Hangover

Emotional Intelligence

Commit to Quit Update

March is Career Checkup Month

Special Campaigns

on the side

"In the SSA Family" Archives

Center for Employee Services

Office of Personnel

Contact Us

Family Matters

# Workplace Problem Solving: Use Common Scents

There was a time when Writer-Editor Karyn Tucker left work in Washington, DC every day feeling extremely tired, but always felt better once she returned home. She was having headaches more often than usual and found herself becoming extremely listless at work.

Karen suffers from Multiple Chemical Sensitivities Syndrome (MCSS), known as Idiopathic Environmental Intolerance (IEI) in medical terms and her coworkers, unknowingly, were affecting her daily life.

IEI can be defined as a "chronic, recurring disease caused by a person's inability to tolerate an environmental chemical or class of foreign chemicals," according to the National Institute of Environmental Health Services. Diagnosing MCSS is extremely difficult and the sensitivity is often questioned. At that time, Karyn was working with and around several chemicals used in publishing.

Karyn's health mystery began to unravel when she fainted after the ladies room had been sprayed with air freshener. After being diagnosed, Karyn spoke with her manager, who gave her complete support. A meeting was held with about 25 people who shared her workspace. She explained MCSS and how it affected her health. She explained that foreign chemicals trigger a reaction in her system. The perfume and cologne in the office stuck to her clothes and even followed her home.

"The meeting was informal," Karyn stated. "Everyone involved agreed to either stop their use of perfumes or colognes or decrease their use significantly while at work."

Since that day, 8 years ago, Karyn's coworkers have consistently spread the word about her condition. Her health has improved and she has seen how important it is to maintain good working relationships.

"Even the security guards know not to wear too much perfume or cologne when they are assigned this post."

When air freshener is sprayed in the bathroom, coworkers will inevitably come to Karyn's desk to forewarn her. When insecticides were sprayed in the office, Karyn worked from home. To this day, her coworkers do not display aromatic flowers in the common areas.

Exhibit  21
Page  10  of  8

"Occasionally, a coworker will warn me that he or she has on a little cologne or perfume so that I may determine whether to limit our contact for that day."

"I want to thank my fellow colleagues in DC for their thoughtfulness in helping me cope over the years, especially the Division of Information Resources (Publications Staff) and the Division of Economic Research. Currently, there are other persons in the office who have allergies or sensitivities similar to MCSS. We've all banded together to make sure that the word is still out there."

*******************

Whether it concerns our physical or mental health, there may come a time in all our careers when we are affected by a coworker's actions. It is important to understand that we all work in a "give-and-take" environment and occasionally need to put our own agendas on hold and show empathy to the concerns of others. Below are some tips on how to resolve such problems quickly and effectively:

- If possible, enlist the support of someone who may be in a position to encourage others to assist you.
- Schedule ample time and a private area to speak with the person(s) whose behavior is impacting your health and wellness.
- Clearly identify the problem using statements beginning with "I," rather than "you."
- Define the problem, explaining how or what it is affecting. Focus on the problematic behavior, not the person.
- Others should listen intently as you reveal what is troubling you. Asking meaningful questions shows that they are invested in finding a resolution.
- Confirm that each person has a clear understanding of the situation.
- Allow for the brainstorming of caring, thoughtful solutions, identifying the consequences of each one. If appropriate, write them down together, adding another level of commitment for everyone.
- Choose a plan of action that everyone can live with.

Remember, resolving differences in the workplace through mutual understanding and respect creates a healthy work environment where employees feel free to express themselves and their needs. For more information on conflict resolution, contact your Employee Assistance Program.

Back to Family Matters
Back to Main Page

Exhibit ____21____
Page ___7___ of _8_

*Exhibit G* [1]
*SSA Anti-Harassment*
*And Examples*

**A Message To All SSA and DDS Employees**

Subject: Policy on the Prevention and Elimination of Harassment in the Workplace

It is the Social Security Administration's policy to maintain a model workplace free from harassment and other forms of discrimination. It is unlawful to harass an employee in any manner, whether physically, verbally, or in writing. The prohibition against harassment covers everyone in the workplace, including supervisors, co-workers, applicants, and non-employees.

Our Policy on the Prevention and Elimination of Harassment in the Workplace (Anti-Harassment Policy), at Anti-Harassment Policy 2014.doc, describes in detail what constitutes prohibited harassment, employees' and management's responsibilities, the corrective actions management may take when harassment is found, the confidentiality of the reporting process, and protections against reprisal.

I would like to emphasize three important elements of this policy:

- Managers and employees alike are responsible for preventing harassment from occurring and stopping harassment before it becomes severe or pervasive;

- We take all harassment complaints seriously and ensure a prompt, thorough, and impartial investigation; and

- We protect the confidentiality of individuals who make harassment complaints, to the extent possible. We will disclose information about a harassment complaint only when legally required.

Our Anti-Harassment Policy builds on the tradition we have established of providing an environment that is free from any form of discrimination or harassment. Only in such an environment can we provide our clients the world-class service they deserve and achieve our individual professional goals and potential.

To learn more about reporting harassment, or other anti-discrimination laws, please visit the Office of Civil Rights and Equal Opportunity's website at http://ocreo.ssahost.ba.ssa.gov/reportingHarassment.cfm. You may also visit the Equal Employment Opportunity Commission's website at http://www.eeoc.gov/federal.

Exhibit 07-19
Page 1 of 6

Thursday, May 1, 2014

# POLICY ON THE PREVENTION AND ELIMINATION OF HARASSMENT IN THE WORKPLACE

It is the Social Security Administration's (SSA) policy to maintain a work environment that is free from harassment based on race, color, religion, national origin, sex, age, disability, genetic information, parental status, marital status, political affiliation, non-job-related conduct, military service, and reprisal for engaging in a protected activity (e.g., opposition to prohibited discrimination or participation in the Equal Employment Opportunity [EEO] complaint process or any other employment discrimination process).

Harassment based on sex means harassment of a sexual or non-sexual nature, including harassment based on sexual orientation, gender identity, and pregnancy. Harassment based on age pertains to individuals who are 40 years of age or older. The prohibition against harassment covers everyone and all relationships in the workplace, including supervisors, non-supervisors, applicants for employment, and non-employees (e.g., contractors and customers).

The U.S. Equal Employment Opportunity Commission (EEOC) develops the anti-discrimination and anti-harassment policies that Federal agencies are required to follow. We are committed to upholding the law and EEOC policies and believe that prevention is the best way to eliminate harassment from the workplace.

## What is prohibited harassment?

Harassment, or unwelcome conduct, is a form of employment discrimination. It is unlawful when the unwelcome conduct is based on a person's protected class or because a person engaged in a protected activity, and it:

- is sufficiently severe or pervasive that it creates a work environment that a reasonable person would consider to be hostile, offensive, intimidating, or abusive, such as when the unwelcome conduct:

  o alters a term, condition, or privilege of employment (e.g., work assignments, work schedules, or training); or
  o has the purpose or effect of unreasonably interfering with an individual's work performance; or

- results in a tangible employment action. A tangible employment action is one that significantly changes another employee's employment status, such as:

  o hiring and firing;
  o promotion and failure to promote;
  o demotion;
  o undesirable reassignment;
  o a significant change in benefits;
  o compensation decisions; and
  o significant change in work assignments or duties in a way that blocks opportunities for promotion or salary increases.

Exhibit _____
Page _____ of _____

Thursday, May 1, 2014

Harassing conduct includes, but is not limited to:

- verbal or written remarks or communications that contain unwelcome name-calling, jokes, personal slurs, ridicule, stereotyping, threats, epithets, bullying, or other denigrating, insulting, humiliating, or intimidating verbal or physical conduct;
- physical actions, such as assault, unwanted touching, and insulting or malicious gestures;
- displaying objects or images that may be considered derogatory or offensive by a member of a protected group, such as pictures, cartoons, posters, or drawings; and
- non-verbal conduct, such as staring, leering, or giving inappropriate gifts.

Harassment can occur in a variety of circumstances. For example:

- the harasser can be the victim's supervisor, a supervisor in another area, a coworker, or a non-employee, such as a contractor;
- the victim does not have to be the individual harassed; the victim can be any person affected by the offensive conduct; and
- unlawful harassment may occur without economic injury to, or employment action taken against, the victim.

Courts recognize that Congress did not intend the anti-discrimination statutes to be a general civility code. Thus, Federal law does not prohibit simple teasing, offhand comments, or isolated incidents that are not extremely serious. Although some isolated incidents may not rise to the level of unlawful harassment, when any incident comes to management's attention, management must take appropriate corrective action to prevent such incidents from escalating.

### Is there a difference between the EEO complaints process and the anti-harassment procedures?

Yes, there is a difference. Congress and the EEOC designed the EEO complaints process to make individuals whole for employment discrimination that has already happened and prevent the recurrence of the unlawful discriminatory conduct. The anti-harassment procedures seek to address and resolve harassing conduct before it ever reaches the level of discrimination.

Our anti-harassment procedures do not affect an employee's right to file an EEO complaint, nor do they alter required timeframes for filing an EEO complaint. An employee who reports harassment under our anti-harassment procedures has not filed an EEO complaint.

If an employee wants to file an EEO discrimination complaint, he or she must contact the Office of Civil Rights and Equal Opportunity (OCREO) or a Regional Civil Rights and Equal Opportunity (CREO) Office within 45 calendar days of the alleged harassing conduct. An employee may pursue both avenues of redress (reporting harassment to management and filing an EEO complaint) simultaneously.

Exhibit O7-19
Page 3 of 10

Thursday, May 1, 2014

## What responsibilities do employees have?

Employees are responsible for taking advantage of any preventive or corrective opportunities that SSA and Federal law provide, to avoid harm otherwise.  This responsibility includes immediately reporting any behavior viewed as harassment **before** it becomes severe or pervasive.  While isolated incidents of harassment generally do not violate Federal law, a pattern of harassing incidents may be unlawful.

We have posted the procedures for reporting harassment and the telephone numbers for the EEO Counselors, EAP, and Regional CREO Offices on all official bulletin boards.  You may also find information on the OCREO website at http://ocreo.ssahost.ba.ssa.gov/reportingHarassment.cfm.

Employees are encouraged to inform the alleged harasser directly that his or her conduct is unwelcome and must stop.  Employees should also report the alleged harassment to a member of management in the employee's chain of command.  If an employee who is the subject of harassment fails to take advantage of any preventive or corrective actions, it is possible that the EEOC, a court, or other adjudicator will not hold the agency responsible for the harassment.

Employees may also seek assistance through the following resources:

➢ Employees in SSA headquarters (excluding Office of Disability Adjudication and Review headquarters and the Office of Central Operations) may seek assistance and report harassment to:

- the Center for Complaints Processing  in OCREO, at (410) 966-1229;
- the Employee Assistance Program (EAP) at headquarters, at (410) 965-1009; or
- their local union representative, if they are in a bargaining unit.

➢ Employees in Office of Disability Adjudication and Review (ODAR) headquarters components may seek assistance and report harassment to:

- the OCREO-Falls Church Office, at (703) 605-8777;
- the EAP at ODAR headquarters, at (800) 869-0276; or
- their local union representative, if they are in a bargaining unit.

➢ Employees in the Office of Central Operations (OCO) may seek assistance and report harassment to:

- the OCO CREO Office, at 410-966-5281;
- the EAP at headquarters, at (410) 965-1009; or
- their local union representative, if they are in a bargaining unit.

➢ Employees  in the regions may seek assistance and report harassment to:

- the Regional CREO Office;
- the Regional EAP; or
- their local union representative, if they are in a bargaining unit.

Exhibit  O7-19
Page  4  of  10

Thursday, May 1, 2014

## **What are management's responsibilities?**

Managers are responsible for maintaining a work environment that is free from harassment. When an employee reports alleged harassment to management, management must immediately investigate the complaint and ensure that:

- the individual who conducts the investigation objectively gathers and considers the relevant facts;
- the alleged harasser does not have supervisory authority over the investigator or any direct or indirect control over the investigation;
- the investigator talks to both the victim and the alleged harasser and, as necessary, all relevant witnesses; and
- the employee is aware of the EEO complaint filing process and the relevant deadlines for filing an EEO complaint.

During the investigation into the complaint, it may be necessary for management to undertake interim measures to stop any potential harassment and protect the alleged victim.  Interim measures may include:

- scheduling changes so the parties avoid contact with each other;
- moving the alleged harasser to another work location; or
- placing the alleged harasser on administrative leave pending the conclusion of the investigation.

Interim measures do not include transferring, involuntarily moving, or otherwise burdening the employee who complained of the harassment since such measures could constitute unlawful retaliation.

If the investigation uncovers harassment, management must take prompt and appropriate corrective disciplinary action against the employee(s) who engaged in the harassing conduct.

Managers must document, retain, and preserve all records that are relevant to harassment complaints, including investigation interview notes and all documents related to actions management took in response to the complaint.

Managers should consult with their servicing EEO Office.  At headquarters, managers may call (410) 966-8868 or 410-965-3318 to request assistance from an OCREO EEO Specialist.  The following link lists CREO Managers for the regions and OCO, and the telephone number for the OCREO-Falls Church Office at ODAR headquarters: http://ocreo.ssahost.ba.ssa.gov/creoContacts.cfm.

Exhibit ___O7-19___
Page __5__ of _10_

Thursday, May 1, 2014

**What corrective actions can the agency take?**

If management determines that harassment has occurred in violation of the law and this policy, it will take immediate and appropriate corrective action to stop the harassment, remedy its effect on the employee, and ensure that the harassment does not recur.  Corrective actions may include:

- reprimand, transfer, demotion, or removal of the harasser;
- training for management and employees; and
- remedial relief to the complainant, where appropriate, if a tangible harm occurred.

The corrective actions need not be those that the employee requests or prefers, but they must be effective.

**How confidential is a harassment complaint?**

The agency will protect the confidentiality of employees who report harassment, to the extent possible.  We will share information and records about the allegation only with those individuals who have a need to know.  However, since we cannot conduct an effective investigation without revealing certain information to the alleged harasser and potential witnesses, we cannot guarantee complete confidentiality.

**Is there any protection against reprisal and retaliation?**

Management also has an obligation to prevent reprisal and retaliation against any employee who reported harassment under the anti-harassment laws and this policy, or against any employee who was a witness or who assisted in a harassment inquiry.  As with harassment complaints, management takes all allegations of reprisal and retaliation seriously.  We will not tolerate reprisal or retaliation against any employee.

An employee who believes that he or she has been the subject of reprisal or retaliation for participating in a harassment complaint or investigation should contact:

- OCREO's Center for Complaints Processing at (410) 966-1229 (headquarters employees);
- The OCREO-Falls Church Office at (703) 605-8777 (ODAR headquarters components); or
- the appropriate CREO Office for the regions and OCO.

As indicated above, employees may also seek assistance through the EAP or a union representative (if the employee is in a bargaining unit).

Exhibit ͟O͟7͟-͟l͟q͟
Page ͟l͟0͟ of ͟l͟0͟

Thursday, May 1, 2014

**Colston, Aretha**

| | |
|---|---|
| **From:** | Colston, Aretha |
| **Sent:** | Friday, May 30, 2014 1:53 PM |
| **To:** | Doan, Tam |
| **Cc:** | Hanft, Mireille; Tom, Jennifer |
| **Subject:** | Meeting/Jennifer Tom |

Hello Mrs. Doan,

This email is in response to our meeting today, 05/30/2014, regarding Jennifer Tom and her alleged medical condition.

I appreciate the opportunity you presented to me to provide as you stated "my side of the story" regarding the on-going problem regarding Ms. Tom's medical condition.

I am willing to do my part to address and resolve this issue. Thus far I have taken the following steps to accommodate Ms. Tom:

> I voluntarily reframed from wearing perfume totally for an extended period of time
> I requested to be permanently relocated to another area (numerous times)
> I changed the type of perfume I wear
> I make sure to only use light dosages of perfume away from the office only
> I do not put on perfume at work at all
> I do not spray perfume at my desk

Moving forward, in order that I further assist in resolving this matter, I would like to respectfully requests the following:

> All requests for me to personally make accommodations for Ms. Tom's medical condition to be in writing supported by SSA legal procedure and policy. Also, I request that her condition be validated and documented by a medical doctor.

> Every effort should be made by SSA to accommodate Ms. Tom's medical condition, (My possible suggestions are employee relocation, providing a fragrance free environment for all employees, telecommuting, medication, etc.)

Please be assured that I am very sensitive to this matter, and I look forward to working with the agency to find a resolution that will allow Ms. Tom and I to move forward and feel comfortable in our respective environments while we focus on accomplishing our collective goal of providing excellent customer service as Benefit Authorizers.

Sincerely,

Aretha Colston
Benefit Authorizer, MOD 10
Western Program Service Center
(510) 970-2520

Exhibit __11-01__
Page __1__ of __1__

*Aretha Colston* 11/18/14

1

**Email #3**

**From:** Doan, Tam
**Sent:** Tuesday, June 24, 2014 4:35 PM
**To:** Colston, Aretha
**Cc:** Hanft, Mireille; Brooks-Norman, Annett
**Subject:** Meeting w/Aretha

Aretha,

Per your request, we are scheduled to meet with you Friday, June 27, 2014 at 10:05am regarding closure on employee's odor allergy.

Meeting will be in conference room 520E . Please let me know if this time does not work for you.

*Tammie Doan*
Assistant Module Manager
WNPSC-Module 10
510-970-2502

**Email #4**

**From:** Doan, Tam
**Sent:** Friday, June 20, 2014 3:14 PM
**To:** Khouri, Raymond
**Cc:** Bruno, Samantha; Hanft, Mireille
**Subject:** Release Jennifer Tom from Duty on June 24, 2014

Raymond,

Jennifer Tom is attending a meeting. Please release her from duty on **June 24, 2014 from 11am to 12pm.**

Feel free to contact me if you have any questions.

*Tammie Doan*
Assistant Module Manager
WNPSC-Module 10
510-970-2502

Exhibit 20
Page 10 of 22



Jennifer Tom
2101 Mangrove Court
Antioch, CA 94509

Clerk, United States District Court
1301 Clay Street Suite 400 S
Oakland, CA 94612

$15.60

DuPont™ Tyvek®
Protect What's Inside.™

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14 © U.S. Postal Service; October 2018; All rights reserved.

Please Recycle