1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2  SARA WINSLOW (DCBN 457643)
   Chief, Civil Division
3  WENDY M. GARBERS (CABN 213208)
   Assistant United States Attorney
4
        450 Golden Gate Avenue, Box 36055
5       San Francisco, California 94102-3495
        Telephone: (415) 436-6475
6       FAX: (415) 436-7234
        wendy.garbers@usdoj.gov
7
   Attorneys for Defendant
8  ANDREW SAUL

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                  OAKLAND DIVISION

12

13 JENNIFER TOM,                        Case No. 19-06322 JST

          Plaintiff,                    **DEFENDANT'S NOTICE OF MOTION AND
14                                       MOTION FOR SUMMARY JUDGMENT;
      v.                                 MEMORANDUM OF POINTS AND
15                                       AUTHORITIES**

16 ANDREW SAUL,                          Date:  August 19, 2021
                                         Time:  2:00 p.m.
17        Defendant.                     The Honorable Jon S. Tigar

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-06322 JST

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................................................1

ISSUES TO BE DECIDED ................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

I.      INTRODUCTION ................................................................................................................1

II.     STATEMENT OF UNDISPUTED FACTS ........................................................................2

        A.      Plaintiff's Background ............................................................................................2

        B.      Relevant Managers ..................................................................................................3

        C.      Plaintiff's Allegations of Co-Worker Harassment ..................................................5

        D.      Plaintiff's Allegations of Supervisor Harassment ..................................................7

        E.      Summary of Medical Documentation Submitted By Plaintiff ................................8

        F.      The Agency's Offered Accommodations and Plaintiff's Ability to Telework ........16

        G.      Telework and Plaintiff's Inability to Work with the Agency's Laptops .................17

        H.      The Agency's Reasonable Accommodation Decisions ..........................................18

        I.      Plaintiff's Absence and the Return to Work Letter ...............................................21

        J.      The Proposal to Remove ........................................................................................22

        K.      Plaintiff's Response to the Proposal to Remove ...................................................23

        L.      The Decision to Remove ........................................................................................23

        M.      Administrative Process ..........................................................................................23

III.    STANDARD OF REVIEW ...............................................................................................25

IV.     ARGUMENT .....................................................................................................................26

        A.      The Facts Make Clear Plaintiff Was Not Subjected to Harassment. ....................27

                1.      Legal Standard–Proving Harassment ........................................................27

                2.      The Incidents Alleged Do Not Amount to Harassment ..............................27

        B.      The Agency Properly Handled Plaintiff's Requests for Accommodation ..............30

                1.      Legal Standard – Reasonable Accommodation ........................................30

                2.      Plaintiff Has Not Established that She is a Qualified Individual with a
                        Disability ...................................................................................................30

3.   The Agency Provided the Majority of Requested Accommodations And Permissibly Denied the Request to Work at Home Full-Time ....................31

C.   The Agency Properly Removed Plaintiff After She Failed to Consistently Report to Work Over a Four Month Period ...........................................................33

1.   The Legal Standard – Proving the AWOL Charge ...............................33

2.   The Agency Properly Removed Plaintiff for 70 Separate AWOL Occurrences................................................................................................34

3.   Plaintiff Experienced Severe Reactions to her Agency Laptop As Well As Daily Migraines that Prevented her from Performing her Job Duties............35

D.   The Agency Did Not Retaliate or Discriminate Against Plaintiff .......................36

1.   The Legal Standard – Proving Disparate Treatment..............................36

2.   Legal Standard – Proving Retaliation ...................................................37

3.   Plaintiff Has Failed to Demonstrate a Prima Facie Case of Disparate Treatment or Retaliation ........................................................................37

4.   The Agency Articulated Legitimate, Non-Discriminatory Reasons for its Actions and Plaintiff Cannot Show that these Reasons are Pretext for Discrimination or Retaliation ...........................................................38

E.   The Agency Properly Dismissed Plaintiff's EEO Complaint............................38

1.   Legal Standard ......................................................................................38

2.   The Agency Properly Dismissed Plaintiff's EEO Complaint..............39

3.   Regardless, No Cause of Action Exits for Challenges to the EEO Claims Processing ...............................................................................39

V.   CONCLUSION.....................................................................................................40

# TABLE OF AUTHORITIES

Cases

2006 WL 4673363 ........................................................................................................ 33

*Ali v. Brown*,
  998 F. Supp. 917 (N.D. Ill. 1998) ............................................................................ 35

*Allen v. Pacific Bell*,
  348 F.3d 1113 (9th Cir. 2003) .................................................................................. 32

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................. 26

*Bologna v. Dep't of Defense*,
  73 M.S.P.R. 110 (1997) ............................................................................................ 36

*Campana v. Dep't of Navy*,
  873 F.2d 289 (Fed. Cir. 1989) .................................................................................. 35

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................................. 26

*Chuang v. Univ. of Cal. Davis, Bd. Of Trs.*,
  225 F.3d 1115 (9th Cir. 2000) .................................................................................. 37

*Cohen v. Fred Meyer, Inc.*,
  686 F.2d 793 (9th Cir. 1982) .................................................................................... 37

*DiFruscio v. Apfel* (Soc. Sec. Admin.),
  EEOC DOC 01982006, 2000 WL 1368134 (Sep. 13, 2000) .................................... 30

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998) ............................................................................................ 27, 30

*Fuller v. City of Oakland, Cal.*,
  47 F.3d 1522 (9th Cir. 1995) .................................................................................... 28

*Galvan v. E.E.O.C.*,
  113 M.S.P.R. 322 (2010) .......................................................................................... 39

*Hawkins v. Counseling Assocs., Inc.*,
  504 F. Supp. 2d 419 (E.D. Ark. 2007) ...................................................................... 32

*Hill v. England*,
  No. CVF05869RECTAG, 2005 WL 3031136 (E.D. Cal. Nov. 8, 2005) .................... 40

*Jordan v. Summers*,
  205 F.3d 337 (7th Cir. 2000) .................................................................................... 40

*Joyner v. Dept. of the Navy*,
  57 M.S.P.R. 154 (1993) ............................................................................................ 34

*Landucci v. State Farm Insurance Co.*,
  65 F. Supp. 3d 694 (N.D. Cal. 2014) ........................................................................ 27

*Manatt v. Bank of America, NA*,
  339 F. 3d 792 (9th Cir. 2003) ................................................................................... 27

*McCarthy v. Brennan*,
  No. 15-CV-03308-JSC, 2016 WL 946099 (N.D. Cal. Mar. 14, 2016) ................. 1, 18

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) .................................................................................................. 37

*Munoz v. Mabus*,
  630 F.3d 856 (9th Cir. 2010) .................................................................................... 37

*Musick v. Burke*,
   913 F.2d 1390 (9th Cir. 1990) ............................................................................... 26
*Offield v. Holder*,
   No. 12-CV-03053-JST, 2014 WL 1892433 (N.D. Cal. May 12, 2014) ............................. 26
*Peterson v. Hewlett-Packard Co.*,
   358 F.3d 599 (9th Cir. 2004) ................................................................................ 37
*Rehling v. City of Chicago*,
   207 F.3d 1009 (7th Cir. 2000) ............................................................................... 32
*Robinson v. Bodman*,
   333 Fed. Appx. 205 (9th Cir. 2009) ........................................................................ 35
*Salmon v. Dade County School Board*,
   4 F.Supp.2d 1157 (S.D.Fla.1998) ........................................................................... 35
*Savage v. Dept. of Army*,
   122 M.S.P.R. 612 (2015) ...................................................................................... 34
*Smith v. Cty. of Humboldt*,
   240 F. Supp. 2d 1109 (N.D. Cal. 2003) .................................................................... 29
*Stewart v. St. Elizabeths Hosp.*,
   589 F.3d 1305 (D.C. Cir. 2010) ............................................................................. 33
*Summers v. Teichert & Son, Inc.*,
   127 F.3d 1150 (9th Cir. 1997) ............................................................................... 26
*Swenson v. Potter*,
   271 F. 3d 1184 (9th Cir. 2001) ......................................................................... 28, 29
*Thornhill Publ'g Co. v. GTE Corp.*,
   594 F.2d 730 (9th Cir. 1979) ................................................................................ 26
*v. Donahoe (USPS)*,
   EEOC DOC 0120132469, 2013 WL 5876916 (Oct. 22, 2013) ....................................... 32
*Vance v. Ball State Univ.*,
   570 U.S. 421 (2013) ....................................................................................... 29, 30
*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) .......................................................................... 27, 37
*Zygas v. U.S. Postal Serv.*,
   116 M.S.P.R. 397 .............................................................................................. 39

Rules

Fed. R. Civ. P. 56(a) ............................................................................................. 26
Federal Rule of Civil Procedure 56 ............................................................................. 1

Regulations

5 C.F.R. § 752.403(a) ............................................................................................ 34
5 C.F.R. § 1201.154(b) .......................................................................................... 39
29 C.F.R. § 1614.107(a)(4) ..................................................................................... 39
29 C.F.R. § 1630.2(m) ........................................................................................... 31
29 C.F.R. § 1630.9 ............................................................................................... 30

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
Case No. 19-06322 JST

iv

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on August 19, 2021, at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 6, Oakland Courthouse, 1301 Clay Street, Oakland, California, before the Honorable Jon S. Tigar, Defendant Andrew Saul shall and hereby does move, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment in Defendant's favor on all claims asserted by Plaintiff herein.  Defendant's motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the accompanying Declarations of James Dokko (Dokko Dec.) and Wendy M. Garbers (Garbers Dec.), and exhibits thereto, the Court's files and records in this matter, and other matters of which the Court takes judicial notice, and any oral argument that may be presented to the Court.

## ISSUES TO BE DECIDED
### (Local Rule 7-4(a)(3))

1.  Whether significant probative evidence exists to support Plaintiff's disability discrimination claim, under the Rehabilitation Act, that the Agency failed to accommodate her medical conditions and/or subjected her to disparate treatment, harassment, or retaliation.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

From 2015 through 2018, the Social Security Administration (SSA or the Agency) accommodated Plaintiff Jennifer Tom's medical conditions consistent with her treating allergist's recommendations of a "room which has isolated airflow from other areas of the building" and "[r]emoval of airborne irritants as much as possible from work environment."  In fact, management offered Plaintiff 16 different private, enclosed office spaces.  Management installed a lock on Plaintiff's office door, as well as draft guards around the doorframe to isolate airflow.  Management purchased a commercial grade air purifier designed specifically for individuals with environmental sensitivities, which had a coverage area larger than Plaintiff's enclosed office.  Management, the Agency's Civil

---

[1] As a former federal employee, Plaintiff must bring all disability discrimination claims under the Rehabilitation Act.  *See, e.g., McCarthy v. Brennan*, No. 15-CV-03308-JSC, 2016 WL 946099, at *8 (N.D. Cal. Mar. 14, 2016) ("[F]ederal employees must bring disability discrimination claims exclusively through [the] Rehabilitation Act, Section 501, 29 U.S.C. § 791[.]").

Rights and Equal Opportunity (CREO) office, and the Regional Commissioner issued training and reminders about hidden disabilities. In addition, management specifically advised staff to avoid use of perfumed products in the workplace. Per Plaintiff's request, management also instructed staff to communicate with Plaintiff by email, instant message, or telephone to avoid potential exposure to chemicals or perfumes. Management offered Plaintiff one-on-one training in lieu of requiring her to attend group trainings. Management purchased specialized facemasks for Plaintiff's use when traveling from her office to other parts of the building. Management also offered to explore reassignment and relocation with Plaintiff, but she declined. Finally, management provided Plaintiff with the maximum amount of advanced sick and annual leave permitted, which Plaintiff exhausted.

The only outstanding accommodation request Plaintiff had pending at the time of her removal was for full-time telework. However, Plaintiff has not submitted evidence to support a claim that what the Agency had already provided was insufficient. Furthermore, Plaintiff has not submitted evidence to show that working from home full-time would be effective. Indeed, because she reports that she is allergic to her Agency laptop, which she would have to use to access Agency networks necessary to perform her work, she cannot show that working from home would permit her to perform the essential functions of her position. Moreover, Plaintiff has daily migraines with aura, which are so severe that, in October 2018, the Office of Personnel Management approved Plaintiff's application for disability retirement. Plaintiff reports that these migraines are nearly constant, requiring treatment that makes her too drowsy to perform normal activities of daily living. Thus, based on Plaintiff's own testimony, full-time telework would not be effective. The Agency properly removed Plaintiff from federal service when she failed to consistently report to work after July 2016, exhausted all available leave options, and accrued more than 500 hours of absence without leave (AWOL).

Plaintiff is unable to demonstrate that the Agency treated her less favorably than a person outside her protected group or that the Agency failed to accommodate her disability, resulting in adverse treatment. Plaintiff is also unable to demonstrate that the Agency subjected her to harassment or retaliation. Summary judgment for the Agency is, therefore, appropriate.

## II. STATEMENT OF UNDISPUTED FACTS

### A. Plaintiff's Background

1.      Plaintiff worked as a Benefit Authorizer (BA) at the Agency's Western Program Service Center (WNPSC) in Richmond, California.

2.      Plaintiff alleged an inability to report to work after July 2016 because of a sensitivity to chemicals and fragrances, vertigo, and migraines with aura.  (Garbers Dec. Ex. L at 152:13-17.)

3.      At her February 1, 2021 deposition, Plaintiff testified that she has had a "sensitivity to environment . . . [a]s far back as I can remember, I haven't tolerated chemicals very well."  (Garbers Dec. Ex. L at 43:9-16.)  Plaintiff testified that the condition continued to worsen even after she stopped reporting to work.  (*Id.* at 44:1-13; 45:18-25.)  Plaintiff testified that she treats the condition with Benadryl (*id.* at 50:7-16), which makes her drowsy.  (*Id.* at 51:3-5.)

4.      Plaintiff also testified that she experiences varying degrees of vertigo on a daily basis.  (Garbers Dec. Ex. L at 38:3-9.)  She cannot read for a full eight-hour day due, in part, to her vertigo symptoms "because I get so nauseous and I cannot focus.  Then my headaches kick in."  (*Id.* at 38:12-21; 39:1-3; 41:4-6.)

5.      Plaintiff also testified that she experiences "one long constant migraine that's broken up by medication."  (Garbers Dec. Ex. L at 17:22-25.)  Plaintiff testified, "I take medication and I fall asleep so I wouldn't be able to say if [the migraine] lasted the whole day [and] . . . when I wake up I have to take more medication and I go back to sleep."  (*Id.* at 20:3-9.)  Plaintiff testified that her migraines have worsened since she stopped coming into work.  (*Id.* at 36:3-5; 84:4-19.)  Plaintiff described her daily activities as, "I wake up with a migraine, take medication, try not to run into anything, and just rest as much as possible."  (*Id.* at 53:15-18.)  Plaintiff testified that she receives Botox injections once every three months that provide about two weeks of relief from the migraines, but thereafter she requires Tylenol with codeine and naps most of the day.  (*Id.* at 54-56.)

6.      On October 24, 2018, the Office of Personnel Management (OPM) approved Plaintiff's disability retirement application finding her "to be disabled for [her] position as a Benefit Authorizer due to Migraine with Aura and Vertigo." (Garbers Dec. Ex. L at 82-84 and Exhibit C to the deposition.)

7.      Plaintiff acknowledges that she has not made any effort to look for a new job since August 2018 and does not plan to work again.  (Garbers Dec. Ex. L at 153-155.)

**B.      Relevant Managers**

Debby Ellis

8.      From September 2013 through June 2018, Debby Ellis was the Assistant Regional Commissioner for the WNPSC's Processing Center.

9.      In June 2018, Ms. Ellis became the Acting Deputy Regional Commissioner for the San Francisco Region.

10.      Ms. Ellis was the deciding official on Plaintiff's accommodation request for fulltime telework/work at home.

James Dokko

11.      Beginning in May 2015, James Dokko was the Operations Manager for Division 4 of the WNPSC.  In this role, Mr. Dokko supervised and directed the activities of the WNPSC Module 10 (Plaintiff's module).

12.      Mr. Dokko was also Plaintiff's third-line supervisor and primary point of contact for her accommodation requests.

13.      Mr. Dokko was the deciding official on Plaintiff's removal for AWOL.

Carmelita Rivera

14.      Carmelita Rivera was the Module Manager for WNPSC Module 10 and Plaintiff's second-line supervisor.  Ms. Rivera was also the proposing official on Plaintiff's removal for AWOL.

Kris Chamrernlaksa

15.      Kris Chamrernlaksa was the Assistant Module Manager (AMM) for WNPSC Module 10 and Plaintiff's first line supervisor.  Kris Chamrernlaksa also sent Plaintiff a letter advising her that the Agency concluded her medical documentation no longer supported continued approval of Leave Without Pay (LWOP), and, if she did not return to work or provide sufficient medical documentation in support of her absence, management would charge her with AWOL.

Mireille Hanft

16.      Mireille Hanft was the Module Manager of WNPSC Module 10 in July 2014.  In this role, she served as the second-line supervisor to Plaintiff.

17.      Ms. Hanft also served as Plaintiff's first-line supervisor from June 2014 until the AMM position was filled.

<u>Rolanda Carter</u>

18.     From October 2011 to May 2014, Rolanda Carter worked as the AMM of Module 10.  In this role, she served as the first-line supervisor to Plaintiff.

<u>Tammie Doan</u>

19.     From July 2014 to July 2015, Tammie Doan worked as the AMM of Module 10.  In this role, she served as the first-line supervisor to Plaintiff.

**C.     Plaintiff's Allegations of Co-Worker Harassment**

20.     Sometime in late November 2013 or early December 2013, Plaintiff talked to co-worker Aretha Colston about Ms. Colston's use of perfume and how it affected Plaintiff.  (Garbers Dec. Ex. A at USA4431 and Ex. D at USA4687.)

21.     Ms. Colston apologized and said she would not spray perfume on herself at her desk again.  (Garbers Dec. Ex. D at USA4687.)

22.     At approximately the same time (late November or early December 2013), Plaintiff told her then-first-line supervisor Rolanda Carter that she was having an allergic reaction to a co-worker's perfume.  (Garbers Dec. Ex. A at USA4431.)

23.     On December 6, 2013, while Ms. Carter was on vacation, Plaintiff talked to her second-line supervisor, Mireille Hanft, about "Aretha's habit of spraying perfumes." (Garbers Dec. Ex. A at USA4431; Dokko Dec Ex. B at USA4635.)

24.     Plaintiff told Ms. Hanft that she and Ms. Colston had resolved the problem because Ms. Colston agreed to stop wearing perfume.  Before their conversation, Plaintiff had never indicated to Ms. Hanft that she had any allergies or sensitivities to scents that affected her in the workplace.  (Garbers Dec. Ex. B at USA4641 and Ex. D at USA4687.)

25.     In response to Plaintiff's report, Ms. Hanft met with Ms. Colston to discuss her use of perfume at work and a co-worker's sensitivity to it.  Ms. Colston explained that she and Plaintiff had already resolved the issue, and Ms. Colston had offered to refrain from spraying perfume on herself at her desk.  Ms. Hanft asked Ms. Colston to wear less perfume, at which point, Ms. Colston said she would stop wearing perfume to work altogether.  (Garbers Dec. Ex. B at USA4641 and Ex. D at USA4687.)

1       26.     On December 6, 2013, Ms. Hanft emailed Plaintiff about her conversation with Ms.

2   Colston and Ms. Colston's agreement to stop using perfume.  (Dokko Dec. Ex. B at USA4638.)

3       27.     Plaintiff acknowledged that, after the conversation with Ms. Hanft, Ms. Colston stopped

4   using perfume for some time.  (Garbers Dec. Ex. A at USA4431.)

5       28.     Five to six months later, in late May and early June 2014, Plaintiff reported to her then-

6   first-line supervisor Tammie Doan that Ms. Colston was wearing perfume again, and it was causing her

7   to sneeze all day.  (Garbers Dec. Ex. C at USA4670; Dokko Dec Ex. B at USA4559, 4581.)

8       29.     Ms. Doan promptly met with both employees.  (Dokko Dec Ex. B at USA4693, 4773-

9   4780.)

10      30.     Ms. Doan moved Plaintiff to a different cubicle so that she would not smell her co-

11  worker's perfume and told Plaintiff that she could bring in and use an air purifier at work.  (Garbers

12  Dec. Ex. C at USA4672.)  Plaintiff declined to bring in her own air purifier.

13      31.     Management temporarily relocated Ms. Colston to a cubicle next to Ms. Hanft, which

14  was a distance away from Plaintiff's cubicle, and eventually reassigned Ms. Colston to a new cubicle

15  that was also located a distance away from Plaintiff's cubicle.

16      32.     Thereafter, Plaintiff began to allege that unidentified individuals were contaminating her

17  workstation with chemicals and fragrances.  In response to Plaintiff's contamination allegations,

18  management filed requests with building facilities and the Office of Environmental Health and

19  Occupational Safety (OEHOS) to investigate.  (Dokko Dec Ex. C at USA361, 379-381, 393-405, 417-

20  419, 421-423, 457, 464-469, 475-477, 509-523, 530-533, 535, 564-574, 586, 589-590, 593-596, 599.)

21  Management also granted Plaintiff leave upon request, offered to relocate her workstation, and provided

22  her with a large ventilation fan.

23      33.     In February 2015, OEHOS explained to management that without having "an idea of

24  what we are testing for (a source of odor), no further testing could be conducted."  (Dokko Dec Ex. B at

25  USA3439-3440.)

26      34.     Similarly, in June 2015, SSA Facilities Manager David Rouggly observed that, "We

27  received one odor report yesterday on the 5th Floor, Mod. 10, from Jennifer Tom.  No one else in the

28  area could smell anything, and we received no other reports."  Mr. Rouggly went on to explain,

1  "Unfortunately, smells can't really be traced down or identified after the fact.  If it is a recurring smell,

2  and can be smelled by more than one person, please notify the manager(s) as appropriate, and, report in

3  a timely manner."  (Dokko Dec. Ex. C at USA565-567.)

4     35.    On February 24, 2016, an SSA employee assigned to timekeeper duties, and specifically

5  assigned to timekeeping duties related to Plaintiff, Alex Urbanski, sent a SKYPE communication to two

6  other SSA employees.  In this communication, Mr. Urbanski wrote "make sure it doesn't have acid or

7  anything like that on it that will burn your fingers...", to which one of the co-workers replied, "lol...is

8  this a new addition?" and Alex Urbanski responded, "that's the comment on the timesheet this morning.

9  I'm waiting to see when she's going to take SL even though she's working from home…"  (Dokko Dec.

10  ¶ 17.)

11     36.    Upon receiving notice of Mr. Urbanski's SKYPE communication, management took

12  immediate action to remove his timekeeping duties, thereby rendering him without any reason to have

13  contact with Ms. Tom or knowledge of her absences.  (Dokko Dec. ¶ 18.)

14     **D.    Plaintiff's Allegations of Supervisor Harassment**

15     37.    Ms. Doan began working with Plaintiff in 2012.  Between 2012 and 2014, Ms. Doan

16  wore perfume to work although she did not spray perfume on herself in her cubicle.  (Garbers Dec. Ex.

17  C at USA4674.)

18     38.    In mid-May 2014, Plaintiff told Ms. Doan that she was allergic to perfumes, and in

19  particular, to Ms. Colston's perfume.  (Garbers Dec. Ex. C at USA4670 and Ex. A at USA4431.)

20     39.    The first time Plaintiff told Ms. Doan that she was bothered by Ms. Doan's personal use

21  of perfume was on June 3, 2014, during a meeting in Ms. Doan's cubicle  Plaintiff did not leave the

22  meeting, but continued talking to Ms. Doan from outside the short partition on the cubicle.  (Garbers

23  Dec. Ex. A at USA4434 and Ex. C at USA4674.)

24     40.    Plaintiff testified that Ms. Doan called her into meetings on other occasions while

25  wearing perfume, but deferred to the ROI (Report of Investigation) for specific dates, of which June 3,

26  2014, is the only date specified.  (Garbers Dec. Ex. K at 58:4-59:22, Ex. A at USA4434, and Ex. C at

27  USA4674.)

28     41.    Plaintiff alleges that after she told Ms. Doan she was affected by Ms. Doan's perfume,

Ms. Doan began to walk by Plaintiff's cubicle during breaks, and on one occasion, Ms. Doan followed Plaintiff to the elevator at the end of the day and rode the elevator to the ground floor with Plaintiff in an attempt to detain her longer than necessary.  (Garbers Dec. Ex. K at 59:22-60:21.)

42.     Plaintiff alleges that, on some unspecified date, Ms. Doan told Plaintiff to sit next to Ms. Colston at a staff meeting and then laughed when Plaintiff declined.  (Garbers Dec. Ex. K at 60:22-61:12.)

43.     In an email dated July 15, 2014, Plaintiff describes alleged harassment by Ms. Doan as "spending more time in my area and making a point of talking to me" and "coming over to me and make small talk."  She does not mention Ms. Doan wearing perfume while talking to or walking by Plaintiff.  (Dokko Dec Ex. B at USA4592.)

44.     Plaintiff alleged supervisor harassment after Ms. Doan denied Plaintiff's request to telework as a reasonable accommodation and explained to her that a reasonable accommodation request was not necessary for an air purifier—Plaintiff could bring an air purifier into the office since Agency policy did not ban their use.  (Dokko Dec Ex. B at USA4593-4595.)

**E.     Summary of Medical Documentation Submitted By Plaintiff**

45.     On May 27, 2014, Plaintiff went to the emergency room, complaining of an allergic reaction "to cleaners at work." She alleged a burning sensation in her lungs, nausea, and dizziness. The clinical notes report that Plaintiff "was seen in the emergency department and the tests were normal." On physical examination, Plaintiff had clear lungs, normal throat without congestion, and normal skin without rash.  A chest x-ray, EKG, and labs were all negative. The doctor determined that "no treatment is indicated" and Plaintiff could return to work at "full duty." (Dokko Dec., Ex. A at USA150-151; USA73.)

46.     On June 2, 2014, Plaintiff reported to her treating physician Sidhartha Gurung, M.D., for a "letter due to adverse reaction to perfume smell from her co-worker."  Plaintiff told Dr. Gurung that her co-worker's perfume caused her to have shortness of breath, difficulty breathing, redness, and itchy skin.  Dr. Gurung's examination findings were normal.  Despite these findings, Dr. Gurung provided Plaintiff a letter stating, "Jennifer M. Tom is allergic to scent from perfumes."  (Dokko Dec., Ex. A at USA154-155; USA75.)

47.     A June 3, 2014 one-page clinical note from Ted Yu-Kuo Young, M.D., recorded Plaintiff's subjective complaint that she had a reaction to perfume at work and concluded that it was "most likely an irritant-based reaction" that affected her nose, eyes, and airways.  Dr. Young did not record any objective clinical findings.  Dr. Young stated, "there is no lab testing to diagnose chemical sensitivity."  Dr. Young recommended "Removal of environmental irritants will help with her symptoms," but did not explain what those irritants were.  Dr. Young suggested Benadryl for symptoms such as "hives, itching, flushing, lip swelling, eye swelling, isolated episodes of vomiting," but did not record that Plaintiff presented with any of those symptoms on the date of the visit.  (Dokko Dec., Ex. A at USA72.)

48.     In an August 4, 2014 statement and an August 5, 2014 Family Medical Leave Act (FMLA) form, Dr. Gurung requested that Jennifer Tom be allowed "to take 1-2 days off per month for her chronic medical condition" through February 4, 2015.  (Dokko Dec., Ex. A at USA69-71.)

49.     On November 13, 2014, Plaintiff reported to the emergency room claiming an allergic reaction to an aerosol cleaner at work resulting in a welts, dizziness, nausea, tightening of her throat, and burning in her lungs.  On examination, the doctor noted that Plaintiff had "no eyelid swelling," no evidence of eye irritation (chemosis), and "no clinical signs of allergy."  A chest examination revealed normal effort and breath sounds and Plaintiff exhibited no evidence of respiratory distress.  The doctor administered Benadryl, "at [Plaintiff's] request."  (Dokko Dec., Ex. A at USA176; USA181-182.)

50.     On November 20, 2014, Plaintiff reported to Myra Taja Cruz, M.D., with complaints similar to those from the week before.  This time, Plaintiff also alleged that the medical assistant (MA) "who roomed her" was wearing a fragrance and, as a result, Plaintiff was "starting to feel flushed" and "her eyelids [were] starting to become swollen."  On examination, the doctor noted that Plaintiff had "no significant eyelid swelling."  A skin prick testing using Plaintiff's co-worker's perfume was negative for any "contact urticaria" [hives].  The doctor released Plaintiff to regular duty with instructions to "avoid strong scents."  (Dokko Dec., Ex. A at USA184-185; USA67.)

51.     On January 13, 2015, at 9:23 a.m., Plaintiff reported to Dr. Gurung that she had an allergic reaction to a co-worker's perfume earlier that morning resulting in hives, itchy eyes, sore throat, and mild tongue and lip numbness.  On examination, Dr. Gurung noted that Plaintiff had normal

1   findings:  She had normal skin coloration without evidence of rash or suspicious skin lesions; normal

2   eye, mouth, and throat findings; no neck tenderness; and clear breath sounds.  Despite these findings,

3   Dr. Gurung provided Plaintiff with a "Work Status Report" excusing her from work for the remainder of

4   the day.  (Dokko Dec., Ex. A at USA204-205; USA66.)

5         52.    On January 26, 2015, Plaintiff reported to Zhihong Zhong, M.D., for a note for work.

6   Plaintiff alleged that she developed a rash on her chest with swelling of her eyelid and lips after

7   encountering perfume at work.  Plaintiff explained that she had left work, took Benadryl, and applied a

8   cream to her rash.  She said the medication and cream helped.  On examination, Dr. Zhong described

9   Plaintiff as alert and well, with clear and normal breath sounds, normal heart rate and rhythm, mild to

10  minimal lip and eyelid swelling, and scattered erythematous papules and patches on her neck and upper

11  chest.  The doctor provided Plaintiff with a Work Status Report stating, "Jennifer has allergic reaction to

12  perfumes. Please try to accommodate perfume free environment for her condition."  (Dokko Dec., Ex. A

13  at USA38; USA65.)

14        53.    Plaintiff returned to Dr. Gurung on January 27, 2015, again reporting an allergic reaction

15  to an exposure to perfume at work earlier that morning.  Plaintiff reported lip swelling, facial hives,

16  throat tightness with shortness of breath.  On examination, Plaintiff had no evidence of facial hives ("no

17  rash") or lip swelling.  She had normal respiratory effort with good air entry.  The doctor noted that

18  there was "No sign of anaphylaxis."  A chest x-ray was normal.  Despite these findings, Dr. Gurung

19  provided Plaintiff with a "Work Status Report" placing her off work through January 30, 2015.  (Dokko

20  Dec., Ex. A at USA211; USA215; USA217; USA219-220; USA63.)

21        54.    On February 2, 2015, Plaintiff reported to her physician complaining of an allergic

22  reaction to a perfume or chemical cleaner at work that same day.  She claimed she developed facial, lip

23  and tongue swelling, eye and throat congestion, and facial skin irritation.  On examination, the physician

24  described Plaintiff as flushed but without evidence of any rash.  Plaintiff had a normal throat without

25  nasal congestion and with good chest air entry.  Despite these findings, the clinician provided Plaintiff

26  with a "Work Status Report" excusing her from work through February 4, 2015, based on "uncontrolled

27  symptoms" related to an "allergic reaction."  The clinician recommended a "work area free of perfume

28  and strong cleaner smell."  (Dokko Dec., Ex. A at USA222; USA224; USA62.)

55.     On February 5, 2015, Plaintiff reported to the emergency department with "symptoms of allergic reaction without objective findings." Justin Aaron Davis, M.D., noted that he "had [a] long discussion [with Plaintiff] about the mind-body connection, and that if she feels like anything will make her sick that she indeed will get sick from anything." Dr. Davis also noted that "this patient needs multidisciplinary intervention." He provided Plaintiff with a work status report excusing her from work for the remainder of the day. (Dokko Dec., Ex. A at USA1973-1975; USA10241.)

56.     On February 12, 2015, Plaintiff's treatment record reflects the following notation "multiple visits for SUBJECTIVE sense of throat swelling, but no one has actually seen it." The doctor diagnosed her with "Anxiety." (Dokko Dec., Ex. A at USA1983 (emphasis in original); USA1986.)

57.     On February 19, 2015, Plaintiff reported to Dr. Gurung for a note for work. Plaintiff alleged that she left work that morning after she began to feel dizzy, throat pain, and facial numbness. On examination, Plaintiff had normal objective findings. Dr. Gurung advised Plaintiff to "be seen by MH (Mental Health)."[2] Despite these findings and recommendation, Dr. Gurung provided Plaintiff with a signed letter requesting that management "allow her to take 2-3 days off per month for her chronic medical condition from today until 02/19/2016." (Dokko Dec., Ex. A at USA246-247; USA57-58.)

58.     On March 3, 2015, Plaintiff reported to Dr. Young that she experienced throat tightness, skin irritation/burning, and facial hives with exposure to fragrances and fumes at work. Plaintiff also acknowledged that her symptoms had improved since a recent move to the second floor of her office building. On examination, Plaintiff had normal objective findings. (Dokko Dec., Ex. A at USA254.)

59.     On March 4, 2015, Plaintiff reported to her doctor with complaints of an allergic reaction to perfume at her workplace earlier that morning. Plaintiff said that the exposure caused her to break out in a rash, cough, and wheeze. On examination, Plaintiff could breathe normally without wheezes, rales, or rhonchi. The doctor did not note any evidence of rash. Despite these benign examination findings, the doctor provided Plaintiff with a "Work Status Report" excusing her from work through March 6, 2015. (Dokko Dec., Ex. A at USA257; USA55.)

---

[2] At her February 1, 2021 deposition, Plaintiff acknowledged that she has not followed Dr. Gurung's guidance to seek mental health treatment or Dr. Davis's recommendation for multi-disciplinary treatment. (Garbers Dec. Ex. L at 125:23-127:2 and 156:5-159:17).

60.     On March 19, 2015, Plaintiff left work early after she alleged that she broke out with a rash and migraine due to a fragrance exposure.  On examination, Plaintiff had normal findings including no focal neurological findings associated with migraines.  The doctor did not note any evidence of rash.  Despite these findings, the physician, Martin Arthur Cogburn, M.D., provided Plaintiff with a note stating, "Please do not have Ms. Tom work in an environment where she is exposed to strong perfumes or other odors that may aggravate her chronic medical condition."  Dr. Cogburn placed Plaintiff off work through the following day.  (Dokko Dec., Ex. A at USA262; USA112-113.)

61.     On March 23, 2015, Plaintiff returned to Dr. Gurung with complaints of headache, facial itching, shortness of breath, and eye pain resulting after being "exposed to perfume" at work that morning.  On examination, Plaintiff had normal objective findings–she had clear breath sounds with symmetric air entry and normal eye findings.  The doctor did not note any abnormal facial findings.  Despite these benign findings, Dr. Gurung provided Plaintiff with a "Work Status Report" excusing her from work for the remainder of the day.  (Dokko Dec., Ex. A at USA264-265; USA115.)

62.     Over the following week, Plaintiff provided additional work status reports that excused her from work through March 31, 2015.  These forms did not identify a specific medical basis for her absence or any objective clinical findings.  (Dokko Dec., Ex. A at USA118-121.)

63.     On April 7, 2015, Dr. Young completed a reasonable accommodation form on Plaintiff's behalf.  In the form, Dr. Young wrote, "Ms. Tom appears to have increased sensitivity to airborne irritants such as perfumes and cleaning products."  He described Plaintiff's symptoms as "sensation of throat tightness" and "skin irritation and burning sensation" and opined that they affected her ability to breath, concentrate, speak, think, and work.  To address these symptoms, the doctor recommended "Removal of airborne irritants as much as possible from work environment."  (Dokko Dec., Ex. A at USA123-124.)

64.     On June 15, 2015, Dr. Gurung wrote a letter stating, "Jennifer M. Tom is patient and I would recommend against driving when she takes Benadryl."  The doctor did not describe how often Plaintiff takes Benadryl or if she could otherwise perform her job duties while taking Benadryl.  (Dokko Dec., Ex. A at USA85.)

65.     On June 16, 2015, Dr. Young wrote a letter stating, "Ms. Jennifer Tom is a patient of

mine since 2012.  She has demonstrated consistent hypersensitivity/irritant-based reaction including throat tightness and skin/eye irritation/burning sensation after fragrance and fume exposure at work.  If she is unable to avoid these chemicals at work and is able to work from home, it is my advice that such an option would provide the best solution for the parties involved."  The doctor did not provide any objective clinical notes alongside his letter.  (Dokko Dec., Ex. A at USA84.)

66.   On June 25, 2015, Plaintiff reported to Dr. Gurung with complaints of dizziness, sinus pain, and congestion.  The examination revealed normal findings.  Dr. Gurung placed Plaintiff off work through June 26, 2015.  (Dokko Dec., Ex. A at USA271-272; USA 125.)

67.   On July 7, 2015, Dr. Young provided a second letter that largely mirrored his June 16, 2015 letter.  In addition, the doctor stated, "Primary treatment for [Plaintiff's] condition is avoidance rather than medications.  The duration may be indefinite."  (Dokko Dec., Ex. A at USA82-83.)

68.   On September 25, 2015, Dr. Young completed a "Reasonable Accommodation Suggestions" form for Plaintiff.  In the form, the doctor acknowledged, "From the viewpoint of my specialty, I do not have any way to determine if the symptoms are organic or psychosomatic in nature.  If organic, consideration can be made for a room, which has isolated airflow from other area of the building (possibly airflow from outside of building).  Or possibly work from home."  (Dokko Dec., Ex. A at USA616-621.)

69.   On December 3, 2015, Plaintiff reported to Daniel Levinsohn, M.D., with complaints of bilateral eye irritation and redness that she alleged worsened "when at work environment with perfumes/construction."  Plaintiff reported "brief flashes of light and also black vision."  On examination, Dr. Levinsohn noted grossly normal findings; Plaintiff's eyelids, lashes, and ducts (lacrimal) were flat bilaterally; her lens, cornea, and anterior vitreous were clear bilaterally; she had "no edema" and "no APD" (afferent pupillary defect); and her pupils were round and reactive.  However, Plaintiff did display bumps (2+ papillae) on her sclera, so the doctor diagnosed her with bilateral allergic conjunctivitis and recommended Plaintiff "decrease exposure to potential antigen" and use Zaditor twice a day and eye drops.  Dr. Levinsohn did not identify any specific antigens Plaintiff should avoid. (Dokko Dec., Ex. A at USA44-45.)

70.   On January 14, 2016, Plaintiff reported to Jennifer Shih-Yu Kung, M.D., with complaints

1   of persistent eye pain and pressure.  Other than some bumps (papillae) on her sclera, Plaintiff had

2   grossly normal findings on examination.  The doctor diagnosed Plaintiff with allergic conjunctivitis and

3   recommended continued allergy medications and eye drops.  (Dokko Dec., Ex. A at USA47-49.)

4        71.     On February 29, 2016, Plaintiff reported to Dr. Kung for follow-up on her eye pain.

5   Plaintiff alleged eye irritation and swelling with nausea, dizziness, and neck pain.  On examination,

6   Plaintiff reported mild improvement with topical anesthetic but reported continued swelling and pressure

7   in her eyes.  An intraocular pressure test revealed grossly normal findings, as did the physical exam of

8   her eyes.  The doctor recommended over the counter eye drops, cool compresses and antihistamines for

9   her allergy symptoms and referred her to a neurologist for her pain since the doctor did not identify an

10  ophthalmic basis for her complaints.  (Dokko Dec., Ex. A at USA50-53.)

11       72.     In a July 5, 2016 letter, Plaintiff's treating allergist, Dr. Young explained, "There isn't

12  any formal system for rating the severity of environmental irritants sensitivity" and stated that he had

13  "not performed allergy skin prick test for you on perfumes or any chemicals" because he did "not

14  consider it safe to perform skin prick test on relatively toxic chemicals."  (Dokko Dec., Ex. A at

15  USA54.)

16       73.     In a September 11, 2016 Work Status Report, Surekha Urva, M.D., opined that Plaintiff

17  "is not able to drive, she can work from home Monday to Friday."  The doctor did not provide any

18  objective clinical notes alongside this report nor did the doctor indicate the medical basis for the

19  opinion.  (Dokko Dec., Ex. A at USA10265.)

20       74.     On October 25, 2016, Plaintiff's neurologist, Alben C. Lui, M.D. placed Plaintiff off

21  work from September 24, 2016 through November 6, 2016 for an unidentified "serious health

22  condition."  The doctor also indicated, however, that Plaintiff could "return to full duties with no

23  restriction on November 7, 2016.  (Dokko Dec., Ex. A at USA3218.)

24       75.     On December 19, 2016, Dr. Lui wrote a letter on Plaintiff's behalf, indicating that he

25  treated Plaintiff for migraines with aura.  He also noted that Plaintiff "reports having certain scent being

26  triggers for her migraines."  (Dokko Dec., Ex. A at USA10268.)

27       76.     In a December 22, 2016 Work Status Report, Christopher Apostol Mascarinas, M.D.,

28  placed Plaintiff off work through January 30, 2017, but did not explain the medical basis for this

recommendation or provide objective clinical findings with the report.  (Dokko Dec., Ex. A at USA10269.)

77.    In work status reports dated February 21, 2017, and March 9, 2017, Dr. Mascarinas diagnosed Plaintiff with vertiginous syndrome and placed her off work from February 20, 2017 through June 6, 2017.  (Dokko Dec., Ex. A at USA10270-10271).

78.    On April 3, 2017, Dr. Gurung completed an FMLA form on Plaintiff's behalf.  In the form, the doctor stated that Plaintiff required 1-3 days off from work each month due to episodic flare-ups of a post-concussion syndrome.[3]  (Dokko Dec., Ex.A at USA86-91.)

79.    On May 5, June 19, June, 22, and June 29, 2017, Dr. Lui placed Plaintiff on modified activity at work and at home through December 21, 2017.  The doctor indicated that Plaintiff could not drive due to vertigo, but could work from home.  The doctor did not explain the frequency of Plaintiff's vertigo, or how it would interfere with driving but not her ability to perform the essential functions of her job.  The doctor did not provide any objective clinical notes alongside his letter.  (Dokko Dec., Ex. A at USA10272-10275.)

80.    On October 3, 2017, Dr. Lui completed a FMLA form on Plaintiff's behalf.  In the form, Dr. Lui indicated that he had treated Plaintiff for migraines and "chronic dizziness which makes it difficult to drive longer distances."  The doctor also indicated that Plaintiff's condition would "cause episodic flare-ups periodically preventing employee from performing [her] job functions," but did not identify the frequency of these flare ups or which job functions would be precluded.  (Dokko Dec., Ex. A at USA10278-10281.)

81.    On November 9, 2017, Dr. Lui provided a signed statement indicating that Plaintiff's headaches and dizziness made her feel unsafe to drive long distances but that she could work remotely or pursue other modes of transport.  (Dokko Dec., Ex. A at USA2161-2162.)

82.    On February 26, 2018, and May 30, 2018, Dr. Lui provided additional signed statements indicating that Plaintiff had "persistent vertigo despite medical treatment" that limited her ability to drive safely.  The doctor also indicated that Plaintiff had episodic flare-ups of the condition with

---

[3] At her February 1, 2021 deposition, Plaintiff testified that she experienced a head injury in 2011 while paintballing.  (Garbers Dec. Ex. L at 16:22-17:13:).

1   headaches "periodically preventing employee from performing [her] job functions" for an entire day

2   approximately four times each month.  (Dokko Dec., Ex. A at USA1698-1701; USA10287-10290.)

3     83. On September 7, 2018, Dr. Lui wrote a letter on Plaintiff's behalf.  In the letter, Dr. Lui

4   explained that he had treated Plaintiff since 2014 for chronic migraines.  Dr. Lui noted that Plaintiff's

5   symptoms included numbness, headache, neck pain, dizziness, and difficulty speaking.  The doctor

6   acknowledged, however, that Plaintiff displayed normal neurological findings on exam and that an April

7   2014 brain MRI "looked normal."  In the letter, Dr. Lui stated that Plaintiff "reports significant dizziness

8   that limits her ability to drive and walk longer distances.  She tells me that she is unable to drive more

9   than 2[-]3 blocks at a time.  After driving 2-3 blocks she would start feeling disoriented and would need

10  to rest for 5-10 minutes before she could start driving again.  Because of this, patient is unable to drive

11  herself to the office in Richmond.  In addition, she reports being hypersensitive to fragrances, and

12  certain lighting."  The doctor recommended Plaintiff be allowed to "work in an environment where

13  restrooms are close by, lighting that can be customized, and an environment free of triggering

14  fragrances."  (Dokko Dec., Ex. A at USA10292-10293.)

15    **F.** **The Agency's Offered Accommodations and Plaintiff's Ability to Telework**

16    84. From 2013 onward, Plaintiff reported a progressively increased sensitivity to odors,

17  fragrances and chemicals.  As discussed above, management investigated Plaintiff's allegations of odor

18  and chemical contaminations.  In addition, management offered Plaintiff 23 different cubicles on four

19  different floors of the building—this included offering Plaintiff cubicles reserved for team leaders,

20  which would not otherwise have been available to her.  (Dokko Dec. Ex. F at ¶¶ 13-14.)

21    85. Consistent with Dr. Young's recommendations of a "room which has isolated airflow

22  from other areas of the building" and "[r]emoval of airborne irritants as much as possible from work

23  environment" (Dokko Dec. Ex. A at USA124 and 619), Agency management offered Plaintiff 16

24  different enclosed offices[4]; installed locks and draft guards on her chosen enclosed offices; purchased

25  and provided Plaintiff with specialized masks as well as a commercial grade air purifier for Plaintiff's

26  exclusive use[5]; and ordered air quality tests (which yielded negative results).  (Dokko Dec. Ex. F at

27

28    [4] The last enclosed office offered was located away from public walkways.

  [5] The commercial grade air purifier was designed specifically for individuals with environmental

¶¶ 12-31.)  In addition, management provided a training to staff about hidden disabilities (including sensitivity to smells) and advised staff to avoid using scents in the workplace (Dokko Dec. Ex. B at USA427-428 and 657-659.)  Per Plaintiff's request, management also requested that her colleagues communicate with her via telephone or electronically, rather than in person, to avoid physical exposure to irritants. (Dokko Dec. Ex. F at ¶ 10.)  Management also excused Plaintiff from group meetings and trainings and offered Plaintiff one-on-one updates and trainings instead.  (Dokko Dec. Ex. F at ¶ 8-10.)

86.     On September 3, 2015, Plaintiff worked a full 8-hour shift plus credit hours while working from her enclosed, locked office with the air purifier.  (Dokko Dec. Ex. B at USA611.)

87.     Thereafter, in July 2016, Plaintiff alleged that she could not work from any of the enclosed offices offered, but did not provide any medical documentation in support of her claim.

88.     Management offered to investigate relocation and reassignment opportunities, but Plaintiff declined.  (Dokko Dec. Ex. B at USA1266-1279.)

89.     Plaintiff stopped coming to the office on July 21, 2016, but continued to telework at least one day a week.  (Garbers Dec. Ex. L at 152:6-17.)

**G.     Telework and Plaintiff's Inability to Work with the Agency's Laptops**

90.     In or around January 2014, management provided Plaintiff with an Agency laptop that would serve as her sole Agency computer and would allow her to participate in the office's pilot Telework program by working from home once each two-week pay period.  (Garbers Dec. Ex L at 141:1-5.)

91.     On August 5, 2015, management expanded Plaintiff's telework and allowed her to work from home once a week.  (Dokko Dec. Ex. F at ¶ 11.)

92.     Thereafter, Plaintiff reported that her Agency laptop was contaminated with unknown chemicals that caused her severe reactions while working.  (Garbers Dec. at Ex. L at 141-144.)  For example, in a November 18, 2015 email, Plaintiff alleged that someone had entered her locked office and sprayed a chemical on her laptop.  (Dokko Dec. Ex. B at USA No. 2200.)  She asserted that the laptop "caused rash and swelling" to break out on her body.  (*Id.*)  She testified that she had to wear

---

sensitivities and had a coverage area larger than her enclosed office. Management allowed Plaintiff to run this air purifier on a 24-hour basis and replaced the filters when needed.

gloves while using the laptop because it made her skin burn.  (Garbers Dec. Ex. L at 144-145.)  Plaintiff testified that she also had to wear gloves and a mask while using the laptop "because it was making my mouth swell. My eyes were swelling."  (*Id.* at 145:22-25.)  Plaintiff said she never fully recovered from these reactions, but would "just try to force my way through the next Wednesday."  (*Id.* at 146:3-16.)

93.    On November 25, 2015, Plaintiff contacted Mr. Dokko to report that the "laptop is still causing my hands to burn and even after it was wiped down eye swelling too."  (Dokko Dec. Ex. B at USA2199.)

94.    In response to Plaintiff's concerns, on December 8, 2015, Mr. Dokko provided Plaintiff with a new laptop.  (Dokko Dec. Ex. F at ¶ 26.)

95.    On January 7, 2016, management provided Plaintiff with a box of rubber gloves to use with her laptop.  (Dokko Dec. Ex. F at ¶ 28.)

96.    On March 8, 2016, management provided Plaintiff with another Agency laptop, her third. (Dokko Dec. Ex. F at ¶ 33.)  Management confirmed that Plaintiff's preferred SYSCO (systems employee), an individual who does not wear any fragrances, assigned her the third laptop (i.e., installed and configured Agency software on the laptop).  (*Id.*)  To avoid potential contamination, management allowed Plaintiff to take the laptop home with her each day.  (*Id.* at ¶ 34.)

97.    On April 14, 2016, Plaintiff contacted Mr. Dokko to explain that she continued "to wear gloves while working at home on the laptop and the laptop is still putting off odors that exacerbate my disability."  (Dokko Dec. Ex. B at USA2194.)

98.    During the Equal Employment Opportunity Commission (EEOC) hearing and at deposition, Plaintiff testified that she experienced severe reactions to her Agency laptop that precluded her from working more than one day a week—she testified that these symptoms sometimes didn't resolve by the next week.  (Garbers Dec. Ex. F at 111:3-11 and Ex. L at 144-146.)

99.    Plaintiff continued these complaints through the date of her removal.

100.    Plaintiff could not perform her job as a Benefit Authorizer on non-Agency equipment because, for security reasons, the proprietary applications could only be downloaded onto the Agency equipment.  (Garbers Dec. Ex. H at 165.)

### H.    The Agency's Reasonable Accommodation Decisions

101.    On November 30, 2015, Module Manager Mireille Hanft issued a decision on Plaintiff's October 28, 2015 request to "Work at Home By Exception" on a permanent basis.  In the decision, Ms. Hanft explained that Article 39 of the negotiated agreement between the Agency and union "expressly states that the exception [to work at home] is for a "limited period" and is not intended to be permanent."  For this reason, Ms. Hanft denied Plaintiff's request.  (Dokko Dec. Ex. D.)

102.    On June 23, 2016, Debby Ellis issued a decision denying Plaintiff's June 22, 2016 request to work at home as an accommodation for her allergies and chemical sensitivity.  In the decision, Ms. Ellis noted that management had already accommodated Plaintiff consistent with the recommendation of her treating allergist, Dr. Young.  In particular, Ms. Ellis observed that Plaintiff received an enclosed, private office with draft guards and an air purifier; the Agency purchased two different types of face masks for Plaintiff's exclusive use; indoor air quality tests were conducted and returned normal findings; sensitivity training was provided to employees in her module regarding hidden disabilities; and Plaintiff received individual updates in lieu of personally attending module group meetings.  Ms. Ellis observed that Plaintiff had not provided any objective medical documentation to support her claims that the accommodations her doctor recommended and the Agency provided were ineffective.  (Dokko Dec. Ex. E.)

103.    On July 13, 2016, Plaintiff submitted a letter in reply to Ms. Ellis' June 23, 2016 decision.  In her reply, Plaintiff acknowledged that her treating allergist had specifically opined that she could work from "a room which has isolated airflow from other areas of the building" and that the Agency had provided her with an enclosed office with a locked door and an air purifier.  Plaintiff argued, however, that the chemicals and scents still entered the room and exacerbated her condition.  Plaintiff also claimed that, that all three laptops the Agency provided were "contaminated."  (Dokko Dec. Ex. G.)

104.    On August 4, 2016, Ms. Ellis issued a decision in response to Plaintiff's reassessment request.  In the decision, Ms. Ellis explained that she had reviewed Plaintiff's letter, a letter from her doctor, and medical documentation Plaintiff had submitted. Ms. Ellis explained that the documents offered no "objective information for me to understand how the alternative accommodations provided are ineffective for your allergic condition."  For this reason, Ms. Ellis denied Plaintiff's request to work

from home full-time. (Dokko Dec. Ex. H.)

105.    On February 9, 2017, Debby Ellis issued a decision in response to Plaintiff's renewed request to work from home as an accommodation.  In the decision, Ms. Ellis explained that she had reviewed the medical documentation Plaintiff had submitted to management since the prior August 4, 2016 decision.  Ms. Ellis explained that the medical documentation did not describe Plaintiff's functional limitations, the extent of those limitations or recommend an accommodation that would assist her to perform the essential functions of her position.  Instead, "the documentation supports that you have been unable to work since 09/24/16, with the latest note dated 01/24/17 extending your time off work through 02/28/17."  For these reasons, Ms. Ellis denied Plaintiff's request to work at home as an accommodation.  (Dokko Dec. Ex. I.)

106.    Similarly, in an April 5, 2017 letter, Operations Manager James Dokko explained that he could not approve Plaintiff's March 20, 2017 request to Work at Home By Exception on a limited basis because her medical documentation did not support her request.  Mr. Dokko noted that the medical documentation placed her off work through June 6, 2017, and did not address her ability to commute to work.  (Dokko Dec. Ex. J.)

107.    On July 21, 2017, Mr. Dokko responded to Plaintiff's subsequent June 2017 request for Work at Home By Exception.  In the response, Mr. Dokko explained that he could not grant Plaintiff's request because the medical documentation she provided was "vague and inconsistent."  For example, Mr. Dokko observed that Plaintiff's doctor did not explain why her "migraines and vertigo only prevent you from driving to work, but not actually working."  Mr. Dokko also observed that the doctor did "not exclude alternative means of commuting to work (dropping off, public transportation, etc.)."  Finally, Mr. Dokko noted that based on Plaintiff's own admissions, "you presently are only able to work one day a week due to your condition."  For these reasons, he denied her request.  (Dokko Dec. Ex. K.)

108.    On August 21, 2017, Ms. Ellis informed Plaintiff that, while the building underwent seismic improvements, management would relocate her enclosed office space.  Ms. Ellis assured Plaintiff that she would receive "a similar work location with the same/similar set up as you have now as part of your reasonable accommodation[.]"  (Dokko Dec. Ex B at USA2164-2165.)

109.    On August 23, 2017, Plaintiff responded to Ms. Ellis' email with a renewed request to

work at home.  Plaintiff also expressed concerns regarding health and safety at the work site while the

building underwent improvements.  (Dokko Dec. Ex B at USA2163-2164.)

110.    Ms. Ellis responded within hours to Plaintiff's concerns by email.  In the email, Ms. Ellis

explained the steps the Agency would take to ensure the health and safety of all employees during the

seismic improvement construction; including routine air quality testing.  Ms. Ellis also noted that

Plaintiff would be located on a floor where there was no active construction was occurring.  In addition,

Ms. Ellis explained that Plaintiff's prior requests to work at home were denied, "because the supporting

medical documentation you provided failed to justify why the alternative accommodation the Agency

provided you were ineffective to allow you to work in the Frank Hagel Federal Building."  Ms. Ellis also

explained that the Agency had not approved her request to work at home by exception under Article 39

of the national agreement because she "didn't qualify under the Agency's requirements as stated in

Article 39."  (Dokko Dec. Ex B at USA2163.)

**I.      Plaintiff's Absence and the Return to Work Letter**

111.    From July 2016 onward, Plaintiff reported to work only remotely, on her assigned

telework day.  (Garbers Dec. Ex. L at 152:6-17.)

112.    In early February 2017, Plaintiff reached the maximum number of hours of advanced sick

leave permitted under Agency policy.  For this reason, management could grant Plaintiff sick leave only

on an accruing basis.

113.    By September 2017, Plaintiff had exhausted her 480 hours of FMLA leave and maxed

out the advanced annual leave of 160 hours.  (Garbers Dec. Ex. H at USA2290-2291.)

114.    Beginning in 2017, senior Agency officials instructed management Agency-wide to

scrutinize administrative forms of leave, such as LWOP, more carefully, prompting Plaintiff's managers

to review the medical documentation Plaintiff had submitted in support of her leave.  (Garbers Dec. Ex.

H at USA2230-2231.)

115.    On September 25, 2017, Assistant Module Manager and Plaintiff's first line supervisor,

Kris Chamrernlaksa, sent Plaintiff a letter advising her that the Agency concluded her medical

documentation no longer supported continued approval of LWOP.  Mr. Chamrernlaksa directed Plaintiff

to return to work by October 10, 2017. Mr. Chamrernlaksa explained that, alternatively, Plaintiff could

1   submit medical documentation to support her leave requests.  Mr. Chamrernlaksa explained that if

2   Plaintiff failed to provide sufficient medical documentation in support of her leave requests or return to

3   work by October 10, 2017, management would charge her absence as AWOL and that disciplinary

4   action, including removal, may result from continuing AWOL occurrences.  (Dokko Dec. Ex. L.)

5       116.    On October 3 2017, Plaintiff responded to the Return to Work letter with notes from her

6   doctor indicating that Plaintiff was unable to drive, but able to work from home.  (Dokko Dec. Ex. B at

7   USA1736.)

8       117.    Management found Plaintiff's medical evidence insufficient to support her absences.

9   Management marked Plaintiff as AWOL on the dates that she did not report to work (essentially all days

10  other than her approved work from home day).  By October 14, 2017, Plaintiff owed the Agency more

11  than 200 hours of advanced sick leave and more than 15 hours of advanced annual leave.  She had been

12  AWOL for at least 500 hours.

13      **J.      The Proposal to Remove**

14      118.    On May 11, 2018, Module Manager and Plaintiff's second line supervisor, Carmelita

15  Rivera issued a Notice of Proposed Removal (Proposal) to Plaintiff based upon the charge of Absence

16  Without Leave, with 70 specifications between October 17, 2017, and February 16, 2018.  (Dokko Dec.

17  Ex. M.)

18      119.    In discussing the nature and seriousness of the offense, the Proposal explained that

19  Plaintiff's "repeated and unapproved absence (AWOL) negatively" affected her ability to complete her

20  work and to perform the duties of her position.  The Proposal explained further that "[t]he Agency's

21  operational and staffing requirements require BAs to be at work when scheduled" and that Plaintiff's

22  repeated "absence places a strain on the office operations" and the Agency's ability to meet its public

23  service mission.  The Proposal explained that as a BA, i.e., Benefit Authorizer, Plaintiff encumbered a

24  position that is vital to the Agency.  (Dokko Dec. Ex. M.)

25      120.    The Proposal noted that Plaintiff was "on clear notice of the rule [she] violated and the

26  potential consequences."  For example, the September 25, 2017 return to work letter explained to

27  Plaintiff that failure to return to work or respond with medical documentation supporting her need for

28  LWOP as an accommodation would result in her absence being charged as AWOL and that disciplinary

1    action, including removal from federal service, could result.  (Dokko Dec. Ex. M.)

2        121.    The Proposal considered Plaintiff's past work record, length of service, performance,

3    ability to get along with fellow workers, and dependability.  The Proposal explained, however, that

4    Plaintiff's "recurring AWOL prevents you from performing the important duties of your position,

5    participating and attending in crucial training sessions regarding your job, and staying up to date with

6    changes in Agency policy and law that are needed to perform your job duties effectively."  (Dokko Dec.

7    Ex. M.)

8        122.    The Proposal also considered Plaintiff's potential for rehabilitation, but explained that

9    Plaintiff failed to report to work as described in the 70 specifications.  The Proposal also acknowledged

10   that Plaintiff had a medical condition affecting her "ability to commute," but explained that "the Agency

11   must have someone available for duty in your position."  (Dokko Dec. Ex. M.)

12       123.    The Proposal informed Plaintiff that Operations Supervisor James Dokko would make

13   the final decision on whether or not to remove her.  (Dokko Dec. Ex. M.)

14       **K.    Plaintiff's Response to the Proposal to Remove**

15       124.    Plaintiff submitted a written response to the Proposal on June 5, 2018 and an oral

16   response on June 11, 2018.  (Dokko Dec. Ex. B at USA1626-1634.)

17       125.    In her responses, Plaintiff acknowledged that she had not maintained consistent

18   attendance at work since July 2016 and only worked on her approved telework days, but argued that

19   management should have given her LWOP in lieu of FMLA instead of AWOL or allowed her to work

20   from home full-time as a reasonable accommodation.  (Dokko Dec. Ex. B at USA1626-1634.)

21       **L.    The Decision to Remove**

22       126.    Operations Manager James Dokko, Plaintiff's third-line supervisor, reviewed the facts set

23   out in the Proposal, the evidence associated with the Proposal, and Plaintiff's response.  Based upon his

24   review of the evidence, Mr. Dokko sustained the AWOL charge and adopted Ms. Rivera's Douglas

25   factor analysis.  Effective August 15, 2018, the Agency removed Plaintiff from her position as a Benefit

26   Authorizer.  (Dokko Dec. Ex. O.)

27       **M.    Administrative Process**

28       127.    On August 6, 2014, Plaintiff filed a formal EEO complaint (Agency No. SF-14-0624),

1   alleging that the Agency had failed to accommodate her since May 2014 and subjected her to

2   harassment in terms of Aretha Colston's and Tammie Doan's perfume use.

3       128.   On January 18 and 19, 2017, EEOC Administrative Judge Virginia Mellema held a

4   limited evidentiary hearing on Complainant's claims raised in Agency No. SF-14-0624, wherein five

5   witnesses testified.  (Garbers Dec. Ex. G.)

6       129.   On April 7, 2017, Judge Mellema issued a decision on Agency No. SF-14-0624.  In the

7   decision, Judge Mellema found, "Complainant has not established that she is a qualified individual with

8   a disability, and, as a consequence, she cannot establish a violation of the Rehabilitation Act on either

9   her harassment or failure to accommodate claims."  Judge Mellema discussed, at length, Plaintiff's

10  medical records including emergency room treatment records that tended to show minimal objective

11  support for Plaintiff's subjective allegations and more support for an inference that Plaintiff may have a

12  "psychological impairment that is interacting with her chemical sensitivity condition, which if treated,

13  might allow her to work in the Richmond Federal Building in the private office she has already been

14  provided."  Judge Mellema observed that in contrast to Complainant's inability to work in Richmond in

15  a private office with an air purifier, Complainant had been able participate in the two-day hearing in a

16  public building "with nothing more than a facemask on" without manifesting any symptoms of her

17  chemical sensitivity.  Judge Mellema concluded that Complainant was an individual with a disability,

18  but rejected as "less clear that *only* full-time telework would be an effective accommodation" especially

19  based on Complainant's acknowledged inability to work with the Agency's laptop.  Finally, Judge

20  Mellema made a point to state that she did not find an "open legal question about whether the Agency

21  engaged in a sincere effort to provide an effective accommodation" and that the undisputed evidence

22  showed that, "as a matter of law, the Agency engaged in good faith efforts to accommodate."  (Garbers

23  Dec. Ex. G (emphasis in original).)

24      130.   On October 5, 2018, Plaintiff filed a formal EEOC complaint (SF-19-0294-SSA) alleging

25  that the Agency had failed to accommodate her from June 2014 to August 2018 and subjected her to

26  disparate treatment, harassment, and retaliation (for prior EEO activity) in terms of leave, telework,

27  accommodation, and removal.  (Garbers Dec. Ex. J at USA3163.)

28      131.   On November 5, 2018, the Agency's EEO office issued a Final Agency Decision (FAD)

1  dismissing her complaint without a formal investigation because it was duplicative of claims pending

2  with the EEOC.[6]  (Garbers Dec. Ex. J at USA3164.)

3      132.    On December 20, 2018, the Agency, per order of the EEOC Administrative Judge who

4  handled Plaintiff's prior EEO complaints, rescinded the part of the November 2018 FAD that addressed

5  Plaintiff's removal.  (Garbers Dec. Ex. J at USA3164.)

6      133.    On January 30, 2019, the Agency issued a new FAD on Plaintiff's removal, finding that

7  Plaintiff had not been discriminated against when she was removed.  The FAD contained appeal rights

8  to the Merit Systems Protection Board (MSPB).  (Garbers Dec. Ex. J at USA3164.)

9      134.    After the Agency issued the January 2019 FAD, Plaintiff complained that it was not

10  properly investigated.  For this reason, on February 13, 2019, the Agency rescinded the January 2019

11  FAD for additional investigation.  (Garbers Dec. Ex. J at USA3164 n.2.)

12      135.    On March 10, 2019, Plaintiff filed an appeal with MSPB challenging her removal.

13      136.    The MSPB accepted the appeal, and in June 2019, held an evidentiary hearing.  (Garbers

14  Dec. Ex. H.)

15      137.    On September 30, 2019, the MSPB issued a decision sustaining Plaintiff's removal and

16  finding that the Agency had not subjected her to disparate treatment or reprisal for prior EEO activity.

17  The MSPB observed that "the agency took all effective means to provide [Plaintiff] with a scent-free

18  work area" and that full time telework "would not have been an effective accommodation" because

19  Plaintiff testified that she could not work on any government provided laptop.  (Garbers Dec. Ex. I.)

20      138.    On December 3, 2019, Plaintiff initiated this district court action.  (ECF 20.)

21  **III.    STANDARD OF REVIEW**

22      The purpose of summary judgment is to identify and dispose of factually unsupported claims.

23  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment is appropriate "if the

24  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

25  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment "is [also] appropriate for 'part

26

27      [6] By this date, Plaintiff had filed seven formal EEO complaints against the Agency raising the
same allegations of disparate treatment, harassment, reprisal, and denial of reasonable accommodation.
28  (SF-16-0264-SSA; SF-17-0039-SSA; SF-17-0411-SSA; SF-17-0526-SSA; SF-17-0799-SSA; SF-18-
0328; SF-18-0604).

of each claim or defense' provided that" these conditions are met. *Offield v. Holder*, No. 12-CV-03053-JST, 2014 WL 1892433, at *4 (N.D. Cal. May 12, 2014). A dispute is "genuine" only if there is sufficient evidence from which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "material" if the fact may affect the outcome of the suit under the governing law. *Id.*

"When judging the evidence at the summary judgment stage, the district court is not to make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). That said, summary judgment must be granted where the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. The party moving for summary judgment has no burden to produce any evidence on elements of a claim on which the non-moving party will bear the burden at trial, but can merely point out an absence of evidence to support any such element. *Celotex*, 477 U.S. at 322-23. Once the moving party does so, the non-moving party must present specific evidence to show there is a genuine issue for trial. *Id.*

The mere existence of a "scintilla" of evidence in support of the non-moving party's position is insufficient; the non-moving party must offer sufficient evidence on which a finder of fact could reasonably find for him. *Anderson*, 477 U.S. at 252; *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) ("[A] mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint.") (internal quotation marks omitted). Indeed, the mere suggestion that facts are in controversy, in combination with conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## IV.   ARGUMENT

Plaintiff alleges the Agency subjected her to harassment, disparate treatment, and retaliation with respect to her chemical sensitivities; and that the Agency failed to accommodate her sensitivity to strong scents and fragrance in the workplace and improperly removed her from federal service. The undisputed

facts tell a different story.

### A.   The Facts Make Clear Plaintiff Was Not Subjected to Harassment.

#### 1.   Legal Standard–Proving Harassment

To establish harassment/hostile work environment, Plaintiff must show five things.  First, Plaintiff must be a member of a statutorily protected class.  Second, the Agency must have engaged in unwelcome verbal or physical conduct.  Third, the unwelcome conduct must be based on Plaintiff's statutorily protected class.  Fourth, the unwelcome conduct must have either (a) affected a term or condition of employment, or (b) had the purpose or effect of unreasonably interfering with the work environment or created an intimidating, hostile, or offensive work environment.  Fifth, there must be a basis for imputing liability to the employer.  *Manatt v. Bank of America, NA*, 339 F. 3d 792, 798-799 (9th Cir. 2003); *Landucci v. State Farm Insurance Co.*, 65 F. Supp. 3d 694, 703-704 (N.D. Cal. 2014).

The alleged harasser's conduct is evaluated from the objective viewpoint of a reasonable person in the plaintiff's circumstances.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787-788 (1998).  Further, the incidents must have been sufficiently severe and pervasive to alter the conditions of plaintiff's employment and create an abusive working environment.  *Faragher*, 524 U.S. at 788 (courts are directed to look at that the frequency and severity of the conduct to filter out complaints addressing "the ordinary tribulations of the workplace").  Absent "specific and substantial" evidence that supports an inference of discriminatory animus, such as criticism of the protected basis, a harassment claim must fail.  *See Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1062 (9th Cir. 2002).

#### 2.   The Incidents Alleged Do Not Amount to Harassment

The incidents alleged in the complaint do not demonstrate that Agency management subjected Plaintiff to unwelcome verbal or physical conduct based upon her alleged disability.  On the contrary, almost as soon as management became aware of that Plaintiff was affected by a co-worker's strong perfume at work, management took prompt action to address the perfume use.  (Fact Nos. 20-32.)[7]

Whether an Agency's response to complaints of harassment was appropriate depends on the severity and persistence of the harassment and the effectiveness of any initial remedial steps.  *Swenson*

---

[7] "Fact Nos." are citations to the numbered paragraphs in the Statement of Undisputed Facts set forth above.

1    *v. Potter*, 271 F. 3d 1184, 1192 (9th Cir. 2001) (Postal Service fulfilled its obligation to take prompt

2    corrective action by separating employee from alleged harasser and investigating the complaint).  Here,

3    the Agency's response to Plaintiff's complaints was prompt and appropriate in light of Plaintiff's

4    allegations at that time.  Plaintiff first told her first line supervisor, Ms. Carter, that she was having a

5    reaction to a co-worker's perfume in approximately late November or early December 2013.  (Fact No.

6    22).  On December 6, 2013, before Ms. Carter had a chance to discuss the co-worker's perfume use,

7    Plaintiff escalated her concerns to her second-line supervisor Ms. Hanft who took prompt and immediate

8    action.  (Fact Nos. 25-27.)  Ms. Hanft (1) talked to both Plaintiff and Ms. Colston, (2) asked Ms. Colston

9    to wear less perfume because of a coworker's sensitivity to it, (3) received Ms. Colston's assurance that

10   she understood the problem and was volunteering to stop wearing perfume to work altogether, and (4)

11   reported back to Plaintiff the fruits of her discussion the same day.  (Fact Nos. 23-26.)  Plaintiff

12   acknowledged that Ms. Colston stopped using perfume for some time.  (Fact No. 27.)  Moreover, this

13   management action appeared effective because Plaintiff did not report having allergic reactions to strong

14   perfumes or scents for the next five or six months.  (Fact Nos. 27-28.)  *See*, *e.g.*, *Fuller v. City of

15   Oakland, Cal.*, 47 F.3d 1522, 1528-1529 (9th Cir. 1995) (effectiveness of an employer's corrective

16   actions evaluated by whether there were further incidents of harassment).  For these reasons,

17   management's prompt and effective response did not create or condone an objectively hostile work

18   environment based on Plaintiff's sensitivity to scents.

19        When Plaintiff next reported that Ms. Colston was wearing perfume again and it was causing her

20   to sneeze all day, her new first-line supervisor took prompt action.  (Fact Nos. 28-31.)  Ms. Doan (1)

21   addressed the issue immediately with both employees; (2) moved Plaintiff to a different cubicle so that

22   she would not smell her co-worker's perfume; and (3) told Plaintiff she could use an air purifier at work.

23   In addition, management also moved Ms. Colston to a workstation away from Plaintiff.  (Fact Nos. 28-

24   31.)  Ms. Doan's response to Plaintiff's report of unwelcome perfume use was prompt and appropriate,

25   and similarly demonstrates that she did not create or condone an objectively hostile work environment.

26        Management's response to the timekeeper's SKYPE message was similarly prompt and

27   appropriate.  Upon learning of the message, Agency management removed the employee's timekeeper

28   duties, thereby rendering him without any reason to have contact with Ms. Tom or knowledge of her

absences.  (Fact Nos. 35-36.)  Employers are not liable for coworker harassment when they take immediate and corrective action.  *Smith v. Cty. of Humboldt*, 240 F. Supp. 2d 1109, 1118–19 (N.D. Cal. 2003) ("In hostile work environment cases in which the alleged harasser is a coworker, this circuit's courts apply a negligence standard which means that an employer is liable only for harassment about which the employer 'knew or should have known.'"); *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001) (no basis for imputing liability to the agency for coworker harassment where the agency "take[s] prompt corrective action that is reasonably calculated to end the harassment").

Plaintiff also alleges that Ms. Doan harassed her by wearing perfume during a meeting on June 3, 2014, when Ms. Doan allegedly knew or should have known it would trigger Plaintiff's allergies. However, when Plaintiff told Ms. Doan, on June 3, 2014 that Plaintiff was bothered by Ms. Doan's perfume, Plaintiff simply moved herself from inside the cubicle to outside the cubicle and the meeting continued.  (Fact No. 39.)  Plaintiff does not allege Ms. Doan sprayed perfume on herself in Plaintiff's presence but simply that Ms. Doan smelled fragrant.  Ms. Doan also was unaware before June 3, 2014, that Plaintiff had a sensitivity to Ms. Doan's perfume because until that date, she had only ever reported a sensitivity to Ms. Colston's perfume.  (Fact Nos. 38-39.)  It would be unreasonable to find harassment based on Ms. Doan's regular practice because she did not yet know the extent of Plaintiff's sensitivities and doing so would elevate an unwitting mistake into intentional mistreatment.  Plaintiff's other allegations that Ms. Doan harassed her by wearing perfume to other meetings are nonspecific and unsubstantiated.  (Fact Nos. 40.)

Moreover, Ms. Doan's allegedly harassing acts of walking by Plaintiff during the workday or riding the elevator with her on one occasion (Fact Nos. 41,43) are within the bounds of reasonable supervisory behavior.  *See Vance v. Ball State Univ.*, 570 U.S. 421, 452 (2013) (Ginsburg, J., dissenting) (antidiscrimination laws do not protect against "the ordinary tribulations of the workplace" or "generally boorish conduct").  Moreover, a group of isolated incidents do not create a hostile work environment unless the conduct is very severe.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[I]solated incidents (unless extremely serious) will not amount to discriminat[ion]"); *DiFruscio v. Apfel* (Soc. Sec. Admin.), EEOC DOC 01982006, 2000 WL 1368134 (Sep. 13, 2000) (finding that six isolated incidents, even when viewed in a group, did not state a claim of harassment).

Even accepting Plaintiff's allegations as true (for the limited purpose of this motion) that Ms. Doan suggested Plaintiff sit next to Ms. Colston at a staff meeting and then laughed when Plaintiff declined (Fact Nos. 38), does not give rise to objectively severe or pervasive enough conduct to rise to the level of harassment.  Plaintiff may characterize the conduct as "rude" and distasteful but it is well settled that remarks, however rude or abrasive, without concrete action are not sufficient to state a claim of harassment.  *Vance*, 570 U.S. at 452.

Finally, Plaintiff repeatedly alleges that un-identified co-workers harassed her by spraying her workstation with chemicals and fragrances.  (Fact Nos. 32.)  Agency management, OEHOS and facilities investigated these allegations and found no evidence to substantiate them.  (Fact Nos. 32-34.)  Nor has Plaintiff provided any evidence to support these claims.  Management nevertheless attempted to address Plaintiff's concerns by installing a lock on her office door and instructing employees to communicate with Plaintiff solely by email, instant message, or telephone.  (Fact No. 85.)  In addition, management provided sensitivity training on hidden disabilities and instructed employees to avoid perfume use in the office.  (Fact No. 85.)  Accordingly, Plaintiff cannot point to facts sufficient to establish a hostile work environment.

### B.    The Agency Properly Handled Plaintiff's Requests for Accommodation

#### 1.    Legal Standard – Reasonable Accommodation

To establish a prima facie case of failure to accommodate under the Rehabilitation Act, a plaintiff must show that (1) she was a qualified individual with a disability; (2) Agency management had notice of the disability; (3) Agency management failed to reasonably accommodate her disability.  *See* 29 C.F.R. § 1630.9.

#### 2.    Plaintiff Has Not Established that She is a Qualified Individual with a Disability

A "qualified" individual with a disability is one who satisfies the requisite skill, experience, education and other job related requirements of the employment position such individual holds, and who, with or without reasonable accommodation, can perform the essential functions of the position.  *See* 29 C.F.R. § 1630.2(m).  Plaintiff has informed management that she is unable to work with the Agency laptops provided to her due to her allergies.  (Fact Nos. 92-99.)  These laptops are the only

1   computer Plaintiff can utilize to access the Agency network.  (Fact No. 100.)  Without an Agency

2   computer, Plaintiff cannot perform the essential functions of her position either at home or in the office.

3   She is therefore not a "qualified" individual with a disability.

4         Similarly, Plaintiff testified that she experiences daily migraines with aura that are so severe that

5   she must treat them with medication that makes her too drowsy to perform normal activities of daily

6   living.  (Fact No. 5.)  Plaintiff's migraines are so severe that OPM approved Plaintiff's disability

7   retirement application finding her "to be disabled for [her] position as a Benefit Authorizer due to

8   Migraine with Aura and Vertigo."  (Fact No. 6.)  Plaintiff's migraines also render her unqualified to

9   perform the essential functions of her job, with or without an accommodation.

10           **3.**     **The Agency Provided the Majority of Requested Accommodations And**
                 **Permissibly Denied the Request to Work at Home Full-Time**

11

12         Plaintiff has failed to demonstrate she is a qualified individual with a disability.  Therefore, she is

13   ineligible for reasonable accommodation.  Even if she were a qualified individual with a disability, the

14   Agency has provided effective accommodations and Plaintiff has failed to identify evidence to show her

15   request to work from home full-time was either a necessary or effective form of accommodation.

16         As discussed above in the statement of undisputed facts, the Agency at first permitted Plaintiff to

17   bring an air purifier to the office, which she chose not to do.  (Fact No. 30.)  Thereafter, the Agency

18   obtained a large ventilation fan and installed it at Plaintiff's cubicle.  (Fact No. 32).  Management also

19   provided Plaintiff with different types of masks, per her request.  (Fact Nos. 85, 102.)

20         The Agency conducted air quality testing which resulted in normal findings.  (Fact No.85, 102.)

21   Management excused Plaintiff from group meetings and provided her one-on-one updates instead.  (Fact

22   Nos. 85.)  Management directed coworkers to communicate with Plaintiff only by electronic means

23   instead of in person, per Plaintiff's request.  (Fact No. 85.)  Module management, CREO, and the

24   Regional Commissioner issued training and reminders about hidden disabilities, and module

25   management specifically advised staff to avoid using perfumed products in the workplace.  (Fact Nos.

26   85, 102.)  *Hawkins v. Counseling Assocs., Inc.*, 504 F. Supp. 2d 419, 437 (E.D. Ark. 2007) (employer

27   reasonably accommodated scent-sensitive employee by asking other "employees . . . as a whole and

28   individually, to stop wearing perfume"); *Plaintiff v. Donahoe* (USPS), EEOC DOC 0120132469, 2013

1    WL 5876916 (Oct. 22, 2013) (Agency reasonably accommodated Plaintiff where they provided service

2    talks to other employees requesting they refrain from wearing strong fragrances.).

3           Management issued Plaintiff at least three different laptops, which they allowed Plaintiff to take

4    home to avoid "contamination."  (Fact Nos. 90-96.)  Management offered Plaintiff 16 different private

5    enclosed office spaces, the last of which was away from public walkways.  (Fact No. 85.)  Management

6    installed a lock on Plaintiff's office door as well as draft guards around the doorframe to isolate airflow.

7    (Fact No. 85.)  Management purchased a commercial grade air purifier designed specifically for

8    individuals with Plaintiff's claimed sensitivities and which had a coverage area larger than her enclosed

9    office.  (Fact No. 85.)  Management allowed Plaintiff to run this air purifier on a 24-hour basis and

10   replaced the filters when needed.  (Fact No. 85.)  Management even offered to explore transfer and

11   reassignment, which Plaintiff declined. (Fact No. 88.)

12          Plaintiff's only outstanding accommodation request was for full-time work from home.  But,

13   Plaintiff has not demonstrated why this would be necessary or even effective.  As an initial matter, it is

14   important to note that a disabled employee is not entitled to the accommodation of her choice, but only a

15   reasonable accommodation.  *See, e.g., Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000),

16   ("[A]n employer is obligated to provide a qualified individual with a reasonable accommodation, not the

17   accommodation he would prefer.").

18          Moreover, the employer is entitled to require medical documentation that supports a reasonable

19   accommodation request, especially where the nexus between the alleged impairment and requested

20   accommodation is unclear.  *See Allen v. Pacific Bell*, 348 F.3d 1113, 115 (9th Cir. 2003) (It is an

21   employee's responsibility to submit medical documentation supporting a requested accommodation);

22   *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1309 (D.C. Cir. 2010) ("When the need for an

23   accommodation is not obvious, an employer, before providing a reasonable accommodation, may

24   require that the individual with a disability provide documentation of the need for accommodation.").

25   The Agency is not required to provide an accommodation if an employee does not provide relevant

26   medical documentation.  *See Enforcement Guidance*, 2006 WL 4673363, Question 6 (if an individual

27   refuses to provide reasonable medical documentation she is not entitled to reasonable accommodation).

28          The only evidence that potentially supports working from home full-time is the September 2015

1   Reasonable Accommodation Suggestions form from Dr. Young, in which he suggested that *either* "a

2   room which has isolated airflow from other areas of the building (possibly airflow from outside of

3   building) or possibly work from home" would allow Plaintiff to perform her job.  (Fact No. 68.)

4   Nothing about Dr. Young's statement requires the Agency to choose telework; on the contrary, Dr.

5   Young only suggests that working from home is possibly effective.  Moreover, Plaintiff never submitted

6   any documentation from Dr. Young, or any of her other providers, indicating that the accommodations

7   the Agency provided her, as suggested by Dr. Young, were ineffective.  For these reasons, it was

8   reasonable for the Agency to pursue the accommodation of a locked, enclosed private office with a

9   commercial grade air purifier and door draft guards.

10         In short, Plaintiff has not introduced evidence to support a claim that what the Agency provided

11   was insufficient.  She has also not submitted evidence that working from home full time would be

12   effective.  Indeed, because she reports that she is allergic to her Agency laptop, which she would have to

13   use to access Agency networks necessary to perform her work, she cannot show that working from

14   home would permit her to perform the essential functions of her position.  (Fact Nos. 90-100.)

15   Moreover, Plaintiff reports daily migraines with aura and that the associated treatment makes her too

16   drowsy to perform normal activities of daily living.  (Fact Nos. 5-6.)  Thus, based on Plaintiff's own

17   testimony, full-time telework would not be effective.

18         **C.**    **The Agency Properly Removed Plaintiff After She Failed to Consistently Report to**
                     **Work Over a Four Month Period**

19

20                 **1.**    **The Legal Standard – Proving the AWOL Charge**

21         The Agency has the burden of proving its removal charges by a preponderance of the evidence.

22   *See* 5 C.F.R. § 1201.56(b)(1)(ii).  If an agency proves its charge, it must show that discipline in some

23   form is warranted to promote the efficiency of the service and that the penalty imposed is within the

24   tolerable limits of reasonableness.  *See* 5 C.F.R. § 752.403(a).

25         An agency may charge AWOL when the employee is absent without requesting leave, or when

26   an employee requested leave but the agency properly denied the request.  *Savage v. Dept. of Army*, 122

27   M.S.P.R. 612, 629 (2015).  "If the employee requested LWOP for the periods when she was placed in an

28   AWOL status, the [Court] will examine the record as a whole to determine if the denial of LWOP was

1  reasonable under the circumstances." *Id.* (citing *Joyner v. Dept. of the Navy*, 57 M.S.P.R. 154, 159

2  (1993)).  "Ordinarily, when an employee who is incapacitated for duty has exhausted all of her leave, an

3  agency may properly deny her LWOP request where there is no foreseeable end in sight to her absences

4  and where those absences are a burden on the agency." *Id.* at 629-630.

5       **2.**     **The Agency Properly Removed Plaintiff for 70 Separate AWOL Occurrences**

6       The Agency properly charged Plaintiff with AWOL after she exhausted all forms of leave,

7  continued to fail to report to work, and failed to provide sufficient medical documentation in support of

8  her absence.  The Agency reasonably removed Plaintiff after 70 separate AWOL occurrences.

9       On September 25, 2017, the Agency sent Plaintiff a letter advising her that the medical

10  documentation did not support continued approval of LWOP.  (Fact No. 115.)  In the letter, management

11  directed Plaintiff to return to work by October 10, 2017.  (Fact No 115.)  Alternatively, the letter advised

12  Plaintiff she could submit medical documentation to support continued LWOP as a reasonable

13  accommodation.  (Fact No. 115.)

14       As discussed above, the medical documentation Plaintiff submitted did not indicate that Plaintiff

15  could only work from home, and there was some evidence to suggest a "psychological component" to

16  the symptoms Plaintiff described.  (Fact Nos. 55-57, 68.)  Plaintiff submitted medical documentation

17  that said she could not drive to work because of dizziness, but which stated that she could do the work as

18  long as no driving is needed.  (Fact Nos. 79-81.)  But, the medical documentation did ***not*** establish that

19  Plaintiff was unable to use alternate methods to get into the office.  Nor did the medical documentation

20  establish that Plaintiff could not work from the locked, private enclosed office space with an air purifier

21  that management provided.  The medical documentation did ***not*** establish that Plaintiff could ***only*** work

22  from home.  In other words, it is undisputed that Plaintiff did not report to work as charged in the

23  Proposal.  The question is whether the Agency permissibly charged her with AWOL or whether it

24  should have approved her request for LWOP.

25       Plaintiff's demand for extensive leave (including LWOP) was based on her say-so that she could

26  not work more than one day per week because of symptom exacerbation from using her laptop, and on

27  her say-so that working from home was the only viable option because she could not drive to the office

28  or tolerate the office environment.  The medical documentation she provided did not establish this.

Federal case law permits agencies to base leave decisions on medical documentation as opposed to an employee's say-so. *See Ali v. Brown*, 998 F. Supp. 917, 922 (N.D. Ill. 1998) ("[I]t is reasonable for an agency to deny an employee LWOP where the employee has failed to return to work or submit medical evidence to justify the absence after being directed to do so and warned that failure to do so could result in discipline."). Therefore, even though Plaintiff requested LWOP, the Agency properly denied that request and charged her with AWOL. *Campana v. Dep't of Navy*, 873 F.2d 289, 291 (Fed. Cir. 1989) (finding that denial of additional LWOP was supported by evidence that employee already received 400 hours of LWOP after exhausting sick leave).

As indicated in the Notice of Proposed Removal, Plaintiff's AWOL negatively affected her ability to perform the important duties of her position as well as participate in and attend crucial trainings. (Fact No. 118-119.) While the Agency empathizes with the fact that Plaintiff's medical condition may affect her ability to commute to work, the Agency permissibly charged her with AWOL. *See Robinson v. Bodman*, 333 Fed. Appx. 205, 208 (9th Cir. 2009) (Federal employer's refusal to allow employee to work from home to accommodate inability to drive to work did not violate Rehabilitation Act)(unpublished); *see also Salmon v. Dade County School Board,* 4 F.Supp.2d 1157, 1163 (S.D.Fla.1998) (an employer is not required to eliminate barriers which exist outside the work environment such as commuting). Removal is a permissible penalty for over 500 hours of AWOL.

### 3. Plaintiff Experienced Severe Reactions to her Agency Laptop As Well As Daily Migraines that Prevented her from Performing her Job Duties

Much of Plaintiff's argument before the Court is premised on her contention that the Agency should have permitted her to work from home full-time as a reasonable accommodation. As discussed above, the medical documents Plaintiff submitted did not support the contention that full-time telework was the only possible effective accommodation. Additionally, Plaintiff's argument that the Agency should have provided her full-time telework is inconsistent with her allegations that using the Agency-provided laptops caused severe reactions that made her unable to work more than a day per week. (Fact Nos. 90-100). In response to Plaintiff's allegations that her laptops were contaminated with unknown chemicals, management provided Plaintiff with new laptops; honored her request to have a particular SYSCO (systems person), who does not wear any fragrances, assign her laptop; and allowed her to keep

1   her laptop at home to avoid potential exposure to other chemicals and fragrances.  (Fact Nos. 90-96.)

2   Despite these measures, Plaintiff informed management that she continued to experience severe

3   reactions to her laptop while using it at home and, from approximately July 2016 until the date of her

4   removal, Plaintiff worked only on her assigned telework day due to the recovery time she said she

5   required after using her Agency laptop from home.  (Fact Nos. 97-99.)

6        Plaintiff's argument that the Agency should have provided her full-time telework is also

7   inconsistent with her allegations that she experienced incapacitating daily migraines with aura and that

8   the associated treatment made her too drowsy to perform normal daily activities.  (Fact Nos. 6-7.)

9        In sum, taking Plaintiff at her word, there is no evidence that, even if the Agency had provided

10  full-time telework, Plaintiff could have worked on the days for which AWOL was charged.  The Notice

11  of Proposed Removal identified how Plaintiff's extremely limited ability to do work (at home or

12  otherwise) negatively impacted the work unit.  (Fact Nos. 118-122.)  *See Bologna v. Dep't of Defense*,

13  73 M.S.P.R. 110 (1997) (LWOP properly denied because no foreseeable end to absence and hardship on

14  the agency).  Accordingly, the evidence does not support Plaintiff's argument that the Agency should

15  have provided her with full-time telework.

16      **D.**    **The Agency Did Not Retaliate or Discriminate Against Plaintiff**

17        Because Plaintiff's retaliation and discrimination claims require a similar analysis of the record

18  evidence, the Agency addresses them together below.

19           **1.**    **The Legal Standard – Proving Disparate Treatment**

20        For claims of disparate treatment, the Supreme Court has adopted a three-step analysis.

21  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Through this analysis, the Plaintiff must

22  establish a prima facie of discrimination by presenting facts that, if unexplained, reasonably give rise to

23  an inference of discrimination, i.e., that a prohibited consideration was a factor in the adverse

24  employment action.  *Id*. at 802.  To establish a prima facie case of discrimination, Plaintiff must show

25  that (1) she is a member of a protected group; (2) she was the recipient of an adverse employment

26  action; and (3) she was treated different from similarly situated employees outside of her protected

27  group.  *Id.*; *Peterson v. Hewlett-Packard Co*., 358 F.3d 599, 603 (9th Cir. 2004).

28        If Plaintiff establishes a *prima facie* case, the burden shifts to the Agency to articulate a

legitimate, non-discriminatory reason for its employment decision.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).  This burden is one of production, not persuasion.  *Id.* ("If the plaintiff establishes a prima facie case, the burden of production—but not persuasion—then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.").

### 2.      Legal Standard – Proving Retaliation

In order to state a *prima facie* case of retaliation, an employee must establish:  (1) she engaged in prior protected activity; (2) the Agency subsequently subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action.  *See Villiarimo*, 281 F.3d at 1064.  To demonstrate a causal connection, an employee bears the burden of presenting "evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action."  *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

Once the employee has established a prima facie case of retaliation, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment decision.  *Chuang v. Univ. of Cal. Davis, Bd. Of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000).  If the employer is successful, the employee must then prove by a preponderance of the evidence that the proffered reasons are pretext for retaliation or that a discriminatory reason more likely motivated the employer's action.  *Munoz v. Mabus*, 630 F.3d 856, 865 (9th Cir. 2010).

### 3.      Plaintiff Has Failed to Demonstrate a Prima Facie Case of Disparate Treatment or Retaliation

Plaintiff has failed to demonstrate a prima facie case of disparate treatment or retaliation.  As to her claim of disparate treatment, Plaintiff has made no attempt to identify a similarly situated employee, outside of her protected class, that management treated more favorably.  As to her retaliation claim, Plaintiff has failed to identify a causal link between her protected activity and the adverse action.  Further, Plaintiff has failed to present any evidence that discriminatory animus motivated the Agency's actions.  Thus, Plaintiff has failed to demonstrate a prima facie case of disparate treatment or retaliation.

The record evidence makes clear that Agency management did not subject Plaintiff to disparate treatment or retaliation when deciding to remove her for AWOL.  Here, Plaintiff acknowledges that, during the relevant period, she was incapacitated for duty, exhausted all of her leave, and there was no

1   foreseeable end in sight to her absences.  As such, Agency management properly removed Plaintiff for

2   AWOL.  Plaintiff has failed to present any evidence, much less preponderant, that discriminatory

3   animus motivated the Agency's action.  Regarding reasonable accommodation, management

4   accommodated Plaintiff consistent with the recommendations of her treating allergist.  Accordingly,

5   Plaintiff cannot point to facts sufficient to establish disparate treatment or retaliation.

6           **4.**      **The Agency Articulated Legitimate, Non-Discriminatory Reasons for its Actions and Plaintiff Cannot Show that these Reasons are Pretext for**

7                            **Discrimination or Retaliation**

8   As discussed above, the Agency articulated legitimate non-discriminatory reasons for denying

9   Plaintiff's reasonable accommodation request for full-time telework and for removing Plaintiff from

10  federal service.  Plaintiff has failed to present any evidence that the Agency's articulated legitimate non-

11  discriminatory reasons are pretext for discrimination.  Accordingly, Plaintiff cannot point to facts

12  sufficient to establish retaliation or discrimination.

13        **E.**      **The Agency Properly Dismissed Plaintiff's EEO Complaint**

14  In her complaint to this Court, Plaintiff also appears to argue that the Agency should re-

15  investigate her EEO claims surrounding her removal and issue a new decision on these claims.  For the

16  reasons set forth below, the Agency properly dismissed Plaintiff's EEO complaint.  In any event,

17  complaints about the administrative process are not actionable.

18        **1.**      **Legal Standard**

19  The federal regulations at 5 C.F.R. § 1201.154(b) provide that where an employee had filed a

20  timely formal EEO complaint, the employee may file an MSPB appeal either within 30 days of the

21  FAD, or, if the Agency has not issued a FAD, within 120 days of the complaint the employee "may

22  appeal the matter directly to the Board at any time after the expiration of 120 calendar days."  Similarly,

23  29 C.F.R. § 1614.302(d)(1)(i) provides that if a FAD is not issued within 120 calendar days, the

24  "complainant may appeal the matter to the MSPB any time thereafter … or may file a civil action."

25  MSPB case law consistently holds that once the 120 days expires, an employee is entitled to the MSPB

26  hearing.  *See Zygas v. U.S. Postal Serv.*, 116 M.S.P.R. 397, 400 n. 2 (2011); *Galvan v. E.E.O.C.*, 113

27  M.S.P.R. 322, 325 (2010).

28  EEOC regulations require an Agency to dismiss "an entire complaint" where the employee "has

1    raised the matter in [] an appeal to the Merit Systems Protection Board" and the record indicates the

2    complainant "has elected to pursue the non-EEO process." 29 C.F.R. § 1614.107(a)(4).

### 2.    The Agency Properly Dismissed Plaintiff's EEO Complaint

4    Because Plaintiff filed her formal EEO complaint on October 5, 2018, on Monday, February 4,

5    2019 (the first business day after the 120-day period), she had the right to go to the MSPB under 5

6    C.F.R. § 1201.154(b) and 29 C.F.R. § 1614.302(d)(1)(i).  (Fact No. 130.)  By filing with the MSPB on

7    March 10, 2019, she exercised that right.  (Fact No. 135.)  Thus, she elected the MSPB appeal process to

8    challenge her removal.  Because Plaintiff filed her appeal with the MSPB, and the MSPB accepted

9    jurisdiction, SSA was required to dismiss the EEO complaint.  (Fact Nos. 135-136.)  *See* 29 C.F.R.

10   §1614.302(c)(2)(ii) (Under 29 C.F.R. § 1614.107(a)(4), an agency is required to dismiss a complaint

11   over which the MSPB assumes jurisdiction).

12   As Plaintiff points out, the Agency had indicated that it would reissue a FAD after doing another

13   investigation.  However, because Plaintiff elected to proceed with the MSPB process—as opposed to

14   letting the Agency do another investigation and issue a new FAD, any new FAD would be irrelevant to

15   MSPB's analysis of Plaintiff's claims.  In the circumstances of this case, any FAD the Agency might

16   issue would be *ultra vires* and of no legal significance under 29 C.F.R. §§ 1614.302(c)(2)(ii) or

17   1614.107(a)(4).  Thus, because Plaintiff elected to proceed at MSPB, there was nothing improper about

18   the Agency dismissing her EEO complaint.

### 3.    Regardless, No Cause of Action Exits for Challenges to the EEO Claims Processing

21   In any event, any complaints about the EEO process are not actionable in federal court.  Even if

22   the EEOC or Agency had improperly handled Plaintiff's complaint, no cause of action exists for

23   challenges to the processing of an EEO complaint.  A "plaintiff cannot rely on the allegations of

24   mishandling of his EEO complaints … as constituting, of itself, a violation of Title VII or the

25   Rehabilitation Act."  *Hill v. England*, No. CVF05869RECTAG, 2005 WL 3031136, at *3 (E.D. Cal.

26   Nov. 8, 2005) ("[I]t nonetheless remains the law that an independent claim based on the mishandling of

27   an EEO complaint cannot be stated under Title VII or the Rehabilitation Act"); *see also Jordan v.*

28   *Summers*, 205 F.3d 337, 342 (7th Cir. 2000) (Plaintiff's claim that the agency "botched the processing of

his [EEO] complaint . . . does not state a claim upon which relief can be granted.").

**V.     CONCLUSION**

For all the foregoing reasons, there are no genuine issues of disputed material fact, and summary judgment should be entered in the Agency's favor.

DATED:  June 28, 2021                          Respectfully submitted,


                                               STEPHANIE M. HINDS
                                               Acting United States Attorney

                                               */s/ Wendy M. Garbers*
                                               WENDY M. GARBERS
                                               Assistant United States Attorney

                                               Counsel for Defendant ANDREW
                                               SAUL